Michael J. Sarrao – Bar No. 184871
3300 East Guasti Road, 3rd Floor
Ontario, California 91761
Telephone:   (909) 235-4400
Facsimile:   (909) 235-4419

Attorneys for Appellants Save The Hospital, Inc., Prime Healthcare Services, Inc., Albert L. Lewis, Jr., John Lloyd, and Edward J. Fazekas

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. EDCV 10-00730-SVW |
| **VALLEY HEALTH SYSTEM, a California Local Health Care District,** | **Bankr. Case No. 6:07-bk-18293-PC**<br>**Adv. Proc. No. 6:09-ap-01708-PC** |
| Debtor. | **APPELLANTS' OPENING BRIEF** |
| **PRIME HEALTHCARE MANAGEMENT, INC., a California corporation; ALBERT L. LEWIS, JR., a taxpayer and resident of the VHS local health care district; JOHN LLOYD, a taxpayer and resident of the VHS local health care district; EDWARD J. FAZEKAS, a taxpayer and resident of the VHS local health care district,** | |
| Appellants | |
| v. | |
| **VALLEY HEALTH SYSTEM, a California local health care district** | |
| Appellee, | |
| **PHYSICIANS FOR HEALTHY HOSPITALS, INC., a California Corporation** | |
| **Real Party in Interest.** | |

1

# **TABLE OF CONTENTS**

I     INTRODUCTION                                                          1

II    JURISDICTIONAL STATEMENT                                              2

III   STATEMENT OF ISSUES                                                   3

IV    STATEMENT OF FACTS AND CASE                                          4

      A. The Parties                                                        4

      B. Kali Chaudhuri, M.D.                                              4

      C. Debtor's Bankruptcy                                               6

      D. Debtor's Board of Directors                                       6

      E. Physicians for Healthy Hospitals, Inc.                            8

      F. The Exclusive Negotiation Agreement                               8

      G. The Memorandum of Understanding & Term Sheet                      8

      H. The Asset Sale Agreement                                          9

      I.  The Challenge Actions                                            9

      J.  Submission of 1090 Action To Jurisdiction of                     10
          Bankruptcy Court

      K. Debtor's Plan                                                     11

      L. The Confirmation Hearing                                          11

      M. The Memorandum Decision                                           11

      N. The Confirmation Order                                            12

      O. The Appeal                                                        12

V     STANDARD OF REVIEW                                                   12

VI    ARGUMENT                                                             13

      A.    Debtor's Plan is Only Feasible If The ASA Is Not              13
            Void Under Section 1092.

2

B.    The ASA Is Void Since Cherry, Rao, and Drier Voted    13
      To Approve It Despite Being Prohibited From Doing
      So By Section 1090.

      1.  Cherry and Drier Were Prohibited By Section 1090    15
          From Voting On The ASA Because They Had
          Financial Relationships With HCMG and KM
          Management and HCMG and KM Management
          Had A Financial Interest In The ASA.

      2.  Cherry, Rao, and Drier Were Prohibited By Section    17
          1090 From Voting On The ASA Because The
          Sponsors Of The ASA Had The Ability To Affect
          Their Fortunes.

      3.  The ASA Is Void Because Cherry, Rao, and Drier    20
          Voted To Approve The ASA Despite Being
          Prohibited From Doing So By Section 1090.

      4.  A Violation Of Section 1090 May Be Established    20
          Without Evidence That The Public Official Was
          Actually Influenced Or Promised Consideration
          For A Favorable Vote.

C.    Since The ASA Is Void Under Section 1092, The Plan    21
      Is Not Feasible And The Confirmation Order Must Be
      Reversed.

VII   CONCLUSION    21

3

## TABLE OF AUTHORITIES

### Federal Cases

*U.S. v. Mississippi Valley Generating Co.*, 364 U.S. 520 (1961) .........15, 17-20

*In re Baroff*, 105 F.3d 439 (9th Cir. 1997) ................................................12

*Ralls v. U.S.*, 52 F.3d 223 (9th Cir. 1995) ...............................................12

### State Cases

*Carson Redevelopment Agency v. Padilla*, 140 Cal.App.4th 1323 (2006) ......14, 20

*Eldridge v. Sierra View Local Hospital Dist.*, 224 Cal.App.3d 311 (1990) .........14

*J.M. Hotchkiss v. J.J. Moran*, 109 Cal.App. 3 (1930) ...............................18

*Marin Healthcare Dist. V. Sutter*, 103 Cal.App.4th 861 (2002) .................13, 20

*People v. Gnass*, 101 Cal.App.4th 1271 (2002) .....................................14, 15

*People v. Honig*, 48 Cal.App.4th 289 (1996) .......................................14, 20

*Thomson v. Call*, 38 Cal.3d 633 (1985) ...............................................13, 20

### Federal Statutes

*11 U.S.C. § 943(b)* .....................................................................13, 21

*28 U.S.C. § 158(a)* ..........................................................................2

### State Statutes

*Gov't Code § 1090* ...................................................................*passim*

*Gov't Code, § 1092* ..................................................................*passim*

1

1

## I

## INTRODUCTION

On April 26, 2010, the Bankruptcy Court entered an order confirming Valley Health System's (the "Debtor") First Amended Plan for Adjustment (the "Confirmation Order"). Debtor's First Amended Plan for Adjustment ("Debtor's Plan) is predicated on Debtor selling substantially all of its assets to Physicians for Healthy Hospitals, Inc. (PHH) pursuant to the terms of an Asset Sale Agreement (the "ASA") which was approved by Debtor's Board of Directors on October 6, 2009. The Confirmation Order should be reversed because: (1) Debtor's Plan is only feasible if the ASA is not void under California Government Code § 1092 ("Section 1092"); (2) the ASA is void under Section 1092 because at least three members of Debtor's Board of Directors were financially interested in the ASA and thus prohibited from voting on the ASA by California Government Code § 1090 ("Section 1090); (3) despite being prohibited from doing so, three members of Debtor's Board of Directors voted to approve the ASA such that the ASA is void under Section 1092; and (4) since the ASA is void, Debtor's Plan is not feasible.

