CHARLES D. AXELROD (SBN 39507)
GARY E. KLAUSNER (SBN 69077)
H. ALEXANDER FISCH (SBN 223211)
MARINA FINEMAN (SBN 193065)
STUTMAN, TREISTER & GLATT
PROFESSIONAL CORPORATION
1901 Avenue of the Stars
12th Floor
Los Angeles, CA 90067
Telephone:   (310) 228-5600
Telecopy:    (310) 228-5788
Email:       gklausner@stutman.com;
             afisch@stutman.com

DANIEL K. SPRADLIN (SBN 82950)
M. LOIS BOBAK (SBN 127540)
WOODRUFF, SPRADLIN & SMART, APC
555 Anton Boulevard, Suite 1200
Costa Mesa, California 92626-7670
Telephone:   (714) 558-7000
Facsimile:   (714) 835-7787
Email:       dspradlin@wss-law.com;
             lbobak@wss-law.com

Attorneys for Appellee
Valley Health System

R.D. KIRWAN (SBN 46259)
CHAD STEGEMAN (SBN 225745)
DEVIN STONE (SBN 260326)
AKIN GUMP STRAUSS HAUER & FELD LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone:   (310) 229-1000
Facsimile:   (310) 229-1001
Email:       rkirwan@akingump.com;
             cstegeman@akingump.com;
             dstone@akingump.com

Attorneys for Appellee
Physicians for Healthy Hospitals, Inc.

545003v1

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| In re | D.C. Case No.: 10-CV-00730-SVW |
| | |
| | Bankr. Case No. 6:07-bk-18293-PC |
| VALLEY HEALTH SYSTEM, a California Local Health Care District, | |
| | Adv. Pro. No. 6:09-ap-01708-PC |
| | |
| | Chapter 9 |
| Debtor. | |
| PRIME HEALTHCARE MANAGEMENT, INC., a California Corporation; ALBERT L. LEWIS, JR., a taxpayer and resident of the VHS local health care district; JOHN LLOYD, a taxpayer and resident of the VHS local healthcare district; EDWARD J. FAZEKAS, a taxpayer and resident of the VHS local health care district, | **NOTICE OF MOTION AND APPELLEES' JOINT MOTION TO DISMISS APPEAL AS MOOT** |
| | |
| | Hearing |
| Appellant, | Date: November 22, 2010 |
| | Time: 1:30 p.m. |
| v. | Judge: Hon. Stephen V. Wilson |
| | Place: Courtroom 6 |
| VALLEY HEALTH SYSTEM, a California local healthcare district; PHYSICIANS FOR HEALTHY HOSPITALS, INC., a California Corporation, | 312 N. Spring Street |
| | Los Angeles, CA 90012 |
| | |
| Appellees. | |

545003v1

1   Appellees, Valley Health System, a California Local Health Care District

2   (the "District"), and Physicians for Healthy Hospitals, Inc. ("PHH"), hereby move this

3   Court (by this "Motion"), under Federal Rule of Bankruptcy Procedure 8011(a), for an

4   order dismissing the above-captioned appeal (the "Appeal"), on the ground that it is

5   moot.

6   The District is the debtor in a case (the "Chapter 9 Case") under chapter 9

7   of title 11 of the United States Code (the "Bankruptcy Code") pending before the

8   United States Bankruptcy Court for the Central District of California (the "Bankruptcy

9   Court").  The District commenced the Chapter 9 Case on December 13, 2007.  On

10   April 26, 2010, the Bankruptcy Court confirmed the District's "First Amended Plan

11   for the Adjustment of Debts of Valley Health System Dated December 17, 2009 as

12   Modified February 19, 2010" (the "Plan") by the "Order (i) Confirming First

13   Amended Plan for Adjustment of Debts of Valley Health System Dated December 17,

14   2009, as Modified February 19, 2010, and (ii) Granting Judgment for Valley Health

15   System in Each Challenge Action" (the "Confirmation Order").

16   PHH is the purchaser of substantially all of the District's assets (including

17   two hospitals) pursuant to the Plan and Confirmation Order.

18   Appellants, Prime Healthcare Management, Inc. ("Prime") (a competitor

19   of PHH and purported would-be bidder for the District's assets); Save the Hospitals,

20   Inc. (a corporation formed by Prime); and three individuals enlisted by Prime –

21   Albert L. Lewis, Jr., John Lloyd, and Edward J. Fazekas (collectively, the

22   "Appellants") appealed from the Confirmation Order.  The Appellants never sought a

23   stay pending appeal of the Confirmation Order.  The sale of the District's assets to

24   PHH (the "Sale") closed on October 13, 2010, and the Plan has been substantially

25   consummated pursuant to the unstayed Confirmation Order.  As a result, this Appeal

26   should be dismissed as moot on two independently dispositive grounds.

27   First, under the long-standing bankruptcy mootness rule specifically

28   applicable to sales, the consummation of the Sale authorized by the Confirmation

Order rendered this Appeal moot.  <u>Second</u>, under the established doctrine of equitable mootness in bankruptcy, the Plan has been so far implemented, in a manner affecting so many persons and entities, many of whom are not parties to this Appeal, that it would be impractical, unmanageable and inequitable to grant the Appellants relief from the Confirmation Order – particularly when they failed even to seek a stay pending appeal of the Confirmation Order.

This Motion is supported by the evidence compiled in the concurrently filed "Appendix to Appellees' Joint Motion to Dismiss" and by the declarations of Gary E. Klausner, John B. Marshall, Keith Marshall, and William E. Thomas.[1]

## I.     INTRODUCTION

Valley Health System is a local health care district formed by resolution of the Board of Supervisors of Riverside County in 1943 to provide for local community hospitals in an underserved area.  Initially, the District took over the operation of a small municipal hospital in Hemet.  The District had taxing authority, but gave that up in the 1970's.  Since the passage of Proposition 13 in 1978, the reinstitution of taxes or bonding authority requires a two-thirds vote of the electorate, which is difficult to obtain.  Over time, the District made several significant additions to the hospital in Hemet and in the late 1980's built two additional hospitals serving the communities of Menifee and Moreno Valley.  However, due primarily to changes in private and public reimbursement for health care, beginning in the late 1990's, the District began incurring significant operating losses.  After several unsuccessful attempts to implement restructuring strategies, including a bond measure and a sale of the District's assets, which were not approved by the voters, the District filed its chapter 9 bankruptcy case in December 2007.

---

[1]   The Appellants, themselves, also appear to agree that this Appeal is now moot.  In their "Application for Extension of Time for Filing Brief" [Docket Nos. 20 & 22], in which the Appellants requested a 45-day extension for filing their opening brief, one of their stated grounds for the extension was that the anticipated closing of the Sale may render the Appeal moot.