First, Debtor's Plan is predicated on the sale of all of its assets pursuant to the ASA and as such, is only feasible if the ASA is not void under Section 1092.

Second, every contract made in violation of Section 1090 is void under Section 1092. The ASA was made in violation of Section 1090 and is thus void under Section 1092 because at least three members of Debtor's Board of Directors, William H. Cherry, M.D. ("Cherry"), Vinay Rao ("Rao"), and Madaleine Drier ("Drier"), were prohibited by Section 1090 from voting on the ASA. Cherry and Drier were financially interested in the ASA because they had financial relationships with Hemet Community Medical Group ("HCMG") and KM Strategic Management ("KM Management") and both of these entities had a

1

1  financial interest in the ASA.  Furthermore, Cherry, Rao, and Drier were

2  financially interest in the ASA because the sponsors of the ASA, Chaudhuri and

3  PHH, had the ability to affect the fortunes of Cherry, Rao, and Drier.

4       Third, despite being prohibited from doing so by Section 1090, Cherry, Rao,

5  and Drier all voted to approve the ASA on October 6, 2009.  As such, the ASA is

6  void under Section 1092.

7       Finally, since the ASA was and is void under Section 1092, Debtor's Plan is

8  not feasible.

9  ## II

10  ## JURISDICTIONAL STATEMENT

11       This Court has jurisdiction over this appeal from the Bankruptcy Court's

12  April 26, 2010 Order (i) Confirming First Amended Plan for Adjustment Of Debts

13  Of Valley Health System Dated December 17, 2009, As Modified February 19,

14  2010, And (ii) Granting Judgment For Valley Health System In Each Challenge

15  Action pursuant to 28 U.S.C. § 158(a).

16

17

18

19

20

21

22

23

24

25

26

27

28

2

---

**APPELLANTS' OPENING BRIEF**

# III

## **STATEMENT OF ISSUES**

Pursuant to Federal Rules of Bankruptcy Procedure 8006, Appellants identified numerous issues to be presented on appeal with regard to the Confirmation Order.  (DN 75[1]).  These issues all relate to one main issue and a number of sub or related issues[2]:

(1)   Whether the Bankruptcy Court erred in entering the Confirmation Order.

(a)   Whether the Bankruptcy Court erred in entering the Confirmation Order by ruling that judgment in each of the Challenge Actions, as described in the Court's Memorandum Decision filed and entered on April 8, 2010 was granted in favor of Debtor;

(b)   Whether the Bankruptcy Court erred in entering the Confirmation Order by ruling that judgment in each of the Challenge Actions, as described in the Memorandum Decision, was granted in favor of the Debtor, by ruling that the Plan was feasible; and

(c)   Whether the Bankruptcy Court erred in entering the Confirmation Order by ruling that judgment in each of the Challenge Actions, as described in the Memorandum Decision, was granted in favor of the Debtor, by ruling that no member of the Debtor's Board of Directors violated Section 1090 of the California Government Code when the Board approved the sale of the Debtor's assets to Physicians for Healthy Hospitals.

---

[1] "DN" refers to the Docket Number in Adversary Proceeding Number 6:09-ap-01708-PC.

[2] Appellants have elected to not pursue appeal of those issues identified as Issues Nos. 2, 3, 4, 5, 6, 9, 11, 12, and 13  in their Statement of Issues on Appeal and instead will focus their appeal on the issues set forth above.

3

**APPELLANTS' OPENING BRIEF**

## IV

## STATEMENT OF FACTS AND CASE

### A.    The Parties

Valley Health System ("Debtor") is a California Local Health Care District which at all times relevant to this appeal owned and operated Hemet Valley Medical Center, a 340 bed acute care hospital in Hemet, California, and Menifee Valley Medical Center, a 84 bed acute care hospital in Sun City, California. (DN 68, p. 3:12-13, 4:1-8.)

Appellant Prime Healthcare Services, Inc., is a Delaware corporation that, by and through its subsidiaries, operates twelve (12) acute care throughout California.  (DN 68, p. 1:21 fn. 3.)

Appellants Albert L. Lewis, Jr. ("Lewis"), John Lloyd ("Lloyd"), and Edward J. Fazekas ("Fazekas") are citizens of California, residents of Riverside County, and each reside in communities within the geographic boundaries served by the Valley Health System district.  (DN 68, p. 2:1 fn. 5.)  Hereinafter, Prime Healthcare Services, Inc., Lewis, Lloyd, and Fazekas shall collectively be referred to herein as "Appellants."

Real Party In Interest Physicians for Healthy Hospitals, Inc., is a California corporation whose sole shareholder is Physicians for Healthy Hospitals, LLC, a limited liability company.  (DN 67, p. 5:9-11.)