1        After approximately a year and a half in the Chapter 9 Case, and unable

2    to develop an internal, "stand alone" restructuring plan, the District entered into a term

3    sheet and eventually an asset sale agreement (the "ASA") with PHH, pursuant to

4    which the District would sell, and PHH would purchase, substantially all of the

5    District's assets.  The ASA provided the District, its community, employees, and

6    creditors with a viable solution to the District's financial problems, which had

7    threatened to force the closure of the District's hospitals.  The District's Board of

8    Directors (the "Board") approved the ASA on October 6, 2009, and pursuant to

9    applicable law, scheduled an election through which the District's voters would be

10   asked to approve the sale to PHH.  On November 2, 2009, the District also filed a

11   chapter 9 plan, and a disclosure statement, under which it proposed payments for all of

12   its creditors, based upon the closing of the transactions contemplated by the ASA.

13       In October 2009, shortly after the Board approved the ASA and

14   scheduled the election, Appellants began a series of actions challenging the proposed

15   sale and the election, both in state court and in the Bankruptcy Court (the "Challenge

16   Actions").  These challenges were spearheaded by Prime, which had sought

17   unsuccessfully to acquire the District's assets.  Prime formed Appellant Save Our

18   Hospitals, Inc.; enlisted the individual Appellants to join in the Challenge Actions;

19   and financed the Challenge Actions in its campaign to block PHH's purchase of the

20   District's assets to pursue its own agenda regarding those assets.

21       Prime's campaign failed.  The community that the District serves and the

22   District's creditors each approved the Sale to PHH by overwhelming majorities.  The

23   District's voters approved the proposed sale to PHH by a vote of approximately 87%

24   and the Plan was accepted by more than 97% of the District's creditors.  After a six-

25   day trial in connection with confirmation of the Plan, and after taking the matter under

26   submission for five weeks, the Bankruptcy Court issued an 82-page Memorandum

27   Decision in which it concluded that: (i) the Plan should be confirmed, (ii) all

28   objections should be overruled, and (iii) the District and PHH should be granted

1    judgment in their favor in all of the Challenge Actions.  On April 26, 2010, the

2    Bankruptcy Court entered the Confirmation Order.

3                On May 6, 2010 Appellants filed their Notice of Appeal from the

4    Confirmation Order.  Appellants never sought a stay of the Confirmation Order.

5    Nevertheless, Appellants seek reversal of the Confirmation Order, notwithstanding the

6    facts that the Sale has been consummated; the bulk of the Sale proceeds received by

7    the District have been distributed to creditors of the District who are not parties to this

8    Appeal; the rights and interests of hundreds of parties, who are not parties to this

9    appeal, have been irrevocably altered by the consummation of the Sale; and the

10   District no longer has the capacity to operate the healthcare facilities that were

11   transferred to PHH.

12               This Motion does not address the merits of the Appeal.  This Court need

13   not reach the merits because, now that the Sale has closed and the Plan has been

14   substantially consummated, the Appeal is moot and must be dismissed.

15               Equitable mootness is a prudential doctrine developed in bankruptcy

16   cases to address the practical necessities entailed in consummating transactions

17   authorized by the bankruptcy courts.  It is often applied in the context of orders

18   confirming plans.  Because plan confirmation orders often authorize commercial

19   transactions that require action and reliance by third parties, those parties must be

20   assured that a transaction that is consummated pursuant to an unstayed confirmation

21   order is not at risk of being "unwound" months or years later by an appeal of the

22   unstayed order.  The equitable mootness doctrine is also based on the impracticality of

23   trying to "unscramble the eggs" once a confirmed plan has been substantially

24   consummated pursuant to an unstayed confirmation order.  Based on such

25   considerations, courts have consistently held that once a plan has been substantially

26   consummated, an appeal from the confirmation order that would disturb transactions

27   undertaken under the plan will be dismissed on mootness grounds.  *See, e.g.*, *Trone v.*

28   *Roberts Farms, Inc. (In re Roberts Farms, Inc.)*, 652 F.2d 793, 797 (9th Cir. 1981).

1        Moreover, courts of appeal have long applied a special bankruptcy

2   mootness rule to asset sales, holding that an appeal from an unstayed bankruptcy court

3   order authorizing a sale will become moot after the sale has closed.  *See In re Onouli-*

4   *Kona Land Co.*, 846 F.2d 1170, 1171 (9th Cir. 1988).

5        Both of these circumstances are present here.  Pursuant to the confirmed

6   Plan and the unstayed Confirmation Order, the Sale closed on October 13, 2010, and

7   the Plan has been largely implemented.  The Sale closing and the Plan's

8   implementation have resulted, among other things, in the granting of liens to lenders

9   who provided PHH with part of the financing necessary to close the Sale, the

10  investment by investors in PHH of millions of dollars to finance the balance of the

11  purchase price, PHH's payment to the District and the District's distribution to

12  creditors of tens of millions of dollars, the District's assumption and assignment to

13  PHH of hundreds of executory contracts, PHH's assumption of millions of dollars in

14  liabilities to third parties, and the District's disbanding of its management and

15  termination of over 1,300 employees.  All of these actions were taken in reliance on

16  the finality of the Confirmation Order, <u>which Appellants never sought to stay</u>.  Except

17  for PHH and the District, *none* of the many persons and entities whose rights would

18  be adversely affected by the reversal of the Confirmation Order are parties to this

19  Appeal.

20        As discussed below, the implementation and consummation of the Plan

21  have simply advanced too far for any relief to be available to the Appellants.  Hence,

22  this Appeal must be dismissed as moot.

23          **II.    STATEMENT OF FACTS**

24  **A.    The District.**

25        The District is a public agency, formed under the State of California

26  Local Healthcare District Law, Cal. Health and Safety Code § 32000 *et seq.*  The

27  District encompasses approximately 882 square miles in the San Jacinto Valley in

28  Riverside County, including the City of Hemet, the City of San Jacinto, the City of

Sun City, and the surrounding unincorporated areas, and is home to approximately 360,000 residents.  John Marshall Decl. ¶ 5.

Faced with a liquidity crisis that threatened its continued operations, the Board concluded that filing a chapter 9 petition was necessary to permit the District to continue its operations while it developed a restructuring plan.  The District filed its bankruptcy petition on December 13, 2007.  The Bankruptcy Court entered an order for relief in the Chapter 9 Case on February 20, 2008.  John Marshall Decl. ¶ 6.

**B.      The Asset Sale Agreement with PHH, the Election on Measure P and the Plan of Adjustment.**

At the start of the Chapter 9 Case, the District owned and operated three acute care hospitals.  The District sold one hospital in June 2008 and continued to operate the other two hospitals, Hemet Valley Medical Center and Menifee Valley Medical Center (the "Hospitals").  The District also operated a skilled nursing facility, which it converted to a chemical dependency treatment center and a post-treatment retreat center.  John Marshall Decl. ¶ 7.