### B.    Kali Chaudhuri, M.D.

Although not a party to these proceedings, Kali Chaudhuri, M.D. ("Chaudhuri") plays a key role in this case through his ownership and/or control of several entities with which Cherry and Drier had financial relationships and with the ability of Chaudhuri and PHH to affect the fortunes of Cherry, Rao, and Drier. In this regard, Chaudhuri owns and/or controls the following entities:

4

1    **1.**    <u>**Physicians for Healthy Hospitals, LLC ("PHH LLC")**</u>

2    Chaudhuri was involved in the formation of PHH and has served as PHH

3    LLC's initial manager since its formation.  (DN 85, p. 64:13-14.)  Chaudhuri is the

4    only member of PHH LLC that can purchase more than 200 shares of PHH LLC

5    and can only be removed as the manager by a vote of 90% of all members of PHH

6    LLC.  (DN 85, pp. 63:25-64:2, 64:10-12, 64:15-16.)  PHH LLC is the sole

7    shareholder of PHH, the buyer of Debtor's assets under the ASA.  (DN 67, p. 5:9-

8    11.)

9    **2.**    <u>**Hemet Community Medical Group ("HCMG")**</u>

10    Chaudhuri owns no less than 38% of the outstanding shares of HCMG and

11    serves as its Chairman.  (DN 68, p. 36:3-4.)  Chaudhuri can only be removed from

12    HCMG's Board of Directors by a vote of 90% of the shareholders of HCMG.

13    Since California law requires cumulative voting, Chaudhuri will always be a

14    member of HCMG's Board of Directors.  (DN 85, p. 53:24-54:5, 55:9-13.)

15    **3.**    <u>**Menifee Valley Community Medical Group ("Menifee Medical**</u>

16          <u>**Group")**</u>

17    Chaudhuri owns all of the outstanding stock of Menifee Medical Group and

18    serves as its Chairman and Chief Executive Officer.  (DN 68, p. 36:10-16.)

19    **4.**    <u>**Temecula Valley Physicians Medical Group ("Temecula Medical**</u>

20          <u>**Group")**</u>

21    Chaudhuri owns ninety percent (90%) of Temecula Medical Group and

22    serves as its Chairman.  (DN 68, p. 36:17-24.)

23    **5.**    <u>**KM Strategic Management ("KM Management")**</u>

24    KM Management is owned by Chaudhuri and Mike Foutz.  (DN 68, p. 37:3-

25    4.)

26

27

28
                                        5

6. **Devonshire Surgical Medical Group ("Devonshire")**

Chaudhuri owns one-third of Devonshire.  (DN 68, p. 37:1.)  In addition, Devonshire is managed by KM Management.  (DN 68, p. 37:3-4.)

7. **Hemet Healthcare Surgery Center ("Hemet Surgery")**

Chaudhuri owns approximately one-third of Hemet Surgery.  (DN 68, p. 37:10-11.)  Chaudhuri is also a member of Hemet Surgery's Board of Directors. (DN 84, p. 218:1-5.)

C. **Debtor's Bankruptcy**

After its attempt to sell substantially all of its assets to Select Healthcare Solutions ("Select") was rejected by the voters in November 2007, Debtor filed a voluntary petition under Chapter 9 of the United States Bankruptcy Code on December 13, 2007.  (DN 68, pp. 5:22-23, 6:21-22).

D. **Debtor's Board of Directors**

At all times after June 24, 2009, Debtor's Board of Directors consisted of Cherry, Amelia Hippert ("Hippert"), Robert O'Donnell ("O'Donnell"), Rao, Tom Wilson ("Wilson"), Glen Holmes ("Holmes"), and Drier.  (DN 68, p. 8:9 fn. 20.) This appeal focuses on the conduct and the relationships of Cherry, Rao, and Drier and their votes in favor of the ASA in violation of Section 1090 which render the ASA void.

1. **Cherry's Relationships with Chaudhuri**

During the period of June 2009 to October 2009 when he voted on the Asset Sale Agreement, Cherry, either directly or by and through his professional corporation, William H. Cherry, M.D., Inc., had the following financial relationships with Chaudhuri:

(a) **HCMG/Chaudhuri**

During the period of June 2009 to October 2009, Cherry received compensation of no less than $10,000 from HCMG in return for serving as the

APPELLANTS' OPENING BRIEF

1  "Medical Director" for Temecula Medical Group under the terms of a contract

2  which could be terminated by HCMG.  (DN 67, p. 8:23-26.)  As noted above,

3  Chaudhuri owns 38% of HCMG and 90% of Temecula Medical Group and serves

4  as Chairman of both HCMG and Temecula Medical Group.  (DN 68, pp. 36:3-4,

5  36:17-24.)

6      **(b)    Menifee Medical Group/Chaudhuri**

7          In addition to serving as a "Medical Director" for HCMG, Cherry also

8  received compensation of no less than $10,000 from Menifee Medical Group for

9  serving as a "Medical Director" during the period of June 2009 to August 2009.

10  (DN 67, pp. 18:26-19:2.)

11     **(c)    KM Strategic Management/Chaudhuri**

12         In addition to relying on HCMG and Chaudhuri for compensation as a

13  "Medical Director" for Temecula Medical Group and Menifee Medical Group,

14  Cherry also relied on Chaudhuri's KM Management to provide the office manager

15  and front and back office staff for his medical practice, William H. Cherry, M.D.,

16  Inc.  (DN 84, pp. 175:12-19, 177:3-5.)

17     **2.    Rao's Relationships with Chaudhuri**

18         During the period of June 2009 to October 2009, Rao was the Administrator

19  of Hemet Surgery, an entity in which Chaudhuri had a one-third interest.  (DN 68,

20  pp. 37:10-11, 39:13-14.)