On October 6, 2009, at a special public meeting, the Board considered and approved the ASA, which provided for the sale of substantially all of the District's assets to PHH.  Under state law, the District was required to obtain voter approval before selling more than 50% of its assets.[2]  Accordingly, the District scheduled an election on a ballot proposition, Riverside County Measure P ("Measure P"), for December 15, 2009, for public approval of the sale to PHH of substantially all of the District's assets pursuant to the ASA.  Measure P passed with "yes" votes cast by eighty-seven percent (87%) of voters.  John Marshall Decl. ¶ 8.

Following the Board's approval of the ASA, on November 2, 2009, the District filed its chapter 9 plan of adjustment, which was premised on the ASA, along with a related disclosure statement.

---

[2]    Cal. Health & Safety Code § 32121(p).

1          As of October 6, 2009, none of the Appellants was a creditor of the

2  District, or had any financial interest in the District's Chapter 9 Case.[3]  Nevertheless,

3  after the Board approved the ASA at the October 6, 2009 Board meeting, Appellants,

4  purporting to act as "citizens" of the District, launched a multi-front attack on the

5  proposed sale by filing actions in the Superior Court for the County of Riverside and

6  motions in the Bankruptcy Court (collectively, the "Challenge Actions") challenging

7  the Sale.  John Marshall Decl. ¶ 9.

8          The Challenge Actions included the following:

9          (i)    an action against the Riverside County Registrar of Voters seeking

10  to rewrite the language on the ballot describing Measure P;

11          (ii)   an action against the District seeking turnover of certain

12  documents and records based on various statutory provisions;

13          (iii)  an action against the District to invalidate the Board's approval of

14  the ASA, based on allegations that in approving the ASA, the District violated the

15  California Environmental Quality Act, Cal. Pub. Res. Code § 21000 *et seq*; and

16          (iv)  a motion for relief from the automatic stay to pursue an action in

17  state court against the District and certain Board members to nullify or invalidate the

18  ASA based on allegations of violations of various provisions of state law.[4]

19

20

---

[3]  One of the Appellants, Prime, had unsuccessfully sought to bid on the District's
assets.  Its status as an unsuccessful bidder did not, however, give it standing to
object to the Plan or the Sale.  *See, e.g., In re Rook Broad. of Idaho, Inc*., 154 B.R.
970, 974 (Bankr. D. Idaho 1993) (prospective purchasers do not have standing to
object to a plan and disclosure statement); *In re Crescent Mfg. Co*., 122 B.R. 979,
981 (Bankr. N.D. Ohio 1990) (potential purchasers do not have standing to object
to a motion for an extension of time for the debtor to file a plan); *In re Karpe*, 84
B.R. 926, 929 (Bankr. M.D. Pa. 1988) (prospective purchasers do not have
standing to present a motion for hearing on a higher bid).  Two years after the
Chapter 9 Case was filed, to create such standing, Prime purchased a $4,920 claim
against the District.  The original holder of which voted in favor of the Plan.

[4]  In addition to these Challenge Actions, Appellants also filed an action to enjoin the
election on Measure P; however, Appellants failed to obtain any injunctive relief
and the action became moot following the election.

To expedite resolution of the Challenge Actions, the District and Appellants stipulated that all of the Challenge Actions would be tried in the Bankruptcy Court as part of the plan confirmation process and that the Bankruptcy Court would have jurisdiction to adjudicate all of the issues pertaining to these actions.  The Bankruptcy Court entered an order on December 23, 2009 approving the District's disclosure statement, which provided for the Bankruptcy Court to hear and decide the Challenge Actions as part of the Plan confirmation process.[5]

## C.   Confirmation Hearings and Judgment for Appellees on the Challenge Actions.

On January 25, 2010 – the deadline to file objections to confirmation of the Plan – Prime purchased a $4,920 general unsecured claim from one of the District's creditors who had voted the claim in favor of the Plan and thereby purported to acquire standing to object to the Plan.[6]  On the same day, Prime filed an objection to the Plan.

The District's Plan was accepted by over ninety-seven percent (97%) of its creditors who voted on the Plan.  The hearing on confirmation of the Plan (the "Confirmation Hearing") commenced on February 9, 2010, by which time all objections to the Plan, except for Prime's, had been withdrawn.  Prime's Plan objections were based on its contentions that: (1) PHH did not have the financial resources to fund the closing of the Sale ("feasibility"), and (2) the various claims set forth in the Challenge Actions made the ASA unenforceable.

The hearing on feasibility took place on February 22, 2010.  On February 23, 2010, the Bankruptcy Court ruled that the District had provided

---

[5]   *See* Order approving the disclosure statement, dated December 23, 2009.  App. at Ex. 7.  The parties memorialized their agreement regarding the Bankruptcy Court's resolution of the Challenge Actions in a subsequent stipulation, which was approved by Bankruptcy Court order entered January 22, 2010.  App. at Ex. 8. None of these orders were appealed.

[6]   The prior holder of the $4,920 claim had voted in favor of Plan confirmation.

1    sufficient evidence of feasibility and overruled Prime's feasibility objection.  *See* App.

2    at Ex. 9 (Tr. 2:3-9:20, Feb. 23, 2010).

3                 The Challenge Actions were tried for four full court days, from February

4    23 through 26.  During that trial, the parties presented ten witnesses, introduced more

5    than one hundred pieces of evidence, and presented extensive oral argument at the

6    conclusion of the trial.  The Bankruptcy Court then took the matter under submission.

7                 On April 8, 2010, the Bankruptcy Court issued a comprehensive, 82-page

8    Memorandum Decision, App. at Ex. 2, in which the court analyzed each of the

9    Challenge Actions, reviewed all the evidence and law applicable to each of

10   Appellants' contentions, and articulated its findings.  The Bankruptcy Court concluded

11   that the District was entitled to a judgment overruling Appellants' remaining Plan

12   objections and that the District and PHH were entitled to judgments dismissing each

13   of the Challenge Actions with prejudice.  On April 26, 2010, the Bankruptcy Court

14   entered the Confirmation Order.[7]  App. at Ex. 1.  This Appeal followed.

15   **D.    The Plan Has Been Consummated, Multiple Transactions Have Closed,**
16   **and The Economic Interests of Many Parties Who Are Not Before The**
     **Court Have Been Irreversibly Affected, All in Reliance on the Unstayed**
17   **Confirmation Order.**

18                With the Plan confirmed and no stay of the Confirmation Order having

19   been sought or obtained, the District and PHH closed the Sale on October 13, 2010.

20   John Marshall Decl. ¶ 13.  The "Effective Date" of the Plan was October 13, 2010.

21   Klausner Decl. ¶ 12.  The District began implementing the Plan immediately, as many

22   of the payment obligations under the Plan came due upon the Closing Date.  To date, a

23   multitude of transactions involving hundreds of parties who are not before the Court

24   has taken place based on the Confirmation Order and the closing of the Sale in

25   accordance with that order.  These transactions include the following:

26

27   _____

28   [7]    Appellants did not object to the form of the Confirmation Order submitted to the
     Bankruptcy Court by the District.