21     **3.    Drier's Relationships with Chaudhuri**

22         Drier is married to Dr. Ralph Drier ("Dr. Drier"), a physician who practices

23  within the boundaries of the VHS district.  During the period of June 2009 to

24  October 2009 when she voted on the Exclusive Negotiation Agreement, the Term

25  Sheet, and the ASA, Dr. Drier had a financial relationship with

26  Chaudhuri/Devonshire which resulted in payments of no less than $25,000 per

27  month to the Driers.  In particular, the Driers reached an agreement in 2004 with

28

7

**APPELLANTS' OPENING BRIEF**

1   Chaudhuri which called for the Driers to receive $20,000 per month from

2   Chaudhuri through Devonshire in return for Dr. Drier agreeing to no longer

3   criticize Chaudhuri, HCMG, and KM Management and instead to support

4   Chaudhuri's efforts.  (DN 84, pp. 62:22-63:1, 65:3-10, 66:9-12, 67:7-17, 69:8-9.)

5   In 2007, the monthly fee received by the Driers for Dr. Drier's silence was

6   increased to $25,000 per month and remained at $25,000 through at least October

7   2009.  (DN 84, p. 69:17-70:4.)

8      **E.**     **Physicians for Healthy Hospitals, Inc. ("PHH")**

9         Physicians for Healthy Hospitals, Inc., is a Delaware corporation, which was

10   formed in July 2009.  (DN 67, p. 5:9-11.).  PHH is wholly owned by PHH, LLC.

11   *Id.*

12      **F.**     **The Exclusive Negotiation Agreement**

13         On July 24, 2009, PHH contacted Debtor regarding an interest in acquiring

14   substantially all of Debtor's assets.  (DN 68, p. 9:8-9.)  At the same time, PHH

15   requested that Debtor enter into an agreement which would give PHH the

16   exclusive right to negotiate with Debtor for a period of ninety (90) days (the

17   "Exclusive Negotiation Agreement").  (DN 68, p. 9:9-11.)  On July 27, 2009, less

18   than three (3) days after PHH first contacted Debtor, Debtor's Board of Directors

19   voted 5-2 to enter into the Exclusive Negotiation with PHH.  (DN 68, p. 9:14-16.)

20   Even though they had conflicts of interest under Section 1090, Cherry, Rao, and

21   Drier participated in the vote and were among the five (5) board members who

22   voted for the Exclusive Negotiation Agreement.  (DN 68, p. 9:14-15.)

23      **G.**     **The Memorandum of Understanding & Term Sheet**

24         On September 15, 2009, the Debtor posted public notice that its Board of

25   Directors would meet one day later on September 16, 2009 to consider, among

26   other things, the approval of a memorandum of understanding and term sheet

27   ("MOU") with PHH regarding the sale of Debtor's assets.  (DN 68, p.10:2-5.)  The

28

8

---

**APPELLANTS' OPENING BRIEF**

1   MOU called for PHH to acquire substantially all of Debtor's assets.  (DN 68, p.

2   10:2-5.)  On September 16, 2009, Debtor's Board of Directors vote 6-1 to approve

3   MOU.  (DN 68, p. 10:5-9.)  Again, even though they had conflicts of interest under

4   Section 1090, Cherry, Rao, and Drier voted in favor of the MOU.  (DN 68, p. 10:5-

5   9.)

6   **H.   The Asset Sale Agreement**

7        On October 5, 2009, the Debtor posted public notice that its Board of

8   Directors would meet one day later on October 6, 2009 to consider possible action

9   to approve an Asset Sale Agreement ("ASA") with PHH.  (DN 68, p. 12:2-3.)  On

10  October 6, 2009, Debtor's Board of Directors voted 6-1 to approve the ASA.  (DN

11  68, p. 12:3-5.)  Like the MOU, the ASA called for PHH to acquire substantially all

12  of Debtor's assets.  The consideration to be paid by PHH in exchange for all of

13  Debtor's assets included cash as well as the resolution/compromise/withdraw of

14  bankruptcy claims submitted by KM Management, HCMG, and Menifee Medical

15  Group.  (DN 68, p. 12:14 fn 32.)  Both KM Management and HCMG had a

16  financial interest in the ASA as their bankruptcy claims would be affected by the

17  ASA.  *Id*.  Even though they had conflicts of interest under Section 1090, Cherry,

18  Rao, and Drier were among the six (6) board members who voted to approve the

19  ASA.  (DN 68, p. 12:5-6).  The ASA was executed on October 14, 2009.  (DN 68,

20  p. 12:6).

21  **I.   The Challenge Actions**

22        On and after October 6, 2009, Appellants filed a number of actions

23  challenging the actions of Debtor and its Board of Directors and the ASA including

24  an action seeking an order declaring that the ASA was void based on violations of

25  Section 1090 by Cherry, Rao, and Drier.[3]  In particular, on October 13, 2009,

26  _____

[3] Appellants also filed actions related to Debtor's proposed ballot language, Debtor's failure to
27  release public records, and Debtor's failure to comply with the California Environmental Quality
Act.  Since this appeal is not based on such actions, Appellant does not discuss such actions
28  herein.

**APPELLANTS' OPENING BRIEF**

1  Appellants filed a motion seeking relief from the automatic stay to file a complaint

2  for injunctive and declaratory relief to obtain an order voiding the ASA based on,

3  among other things, violations of Section 1090 by Cherry, Rao, and Drier

4  ("Section 1090 Action").  (DN 68, p. 15:4-12.)

5       On November 12, 2009, the Bankruptcy Court denied Appellants request for

6  relief from the automatic stay.  (DN 68, p. 15:17-19).  Before the Bankruptcy

7  Court entered its November 23, 2009 order denying Appellants' request for relief

8  from automatic stay, Appellants filed a renewed motion for relief from automatic

9  stay seeking, among other things, relief to commence the Section 1090 Action.