545003v1                                         9

1.     The District has disbanded its management and, as of October 12, 2010, terminated its employment of over 1,300 employees who were working at the Hospitals.  All of the Hospitals' operations are now being managed by PHH.[8]  John Marshall Decl. ¶ 14.a.  The District no longer has any source of revenue, capital, or employees, with the exception of $400,000 a year to be paid by PHH to carry on its mandated functions as a public entity for up to five years.  *Id.*

2.     PHH paid approximately $58 million in cash to the District at closing.  Thomas Decl. ¶ 4.  PHH financed approximately $31 million of the purchase price through loans from third-party lenders which are secured by liens in favor of those lenders on the assets sold to PHH pursuant to the Confirmation Order.  Approximately $30 million of the funds came from a consortium of local physicians, who are investors in and members of Physicians for Healthy Hospitals, LLC, a California limited liability company, the sole shareholder of PHH.  *Id.* ¶ 4.

3.     The District has distributed approximately $48 million of the Sale proceeds to the indenture trustee for the District's special revenue bondholders, in full satisfaction of such parties' secured claims.  John Marshall Decl. ¶ 14.b; Keith

---

[8]   As of the closing date of the Sale, PHH had not yet obtained all of the licenses, permits and other authorizations and certifications from governmental agencies, including hospital licenses and Medicare certification, required to operate hospitals and to obtain Medicare and Medi-Cal reimbursement (collectively, the "Licensure").  The need to provide an interim arrangement for management and financial responsibility for the time period during which a purchaser is obtaining all necessary licenses and certifications is a standard post-closing item in California hospital sale transactions in which the purchaser is not licensed at the time of sale.  That process is anticipated to take one to two months to complete.  Accordingly, as contemplated in the ASA, the District and PHH entered into a Lease and an Interim Management Agreement, pursuant to which the District leased back the hospital facilities to PHH and PHH agreed to provide all management functions (including the provision of all personnel), and PHH assumed all financial responsibility for any losses, and retains all profits, during this interim period.  The interim Lease and Management Agreement will terminate once PHH obtains all necessary Licensure, or nine months after the closing date, whichever occurs first.   John Marshall Decl. ¶ 14.a n.2.

Marshall Decl. ¶ 3.  The indenture trustee has distributed these funds to the individual bondholders.  Keith Marshall Decl. ¶ 4.

> 4.      PHH has assumed the District's administrative obligations under a $9 million note owed to Select VHS Acquisition Company, LLC ("Select").  John Marshall Decl. ¶ 14.b.  Under the terms of the Plan, Select has no further recourse against the District.  Klausner Decl. ¶ 16.

> 5.      PHH has assumed substantially all of the District's "current" administrative liabilities, estimated at approximately $31 million as of the date of the Sale closing.  Marshall Decl. ¶ 14.   Under the terms of the Plan, none of the claimants whose claims have been assumed by PHH has any further recourse against the District.  Klausner Decl. ¶ 17.

> 6.      PHH has assumed approximately $55 million in general unsecured claims owed by the District to holders of what are classified in the Plan as Class 2B claims, resulting from the rejection and/or breach of such parties' contracts.  Klausner Decl. ¶ 18 and Thomas Decl. ¶ 6.  Under the terms of the Plan, none of these creditors has any further recourse against the District.  Klausner Decl. ¶ 18.

> 7.      PHH has hired over 1,300 employees to work in the Hospitals. Thomas Decl. ¶ 5.  PHH has also caused the District's liability for severance, vacation, paid time off and other benefits to be paid out.  *Id.* ¶ 5.

> 8.      The District has "assumed and assigned" to PHH approximately four hundred executory contracts and unexpired leases with various entities, including without limitation, insurance agents, medical groups, pharmacies and other medical service providers, software and equipment lessors and licensors, and insurance companies.[9]  Klausner Decl. ¶ 15.  PHH is now liable for all current and future

---

[9]    Bankruptcy Code section 365(b) provides that, where there have been prepetition and/or postpetition defaults under executory contracts or unexpired leases that a debtor seeks to assume, the debtor must cure any such defaults before it is allowed to assume such contracts.  Therefore, in compliance with (i) the Bankruptcy Court's orders authorizing the District's assumption of certain contracts and leases pursuant to the Plan (some of which were subsequently assigned to PHH), and

amounts due and owing under such contracts, including any damages that may result from the breach or early termination thereof, and the contract parties have no recourse against the District.[10]  Klausner Decl. ¶ 15.

9.    The District has also assumed:[11] (i) approximately forty payor contracts (such as with Aetna, Blue Shield, etc.), which it will assign to PHH once PHH obtains its Licenses; and (ii) approximately forty physician and government contracts (such as with Medi-Cal and Medicare), which the District will terminate once PHH has obtained all necessary licenses and Medicare Certifications and is able to enter into new agreements with these persons and entities.  Klausner Decl. ¶ 19.  As part of such assumptions.  PHH is now liable, in 100 cent dollars, for all current and future amounts due and owing under such contracts, including any damages that may result from the early termination thereof.  Klausner Decl. ¶ 19.

10.    The District has rejected and/or terminated approximately thirty prepetition and postpetition agreements with, among others, laboratories, technical service providers, medical service providers, and surgical centers, which are required for the operation of the Hospitals but which PHH decided not to assume.  *Id.* ¶ 20.

---

(ii) PHH's obligations under the ASA, PHH cured all existing monetary defaults under all of the contracts that the District assumed and assigned to PHH upon the Closing Date.

[10] Once a debtor in a bankruptcy case assumes a prepetition executory contract or unexpired lease, all of the prepetition and postpetition obligations under that contract or lease become administrative liabilities of the estate, and any future rejection of the contract or lease will generally give rise to an administrative claim. *See generally* 11 U.S.C. §§ 365(b), 365(g)(2).  To the extent that contracts were assumed and assigned to PHH under the Plan, the District has no liability for any breach of contract occurring after the assignment, and any such liability will be the exclusive liability of PHH.  *See* 11 U.S.C. § 365(k).  Thus, PHH is now liable to counterparties who are not parties to this Appeal for all amounts outstanding under all of the assumed contracts, in hundred cent dollars, as well as any early termination fees that may accrue if such contracts are terminated before they expire by their own terms.

[11] Such contracts were assumed subject to PHH's assumption of liability for these obligations under the ASA and the Management Agreement, as discussed *supra* note 7.

1    11.    PHH has assumed all of the District's contractual relationships

2  with, among others, the federal government, vendors, payors, suppliers, physicians,

3  pharmacies, medical service providers, and insurance companies.  Thomas Decl. ¶ 6.

4    12.    PHH has assumed the District's collective bargaining agreements.

5  *Id.* ¶ 7.

6    13.    PHH has paid to the District the first of five annual $400,000

7  payments to be used for the District's post-closing operations, as provided for in the

8  Plan and ASA, and pursuant to the Lease and Management Agreement described

9  *supra* note 7.  John Marshall Decl. ¶ 14.e.

10    14.    PHH has paid the District $4 million to be used for the District's

11  administrative expenses and to the extent not so used, for distribution to unsecured

12  creditors pursuant to the Plan.  *Id.* ¶ 14.f.