10  (the "Renewed Motion") (DN 68, pp. 15:19-16:1).  On November 30, 2009, the

11  Bankruptcy Court denied Appellants' request for an expedited hearing on the

12  Renewed Motion.  (DN 68, p. 16:1-3.)

13       On December 7, 2009, Appellants filed a notice of appeal with respect to the

14  Bankruptcy Court's November 23, 2009 order denying their request for relief from

15  stay to pursue the Section 1090 Action.  (DN 68, p. 16:1-3.)

16  **J.**    **Submission of Section 1090 Action To Jurisdiction of Bankruptcy**

17         **Court.**

18       On January 20, 2010, Appellants, Debtor, and PHH filed a stipulation with

19  the Bankruptcy Court which, among other things, provided that Appellants would

20  withdraw the Renewed Motion and their appeal of the November 23, 2009 order

21  denying relief from stay and that the Bankruptcy Court would have jurisdiction to

22  adjudicate Appellants' claim that the ASA was void under Section 1092 based on

23  violations of Section 1090 by certain members of Debtor's Board of Directors in

24  conjunction with confirmation of Debtor's Plan.  (DN 68, p. 16:6-11).  On January

25  22, 2010, the Bankruptcy Court entered an order approving the parties stipulation.

26  (DN 68, pp. 16:11-17:1.)

27

28

**APPELLANTS' OPENING BRIEF**

1

### K.     Debtor's Plan

2      On November 2, 2009, Debtor filed a disclosure statement and proposed

3  plan of adjustment which is predicated upon Debtor selling substantially all of its

4  assets to PHH under the ASA.[4]  (DN 68, p. 12:7-8).  Debtor cannot consummate its

5  plan of adjustment if the ASA is void under Section 1092.

6

### L.     The Confirmation Hearing

7      On February 9, 2010, the Bankruptcy Court commenced a hearing on

8  confirmation of Debtor's Plan.  (DN 69, p. 17:6-7).  At the February 9, 2010

9  hearing, the Bankruptcy Court overruled certain objections raised by Appellants

10  and continued the hearing until February 22, 2010 for an evidentiary hearing with

11  respect to, among other things, Appellants' Section 1090 Action.  (DN 68, pp.

12  17:6-18:6.)

13      On February 22, 2010 and continuing through February 26, 2010, the

14  Bankruptcy Court received evidence regarding the Section 1090 Action.  (DN 68,

15  pp. 19:1-20:6).  At the conclusion of the hearing on February 26, 2010, the

16  Bankruptcy Court took the matter under submission.  (DN 68, p. 20:6-7).

17

### M.     The Memorandum Decision

18      On April 8, 2010, the Bankruptcy Court issued a Memorandum Decision

19  regarding the confirmation of Debtor's Plan and the adjudication of the challenge

20  actions.  (DN 68).  In its decision, the Bankruptcy Court concluded (albeit

21  incorrectly) that the ASA was not void under Section 1092 because: (1) there was

22  no credible evidence that Cherry, Rao, or Drier were unduly influenced by

23  Chaudhuri; (2) that there was no evidence that Chaudhuri or any other individual

24  directed Cherry, Rao, and Drier how to vote on the ASA and/or promised Cherry,

25  Rao, and Drier consideration in exchange for a favorable vote on the ASA; and (3)

26  that the financial relationships between Cherry, Rao, and Drier and PHH,

27

28

---

[4] Appellants are informed and believe that Debtor and PHH have yet to complete the transaction called for by the ASA.

11

1    Chaudhuri, and others were too remote and speculative to result in a violation of
2    Section 1090.  (DN 68.)
3          **N.**     **The Confirmation Order**
4          On April 26, 2010, the Bankruptcy Court entered an order confirming
5    Debtor's Plan and rendering judgment in favor of Debtor as to the Challenge
6    Actions.  (DN 69.)
7          **O.**     **The Appeal**
8          On May 6, 2010, Appellants filed a notice of appeal as to the Confirmation
9    Order.  (DN 70).

10                                          **V**

11                          **STANDARD OF REVIEW**

12         When considering an appeal from the bankruptcy court, a district court uses
13   the same standard of review that a circuit court would use in reviewing a decision
14   of the district court.  *In re Baroff*, 105 F.3d 439, 441 (9th Cir. 1997).  District court
15   decisions which are based on a mixed question of law and facts are subject to de
16   novo review when the application of law to facts will require the consideration of
17   legal concepts and involve the exercise of judgment about the values underlying
18   the legal principles.  *Ralls v. U.S.*, 52 F.3d 223, 227 (9th Cir. 1995).  In this case,
19   the facts were largely undisputed and those portions of the Bankruptcy Court Order
20   which are the subject of this appeal turn on the Bankruptcy Court's application of
21   Section 1090 to these facts while exercising judgment about the values underlying
22   Section 1090.  As such, a de novo review is appropriate in this case.  *Id.*

23
24
25
26
27
28

                                         12

## VI

## ARGUMENT

The Bankruptcy Court erred when it issued the Confirmation Order and the Confirmation Order must be reversed because: (1) Debtor's Plan is only feasible if the ASA is not void under Section 1092; (2) the ASA is void under Section 1092 because Cherry, Rao, and Drier violated Section 1090 when they voted to approve the ASA; and (3) since the ASA is void under Section 1092, Debtor's Plan is not feasible.

### A.   Debtor's Plan Is Only Feasible If The ASA Is Not Void Under Section 1092.

A plan of adjustment is not feasible if it requires the debtor to take an action necessary to carry out the plan which is prohibited by law. *See 11 U.S.C. § 943(b).* Debtor's Plan is predicated on and can only be carried out if the transactions contemplated by the ASA are consummated.  (DN 68, p. 12:7-8.)  As such, if the ASA is void under Section 1092, Debtor's Plan is not feasible . *See 11 U.S.C. § 943(b).*

### B.   The ASA Is Void Since Cherry, Rao, and Drier Voted To Approve It Despite Being Prohibited From Doing So By Section 1090.