13    These are just some of the complex financial, legal ,and contractual

14  transactions that have occurred in reliance on the Confirmation Order and, pursuant to

15  PHH's acquisition of the District's assets, under the ASA.  Importantly, except for the

16  District and PHH, *none* of the parties identified in paragraphs 1-14, above, is a party

17  to this Appeal.  It would be impossible to "undo" these transactions in an effective or

18  equitable manner.

### III.    ARGUMENT

20  A.    **Because of the Special Need for Finality in Bankruptcy Proceedings, Appeals of Unstayed Sale Orders And Plan Confirmation Orders Are Moot Once The Sale Closes Or The Plan Is Substantially Consummated.**

22    There are three types of mootness that may require the dismissal of

23  appeals from bankruptcy court orders: constitutional, equitable, and statutory.

24  Constitutional mootness is a limit on the jurisdiction of federal courts.  U.S. Const. art.

25  III, § 2; *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S. Ct.

26  1003 (1998).  A federal court not empowered to issue opinions on moot questions or

27  declare rules of law that cannot affect the matter in the case before it.  *Id.*  Thus, when

28  an intervening event prevents the appellate court from granting effective relief or

renders a decision unnecessary, an appeal must be dismissed for lack of jurisdiction on mootness grounds.  *See, e.g., Ruvalcaba v. City of Los Angeles*, 167 F.3d 514, 520 (9th Cir. 1999); *Chew v. Gates*, 27 F.3d 1432, 1437 (9th Cir. 1994).

Equitable mootness is a prudential doctrine that recognizes independent equitable grounds for dismissing as moot appeals from bankruptcy court orders that authorize a debtor to enter into transactions when the transactions are implemented in the absence of a stay pending appeal.  Equitable mootness differs from constitutional mootness because, while it may not technically be impossible for the appellate court to grant effective relief, it nonetheless would be inequitable because of a change of circumstances resulting from the implementation of the unstayed order and the unique circumstances found in the bankruptcy context.  "Unlike Article III mootness, equitable mootness is prudential, not jurisdictional."  *In re Vineyard Bay Dev. Co.*, 132 F.3d 269, 271 (5th Cir. 1998).  Under this doctrine, "an appeal should . . . be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable."  *Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.)*, 988 F.2d 322, 325 (2d Cir. 1993).

Unlike typical litigation seeking money damages, a bankruptcy court is frequently called upon to authorize business transactions with third parties, who must be able to rely on such authorizing orders in closing the relevant transaction.  For example, under chapter 9 of the Bankruptcy Code, a debtor requires the bankruptcy court's approval to confirm a plan of adjustment, which may be premised upon a sale of assets.  *See* 11 U.S.C. §§ 943, 904.  Understandably, parties will be reluctant to transact business with a debtor or rely on a confirmation order, even in the absence of a stay, if the bankruptcy court's order may be overturned, and complex business transactions unwound on appeal, months or years later.

In addition, the implementation of a plan of reorganization may involve a multitude of transactions, including asset transfers; distributions to creditors; the

1  rejection, assumption, and assumption and assignment of contracts with many

2  counterparties; and the actions of still other parties in reliance on the state of affairs

3  created by the implementation of the plan.  The courts have recognized that there

4  comes a point at which the implementation of a plan confirmed by an unstayed

5  confirmation order has produced such extensive and comprehensive changes in the

6  parties' positions that it would be impracticable (or even impossible) to restore the

7  parties to the position that they occupied immediately before confirmation of the plan.

8  To address this concern, equitable mootness bars "unscrambling the egg."  *Baker &*

9  *Drake, Inc. v. Public Serv. Comm'n*, 35 F.3d 1348, 1352 (9th Cir. 1994).[12]

10              Even outside the plan confirmation context, the Bankruptcy Code and

11  case law limit an appellate court's ability to fashion relief from an unstayed order

12  authorizing a sale of assets once the sale authorized by that order has been

13

14  [12] *See also In re Roberts Farms*, 652 F.2d at 797 (dismissing appeal as moot where
requested relief would unravel the plan and create unmanageable situation for
15  bankruptcy court); *Ederel Sport v. Gotcha Int'l L.P.*, 311 B.R. 250, 254 (9th Cir.
B.A.P. 2004) (finding an appeal becomes "equitably moot" when "a
16  comprehensive change of circumstances may make it inequitable to consider the
merits of the appeal and prevents [a court] from fashioning effective relief."); *BC*
17  *Brickyard Assocs., Ltd. v. Ernst Home Ctr., Inc. (In re Ernst Home Ctr., Inc.)*, 221
B.R. 243, 247 (9th Cir. B.A.P. 1998) (dismissing appeal of sale order as moot
18  where appellant failed to obtain a stay and sale was consummated); *In re Clarke*,
98 B.R. 979, 980 (9th Cir. B.A.P. 1989) (dismissing appeal as moot where the plan
19  has been substantially consummated); *Washington v. Islands Bakery P'ship (In re
Islands Bakery P'ship)*, 179 B.R. 243, 244-45 (W.D. Wash. 1995) (dismissing an
20  appeal of a substantially consummated plan as moot); *In re 203 N. LaSalle St.
P'ship*, 126 F.3d 955, 961 (7th Cir. 1997), *cert. granted*, 118 S. Ct. 1674 (1998)
21  (holding an appeal should be dismissed as moot if the relief requested requires
modification of a confirmed and implemented plan and would upset legitimate
22  expectations or "bear unduly on the innocent"); *In re Envirodyne Indus., Inc.*, 29
F.3d 301, 304 (7th Cir. 1994) (stating that in determining whether an appeal is
23  moot, a court must consider the effects of the relief requested on innocent third
parties); *Miami Ctr. Ltd. P'ship v. Bank of N.Y.*, 838 F.2d 1547 (11th Cir. 1988)
24  (same); *In re Public Serv. Co.*, 963 F.2d 469, 473 (1st Cir. 1992) (finding an appeal
should be dismissed if the requested relief would be either inequitable or
25  impracticable in light of the change of circumstances); *In re Adelphia Commc'n
Corp.*, 367 B.R. 84, 91 (S.D.N.Y. 2007) (finding that mootness of appeals of
26  confirmation orders is generally "presumed when the reorganization plan has been
substantially consummated during the pendency of the appeal.").
27

28

consummated.  In an example of the third type of mootness – statutory mootness – section 363(m) of the Bankruptcy Code provides that the reversal or modification on appeal of an unstayed order authorizing a sale does not affect the validity of the sale if the purchase was made in good faith.[13]  But the policy considerations underlying section 363(m) are not limited to sales authorized under section 363, and the bankruptcy sale mootness doctrine is not limited to sales authorized under section 363 of the Bankruptcy Code.  The purpose of the bankruptcy sale mootness rule is to encourage finality in bankruptcy sales, which serves the dual goals of enhancing the value of the estate's property and protecting the rights of third-party purchasers reliant on sale orders;[14] thus, in the Ninth Circuit, the bankruptcy sale mootness rule applies to all orders authorizing sales in bankruptcy proceedings.  *See, e.g., Algeran, Inc. v. Advance Ross Corp.*, 759 F.2d 1421, 1424 (9th Cir. 1985).[15]

---

[13]  The Bankruptcy Court found that PHH was a good faith purchaser.  *See* App. at Ex. 1 (Confirmation Order ¶ 15) ("[A]ll actions taken by the [District], PHH or any other person or entity in connection with the implementation of the Plan, including the Closing of the ASA shall be deemed to have been taken in good faith and in accordance with all applicable law.")