Every contract made in violation of Section 1090 is void. *See Gov't Code §* 1092; *Marin Healthcare Dist. V. Sutter*, 103 Cal.App.4[th] 861, 877 (2002).  Section 1090 specifically addresses conflicts of interest in the contract making process and prevents state, county, district, and city officers or employees from being "financially interested in any contract made by them in their official capacity, or by any body or board of which they are members." *Gov't Code*, § 1090.  If an official is a member of a board that actually executes or approves the contract, he or she is conclusively presumed to be involved in the making of his or her agency's contract. *Thomson v. Call*, 38 Cal.3d 633, 649 (1985).  A director of a hospital

13

1   district like the members of Debtor's Board of Directors are subject to the

2   prohibition against participating in a transaction in which he or she is financially

3   interested.  *See Eldridge v. Sierra View Local Hospital Dist.*, 224 Cal.App.3d 311,

4   320 (1990).

5          The object of Section 1090 is to remove or limit the possibility of any

6   personal influence, either directly or indirectly, which might bear on an official's

7   decision.  *People v. Gnass*, 101 Cal.App.4[th] 1271, 1298 (2002).  The evil to be

8   thwarted by Section 1090 is easily identified: If a public official is pulled in one

9   direction by his financial interest and in another direction by his official duties, his

10  judgment cannot and should not be trusted, even if he attempts impartiality.

11  *Carson Redevelopment Agency v. Padilla*, 140 Cal.App.4[th] 1323, 1330 (2006).

12  Indeed, Section 1090 is more concerned about what might have happened then

13  what actually happened.  *Carson Redevelopment Agency v. Padilla*, 140

14  Cal.App.4[th] at 1330; *People v. Honig*, 48 Cal.App.4[th] 289, 314 (1996).  Section

15  1090 is concerned with any interest, other than perhaps a remote or minimal

16  interest, which would prevent the official involved from exercising absolute loyalty

17  and undivided allegiance to the best interests of the public entity.  *People v. Honig*,

18  48 Cal.App.4[th] at 315.  In this regard, courts have continually reiterated that no

19  matter how "devious and winding the trail may be which connects the officer to the

20  forbidden contract," if a connection can be made, a violation of Section 1090 will

21  be found.  *Id.*  For example, in *People v. Gnass*, the court found that the possibility

22  that an agency created by the city for which the defendant served as city attorney

23  and a third party with which the defendant had no connection, might select the

24  defendant's law firm to serve as counsel for a portion of a bond measure to be

25  issued by the new agency was sufficient to create a conflict of interest under

26  Section 1090. *People v. Gnass*, 101 Cal.App.4[th] 1271, 1300 (2002).

27

28

**APPELLANTS' OPENING BRIEF**

In interpreting Section 1090, California courts have relied on the United States Supreme Court's decision in *U.S. v. Mississippi Valley Generating Co.*, 364 U.S. 520 (1961) for guidance. *People v. Gnass*, 101 Cal.App.4th at 1300. In *Mississippi Valley*, the Supreme Court held that because the sponsors of a proposed contract were in a position to affect the fortune of the public official, the official was to say the least, subconsciously tempted to ingratiate himself with the sponsors and accede to their demands and thus a violation of the federal equivalent of Section 1090 had occurred. *U.S. v. Mississippi Valley Generating Co.*, 364 U.S, 520, 557 (1961).

In this case, the ASA was made in violation of Section 1090 and is thus void under Section 1092 because: (1) Cherry and Drier were prohibited by Section 1090 from voting on the ASA because they had financial relationships with HCMG and KM Management and HCMG and KM Management had a financial interest in the ASA; (2) Cherry, Rao, and Drier were prohibited by Section 1090 from voting on the ASA because Chaudhuri, the sponsor of the ASA, was in a position to affect the fortunes of Cherry, Rao, and Drier; (3) Cherry, Rao, and Drier voted to approve the ASA despite being prohibited from doing so by Section 1090; and (4) a violation of Section 1090 may be established without evidence that the public official was actually influenced or promised consideration for a favorable vote.

1.      **Cherry and Drier Were Prohibited By Section 1090 From Voting On The ASA Because They Had Financial Relationships With HCMG and KM Management and HCMG and KM Management Had A Financial Interest In The ASA.**

Cherry and Drier were prohibited by Section 1090 from voting on the ASA because they had financial relationships with HCMG and KM Management at the time they voted on the ASA and HCMG and KM Management had a financial interest in the ASA. First, HCMG and KM Management filed claims in Debtor's

1  bankruptcy in which they claimed they were owed money by Debtor.  (DN 68, p.

2  12:14 fn. 32.)  The ASA, which was approved by Cherry and Drier on October 6,

3  2009, values the claims of HCMG and KM Management along with claims by two

4  other Chaudhuri controlled entities to be worth $55 Million, calls for PHH to

5  assume liability for these claims, and treats PHH's assumption of liability as part

6  of the consideration to be paid for Debtor's assets.  (DN 68, p. 12:10-14.)  In other

7  words, HCMG's and KM Management's assets are part of the consideration to be

8  paid by PHH under the ASA.  Thus, HCMG and KM Management have a financial

9  interest in the ASA.