[14]  In fact, the principle that the consummation of a sale authorized by the bankruptcy court moots an appeal from the order authorizing the sale pre-dates the Bankruptcy Code, section 363(m) or any other codification of that principle by rule or statute. *See, e.g., In re Combined Metals Reduction Co.*, 557 F.2d 179, 186 (9th Cir. 1977) (dismissing as moot appeals from sale orders in case under Chapter X of former Bankruptcy Act); *Taylor v. Austrian,* 154 F.2d 107 (4th Cir. 1946) (consummation of sale of securities rendered moot an appeal from order authorizing trustee in case under Chapter X of former Bankruptcy Act to sell such securities).

[15]  *See also, e.g., In re Onouli-Kona Land Co.*, 846 F.2d at 1172 (the bankruptcy mootness rule is not limited to sales under section 363 but applies in all bankruptcy proceedings "when an appellant has failed to obtain a stay from an order that permits a sale of a debtor's assets."); *Nat'l Mass Media Telecomm. Sys. v. Stanley (In re Nat'l Mass Media Telecomm. Sys.)*, 152 F.3d 1178, 1181 (9th Cir. 1998) (same); *In re Weston*, 110 B.R. 452, 458 (E.D. Cal. 1989) (same); *In re Sewanee Land, Coal & Cattle, Inc.* 735 F.2d 1294, 1296 (9th Cir. 1984).

1

**B.    This Appeal Is Moot Under The Bankruptcy Mootness Rule Specifically
Applicable to Sales.**

2

3          Under the long-standing bankruptcy mootness rule specifically applied to

4    sales, the consummated Sale cannot be disturbed or "undone."  In the Ninth Circuit, an

5    appeal of an order that authorizes a sale of a debtor's assets to a good faith purchaser is

6    *per se* moot for lack of jurisdiction if the appellant fails to obtain a stay pending

7    appeal.  *See In re Onoili-Kona Land Co*. 846 F.2d at 1171.[16]  Although this judicial

8    mootness rule was codified in section 363(m), the codification did not abrogate the

9    long-standing common law by limiting the doctrine to sales under section 363 of the

10   Bankruptcy Code.  *See Algeran, Inc. v. Advance Ross Corp.*, 759 F.2d at 1424.

11   Instead, the judicial rule applies to any unstayed order authorizing or approving a sale

12   of assets in a bankruptcy proceeding once the sale approved by that order closes.  *Id.*

13   Such appeals must be dismissed as moot, regardless of whether the purchaser is party

14   to the appeal or whether relief would otherwise be possible in the absence of the

15   doctrine.  *In re Onoili-Kona Land Co*. 846 F.2d at 1171.[17]

16         Here, the Bankruptcy Court specifically found that PHH acted in a good

17   faith when purchasing the District's assets.  App. at Ex. 1 (Confirmation Order ¶15),

18   *quoted supra* note 13.  Appellants did not challenge this finding in the Chapter 9 Case

19   and have not sought review of the good faith finding in the Appeal.  Thus, the Appeal

20   must be dismissed as moot under the bankruptcy sale mootness doctrine.

21   _____

22   [16]  *See also In re Nat'l Mass Media Telecomm. Sys.*, 152 F.3d at 1181; *Algeran, Inc. v.
     Advance Ross Corp.*, 759 F.2d at 1424.

23   [17]  The limited exception to the bankruptcy mootness rule recognized by the Ninth

24   Circuit – where real property subject to statutory rights of redemption is sold to a
     *creditor* who is party to the appeal – is not applicable here.  *In re Onoili-Kona

25   Land Co*. 846 F.2d at 1173.  First, the purchaser, PHH, was not a creditor in the
     bankruptcy case.  Second, while the property sold may include real property, the

26   assets sold primarily were the Hospitals as a going concern business.  Third, there
     is no right of redemption.  The fact that PHH is party to the appeal is irrelevant if

27   the other grounds for the exception are not met.  *Id.* at 1173 ("No such justification
     supports a broader exception for all real property sold to a creditor who is party to

28   the appeal").

**C.     The Appeal Should be Dismissed as Equitably Moot Because the Complex Transactions Consummated Pursuant to the Plan Should Not, and in Most Instances Cannot, be Unraveled.**

In determining whether a bankruptcy appeal is equitably moot, courts analyze: (1) whether appellants obtained a stay pending appeal; (2) whether the plan has been substantially consummated in the absence of a stay; (3) whether the relief requested would affect the rights of third parties not before the court; (4) whether the relief requested would affect the success of the plan by creating an unmanageable, uncontrollable situation for the bankruptcy court; and (5) the public policy of affording finality to bankruptcy judgments.  *In re Cont'l Airlines*, 91 F.3d 553, 560 (3d Cir. 1996); *In re Roberts Farms*, 652 F.2d at 797.  All of these elements need not be present in order for equitable mootness to apply.  *Id.*   Here, however, each of these elements does exist; consequently, the Appeal should be dismissed as equitably moot.

**1.     Appellants Did Not Seek a Stay of the Confirmation Order.**

The Ninth Circuit has highlighted the failure to obtain a stay pending appeal (such as that of the Appellants) as a basis for dismissing an appeal as moot:

> In the field of the administration of estates under the bankruptcy laws, the policy of the law strongly supports a requirement that a stay be obtained if review on appeal is not to be foreclosed because of mootness. . . .
> . . . .
>
> [T]he practical necessities involved in a successful reorganization require that unless an order of the bankruptcy judge or the district judge is stayed pending appeal, the trustee's acts in accordance with that order should not thereafter be subject to reversal, even if the order is subsequently overturned on appeal.