10      In addition, Cherry and Drier had financial relationships with HCMG and

11  KM Management when they voted to approve the ASA.  Cherry received monthly

12  payments from HCMG to serve as a "Medical Director" for Temecula Medical

13  Group and Menifee Medical Group.  (DN 67, p. 8:23-26.)  At the same time, KM

14  Management also provided an office manager and other office staff to Cherry's

15  medical practice.  (DN 84, p. 175:12-19, 177:3-5.)  Like Cherry, Drier also had

16  financial relationships with HCMG and KM Management.  Dr. Drier, Drier's

17  husband, received referrals from HCMG and the Driers received $25,000 per

18  month from Devonshire, which was managed by KM Management, to no longer

19  criticize HCMG and Chaudhuri and instead support HCMG and Chaudhuri.  (DN

20  84, pp. 62:22-63:1, 65:3-10, 66:9-12, 67:7-17, 69:8-9, 69:17-70:4.)  Indeed, it was

21  Mike Foutz, Chaudhuri's partner in KM Management and an investor in PHH, that

22  increased the Drier's monthly payment from $20,000 to $25,000.  (DN 84, p.

23  69:17-70:4.)

24      HCMG's and KM Management's interest in the ASA and Cherry's and

25  Drier's financial relationships with HCMG and KM Management are more than

26  sufficient to create a conflict of interest under Section 1090 which prohibited

27  Cherry and Drier from voting on the ASA.  *Gov't Code*, §§ 1090.  This is

28

16

1   especially true since Cherry admitted that his relationship with HCMG was

2   sufficient to require recusal when Debtor's Board of Directors were considering a

3   sale of Debtor's assets to Select Healthcare.

4   **2.   Cherry, Rao, and Drier Were Prohibited By Section 1090 From**

5   **Voting On The ASA Because The Sponsors Of The ASA Had The**

6   **Ability To Affect Their Fortunes.**

7   As noted above, California courts have relied on *U.S. v. Mississippi Valley*

8   *Generating Co.*, 364 U.S. 520, 557 (1961) in order to interpret Section 1090.

9   *People v. Gnass*, 101 Cal.App.4[th] at 1300.  In *Mississippi Valley*, Adolph Wenzell

10   ("Wenzell") undertook to advise the federal government and act on its behalf in

11   negotiations which culminated in a contract between the federal government and

12   Mississippi Valley Generating Company ("MVG") for the construction of a power

13   plant in Memphis, Tennessee.  *U.S. v. Mississippi Valley Generating Co.*, 364 U.S.

14   520, 524 (1961).  Wenzell was not a shareholder or employee of MVG, but instead

15   was employed by First Boston Corporation.  *Id.* at 523.  After MVG sued the

16   federal government for breach of contract, the federal government claimed that the

17   contract with MVG was void under federal conflict of interest statutes because

18   Wenzell worked for First Boston and it was apparent that First Boston was likely

19   to receive benefit from the contract by financing the construction of the power

20   plant.  *Id.*  In finding that Wenzell did in fact have a conflict of interest even

21   though he had no interest in MVG, the Supreme Court held that the proper test to

22   determine whether Wenzell had a conflict of interest was whether MVG, as the

23   sponsor of the project, had the ability to affect the fortunes of Wenzell.  Applying

24   this test, the Supreme Court held that Wenzell had a conflict of interest because

25   MVG was in a position to affect the futures of Wenzell or his firm, Wenzell was to

26   say the least, subconsciously tempted to ingratiate himself with MVG and accede

27   to their demands.  *Id.* at 557.  In this case, much like MVG in the *Mississippi*

28

17

**APPELLANTS' OPENING BRIEF**

1  *Valley* case, the sponsors of the ASA (PHH and Chaudhuri) were in a position to

2  affect the fortunes of Cherry, Rao, and Drier such that Cherry, Rao, and Drier

3  violated Section 1090 when they voted to approve the ASA.[5]

4      **(a)**     **Cherry**

5          Chaudhuri owns and/or controls HCMG and KM Management. HCMG

6  paid Cherry to serve as a "Medical Director" for Temecula Medical Group, which

7  is owned by Chaudhuri, and Menifee Medical Group, which is also owned by

8  Chaudhuri. (DN 67, p. 8:23-26.) Based on his ownership interests as well as his

9  membership on HCMG's Board of Directors and his role as Chairman of HCMG,

10  Menifee Medical Group, and Temecula Medical Group, Chaudhuri had the ability

11  to terminate these relationships and/or increase the financial value of these

12  relationships to Cherry. No payments from HCMG or an increase in payments

13  from HCMG would certainly affect Cherry's fortunes. Therefore, Cherry had a

14  conflict of interest when he voted on the ASA. *Gov't Code*, § 1090; *U.S. v.*

15  *Mississippi Valley Generating Co.*, 364 U.S. at 557.

16          In addition to monthly payments from HCMG, Cherry also relies on KM

17  Management to manage his medical practice by providing an office manager and

18  other staff for his medical practice. (DN 84, p. 175:12-19, 177:3-5.) As the owner

19  of KM Management, Chaudhuri had the ability to stop providing practice

20  management employees to Cherry which would certainly affect his fortunes. Thus,

21  Chaudhuri, by and through KM Management, had the ability to affect Cherry's

22  fortunes and as a result, Cherry had a conflict of interest when he voted on the

23  ---

24  [5] In the Decision, the Bankruptcy Court relied on *J.M. Hotchkiss v. J.J. Moran*, 109 Cal.App. 3, 21 (1930) as support for its conclusion that Cherry, Rao, and Drier did not violate Section 1090 when they voted to approve the ASA. The Bankruptcy Court's reliance on Hotchkiss is misplaced. First, unlike Hotchkiss, Appellants' claims are based on much more than Chaudhuri being a shareholder of PHH and entities with which Cherry, Rao, and Drier have a financial relationship. Rather, Appellants' claims are based on HCMG's and KM Management's financial interest in the ASA and Cherry and Drier's relationships with HCMG and KM Management and Chaudhuri's ability to affect the fortunes of Cherry, Rao, and Drier as a result of his control over HCMG, KM Management, and Devonshire. In addition, unlike the respondent in *Hotchkiss*, PHH is not the only entity that could acquire Debtor's assets.