*In re Roberts Farms, Inc.*, 652 F.2d at 796-98 (citation and quotation marks omitted).[18]

---

[18]   *See also Ewell v. Diebert (In re Ewell)*, 958 F.2d 276 (9th Cir. 1992) (dismissing appeal as moot where transfer of property occurred prior to appellant seeking stay pending appeal); *Kaonohi Ohana, Ltd. v. Sutherland (In re Kaonohi Ohana, Ltd.)*, 873 F.2d 1302, 1306 (9th Cir. 1989) (dismissing appeal of district court order

1   　　　　　By failing even to seek a stay of the Confirmation Order, Appellants
2   accepted the risk that the complex transactions envisioned in the Plan would be so
3   substantially consummated that the relief requested in the Appeal would become
4   impracticable, and the Appeal would become moot.  Appellants were aware that:
5   (i) the ASA required the parties to close the Sale as soon as possible after the
6   Confirmation Order was entered; (ii) the Sale would leave the District with no funds,
7   assets, management or employees that would enable it to resume operation of the
8   Hospitals; (iii) third party lenders would loan funds secured by the purchased assets;
9   (iv) third party creditors would be obligated to release the District and accept PHH's
10  assumption of obligations owed to them; and (v) PHH would take over the operation
11  of the Hospitals, hire employees and enter into a multitude of contracts in connection
12  therewith, all in reliance on the unstayed Confirmation Order.

13  　　　　　The Appellants also knew that numerous third parties who are not parties
14  to this Appeal, including creditors, employees, contract parties, investors, and lenders,
15  would alter their rights and enter into a series of transactions, many of them complex,
16  in reliance on the unstayed Confirmation Order and PHH's acquisition of assets
17  pursuant thereto.  Allowing the Appeal to continue after Appellants' failure even to
18  *seek* a stay of the Confirmation Order would be particularly inequitable.  *See, e.g.*,
19  *Unaffiliated S'holders v. Mega-C Power Corp. (In re Mega-C Power Corp.)*, 295 Fed.
20  Appx. 242, 244 (9th Cir. 2008) (citing *Roberts Farms* and dismissing an appeal of a
21  confirmation order as moot after appellant failed to seek a stay pending appeal, the
22  plan was substantially consummated and the relief requested would require undoing
23  too many transactions to the detriment of third parties).

24  　　　　　Appellants were also obviously aware of the financial issues that
25  precipitated the Board's decision to sell the District's assets, including the District's
26

27  　　　affirming bankruptcy court's order finding real property contract was executory
28  　　　and subject to rejection by debtor where appellant failed to obtain a stay pending
　　　　appeal and debtor sold property to third party).

1  liquidity crisis, and the urgency with which the District needed to close the Sale in

2  face of the prospect that it might have to cease operation of the Hospitals.

3      **2.    The Plan Has Been Substantially Consummated and the
            Transactions on Which the Plan was Based Cannot be Unraveled.**

4

5              In the absence of a stay, the Plan was substantially consummated and the

6  transactions entered into under the Plan cannot now be reversed.  *In re Roberts Farms,*

7  *Inc.*, 652 F.2d at 796-98.  Substantial consummation is defined as the:

8              (A) transfer of all or substantially all of the property
               proposed by the plan to be transferred;

9

10             (B) assumption by the debtor or by the successor to the
               debtor under the plan of the business or the management of
               all or substantially all of the property dealt with by the plan;

11             and

12             (C) commencement of distribution under the plan.

13  11 U.S.C. § 1101(2).  Although section 1101 of the Bankruptcy Code is not applicable

14  to cases filed under chapter 9, the same concepts of finality and principles of equity

15  apply to chapter 9 plans.

16             In *In re Roberts Farms, Inc.* 652 F.2d 793, as in this case, the plan was

17  based on a sale of assets.  The sale could not be modified without disrupting the plan

18  because, as with the District's Plan, "the property transactions do not stand

19  independently and apart from the plan of arrangement."  *Id.* at 797.  Dismissing the

20  appeals as moot, the court explained:

21             [M]any intricate and involved transactions . . . were
               contemplated by the plan of arrangement (even to and
22             including liquidation and reorganization of the debtor
               corporation) and stand solely upon the order confirming the
23             plan of arrangement for court approval and confirmation of
               the transactions. . . .  Certainly, reversal of the order
24             confirming the plan of arrangement, which would knock the
               props out from under the authorization for every transaction
25             that has taken place, would do nothing other than create an
               unmanageable, uncontrollable situation for the Bankruptcy
26             Court.

27

28  *Id.*

545003v1                                        20

1       These considerations apply with particularly compelling force to this

2   Appeal, as it involves the fate of two hospitals whose smooth and uninterrupted

3   operation is literally a matter of life and death.  PHH now owns and operates the

4   Hospitals and the recovery and treatment center.  PHH's lenders have been granted

5   liens on the purchased assets.  PHH has assumed obligations under more than 400

6   contracts.  Pursuant to the Plan and the ASA, severance benefits, paid time off, and

7   other benefits have been paid out to the District's employees.

8       Meanwhile, in the aftermath of the Sale closing, the District has

9   disbanded its management and terminated all employees who worked at the Hospitals

10  and treatment center.  The District has no employees and is in no position to resume

11  the operation of the Hospitals.  The District has already distributed most of the

12  proceeds that the District received from PHH to the District's creditors.  The only

13  significant tasks that remain under the Plan are the completion of the claims review

14  process and the distributions to be made by the Class 2A Claims

15  Allowance/Disbursing Agent.  Klausner Decl. ¶ 13.  The Plan has been substantially

16  consummated, and cannot now be "undone."

17      **3.**    **A Reversal of the Confirmation Order Would Unjustly Affect The**
18                **Rights of Numerous Third Parties Not Before The Court And Would**
                      **Create Massive Chaos for the Bankruptcy Court, the District and**
19                **Such Parties.**

20      There can be no question that reversal of the Confirmation Order and the

21  Sale to PHH on Appeal would adversely affect the rights and interests of, and require

22  relief against, a multitude of persons and entities not before the Court.  <u>First</u>, on the

23  Closing Date, PHH transferred just under $60 million to the District, and the District

24  has since distributed the vast majority of this money to its creditors as required by the

25  Plan.  These third party transferees are not parties to the Appeal, and this Court lacks

26  jurisdiction over those creditors, or the relevant disbursing agents, to require

27  disgorgement of the Sale proceeds used to satisfy claims.  *See, e.g., Valley Nat'l. Bank*

28  *of Ariz. v. Trustee for Westgate-Cal. Corp.,* 609 F.2d 1274, 1283 (9th Cir. 1979), *cert.*

1    *denied,* 444 U.S. 1015, 100 S. Ct. 666, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980)

2    (holding that an action to negate a merger under former Bankruptcy Act is moot

3    because the court lacks jurisdiction over the vast majority of persons affected by

4    merger).[19]  Without the return of those funds, the District is in no position to

5    reimburse the purchase price to PHH.