28

**APPELLANTS' OPENING BRIEF**

1   ASA on October 6, 2009.  *Gov't Code*, § 1090; *U.S. v. Mississippi Valley*

2   *Generating Co.*, 364 U.S. at 557.

3       **(b)**   <u>**Rao**</u>

4       Chaudhuri owns one-third of Hemet Surgery, Rao's employer.  (DN 68, pp.

5   37:10-11, 39:13-14.)  As a one-third owner of Hemet Surgery, Chaudhuri would

6   have the ability to affect Rao's fortunes by, among other things, recommending a

7   salary increase, recommending a salary decrease, recommending a bonus, and/or

8   recommending that Rao's employment be terminated.  As such, Rao had a conflict

9   of interest under Section 1090.  *Gov't Code*, § 1090; *U.S. v. Mississippi Valley*

10  *Generating Co.*, 364 U.S. at 557.

11      **(c)**   <u>**Drier**</u>

12      At all relevant times, Chaudhuri owned and/or controlled HCMG, KM

13  Management, and Devonshire.  In addition, KM Management managed the

14  operations of Devonshire.  At the same time, Dr. Drier, Drier's husband, received

15  referrals from HCMG and the Driers received no less than $25,000 per month from

16  Chaudhuri, by and through Devonshire, in exchange for Dr. Drier's agreement to

17  no longer criticize Chaudhuri and HCMG and instead to support them.  The

18  agreement to pay the Driers $25,000 for Dr. Drier's support was negotiated and

19  controlled by Chaudhuri and KM Management.  For example, Chaudhuri attended

20  the initial meeting where the agreement was reached and Mike Foutz, Chaudhuri's

21  partner in KM Management and an investor in PHH, approved the Driers' request

22  for an increase from $20,000 to $25,000 per month.  (DN 84, pp. 62:22-63:1, 65:3-

23  10, 66:9-12, 67:7-17, 69:8-9, 69:17-70:4.)  Chaudhuri had the ability to stop the

24  payments of $25,000 per month to the Driers and there is no question that a loss of

25  $25,000 per month would affect the fortunes of any person, much less the Driers.

26  Therefore, Chaudhuri had the ability to effect the fortunes of Drier and Drier thus

27

28

19

1  had a conflict of interest under Section 1090.  *Gov't Code*, § 1090; *U.S. v.*

2  *Mississippi Valley Generating Co.*, 364 U.S. at 557.

3      **3.**   **The ASA Is Void Because Cherry, Rao, and Drier Voted To**

4           **Approve The ASA Despite Being Prohibited From Doing So By**

5           **Section 1090.**

6      Every contract made in violation of Section 1090 is void.  *See Gov't Code* §

7  1092; *Marin Healthcare Dist. V. Sutter*, 103 Cal.App.4[th] at 877.  A board member

8  who approves the contract is conclusively presumed to be involved in the making

9  of the contract.  *Thomson v. Call*, 38 Cal.3d at 649.  As discussed above, Cherry,

10  Rao, and Drier were prohibited by Section 1090 from voting on the ASA under

11  Section 1090 because they were financially interested in the ASA.  Nonetheless,

12  Cherry, Rao, and Drier all voted to approve the ASA.  (DN 68, p. 12:5-6.)  As

13  such, the ASA was made in violation of Section 1090 and is void under Section

14  1092.  *See Gov't Code* § 1092; *Marin Healthcare Dist. V. Sutter*, 103 Cal.App.4[th]

15  at 877.

16      **4.**   **A Violation Of Section 1090 May Be Established Without**

17           **Evidence That The Public Official Was Actually Influenced Or**

18           **Promised Consideration For A Favorable Vote.**

19      In its April 8, 2010 Memorandum Decision, the Bankruptcy Court seems to

20  suggest that Appellants were required to establish that Cherry, Rao, and/or Drier

21  were either unduly influenced, were directed to vote in a certain manner, or were

22  promised consideration in return for a favorable vote on the ASA to establish a

23  violation of Section 1090.  To the extent the Bankruptcy Court's decision was

24  based on Appellants failure to produce evidence in this regard, it constitutes error

25  because Section 1090 is more concerned about what might have happened then

26  what actually happened.  *See Carson Redevelopment Agency v. Padilla*, 140

27  Cal.App.4[th] at 1330; *People v. Honig*, 48 Cal.App.4[th] at 314.

28

**APPELLANTS' OPENING BRIEF**

**C.**    **Since The ASA Is Void Under Section 1092, The Plan Is Not**
**Feasible And The Confirmation Order Must Be Reversed.**

As discussed above, Debtor Plan is predicated on and can only be carried out if the transactions contemplated by the ASA are consummated.  Since the ASA is void under Section 1092, the transactions contemplated by the ASA cannot be consummated and Debtor's Plan is not feasible.  *See 11 U.S.C. § 943(b).*  As such, the Confirmation Order must be reversed.

**VII**

**CONCLUSION**

For the foregoing reasons, Appellants request that their appeal be granted and that this Court enter the Confirmation Order be reversed and the ASA declared void under Section 1092.

**MICHAEL J. SARRAO, ESQ.**

Dated: October 13, 2010          By:  /s/ Michael J. Sarrao
                                         Michael J. Sarrao
                                         Attorney for Appellants Save The Hospital,
                                         Inc., Prime Healthcare Services, Inc., Albert
                                         L. Lewis, Jr., John Lloyd, and Edward J.
                                         Fazekas

**APPELLANTS' OPENING BRIEF**