6              Second, PHH raised funds to finance its acquisition of the District's assets

7    and to provide PHH with working capital by entering into transactions and agreements

8    with lenders and investors acting in good faith.   These third parties have made

9    irreversible changes in position based on the legitimate expectation that they could

10   rely on the Confirmation Order in the absence of a stay pending appeal.   PHH's

11   lenders were granted liens on the purchased assets.   These lenders and investors are

12   not parties to the Appeal and are not subject to the jurisdiction of this Court.  *See, e.g.,*

13   *In re Pub. Serv. Co. of N.H.*, 963 F.2d 469, 475-76  (1st Cir. 1992) (dismissing appeal

14   of substantially consummated plan upon finding court lacks jurisdiction over non-

15   party investors acting in reliance on order).[20]  As such, the Appeal should be

16   dismissed as moot based on the substantial adverse consequences that the relief

17   requested would have on these third parties.  *Id.*

18             Third, PHH has hired most of the District's 1,300 employees to manage

19   and operate the Hospitals.   Since such employees were terminated by the District,

20   their accrued paid time off has been paid, and severance benefits have been paid to the

21   District's employees who were not hired by PHH.   These employees could not be

22

23

24   ────────────────

     [19]  *See also In re Pub. Serv. Co.*, 963 F.2d at 469 (dismissing appeal of substantially
          consummated plan upon finding court lacks jurisdiction over non-party investors
25        acting in reliance on order); *Cent. States, Se. & Sw. Areas Pension Fund v. Cent.
          Trans., Inc.*, 841 F.2d 92, 96 (4th Cir. 1988) (finding court lacks jurisdiction "to
26        impose substantial adverse consequences" on creditors receiving distributions
          under a consummated plan who are not party to an appeal).

27
     [20]  *See also, Valley Nat'l Bank v. Trustee for Westgate-Cal. Corp.*, 609 F.2d at 1283;
28        *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Trans., Inc.*, 841 F.2d at 96.

1   required to return any of these payments already received because they are not parties

2   to the Appeal and are not subject to the jurisdiction of this Court.  *Id.*

3            Finally, and perhaps most importantly, if the Sale is unraveled, the

4   District's citizens, who voted in favor of the Sale and are also not parties to the

5   Appeal, will be left without critical local medical services.  The District cannot now

6   operate the Hospitals or the recovery and treatment center as going concerns and,

7   instead, would be forced to immediately close the facilities and liquidate.

8        **4.    The Public Policy of Affording Finality to Bankruptcy Judgments
                 Weighs in Favor of Dismissal.**

9

10            When courts addressing equitable mootness speak of the importance of

11   according "finality" to bankruptcy judgments, what they mean is that parties to

12   bankruptcy proceedings and third parties entering into transactions with a debtor in a

13   bankruptcy case that require court approval must be able to rely upon, and proceed on

14   the basis of, unstayed orders authorizing sales and confirming plans of reorganization.

15   *See, e.g.*, *In re Pub. Serv. Co. of N.H.*, 963 F.2d at 471-72 (explaining that "the

16   equitable component centers on the important public policy favoring orderly

17   reorganization and settlement of debtor estates by 'affording finality to the judgments

18   of the bankruptcy court'").[21]  Otherwise, any disgruntled party – such as an

19   unsuccessful bidder who manufactures standing by buying a small claim – could force

20   bankruptcy court-approved transactions into an appellate limbo or bring a court-

21   approved reorganization to a grinding halt by the simple tactic of filing a notice of

22   appeal, without seeking a stay or posting a bond.  The destructive impact of such a

23   construct on the administration of bankruptcy cases cannot be overstated: parties to

24   transactions with debtors that require bankruptcy court approval would either (i) walk

25   away from such transactions in face of an appeal if they were unwilling to remain

---

26   [21]  *See also, e.g.*, *In re Cont'l Airlines*, 91 F.3d at 562 (finding that "[h]igh on the list
27   of prudential considerations taken into account by courts considering whether to
     allow an appeal following a consummated reorganization is the reliance by third
28   parties, in particular investors, on the finality of the transaction").

1    committed to the transaction for the duration of two levels of appeal,[22] or (ii) insist on

2    a substantial discount to the purchase price to compensate for the risk that a

3    transaction that closed in reliance on an unstayed order could be "undone" months or

4    years after it has closed.  Courts developed the prudential doctrine of equitable

5    mootness precisely to avoid such a value-restrictive structure.

6            In this case, the policy of affording "finality" to the Confirmation Order

7    requires that, absent a stay, the District, PHH, PHH's lenders and investors, and others

8    be able to rely on the Confirmation Order and to close the Sale and implement the

9    Plan without risk.  The principle of finality requires that the actions that were taken

10   pursuant to the unstayed Confirmation Order not be "undone."

11   **D.    The Appeal is Constitutionally Moot and Must be Dismissed for Lack of**
12   **Jurisdiction, Because There is No Remedy Available to Appellants.**

13           Finally, the Appeal is also constitutionally moot because there is no

14   longer any effective relief available to the Appellants.  The relief requested in the

15   Appeal necessitates that the Sale be reversed.  This would require PHH to return fully

16   functioning Hospitals and the recovery and treatment center to the District.  This relief

17   is not available.  *See, e.g.*, *Valley Nat'l Bank v. Trustee for Westgate-Cal. Corp.*, 609

18   F.2d at 1283 (holding that an action to negate a merger is moot because the court lacks

19   jurisdiction over the vast majority of persons affected by merger).[23]  The District

20   cannot accept the return of the transferred assets.  The assets sold under the

21   Confirmation Order and ASA included two operating Hospitals and a recovery and

22   treatment center operating as going concern businesses.  As already explained, the

23   District is no longer able to operate or manage the facilities or care for their patients.

24   The District has no contracts, no working capital, and no employees to operate the

25   Hospitals.

26   _____

27   [22]  From a final bankruptcy court order, parties may appeal to the district court or
     bankruptcy appellate panel, followed by an appeal to the circuit court of appeals.

28   [23]  *See also* cases cited *supra* note 19.

1    Because there is no relief available to the Appellants, the only function

2    remaining for the Court is to announce its lack of jurisdiction and dismiss the Appeal.

3    *See*, *e.g., Steel Co. v. Citizens for a Better Env't*, 523 U.S. at 94-95; *Ruvalcaba v. City*

4    *of Los Angeles,* 167 F.3d at 520.

5                        **IV.    CONCLUSION**

6                   For all of the reasons set forth herein, the District respectfully requests

7    that this Court dismiss the Appeal on mootness grounds and grant such other relief as

8    this Court deems to be just and proper.

9                                      Respectfully submitted,

10   Dated: October 22, 2010          STUTMAN, TREISTER & GLATT

11                                     PROFESSIONAL CORPORATION

12                                     CHARLES D. AXELROD
                                       GARY E. KLAUSNER
13                                     H. ALEXANDER FISCH
                                       MARINA FINEMAN

14                                     -and-

15                                     WOODRUFF, SPRADLIN & SMART, APC

16                                     DANIEL K. SPRADLIN
                                       M. LOIS BOBAK
17

18

19                                     By:    _/s/ H. Alexander Fisch_____

20                                        Attorneys for Appellee
                                          VALLEY HEALTH SYSTEM
21

22

23

24

25

26

27

28

Dated: October 22, 2010

AKIN GUMP STRAUSS HAUER & FELD LLP

R.D. KIRWAN
CHAD STEGEMAN
DEVIN STONE

By:    /s/ R.D. Kirwan

Attorneys for Appellee PHYSICIANS FOR HEALTHY HOSPITALS, INC.

545003v1