1 | CHARLES D. AXELROD (SBN 39507)
2 | GARY E. KLAUSNER (SBN 69077)
  | H. ALEXANDER FISCH (SBN 223211)
3 | MARINA FINEMAN (SBN 193065)
  | STUTMAN, TREISTER & GLATT
4 | PROFESSIONAL CORPORATION
  | 1901 Avenue of the Stars
5 | 12th Floor
  | Los Angeles, CA 90067
6 | Telephone:   (310) 228-5600
7 | Telecopy:     (310) 228-5788
  | Email:          gklausner@stutman.com;
8 |                    afisch@stutman.com

9 | DANIEL K. SPRADLIN (SBN 82950)
10 | M. LOIS BOBAK (SBN 127540)
  | WOODRUFF, SPRADLIN & SMART, APC
11 | 555 Anton Boulevard, Suite 1200
  | Costa Mesa, California 92626-7670
12 | Telephone:   (714) 558-7000
13 | Facsimile:    (714) 835-7787
  | Email:          dspradlin@wss-law.com;
14 |                    lbobak@wss-law.com

15 | Attorneys for Appellee
  | Valley Health System
16 |

17 | R.D. KIRWAN (SBN 46259)
  | CHAD STEGEMAN (SBN 225745)
18 | DEVIN STONE (SBN 260326)
  | AKIN GUMP STRAUSS HAUER & FELD LLP
19 | 2029 Century Park East, Suite 2400
  | Los Angeles, California 90067
20 | Telephone:   (310) 229-1000
21 | Facsimile:    (310) 229-1001
  | Email:          rkirwan@akingump.com;
22 |                    cstegeman@akingump.com;
  |                    dstone@akingump.com
23 |

24 | Attorneys for Appellee
  | Physicians for Healthy Hospitals, Inc.

25

26

27

28

545012v1

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| In re | D.C. Case No.: 10-CV-00730-SVW |
| | Bankr. Case No. 6:07-bk-18293-PC |
| VALLEY HEALTH SYSTEM, a California Local Health Care District, | Adv. Pro. No. 6:09-ap-01708-PC |
| | Chapter 9 |
| Debtor. | |
| PRIME HEALTHCARE MANAGEMENT, INC., a California Corporation; ALBERT L. LEWIS, JR., a taxpayer and resident of the VHS local health care district; JOHN LLOYD, a taxpayer and resident of the VHS local healthcare district; EDWARD J. FAZEKAS, a taxpayer and resident of the VHS local health care district, | **APPENDIX TO APPELLEES' JOINT MOTION TO DISMISS** |
| Appellant, | <u>Hearing</u><br>Date:      November 22, 2010<br>Time:      1:30 p.m.<br>Judge:     Hon. Stephen V. Wilson<br>Place:     Courtroom 6<br>              312 N. Spring Street<br>              Los Angeles, CA  90012 |
| v. | |
| VALLEY HEALTH SYSTEM, a California local healthcare district; PHYSICIANS FOR HEALTHY HOSPITALS, INC., a California Corporation, | |
| Appellees. | |

Appellees, Valley Health System, a California Local Health Care District, and Physicians for Healthy Hospitals, Inc., hereby file this "Appendix to Appellees' Joint Motion to Dismiss" in support of their "Joint Motion To Dismiss Appeal As Moot," filed concurrently herewith.

Attached hereto are the following exhibits:

| Exhibit Number | Document |
|---|---|
| 1 | Order (i) Confirming First Amended Plan for Adjustment of Debts of Valley Health System Dated December 17, 2009, As Modified February 19, 2010, and (ii) Granting Judgment for Valley Health System in Each Challenge Action |
| 2 | Memorandum Decision Re: Confirmation of First Amended Plan of Adjustment of Debts of Valley Health System Dated December 17, 2009, As Modified on February 19, 2010, and Adjudication of the Challenge Actions |
| 3 | Asset Sale Agreement by and between Valley Health System and Physicians for Healthy Hospitals, Inc., dated October 14, 2009 |
| 4 | First Amended Plan of Adjustment of Debts of Valley Health System Dated December 17, 2009 |
| 5 | Modification of First Amended Plan for the Adjustment of Debts of Valley Health System Dated December 17, 2009 |
| 6 | Buyer's/Borrower's Settlement Statement |

| 7 | Order: (1) Approving the Adequacy of the First Amended Disclosure Statement; (2) Setting Date and Time of the Confirmation Hearing; (3) Establishing the Last Day to Vote on or Object to Confirmation of the First Amended Plan; and (4) Establishing Other Confirmation Procedures |
| 8 | Stipulation to Withdraw Renewed Motion for Relief from Stay, Dismiss Appeal and to Adjudicate Issues Raised by Challenge Actions |
| 9 | Excerpt of Transcript of Proceedings before the Bankruptcy Court on February 23, 2010 |

Respectfully submitted,

Dated: October 22, 2010

STUTMAN, TREISTER & GLATT
PROFESSIONAL CORPORATION
CHARLES D. AXELROD
GARY E. KLAUSNER
H. ALEXANDER FISCH
MARINA FINEMAN

-and-

WOODRUFF, SPRADLIN & SMART, APC
DANIEL K. SPRADLIN
M. LOIS BOBAK

By:     /s/ H. Alexander Fisch

Attorneys for Appellee
VALLEY HEALTH SYSTEM

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: October 22, 2010

AKIN GUMP STRAUSS HAUER & FELD LLP

R.D. KIRWAN
CHAD STEGEMAN
DEVIN STONE

By: ____/s/ Devin Stone_____

Attorneys for Appellee PHYSICIANS FOR HEALTHY HOSPITALS, INC.

# Exhibit 1

FILED & ENTERED

APR 26 2010

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY craig      DEPUTY CLERK

1   CHARLES D. AXELROD – State Bar No.39507
    GARY E. KLAUSNER – State Bar No. 69077
2   H. ALEXANDER FISCH – State Bar No. 223211
    MARINA FINEMAN – State Bar No. 193065
3   NEETA MENON – State Bar No. 254736
    STUTMAN, TREISTER & GLATT
4   PROFESSIONAL CORPORATION
    1901 Avenue Of The Stars, 12th Floor
5   Los Angeles, CA  90067
    Telephone:  (310) 228-5600
6   Facsimile:  (310) 228-5788
    caxelrod@stutman.com; gklausner@stutman.com;
7   mfineman@stutman.com; nmenon@stutman.com

8   Chapter 9 Counsel for Valley Health System

9   DANIEL K. SPRADLIN - State Bar No. 82950
    dspradlin@wss-law.com
10  M. LOIS BOBAK - State Bar No. 127540
    lbobak@wss-law.com
11  WOODRUFF, SPRADLIN & SMART, APC
    555 Anton Boulevard, Suite 1200
12  Costa Mesa, California 92626-7670
    Telephone:  (714) 558-7000
13  Facsimile:  (714) 835-7787

14  Special Counsel for Debtor and Defendant Valley Health System

15  Counsel continued on next page.

16              UNITED STATES BANKRUPTCY COURT

17        CENTRAL DISTRICT OF CALIFORNIA, RIVERSIDE DIVISION

18
19  In re                                        CASE NO. 6:07 -BK-18293-PC

20  VALLEY HEALTH SYSTEM, a California            CHAPTER 9
    Local Health Care District,
21                    Debtor.                     ADV. PROC. NO. 6:09-AP-01708-PC

22  PRIME HEALTHCARE MANAGEMENT,                  **ORDER (i) CONFIRMING FIRST
23  INC., a California corporation, et al.        AMENDED PLAN FOR ADJUSTMENT
                                                  OF DEBTS OF VALLEY HEALTH
24                    Plaintiffs,                 SYSTEM DATED DECEMBER 17, 2009,
                                                  AS MODIFIED FEBRUARY 19, 2010,
25  v.                                            AND (ii) GRANTING JUDGMENT FOR
                                                  VALLEY HEALTH SYSTEM IN EACH
26  VALLEY HEALTH SYSTEM, a California            CHALLENGE ACTION**
    Local Healthcare District, et al., DOES 1-10,
27
                      Defendants.
28

537207v2                         5

R.D. KIRWAN (SBN 046259)
PETER J. GURFEIN (SBN 127173)
CHAD STEGEMAN (SBN 225745)
DEVIN STONE (SBN 260326)
AKIN GUMP STRAUSS HAUER & FELD LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone:  310.229.1000
Facsimile:  310.229.1001
Email:       rkirwan@akingump.com
             pgurfein@akingump.com
             cstegeman@akingump.com
             dstone@akingump.com

Attorneys for Real Party in Interest in Adversary Proceeding
Physicians for Healthy Hospitals, Inc.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The hearing ("Confirmation Hearing") to consider confirmation of the First Amended Plan For The Adjustment of Debts of Valley Health System Dated December 17, 2009 (as modified by the Plan Modifications defined in (xii) below, the "Plan") commenced before the undersigned Judge of the United States Bankruptcy Court for the Central District of California, Riverside Division (the "Court") in Courtroom 304 located at 3420 Twelfth Street, Riverside, California, on February 9, 2010, at 10:30 a.m. and continued from time to time thereafter until its conclusion on February 26, 2010.  Appearances are as set forth in the record of the hearing dates.

Pursuant to this Court's order of December 23, 2009 ("Order Approving Disclosure Statement") [Docket No. 694], the Stipulation to Withdraw Renewed Motion for Relief from Stay, Dismiss Appeal and to Adjudicate Issues Raised by Challenge Actions ("Stipulation to Withdraw Renewed Motion for Relief from Stay") [Docket No. 753] and the Order Approving Stipulation to Withdraw Renewed Motion for Relief from Stay, Dismiss Appeal and to Adjudicate Issues Raised by Challenge Actions, entered by this Court on January 22, 2010 ("Order Approving Stipulation to Withdraw Renewed Motion for Relief from Stay") [Docket No. 755], the Confirmation Hearing was consolidated with trial of the various claims and causes of actions which were described in the Disclosure Statement as the "Challenge Actions."  Accordingly, the findings of fact and conclusions of law made by this Court on the record in connection with the Plan Confirmation Hearing and the Memorandum Decision filed and entered by this Court on April 8, 2010 address and fully adjudicate all claims, causes of action and issues which were raised, or could have been raised, in connection with the Plan and the Challenge Actions.

Having considered, among other things:

(i)        the Plan;

(ii)       the disclosure statement, approved by the Order Approving Disclosure Statement, entered December 23, 2009, finding and holding, among other things, that the disclosure statement contained adequate information for use in connection with the solicitation of acceptances of the Plan, including all of the exhibits thereto (the "Disclosure Statement");

(iii)      the declarations of service relative to the dissemination of the Plan, Disclosure Statement, ballots and notice of the date and time of the confirmation hearing and the deadlines to

1   vote on and object to confirmation of the Plan, including the Affidavit of Service and Vote

2   Certification of Robert Stevens of Globic Advisors, Inc., the Declaration of Nick Eller of the Press

3   Enterprise regarding publication in that newspaper of notice regarding the hearing on confirmation

4   of the Plan, and the affidavit of Joyce Carter of Bowne Communications;

5            (iv)    Declaration of Kendra A. Johnson to which is attached the ballot tabulation

6   report of the Voting Agent;

7            (v)    the objections (including those of Beckman Coulter, Inc. "BCI"), Key

8   Equipment Finance Inc ("Key"), U.S. Bank National Association, as Indenture Trustee (the

9   "Indenture Trustee"), and Prime Healthcare Services, Inc. and its associates (collectively, "Prime")

10  and the Supplemental Objection of Prime, responses to objections, supporting declarations

11  (including those of William Cherry, M.D., Michael B. Foutz, and Todd E. Swanson) and all

12  pleadings and memoranda of points and authorities filed in support of, or in opposition to,

13  confirmation of the Plan, the withdrawals in open court of the confirmation objections of the

14  Indenture Trustee, BCI and Key (leaving Prime as the sole objector to confirmation);

15           (vi)    the pleadings and related documents filed in connection with the acquisition

16  by Prime of a Class 2A Claim in the approximate amount of $4,300 on January 22, 2010;

17           (vii)   the oral motion to strike the Supplemental Objection of Prime as having been

18  filed after the Court ordered deadline for filing objections, which motion was granted;

19           (viii)  the motions for protective orders by the Debtor regarding the scope of

20  discovery, the oppositions filed by Prime to the protective order motions, any stipulation reached by

21  the parties regarding protective orders and voluntary limitations on the scope of discovery, this

22  Court's rulings on the protective order motions and on any discovery limitation stipulation presented

23  to this Court for its approval;

24           (ix)    the argument of counsel at the Confirmation Hearing;

25           (x)    the testimony, documentary evidence and other items admitted into evidence

26  at the Confirmation Hearing;

27

28

1     (xi)    the Administrative Record prepared and certified by Debtor in considering

2  whether to approve the sale of substantially all of its assets to Physicians for Healthy Hospitals, Inc.

3  ("PHH");

4     (xii)    the Plan modifications filed by the Debtor on February 19, 2010 (the "Plan

5  Modifications"); and

6     (xiii)    the pleadings, evidence and argument presented by the parties prior to and at

7  the trial of the Challenge Actions;

8     Having separately issued, on the record, its findings of fact and conclusions of law

9  regarding the confirmation requirements of section 943(b), finding herein that all amounts to be paid

10  for services or expenses in the case or incident to the Plan have been fully disclosed and are

11  reasonable and concluding that compliance has been made with all aspects of section 943(b)(1)-(7)

12  of the Bankruptcy Code, including those aspects of title 11 made applicable by sections 103(e) and

13  901 of title 11, and that judgment in each of the Challenge Actions must be granted in favor of the

14  Debtor and/or PHH, as the case may be, the Court hereby

15     **ORDERS:**

16     1.    Pursuant to Bankruptcy Code section 943, the Plan is confirmed.

17     2.    All Plan objections, not expressly withdrawn, are overruled on the merits.

18     3.    Pursuant to Bankruptcy Code section 944: (1) the Debtor is discharged as of

19  the effective date of the Plan ("Effective Date") from all pre-Effective Date debts, obligations and

20  claims other than those excepted from discharge by the Plan or this Order or those owed to an entity

21  that, before confirmation of the Plan, had neither notice nor actual knowledge of the Debtor's

22  chapter 9 case, and (2) the provisions of the Plan bind any creditor whether or not (a) a proof of such

23  creditor's claim was filed or is deemed to have been filed, (b) such claim is allowed or (c) such

24  creditor has accepted the Plan.

25     4.    The Court retains jurisdiction over the Debtor's chapter 9 case in the manner

26  provided for in the Plan.

27     5.    All entities that have, hold or may hold claims arising prior to the Effective

28  Date, including any plaintiffs or petitioners in any of the Challenge Actions, are permanently

1    enjoined, from and after the Effective Date, from (a) commencing or continuing, in any manner, any

2    action or other proceeding of any kind with respect to any such pre-Effective Date claim or cause of

3    action against the Debtor or PHH or that would interfere with the closing of the transactions

4    contemplated by the Plan or otherwise delay or impede the full implementation of the Plan, (b)

5    enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree

6    or order against the Debtor with respect to such pre-Effective Date claims or causes of action, (c)

7    creating, perfecting or enforcing any lien or encumbrance of any kind against the Debtor or its

8    property or interests in property, and (d) asserting any right of setoff, subrogation or recoupment of

9    any kind against any obligation due to the Debtor with respect to any such pre-Effective Date claim

10   or cause of action except as otherwise permitted by section 553 of the Bankruptcy Code; provided,

11   however, the injunction and discharge provided for in the Plan or in this Order shall not preclude

12   Aetna from exercising any otherwise valid and enforceable right of setoff or recoupment in

13   connection with the Post-Petition Contract.[1]

14           6.      All injunctions or stays provided for in the Debtor's chapter 9 case pursuant to

15   sections 105, 362, or 922 of the Bankruptcy Code shall remain in full force and effect until the last to

16   occur of the Effective Date or the date on which the discharge of the Debtor occurs.

17           7.      The Debtor and all of its officers, directors, employees, and professionals are

18   authorized to take any and all actions deemed necessary or reasonable by them in the exercise of

19   their business judgment to cause the consummation and implementation of all transactions

20   contemplated by the Plan to occur and to otherwise assure that the Plan's provisions are implemented

21   as provided for in the Plan.  In particular, the Debtor is authorized to take all actions necessary to

22   close and implement the sale of substantially all of the Debtor's assets to PHH pursuant to the terms

23   of the Asset Sale Agreement entered into between the Debtor and PHH as of October 14, 2009

24   ("ASA").

25

26

27   [1]    "Aetna" and "Post Petition Contract" are defined in the Settlement Agreement between Aetna
            and the Debtor entered into as of March 10, 2010.

28

8.      In the event that the Aetna Post-Petition Contract is not assumed by the Debtor and assigned to PHH prior to or as of the Effective Date, then, or before the Effective Date, the Debtor shall deposit the sum of $750,000 into a segregated account which shall be used solely for the purpose of satisfying any allowed Administrative Claim of Aetna relating to the Post-Petition Contract (herein the "Aetna Reserve Fund").  The Debtor's creation of the Aetna Reserve Fund shall not reduce or limit any obligation by PHH in connection with the ASA, including, without limitation, PHH's obligations, pursuant to ¶ 1.2.4 of the ASA.  At such time as a determination has been made by the Bankruptcy Court in a Final Order, or pursuant to agreement of the parties, regarding Aetna's administrative claim, if any, the monies in the Aetna Reserve Fund shall be disbursed either: (a) to Aetna, pursuant to court order or agreement of the parties, or (b) to the extent not necessary to satisfy any Aetna administrative claim, to PHH.

9.      The Effective Date of Plan shall occur on the first day after which the conditions set forth in section XII.B of the Plan are satisfied or waived.

10.     The provisions of the Plan and this Order shall bind the Debtor and all its creditors and all of the petitioners and plaintiffs in the Challenge Actions regardless of: (a) whether or not the claims of such creditors or claims and causes of action of such plaintiffs and petitioners in the Challenge Actions are expressly provided for under the Plan; (b) whether or not such creditors or petitioners and plaintiffs in the Challenge Actions have accepted the Plan; and (c) whether or not such creditors or plaintiffs or petitioners in the Challenge Actions have filed proofs of claim in this case.

11.     All executory contracts and unexpired leases of the Debtor, to the extent not previously assumed or rejected, are rejected as of the Effective Date or such other date as set forth in any order regarding the rejection of any of the Debtor's executory contracts or unexpired leases.  The bar date for filing a proof of claim based on the rejection of an executory contract or unexpired lease which is rejected pursuant to the terms of this Order, shall be thirty (30) days from service of notice of entry of this Order or as otherwise provided in any order regarding the rejection of any of the Debtor's executory contracts or unexpired leases.

1       12.    From and after the Effective Date, any person who desires notice of any

2   pleadings or documents filed with the Court, or any hearing in the Court, or other matter as to which

3   the Bankruptcy Code requires notice to be provided, shall file a request for post-confirmation notice

4   and shall serve the request on the Debtor.

5       13.    Following the Effective Date, the adjudication of claims and the distribution

6   of payments to Class 2A creditors under the Plan shall be administered by the Disbursing Agent to

7   be appointed by the Creditors Committee prior to the Effective Date.  The costs and fees incurred for

8   and by the Disbursing Agent shall be paid out of the funds paid to the Class 2A creditors by PHH

9   pursuant to the ASA.

10       14.    If and to the extent that there is any direct conflict between the terms of the

11   Plan and the terms of this Order, the terms of this Order shall govern and control.  The failure to

12   reference any particular provision of the Plan in this Order shall have no effect on the binding nature,

13   enforceability or legality of such provision and such provision shall have the same binding effect,

14   enforceability and legality of any other provision of the Plan.

15       15.    This Order shall constitute all approvals and consents required, if any, by the

16   laws, rules or regulations of any state or any other governmental or regulatory authority or

17   governmental unit with respect to the implementation or consummation of the Plan or any

18   documents, instruments or agreements referred to in or contemplated by the Plan and any

19   amendments or modifications thereto and any other acts referred to in or contemplated by the Plan,

20   the Disclosure Statement and any documents, instruments, or agreements and any amendments or

21   modifications thereto and all actions taken by the Debtor, PHH or any other person or entity in

22   connection with the implementation of the Plan, including the Closing of the ASA shall be deemed

23   to have been taken in good faith and in accordance with all applicable law.

24       16.    All requests for payment of any administrative claims (other than those

25   administrative claims assumed by PHH pursuant to the ASA and claims for professional fees) must

26   be filed and served on the Debtor and Creditors Committee no later than sixty days after the

27   Effective Date (the "Administrative Claims Bar Date"); provided however, that the Administrative

28   Claims Bar Date may be extended from time to time upon the mutual agreement of the Debtor and

1   Committee or pursuant to order of the Bankruptcy Court.  Holders of administrative claims that are

2   required to file a request for payment of such administrative claims that do not file such a request by

3   the applicable Administrative Claims Bar Date will be forever barred from asserting such

4   administrative claims against the Debtor or its property.

5          17.    Judgment in each of the Challenge Actions, as described in this Court's

6   Memorandum Decision filed and entered on April 8, 2010, is granted in favor of the Debtor and

7   PHH.  The Debtor and PHH are authorized and directed to file any documents or pleadings in any of

8   the Challenge Actions that are necessary to inform any court in which any such action was pending,

9   that such action has been resolved by this Court and that judgment has been entered in favor of the

10  Debtor and PHH.

11         18.    This Court's judgment in favor of the Debtor and PHH in the Challenge

12  Actions is a determination on the merits of each of the claims and causes of action that were or could

13  have been adjudicated in each of the Challenge Actions and this judgment shall be preclusive as to

14  all issues that were raised or could have been raised by the plaintiffs and petitioners in each of said

15  Challenge Actions such that each of the plaintiffs and petitioners shall be barred by *res judicata* and

16  collateral estoppel from attempting to assert any claims or causes of actions described in or arising in

17  or relating to any of the transactions set forth or which could have been set forth in the Challenge

18  Actions in any future actions or proceedings against the Debtor or PHH.  Judgment on each of the

19  Challenge Actions includes, but is not limited to, the following:

20         a.    Debtor's Board of Directors did not violate a fiduciary duty by

21  approving the Asset Sale Agreement with an unconditional "no shop" provision.  Neither California

22  law nor federal bankruptcy law require Debtor to engage in competitive bidding or "shop" its assets.

23  Judgment is therefore entered in Debtor's and PHH's favor that Debtor and its Board of Directors

24  upheld their fiduciary duties in completing the proposed sale of assets.

25         b.    No member of Debtor's Board of Directors was "financially interested"

26  in the Asset Sale Agreement, or attendant contracts, in violation of California Government Code

27  section 1090.  Even if one of the board members possessed an "interest" in the asset sale, such

28  interest would be too remote and speculative to run afoul of Section 1090 of the Government Code.

537207v2                                13                7

1   Therefore, judgment is entered in favor of Debtor and PHH that no member of the Debtor's Board of

2   Directors was financially interested in any way in the proposed sale.

3       c.  The proposed asset sale provides "fair market value" for Debtor's

4   assets under California Health & Safety Code § 32121(p)(1).  Debtor's appraiser – an independent

5   consultant with expertise in methods of appraisal and valuation – in accordance with applicable

6   governmental and industry standards for appraisal and valuation, determined that PHH offered and

7   Debtor would receive fair and reasonable consideration for its assets.  Thus, judgment is entered in

8   Debtor's and PHH's favor.  The proposed transfer of assets to PHH for the consideration offered

9   constitutes a transfer of the assets at fair market value.

10      d.  Debtor's sale of assets to PHH pursuant to the ASA is not a "project"

11  for the purposes of the California Environmental Quality Act ("CEQA").  There is no evidence in the

12  administrative record that Debtor's approval of the ASA will potentially cause either a direct

13  physical change in the environment or a reasonably foreseeable indirect physical change in the

14  environment.  To the contrary, Debtor's approval of the ASA results in nothing more than a change

15  in ownership of Debtor's assets.  Accordingly, Debtor's sale of assets to PHH was not subject to

16  CEQA.  Furthermore, because plaintiffs had ample opportunity during the administrative

17  proceedings to raise their objections, but failed to do so, they are now barred from challenging the

18  transaction pursuant to CEQA.  Judgment is therefore entered in Debtor's and PHH's favor that

19  Debtor did not violate CEQA in connection with the proposed asset sale.

20      e.  Debtor's proposed sale of assets to PHH did not violate California

21  Government Code section 65402.  Plaintiffs failed to submit evidence of the existence of general

22  plans in the applicable jurisdictions that would trigger the advisory procedures specified in

23  Government Code section 65402.  Further, even if Government Code section 65402 was indeed

24  applicable, Debtor could still submit the proposed sale of its assets to the appropriate agency at any

25  time prior t a transfer of the assets to PHH.  Because plaintiffs had ample opportunity during the

26  administrative proceedings to raise their objections, but failed to do so, they are now barred from

27  challenging the transaction pursuant to Government Code section 65402.  Judgment is therefore

28  entered in Debtor's and PHH's favor that Debtor did not violate Government Code section 65402.

1          f.    Debtor's sale of assets to PHH does not require approval by the Local

2   Agency Formation Commission ("LAFCO") under California Government Code § 56824.12.  The

3   proposed sale of assets to PHH and the Plan do not constitute a "change of organization" within the

4   Government Code and in any event is controlled by the provisions of California Health & Safety

5   Code § 32121(p)(1).  Therefore judgment is entered in Debtor's and PHH's favor that Debtor was not

6   required to seek LAFCO approval before or after the proposed sale of assets to PHH.

7          19.    This Order shall be effective upon entry on the Court's docket, and the stay

8   imposed by Bankruptcy Rule 3020(e) shall not apply.

9

10  Presented by:

11

12  /s/ *H. Alexander Fisch*
    CHARLES D. AXELROD

13  GARY E. KLAUSNER
    H. ALEXANDER FISCH

14  NEETA MENON
    STUTMAN, TREISTER & GLATT

15  PROFESSIONAL CORPORATION

16  Chapter 9 Counsel for VALLEY HEALTH SYSTEM

17                                    ###

18

19

20

21

22

23

24

25

26  DATED: April 26, 2010
                                    _____
                                    United States Bankruptcy Judge
27

28

537207v2                          15   9

| In re: VALLEY HEALTH SYSTEM,<br><br>                                   Debtor(s). | CHAPTER 9<br>CASE NUMBER 6:07-bk-18293-PC<br>ADV. PROC. NO. 6:09-AP-01708-PC |
|---|---|

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I.
Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 1901 Avenue of the Stars, 12th Floor, Los Angeles, CA  90067.

The foregoing document described as **[PROPOSED] ORDER (i) CONFIRMING FIRST AMENDED PLAN FOR ADJUSTMENT OF DEBTS OF VALLEY HEALTH SYSTEM DATED DECEMBER 17, 2009, AS MODIFIED FEBRUARY 19, 2010, AND (ii) GRANTING JUDGMENT FOR VALLEY HEALTH SYSTEM IN EACH CHALLENGE ACTION** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☐  Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:** On **April 15, 2010**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

See following page.

☒  Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____ ___ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 04/15/2010 | Claudia C. Lee | /s/  Claudia C. Lee |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                   16                                   **F 9013-3.1**

537207v2

| In re:  VALLEY HEALTH SYSTEM, | | CHAPTER 9 |
|---|---|---|
| | Debtor(s). | CASE NUMBER 6:07-bk-18293-PC |
| | | ADV. PROC. NO. 6:09-AP-01708-PC |

## I.  SERVICE BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")

> None.

## II.  SERVICE BY U.S. MAIL

The Honorable Peter Carroll
USBC - Central District of California
3420 Twelfth Street
Courtroom No. 304
Riverside, CA  92501-3819

Valley Health System
1117 East Devonshire Avenue
Hemet, CA  92543

Attys for the Committee of Unsecured Creditors
Sam Maizel, Esq.
Jeff Kandel, Esq.
Pachulski, Stang Ziel & Jones LLP
10100 Santa Monica Blvd., Suite 100
Los Angeles, CA  90067

Internal Revenue Service
Insolvency Group 1
290 North "D" Street
San Bernardino, CA  92401

Securities Exchange Commission
5670 Wilshire Blvd., 11th Floor
Los Angeles, CA  90036

Employment Development Dpt.
Bankruptcy Group MIC 92E
P.O. Box 826880
Sacramento, CA  94280-0001

Franchise Tax Board
Attn:  Bankruptcy
P.O. Box 2952
Sacramento, CA  95812-2952

Trustee for Bondholders
US Bank/ FAX:  651/495-3775
Attn:  Mike Vraa, Trust Officer
60 Livingston Ave.
Mail Code EP-MN-WE3T
St. Paul, MN  55107-2292

United States Trustee
Office of the U.S. Trustee
3685 Main Street, Suite 300
Riverside, CA  92501

Atty for Both: Menifee Valley Community Medical Group & Hemet Community Medical Group
Joseph M. Galosic, Esq.
26632 Towne Center Dr. #300
Foothill Ranch, CA  92610-2808

Atty/ DePuy Orthopedics, Inc.
David W. Dykhouse
Patterson Bleknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY  10036-6710

Atty: Anaheim Memorial Hospital
Paul R. Glassman
Greenberg Traurig, LLP
2450 Colorado Avenue, Ste. 400E
Santa Monica, CA  90404

DaVita
Michael S Winsten, Esq.
Winsten Law Group
27201 Puerta Real, Ste. 465
Mission Viejo, CA  926917

Renal Treatment Center- California, Inc.
Michael S Winsten, Esq.
Winsten Law Group
27201 Puerta Real, Ste. 465
Mission Viejo, CA  92691

Primeshares
60 Madison Ave., 2nd Floor
New York, NY  10011-1600

Atty/Sodexho USA aka Sodexho Marriott Servs.
Poyner & Spruill LLP
Attn:  Judy D. Thompson
301 South College St., #2300
Charlotte, NC  28202

Atty/Blue Cross of CA
Creim Macias Koenig & Frey LLP
Attn:  Stuart I. Koenig
633 W. Fifth St., 51st Fl.
Los Angeles, CA  90071

Atty/Menifee Valley Community Med. Grp.
William E. Thomas, Esq.
6800 Indiana Avenue, #130
Riverside, CA  92506

Atty/KM Strategic Mgmt.
Davis & Wojcik
Robert A. Davis, Jr.
1105 East Florida Ave.
Hemet, CA  92543

Atty/Southland Endoscopy
Davis & Wojcik
Attn:  Joseph M. Wojcik
1105 East Florida Ave.
Hemet, CA  92543

Atty/Hemet Community Med. Group
Shulman Hodges & Bastian LLP
Attn:  L.M. Shulman/M. Bradshaw
26632 Towne Center Dr., #300
Foothill Ranch, CA  92610

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| In re:  VALLEY HEALTH SYSTEM,<br><br><div align="right">Debtor(s).</div> | CHAPTER 9<br>CASE NUMBER 6:07-bk-18293-PC<br>ADV. PROC. NO. 6:09-AP-01708-PC |
|---|---|

IBM Credit LLC
Special Handling Group
Attn:  Pamela Wilcox
4111 Northside Parkway
Atlanta, GA  30327

Atty/Health Net
Pillsbury Winthrop Shaw Pittman LLP
Attn:  Nadine J. Youssef
725 S. Figueroa St., #2800
Los Angeles, CA  90017

Health Net
Attn:  Patrice Halloway
7755 Center Ave., 8th Fl.
Huntington Beach, CA  92647

Atty/ Siemens Financial Services Inc.
Uzzi O Raanan
Danning Gill et al LLP
2029 Century Park E, 3rd Fl.
Los Angeles, CA  90067-2904

Attys/ Siemens Financial Services Inc.
Arlene N. Gelman & Stephanie Hor-Chen
Vedder Price P.C.
222 North LaSalle Street
Chicago, IL  60601

Atty/ Valley Medical Staffing Inc.
Michael B. Conley
3685 Mount Diablo Blvd,. #351
Lafayette, CA  94549

Owens & Minor, Inc.
Larry R. Whitley CBF
455 South Brea Canyon Road
City of Industry, CA  91789-3058

Meline Industries, Inc.
Attn: Anne Kisha
One Medline Place
Mundelein, IL  60060

Atty/ Owens & Minor, Inc
Buchalter Nemer P.C.
Benjamin S. Seigel, Esq.
1000 Wilshire Blvd., Ste. 1500
Los Angeles, CA  90017

Atty/ HRC Manor Care Inc.
Fredrick Borges, Glen Stebens, Dale Pomerantz
Beam, Brobeck, West, Borges & Rosa LLP
1301 Dove Street, #700
Newport Beach, CA  92660-2412

Agent for GE Money Bank
Recovery Management Systems Corp.
Attn: Ramesh Singh
25 SE 2nd Ave., Ste 1120
Miami, FL  33131-1605

Atty/ Inland Empire Health Plan
Tin Kin Lee Esq.
Law Offices of Tin Kin Lee
55 S. Lake Ave., Ste 705
Pasadena, CA  91101

Atty/ US Bank National Association
Jean B LeBlanc
McDermott Will & Emery LLP
2049 Century Park East, Ste. 3800
Los Angeles, CA  90067

Atty/ US Bank National Assn. as Trustee
William P. Smith, Nathan F. Coco, Miles W.
Hughes, & Jason J. DeJonker
McDermott, Will Emery
227 West Monroe St., Ste. 5400
Chicago, IL  60606

U.S. Bank National Association
Corporate Trust Services
Attn: Keith Marshall
633 West Fifth St., 24th Floor
Los Angeles, CA  90071

Universal Health Services
Robert E. Darby
Fulbright & Jaworski, LLP
555 South Flower St., 41st Floor
Los Angeles, CA  90071

Atty/ Cardinal Health 110, Inc. et al
Greenberg Traurig LLP
Attn: S.L. Heyen/ J.K. Terry
1000 Louisiana, #1800
Houston, TX  77002

Atty/ Scan Health
Karl E. Block, Esq.
Loeb & Loeb LLP
10100 Santa Monica Blvd., Ste. 2200
Los Angeles, CA  90067

Attorney for Beckman Coulter
Jillan L. Nolan, Esq.
Bernstein Law Firm P
Suite 2200 Gulf Tower
Pittsburgh, PA 15219

Attorney for Beckman Coulter
Jennifer Witherell Crastz, Esq.
Hemar, Rousso & Heald, LLP
15910 Ventura Blvd., 12ᵗʰ Flr.
Encino, CA  91436

Atty/Prime Healthcare Management,
Inc. Albert L. Lewis, Jr./John Lloyd/
Edward J. Fazekas /Daniel P. Brunton,
Esq./Lauren B. Ross, Esq.
Latham & Watkins LLP
600 West Broadway, Suite 1800
San Diego, CA 92101-3375

Counsel for Save the Hospitals, Inc.; Prime Healthcare
Services, Inc./ A. Lewis Jr./ J. Lloyd/ E. Fazekas
Marc Rappel/Heather Fowler/Nathan Smith
Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA 90071

Law Offices of Yolanda Flores-Burt
Yolanda Flores-Burt
780 North Euclid Street, Suite 201
Anaheim, CA 92801

Law Offices of Shawna S. Nazari
15303 Ventura Blvd., 9th Floor
Sherman Oaks, CA 91403

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| In re:  VALLEY HEALTH SYSTEM, | | CHAPTER 9 |
|---|---|---|
| | Debtor(s). | CASE NUMBER 6:07-bk-18293-PC |
| | | ADV. PROC. NO. 6:09-AP-01708-PC |

Atty/ US Bank National Association
Jason D. Strabo
McDermott Will & Emery LLP
2049 Century Park East, 38th Floor
Los Angeles, CA  90067

## II.  <u>SERVICE BY OVERNIGHT COURIER</u>

Hon. Peter H. Carroll
U.S. Bankruptcy Court
Central District of California-Riverside Division
3420 Twelfth Street, Room 385
Riverside, CA 92501-3819

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9013-3.1**

537207v2

| In re:  VALLEY HEALTH SYSTEM, | | CHAPTER 9 |
|---|---|---|
| | | CASE NUMBER 6:07-bk-18293-PC |
| | Debtor(s). | ADV. PROC. NO. 6:09-AP-01708-PC |

### NOTE TO USERS OF THIS FORM:

**1)**  Attach this form to the last page of a proposed Order or Judgment.  Do not file as a separate document.
**2)**  The title of the judgment or order and all service information must be filled in by the party lodging the order.
**3)  Category I.** below:  The United States trustee and case trustee (if any) will always be in this category.
**4)  Category II.** below:  List ONLY addresses for debtor (and attorney), movant (or attorney) and person/entity (or attorney) who filed an opposition to the requested relief.  <u>DO NOT</u> list an address if person/entity is listed in category I.

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled **ORDER (i) CONFIRMING FIRST AMENDED PLAN FOR ADJUSTMENT OF DEBTS OF VALLEY HEALTH SYSTEM DATED DECEMBER 17, 2009, AS MODIFIED FEBRUARY 19, 2010, AND (ii) GRANTING JUDGMENT FOR VALLEY HEALTH SYSTEM IN EACH CHALLENGE ACTION** was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I.  SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**  Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of **April 15, 2010**, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

     See following page.

          ☒  Service information continued on attached page

**II.  SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by U.S. Mail to the following person(s) and/or entity(ies) at the address(es) indicated below:

     See following page.

          ☒  Service information continued on attached page

**III.  TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s) and/or email address(es) indicated below:

     See following page.

          ☒  Service information continued on attached page

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9021-1.1**

537207v2

| In re:  VALLEY HEALTH SYSTEM, | | CHAPTER 9 |
|---|---|---|
| | Debtor(s). | CASE NUMBER 6:07-bk-18293-PC<br>ADV. PROC. NO. 6:09-AP-01708-PC |

## I.  SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")

Andrew K Alper on behalf of Creditor Key Equipment Finance Inc.
aalper@frandzel.com, efiling@frandzel.com;ekidder@frandzel.com

Terri H Andersen on behalf of U.S. Trustee United States Trustee (RS)
terri.andersen@usdoj.gov

Kathryn M Barnes on behalf of Creditor c/o Kathryn Barnes Valley Medical Staffing, Inc.
kbarnes@thelen.com

Mark Bradshaw on behalf of Creditor Hemet Community Medical Group Inc
mbradshaw@shbllp.com

Michael E Busch on behalf of Creditor BETA Healthcare Group
michael.busch@fnf.com

Traci L Cotton on behalf of Creditor UT System obo UT MD Anderson Cancer Center
tcotton@utsystem.edu

Jennifer Witherell Crastz on behalf of Creditor Beckman Coulter, Inc.
jcrastz@hemar-rousso.com

Melissa Davis on behalf of Creditor KM Strategic Management LLC
mdavis@shbllp.com

Timothy J Farris on behalf of U.S. Trustee United States Trustee (RS)
timothy.j.farris@usdoj.gov

H Alexander Fisch on behalf of Counter-Defendant Valley Health System
afisch@stutman.com

Yolanda Flores-Burt on behalf of Interested Party NEF
yflores1@sbcglobal.net

Heather Fowler on behalf of Interested Party Prime Healthcare Management, Inc.
heather.fowler@lw.com, colleen.rico@lw.com

Roger F Friedman on behalf of Creditor Kali Chaudhuri
rfriedman@rutan.com

Fred Gaines on behalf of Debtor Valley Health System
fgaines@gaineslaw.com

Peter J Gurfein on behalf of Interested Party Physicians for Healthy Hospitals, Inc.
pgurfein@akingump.com

Mark S Horoupian on behalf of Interested Party Prime Healthcare Management LLC
mhoroupian@sulmeyerlaw.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*    21    **F 9021-1.1**

537207v2

| In re:  VALLEY HEALTH SYSTEM,<br><br>                                                     Debtor(s). | CHAPTER 9<br>CASE NUMBER 6:07-bk-18293-PC<br>ADV. PROC. NO. 6:09-AP-01708-PC |
|---|---|

Allan H Ickowitz on behalf of Creditor Kaiser Foundation Hospitals
aickowitz@nossaman.com

Jeffrey L Kandel on behalf of Creditor Committee Official Committee of Creditors Holding
Unsecured Claims
jkandel@pszjlaw.com

Sheri Kanesaka on behalf of Creditor Catholic Healthcare West
kanesaka@gmail.com

Q Scott Kaye on behalf of Creditor U.S. Bank, National Association, as trustee
qskaye@mwe.com

John W Kim on behalf of Creditor Kaiser Foundation Hospitals
jkim@nossaman.com

Bradford Klein on behalf of Creditor Halo Unlimited, Inc dba Infant Hearing Screening
Specialists
brad.e.klein@gmail.com

Robert A Klyman on behalf of Interested Party Prime Healthcare Services, Inc.
robert.klyman@lw.com

Stuart I Koenig on behalf of Creditor Blue Cross Of California
Skoenig@cmkllp.com

Jean LeBlanc on behalf of Creditor U.S. Bank, National Association, as trustee
jleblanc@mwe.com

Paul J Leeds on behalf of Creditor Healthcare Management Solutions, Inc.
reisingc@higgslaw.com

Dana N Levitt on behalf of Creditor U.S. Bank, National Association, as trustee
dlevitt@mwe.com, WSmith@mwe.com

Michael S Lurey on behalf of Creditor Catholic Healthcare West
michael.lurey@lw.com, colleen.rico@lw.com

Samuel R Maizel on behalf of Creditor Committee Official Committee of Creditors Holding
Unsecured Claims
smaizel@pszjlaw.com, smaizel@pszjlaw.com

David J Mccarty on behalf of Counter-Claimant Aetna Health Management LLC
dmccarty@sheppardmullin.com, pibsen@sheppardmullin.com

Neeta Menon on behalf of Debtor Valley Health System
nmenon@stutman.com

Thomas J Polis on behalf of Creditor DaVita Inc
tom@polis-law.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

537207v2                                                   22

**F 9021-1.1**

| In re:  VALLEY HEALTH SYSTEM,<br><br>                                                    Debtor(s). | CHAPTER 9<br>CASE NUMBER 6:07-bk-18293-PC<br>ADV. PROC. NO. 6:09-AP-01708-PC |
|---|---|

Uzzi O Raanan on behalf of Creditor Siemens Financial Services, Inc.
uor@dgdk.com

Christian L Raisner on behalf of Creditor Local 121 RN
bankruptcycourtnotices@unioncounsel.net, craisner@unioncounsel.net

Christopher O Rivas on behalf of Creditor General Electric Capital Corporation
crivas@reedsmith.com

Stephanie M Seidl on behalf of Counter-Claimant Aetna Health Management LLC
sseidl@sheppardmullin.com

Leonard M Shulman on behalf of Creditor Hemet Community Medical Group Inc
lshulman@shbllp.com

Gerald N Sims on behalf of Creditor BETA Healthcare Group
jerrys@psdslaw.com

Nathan M Smith on behalf of Interested Party Save The Hospitals, Inc.
nathan.smith@lw.com

Adam M Starr on behalf of Creditor Anaheim Memorial Hospital
starra@gtlaw.com

Jason D Strabo on behalf of Creditor U.S. Bank, National Association, as trustee
jstrabo@venable.com, losangelestrialdocket@mwe.com

Derrick Talerico on behalf of Creditor SCAN Health Plan
dtalerico@loeb.com, kpresson@loeb.com;ljurich@loeb.com

Wayne R Terry on behalf of Creditor BANK OF THE WEST
wterry@hemar-rousso.com

United States Trustee (RS)
ustpregion16.rs.ecf@usdoj.gov

Andrea M Valdez on behalf of Creditor Universal Health Services
avaldez@fulbright.com

David M Wiseblood on behalf of Creditor
c/o Christian L. SEIU-United Healthcare Workers West
dwiseblood@seyfarth.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                    **F 9021-1.1**

537207v2                                           23

| In re:  VALLEY HEALTH SYSTEM,<br><br>Debtor(s). | CHAPTER 9<br>CASE NUMBER 6:07-bk-18293-PC<br>ADV. PROC. NO. 6:09-AP-01708-PC |
|---|---|

## II.  SERVICE BY THE COURT/BNC

**Attorneys for Debtor**
H. Alexander Fisch, Esq.
Stutman, Treister & Glatt
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA  90067

**Debtor**
Valley Health System
1117 East Devonshire Avenue
Hemet, CA  92543

**Attorney for Beckman Coulter**
Jennifer Witherell Crastz, Esq.
Hemar, Rousso & Heald, LLP
15910  Ventura Boulevard, 12th Floor
Encino, CA  91436

**Attorney for Beckman Coulter**
Jillian L. Nolan, Esq.
Bernstein Law Firm, P.C.
Suite 2200 Gulf Tower
Pittsburgh, PA  15219

## III.  TO BE SERVED BY THE DEBTOR BY U.S. MAIL

Attys for the Committee of Unsecured
Creditors
Sam Maizel, Esq.
Jeff Kandel, Esq.
Pachulski, Stang Ziel & Jones LLP
10100 Santa Monica Blvd., Suite 100
Los Angeles, CA  90067

Internal Revenue Service
Insolvency Group 1
290 North "D" Street
San Bernardino, CA  92401

Securities Exchange Commission
5670 Wilshire Blvd., 11th Floor
Los Angeles, CA  90036

Employment Development Dpt.
Bankruptcy Group MIC 92E
P.O. Box 826880
Sacramento, CA  94280-0001

Franchise Tax Board
Attn: Bankruptcy
P.O. Box 2952
Sacramento, CA  95812-2952

Trustee for Bondholders
US Bank/ FAX:  651/495-3775
Attn:  Mike Vraa, Trust Officer
60 Livingston Ave.
Mail Code EP-MN-WE3T
St. Paul, MN  55107-2292

United States Trustee
Office of the U.S. Trustee
3685 Main Street, Suite 300
Riverside, CA  92501

Atty for Both: Menifee Valley Community
Medical Group & Hemet Community Medical
Group
Joseph M. Galosic, Esq.
26632 Towne Center Dr. #300
Foothill Ranch, CA  92610-2808

Atty/ DePuy Orthopedics, Inc.
David W. Dykhouse
Patterson Bleknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY  10036-6710

Atty: Anaheim Memorial Hospital
Paul R. Glassman
Greenberg Traurig, LLP
2450 Colorado Avenue, Ste. 400E
Santa Monica, CA  90404

DaVita
Michael S Winsten, Esq.
Winsten Law Group
27201 Puerta Real, Ste. 465
Mission Viejo, CA  926917

Renal Treatment Center- California, Inc.
Michael S Winsten, Esq.
Winsten Law Group
27201 Puerta Real, Ste. 465
Mission Viejo, CA  92691

Primeshares
60 Madison Ave., 2nd Floor
New York, NY  10011-1600

Atty/Sodexho USA aka Sodexho Marriott
Servs.
Poyner & Spruill LLP
Attn: Judy D. Thompson
301 South College St., #2300
Charlotte, NC  28202

Atty/Blue Cross of CA
Creim Macias Koenig & Frey LLP
Attn:  Stuart I. Koenig
633 W. Fifth St., 51st Fl.
Los Angeles, CA  90071

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                         **F 9021-1.1**

| In re: VALLEY HEALTH SYSTEM,<br><br>Debtor(s). | CHAPTER 9<br>CASE NUMBER 6:07-bk-18293-PC<br>ADV. PROC. NO. 6:09-AP-01708-PC |
|---|---|

Atty/Menifee Valley Community Med. Grp.
William E. Thomas, Esq.
6800 Indiana Avenue, #130
Riverside, CA 92506

Atty/KM Strategic Mgmt.
Davis & Wojcik
Robert A. Davis, Jr.
1105 East Florida Ave.
Hemet, CA 92543

Atty/Southland Endoscopy
Davis & Wojcik
Attn: Joseph M. Wojcik
1105 East Florida Ave.
Hemet, CA 92543

Atty/Hemet Community Med. Group
Shulman Hodges & Bastian LLP
Attn: L.M. Shulman/M. Bradshaw
26632 Towne Center Dr., #300
Foothill Ranch, CA 92610

IBM Credit LLC
Special Handling Group
Attn: Pamela Wilcox
4111 Northside Parkway
Atlanta, GA 30327

Atty/Health Net
Pillsbury Winthrop Shaw Pittman LLP
Attn: Nadine J. Youssef
725 S. Figueroa St., #2800
Los Angeles, CA 90017

Health Net
Attn: Patrice Halloway
7755 Center Ave., 8th Fl.
Huntington Beach, CA 92647

Atty/ Siemens Financial Services Inc.
Uzzi O Raanan
Danning Gill et al LLP
2029 Century Park E, 3rd Fl.
Los Angeles, CA 90067-2904

Attys/ Siemens Financial Services Inc.
Arlene N. Gelman & Stephanie Hor-Chen
Vedder Price P.C.
222 North LaSalle Street
Chicago, IL 60601

Atty/ Valley Medical Staffing Inc.
Michael B. Conley
3685 Mount Diablo Blvd,. #351
Lafayette, CA 94549

Owens & Minor, Inc.
Larry R. Whitley CBF
455 South Brea Canyon Road
City of Industry, CA 91789-3058

Meline Industries, Inc.
Attn: Anne Kisha
One Medline Place
Mundelein, IL 60060

Atty/ Owens & Minor, Inc
Buchalter Nemer P.C.
Benjamin S. Seigel, Esq.
1000 Wilshire Blvd., Ste. 1500
Los Angeles, CA 90017

Atty/ HRC Manor Care Inc.
Fredrick Borges, Glen Stebens, Dale Pomerantz
Beam, Brobeck, West, Borges & Rosa LLP
1301 Dove Street, #700
Newport Beach, CA 92660-2412

Agent for GE Money Bank
Recovery Management Systems Corp.
Attn: Ramesh Singh
25 SE 2nd Ave., Ste 1120
Miami, FL 33131-1605

Atty/ Inland Empire Health Plan
Tin Kin Lee Esq.
Law Offices of Tin Kin Lee
55 S. Lake Ave., Ste 705
Pasadena, CA 91101

Atty/ US Bank National Association
Jean B LeBlanc
McDermott Will & Emery LLP
2049 Century Park East, Ste. 3800
Los Angeles, CA 90067

Atty/ US Bank National Assn. As Trustee
William P. Smith, Nathan F. Coco, Miles W. Hughes, & Jason J. DeJonker
McDermott, Will Emery
227 West Monroe St., Ste. 5400
Chicago, IL 60606

U.S. Bank National Association Corporate Trust Services
Attn: Keith Marshall
633 West Fifth St., 24th Floor
Los Angeles, CA 90071

Universal Health Services
Robert E. Darby
Fulbright & Jaworski, LLP
555 South Flower St., 41st Floor
Los Angeles, CA 90071

Atty/ Cardinal Health 110, Inc. et al
Greenberg Traurig LLP
Attn: S.L. Heyen/ J.K. Terry
1000 Louisiana, #1800
Houston, TX 77002

Atty/ Scan Health
Karl E. Block, Esq.
Loeb & Loeb LLP
10100 Santa Monica Blvd., Ste. 2200
Los Angeles, CA 90067

Atty/Prime Healthcare Management, Inc./
Albert L. Lewis, Jr./John Lloyd/ Edward J. Fazekas
Daniel P. Brunton, Esq./Lauren B. Ross, Esq.
Latham & Watkins LLP
600 West Broadway, Suite 1800
San Diego, CA 92101-3375

Counsel for Save the Hospitals, Inc.; Prime Healthcare Services, Inc./ A. Lewis Jr./ J. Lloyd/ E. Fazekas
Marc Rappel/Heather Fowler/Nathan Smith
Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA 90071

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

25

**F 9021-1.1**

537207v2

| In re:  VALLEY HEALTH SYSTEM, | | CHAPTER 9 |
| | | CASE NUMBER 6:07-bk-18293-PC |
| | Debtor(s). | ADV. PROC. NO. 6:09-AP-01708-PC |

Law Offices of Yolanda Flores-Burt
Yolanda Flores-Burt
780 North Euclid Street, Suite 201
Anaheim, CA 92801

Law Offices of Shawna S. Nazari
15303 Ventura Blvd., 9th Floor
Sherman Oaks, CA 91403

Atty/ US Bank National Association
Jason D. Strabo
McDermott Will & Emery LLP
2049 Century Park East, 38th Floor
Los Angeles, CA  90067

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# Exhibit 2

FILED

APR − 8 2010

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:_____ Deputy Clerk



**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**RIVERSIDE DIVISION**

| | |
|---|---|
| In re: | Case No. 6:07-bk-18293-PC |
| VALLEY HEALTH SYSTEM, a California Local Health Care District, | Chapter 9 |
| Debtor. | Adversary No. 6:09-ap-01708-PC |
| PRIME HEALTHCARE MANAGEMENT, INC., a California corporation, et al., | **MEMORANDUM DECISION RE: CONFIRMATION OF FIRST AMENDED PLAN OF ADJUSTMENT OF DEBTS OF VALLEY HEALTH SYSTEM DATED DECEMBER 17, 2009, AS MODIFIED ON FEBRUARY 19, 2010, AND ADJUDICATION OF THE CHALLENGE ACTIONS** |
| Plaintiffs, | |
| v. | |
| VALLEY HEALTH SYSTEM, a California Local Health Care District, et al., | Date:  February 22, 2010<br>Time:  10:30 a.m.<br>Place:  United States Bankruptcy Court<br>Courtroom # 304 |
| Defendants. | 3420 Twelfth Street<br>Riverside, CA 92501 |

Valley Health System, a California Local Health Care District ("VHS") seeks

confirmation of its First Amended Plan for the Adjustment of Debts of Valley Health System

Dated December 17, 2009, as modified on February 19, 2010 (the "Modified First Amended

Plan") pursuant to § 943(b) of the Bankruptcy Code,[1] dismissal of the complaint in the above

referenced adversary proceeding, and adjudication of other causes of action alleged by Save the

Hospitals, Inc.,[2] Prime Healthcare Services, Inc.,[3] Prime Healthcare Management, Inc.,[4] Albert L.

_____

[1] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 after its amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 (2005).  "Rule" references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable certain Federal Rules of Civil Procedure ("F.R.Civ.P.").  "AR" references are to the 1,822-page administrative record lodged by VHS with the court on February 1, 2010.

[2] Save The Hospitals, Inc. is a California corporation organized on October 15, 2009.  The corporation's principal place of business is Ontario, California.  Save The Hospitals, Inc. does

28

1  Lewis, Jr. ("Lewis"), John Lloyd ("Lloyd"), and Edward J. Fazekas ("Fazekas")[5] that arise under

2  state law and impact the feasibility of VHS's Modified First Amended Plan.  At the hearing,

3  Gary E. Klausner, Daniel K. Spradlin, and M. Lois Bobak appeared for VHS; R.D. Kirwan and

4  Carlyle W. Hall, Jr. appeared for Physicians for Healthy Hospitals, Inc. ("PHH");[6] Marc W.

5  Rappel, Robert A. Klyman, Nathan M. Smith, and Daniel P. Brunton appeared for Save the

6  Hospitals, Inc., Prime Healthcare Services, Inc. and Prime Healthcare Management, Inc.

7  (collectively, "Prime"), Lewis, Lloyd, & Fazekas;[7] Samuel R. Maizel appeared for the Official

8  Committee of Unsecured Creditors (the "Committee");[8] Peter J. Mort appeared for Kali P.

9

10  not have any public members.  It is not a creditor in VHS's bankruptcy case nor is it a resident or
taxpayer in the VHS district.

11

12  [2] Prime Healthcare Services, Inc. is a Delaware corporation, qualified to do business in
California.  Prime Healthcare Services, Inc. is owned by Prem Reddy, M.D. ("Reddy") (10%

13  interest) and the Prem Reddy Family Foundation (90%).  Reddy, in turn, is the sole director and
member of the Prem Reddy Family Foundation, which has no employees.  Prime Healthcare

14  Services, Inc., by and through its affiliates and subsidiaries, owns and operates 13 acute care
hospitals throughout California.  None of the hospitals are located within the geographic borders

15  of the VHS district, nor is the corporation a resident or taxpayer in the VHS district.

16  [3] Prime Healthcare Management, Inc. is a California corporation conducting business in
California.  Reddy owns 100% of Prime Healthcare Management, Inc., which provides

17  management services to Prime Healthcare Services, Inc.  Prime Healthcare Management, Inc. is

18  not a creditor in VHS's bankruptcy case nor is it a resident or taxpayer in the VHS district.

19  [5] Lewis, Lloyd, and Fazekas are citizens of California and residents of Riverside County.  Lewis,
Lloyd, and Fazekas each reside in communities within the geographic boundaries served by the

20  VHS district.  Lewis, Lloyd and Fazekas are not creditors of VHS.

21  [6] PHH is a Delaware corporation organized on June 18, 2009.  PHH is qualified to do business

22  in California.  The directors and officers of PHH are: Sreenivasa Nakka, M.D., President and
Director; Ratan Tiwari, M.D., Vice President and Director; Bhoodev Tiwari, M.D., Vice

23  President; Girdhari Purohit, M.D., Vice President; and Anil Rastogi, M.D., Secretary/CFO.

24  [7] Save the Hospitals, Inc., Prime, Lewis, Lloyd, and Fazekas are, at times, collectively referred to

25  as "the petitioners."

26  [8] The Committee appointed on March 26, 2008, consists of (a) SEIU, United Healthcare
Workers - West ("SEIU"); (b) Universal Health Services of Rancho Springs, Inc.; (c) LHIO, LLC

27

- 2 -

1   Chaudhuri, M.D. ("Chaudhuri"); Nathan F. Coco appeared for U.S. Bank, as Indenture Trustee

2   for the holders of the Valley Health System Certificates of Participation (1993 Refunding

3   Project) and the Valley Heath System District Revenue Bonds (Refunding and Improvements

4   Project) 1996 Series A ("U.S. Bank"); and Jay N. Hartz and Robert A. Davis, Jr. appeared for

5   Hemet Community Medical Group, Inc. ("HCMG").  The court, having considered VHS's

6   Modified First Amended Plan, the petitioners' objections thereto,[9] the petitioners' claims against

7   VHS under state law,[10] the evidentiary record, and arguments of counsel, makes the following

8   findings of fact and conclusions of law[11] pursuant to F.R.Civ.P. 52(a)(1), as incorporated into

9   FRBP 7052 and applied to contested matters by FRBP 9014(c).

10                              I. STATEMENT OF FACTS

11  A.      VHS – The District

12          VHS is a public agency formed in 1946 under the State of California Local Health Care

13  District Law ("LHCDL").[12]  VHS serves a district that encompasses 882 square miles in the San

14  Jacinto Valley in Riverside County, California, with a population within the district of nearly

15  360,000.  At its inception, VHS operated only an 18-bed hospital purchased from the city of

16

17  ("LHIO"); (d) Sodexo USA, Inc.; (e) HCR Manor Care, Inc.; (f) Hemet Healthcare Surgery, Inc.;
18  (g) Anaheim Memorial Medical Center; (h) HCMG; and (i) Southland Endoscopy Center.

19  [9] Save the Hospitals, Inc., Prime Healthcare Services, Inc., Lewis, Lloyd, and Fazekas object to
    confirmation of the VHS's Modified First Amended Plan.
20

21  [10] Prime Healthcare Management, Inc., Lewis, Lloyd, and Fazekas allege certain claims against
    VHS and PHH under state law.  The parties have stipulated to the jurisdiction of this court to
22  decide such claims in conjunction with confirmation of VHS's Modified First Amended Plan.
    See Stipulation, infra note 39.
23

24  [11] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby
    adopted as such.  To the extent that any conclusion of law is construed to be a finding of fact, it is
25  hereby adopted as such.

26  [12] Cal. Health & Safety Code § 32000, et seq.  Residents within VHS's territorial boundaries do
    not pay any taxes to VHS.
27

- 3 -

1   Hemet, California. On the petition date, VHS owned and operated the Hemet Valley HealthCare

2   Center (the "Skilled Nursing Facility"), a 113-bed skilled nursing facility in Hemet, California,

3   together with three acute hospitals – Hemet Valley Medical Center ("Hemet Hospital"), a 340-

4   bed facility in Hemet, California; Menifee Valley Medical Center ("Menifee Hospital"), an 84-

5   bed facility in Sun City, California; and Moreno Valley Community Hospital ("Moreno Valley

6   Hospital"), a 95-bed facility in Moreno Valley, California. The Moreno Valley Hospital and its

7   primary service area were situated outside VHS's boundaries. Each of the hospitals provided

8   comprehensive health services and 24-hour emergency medical services.[13]

9          The cost of VHS's comprehensive health care system was financed, in large part, by two

10   series of bonds issued by VHS (collectively, the "Bonds"): (1) the $61,650,000 Valley Health

11   System Certificates of Participation (1993 Refunding Project); and (2) the $47,335,000 Valley

12   Health System District Revenue Bonds (Refunding and Improvements Project) 1996 Series A.

13   U.S. Bank, VHS's largest creditor, was owed approximately $84 million in principal and interest

14   on the Bonds as of the date of the petition.

15   B.     Events Leading to Bankruptcy

16          Before filing its petition, VHS communicated with its major creditors, including U.S.

17   Bank, and the two labor unions that had been certified as the bargaining representatives for

18   certain VHS employees – SEIU and the California Nurses Association ("CNA"). VHS advised

19

20   _____

21   [13] Services offered at the Hemet Hospital include the Emory J. Cripe Radiation Therapy
     Treatment Center for cancer treatment; cardiac care services; inpatient and outpatient surgical
22   services; behavioral health services; speech, physical, and occupational therapy services; and CT
     imaging and magnetic resonance imaging. The Menifee Hospital provided inpatient and
23   outpatient X-ray services, including mammography, CT scan, and MRI services; a critical care
     unit; inpatient and outpatient surgery; inpatient and outpatient laboratory services; respiratory
24   services; physical therapy services; a joint replacement center; and cataract and retina specialty
     surgeries. The Moreno Valley Hospital offered inpatient medical, surgical and pediatric services;
25   critical care, post-critical care, and telemetry units; maternity and women's services; obstetrics;
     inpatient and outpatient surgery; the Spine Center of Excellence program; cardiopulmonary
26   services; and physical rehabilitation services.

27
                                                -4-

1   its creditors and the unions of its intention to seek relief under chapter 9, and assured them that it

2   would negotiate a plan of adjustment consistent with the requirements of chapter 9 once it

3   developed a viable business plan. VHS's Board of Directors approved the chapter 9 filing only

4   after a public meeting, noticed in accordance with state law, at which attendees were advised of

5   VHS's intention to file a chapter 9 petition and given the opportunity to question the board of

6   directors and its professionals and to be heard on the issue. VHS's decision "was made only

7   after a careful review of all options and strategies and with the input and guidance of consultants

8   with expertise in healthcare restructuring, corporate counsel, bond counsel, and bankruptcy

9   counsel."[14]

10      VHS sought relief under chapter 9 only after exhausting its efforts to solve its financial

11  problems through an out-of court restructuring of debt or the sale of its assets. Two years earlier,

12  VHS had attempted to restructure its debt through Riverside County Measure I ("Measure I")

13  which contemplated the issuance of $485 million in general obligation bonds, secured by

14  property tax revenues, to retire VHS's special revenue bond debt, finance necessary capital

15  improvements, and provide VHS the time and capital required to return to profitability. Measure

16  I was rejected by the voters on September 16, 2005. VHS then attempted to improve its liquidity

17  through the sale of assets.

18      On August 8, 2007, VHS approved a sale of substantially all of its assets to Select

19  HealthCare Solutions ("Select"), subject to voter approval in accordance with California law.

20  Select and VHS further agreed that, in the event the sale was not approved by the voters, then

21  Select would have the opportunity to purchase the Moreno Valley Hospital from VHS for $47

22  million. Voters rejected Riverside County Measure G ("Measure G"), which sought approval of

23  the asset sale to Select, on November 6, 2007 – 37 days before VHS filed its chapter 9 petition.

24

25  _____

26  [14] VHS's Reply to Objection of U.S. Bank as Indenture Trustee and Limited Objection of SEIU-
    United Healthcare Workers – West and Local 121 RN to Chapter 9 Petition of Valley Health
    System, 3:1-3.

27

- 5 -

1  The Moreno Valley Hospital was generating monthly losses of between $300,000 to $500,000,
2  and Select had not pursued its opportunity to purchase the hospital from VHS prior to the petition
3  date.

4      VHS's method for generating revenue exacerbated its operating losses. VHS derived its
5  income from a complicated system of capitation and sub-capitation agreements. VHS was losing
6  money under its capitation contracts, as well as the associated capitation risk pools formed with
7  certain physician groups. The unpaid risk pool liability alone associated with these capitation
8  contracts exceeded $16 million on the petition date, and VHS had not reserved funds for the
9  payment of these liabilities.

10      QHR Consulting Services ("QHR"), a turnaround specialist, was retained by VHS on
11  October 15, 2007 to analyze VHS's operations and complex contractual relationships, stabilize
12  VHS's financial situation, and assist in formulating a business plan to return VHS to profitability.
13  QHR examined VHS's $250 million annual budget before undertaking the task of framing a
14  meaningful business plan. Based on its preliminary findings, QHR recommended operational
15  changes to increase VHS's revenues by approximately $12 million without materially increasing
16  expenses and to eliminate approximately $20 million in annual expenses with no degradation to
17  the quality of VHS's operations. QHR determined that the key to returning VHS to profitability,
18  however, hinged upon (1) negotiating fee for service agreements to replace its capitation
19  contracts; and (2) consummating a sale of the Moreno Valley Hospital.

20  C.    VHS's Chapter 9 Petition

21      On December 13, 2007, VHS filed a voluntary petition under chapter 9 in this case
22  disclosing approximately 5,000 creditors holding claims in excess of $100 million. On January
23  11, 2008, the court denied the United States trustee's motion seeking appointment of a patient
24  care ombudsman pursuant to § 333(a)(1).[15] On February 20, 2008, the court overruled the

25

26  _____

27  [15] In re Valley Health Sys., 381 B.R. 756, 765 (Bankr. C.D. Cal. 2008).

- 6 -

1  objections of U.S. Bank and SEIU to VHS's petition and denied U.S. Bank's motion to dismiss,

2  holding that VHS had established that it was eligible for relief under chapter 9 and "was unable

3  to negotiate with creditors prior to the filing of its chapter 9 petition . . . because negotiation was

4  impracticable within the meaning of § 109(c)(5)(C)."[16]

5  D.    Relevant Events During Bankruptcy

6       After the filing of the petition, VHS renegotiated its contracts with Blue Cross, Health

7  Net, PacifiCare (United Health Care), Secure Horizons (United Health Care), Inter Valley, Inland

8  Empire Health Plan, and SCAN resulting in an estimated $1.2 million per month reduction in

9  operating losses.  Extensive negotiations between VHS, Select and Kaiser Hospital Foundation

10  ("Kaiser") resulted in a court-approved sale of the Moreno Valley Hospital to Kaiser for

11  approximately $53 million on May 20, 2008, which, among other things, reduced VHS's debt to

12  Select by $10.4 million and VHS's liability to U.S. Bank on the Bonds by nearly $40 million.

13  VHS closed the Skilled Nursing Facility in December 2008,[17] sold its interest in Hemet Global

14  Services to HCMG for $3.4 million, and successfully renegotiated its labor agreements with

15  CNA and SEIU.

16       On May 21, 2009, VHS posted public notice under the Brown Act[18] that the VHS Board

17

18  _____

[16] In re Valley Health Sys., 383 B.R. 156, 165 (Bankr. C.D. Cal. 2008).

19

20  [17] VHS continues to operate a chemical dependency and post-treatment retreat center on grounds previously occupied by the Skilled Nursing Facility.

21  [18]  Under the Brown Act, the legislative body of a local agency, or its designee, must post an

22  agenda at least 72 hours before a regular meeting briefly describing each item of business to be transacted or discussed at the meeting. Cal. Gov't Code § 54954.2(a).  The Brown Act also

23  provides that a special meeting may be called at any time upon 24 hours notice specifying the time and place of the special meeting and the business to be transacted or discussed.  Cal. Gov't

24  Code § 64956.  Michael Sarrao, Vice President and General Counsel for Prime Healthcare

25  Services, Inc. ("Sarrao"), received email notification of each of the relevant VHS Board of Directors' meetings at issue in this case.  Prime does not raise any legal challenge regarding

26  whether the notice or agenda posted by VHS for each of these regular or special meetings of VHS's Board of Directors met the requirements of the Brown Act.

27

- 7 -

1 of Directors would meet on May 27, 2009, to consider VHS's most recent financial statements.

2 At the meeting on May 27, 2009, Melanie Van Winkle, Vice President of Finance, presented the

3 Board of Directors with VHS's financial statements for the ten month period ending April 30,

4 2009. The statements confirmed that, despite fundamental changes in VHS's operations, VHS

5 was continuing to operate at a substantial loss. In response thereto, the VHS Board of Directors

6 formed an Ad Hoc Subcommittee of three board members, Vinay M. Rao, Glen Holmes, and

7 Amelia Hippert, to oversee "all aspects of the development and implementation of a financial

8 restructuring plan for the District."[19]

9       On June 26, 2009, VHS posted public notice that its Board of Directors[20] would meet on

10 June 29, 2009, to consider VHS's most recent financial statements and operating plans. At the

11 meeting on June 29, 2009, Hippert announced that VHS would henceforth "pursue a dual track in

12 addressing [VHS's] severe financial problems," stating that VHS would both "honor [its]

13 commitment to developing and implementing fiscal controls to stem continued losses," and

14 "simultaneously explore the potential sale of [VHS's] assets."[21]

15      VHS sustained a net loss of approximately $7.5 million for the fiscal year ending June 30,

16 2009. Although an improvement over the $17.8 million loss for the prior fiscal year, VHS

17 projected that it would do no better than break even from operations for the fiscal year ending

18 June 30, 2010. Heeding concerns of the Committee and U.S. Bank that it could run out of cash

19 by spring of 2010, VHS weighed all strategic options and slowly shifted the focus of a proposed

20 plan of adjustment from a financial restructuring of the district to a sale or lease of its remaining

21 _____

22 [19] Joint Pre-Trial Order, 7:8-9.

23 [20] At all material times after June 24, 2009, the VHS Board of Directors consisted of the
following members: William Cherry, M.D. ("Cherry"), Chairman; Amelia Hippert ("Hippert"),
24 Vice Chairwoman; Robert O'Donnell ("O'Donnell"), Secretary; Vinay M. Rao ("Rao"),
Treasurer; Tom Wilson ("Wilson"), Director; Glen Holmes ("Holmes"), Director; and Madaleine
25 Dreier ("Dreier"), Director.

26 [21] AR00026.

27

- 8 -

1    two facilities – Hemet Hospital and Menifee Hospital.

2        On July 14, 2009, VHS posted public notice that its Board of Directors would meet on

3    July 15, 2009, to consider approval of an agreement with The Peira Group for consulting services

4    in connection with a potential sale of VHS's assets.  On July 15, 2009, the VHS Board of

5    Directors approved a consulting agreement with The Peira Group at a public meeting.

6    E.    VHS's Plan of Adjustment

7        1. Exclusive Negotiation Agreement

8        On July 24, 2009, PHH contacted VHS regarding its interest in purchasing substantially

9    all of VHS's assets.  To expedite the negotiations, PHH requested an exclusive right to negotiate

10   with VHS for a period of 90-days regarding a purchase of its assets and provided a draft

11   agreement (the "letter agreement") for VHS to consider at its next meeting.  That day, VHS

12   posted public notice that its Board of Directors would meet on July 27, 2009, to consider

13   approval of the letter agreement between VHS and PHH.

14       At the meeting on July 27, 2009, the VHS Board of Directors voted 5-2 to approve the

15   letter agreement between VHS and PHH with Cherry, Hippert, Dreier, Holmes, and Rao voting

16   for approval.  On July 30, 2009, VHS executed a letter agreement with PHH, effective on July

17   27, 2009, pursuant to which VHS agreed to negotiate exclusively with PHH for a period of 90

18   days for the sale of substantially all of its assets, including the Hemet Hospital and Menifee

19   Hospital.

20       On July 30, 2009, Universal Health Services ("Universal"), a publicly traded company,

21   sent Cherry a letter expressing its interest in purchasing substantially all of VHS's healthcare

22   facilities for approximately $25 million.  By letter dated August 13, 2009, Prime also advised

23   VHS of its interest in purchasing substantially all of VHS's assets, including the Hemet Hospital

24   and Menifee Hospital, for an unspecified amount.  On August 14, 2009, VHS responded that

25   VHS was subject to an exclusive negotiation agreement with PHH.

26

27

-9-

2. <u>Memorandum of Understanding and Term Sheet</u>

On September 15, 2009, VHS posted public notice that its Board of Directors would meet on September 16, 2009, to consider, among other things, a proposed Memorandum of Understanding and Term Sheet ("MOU/TS") between VHS and PHH concerning the sale of substantially all of VHS's assets to PHH for an estimated price of $156,000,000. On September 16, 2009, VHS's Board of Directors, at the conclusion of a public session, voted 6-1 to approve a non-binding MOU/TS providing for the sale of substantially all of VHS's assets to PHH, subject to voter approval. Cherry, Hippert, Dreier, Holmes, Rao, and Wilson voted to approve the MOU/TS and three resolutions calling for a special election. An initiative election to secure voter approval was scheduled for December 15, 2009. The MOU/TS further provided that, in the event the sale was not approved by voters, VHS would sell the Menifee Hospital to PHH but retain and continue to operate the Hemet Hospital (the "Alternate Sale"). VHS and PHH agreed to "negotiate, finalize and enter into a mutually acceptable form of an Asset Sale Agreement . . . , on terms generally consistent with the terms of [the MOU/TS], and to reasonably resolve any other issues not addressed [by the MOU/TS], by October 5th, 2009."[22]

3. <u>Fair Consideration Opinion</u>

On October 5, 2009, Valuation & Information Group ("V&IG")[23] presented the VHS Board of Directors with a document entitled "An Assessment and Comparison Between the Fair Market Value of Valley Health System and Related Assets and The Transaction Consideration

---

[22] AR01542.

[23] V&IG is a healthcare valuation and financial consulting business serving clients throughout the nation. V&IG is composed of licensed and experienced real estate appraisers, financial analysts, and healthcare industry professionals. V&IG had been retained by VHS to prepare an appraisal of (a) the Hemet Hospital; (b) the Menifee Hospital; (c) the three vacant parcels adjacent to the Menifee Hospital; (d) the Skilled Nursing Facility; (e) the Hemet Valley Medical Arts Building; and (f) five accessory buildings. VHS and Prime, which each engaged the professional services of V&IG on unrelated matters prior to the sale at issue in this case, stipulated that V&IG is a qualified appraiser for purposes of California Health & Safety Code § 32121(p).

- 10 -

By and Between PHH for Healthy Hospitals and Valley Health System" (the "Fair Consideration

Opinion"). In conjunction with the Fair Consideration Opinion, V&IG appraised the following

properties of VHS:

| Property | Value As of August 5, 2009 |
|---|---|
| Hemet Hospital | $27,830,000[24] |
| Menifee Hospital | 25,800,000[25] |
| Menifee – Adjacent Vacant Parcels | 6,830,000[26] |
| Skilled Nursing Facility | 4,500,000[27] |
| Hemet Valley Medical Arts Building | 8,700,000[28] |
| Five Accessory Buildings | 3,330,000[29] |

V&IG concluded in its Fair Consideration Opinion that, as of August 5, 2009, "[t]he Transaction

Consideration of $169.773 million (including approximately $55 million of disputed claims) by

and between PHH and VHS is equal to or greater than our estimate of the fair market value of the

VHS Assets to be transferred in the Transaction, and that such amount constitutes fair and

reasonable consideration to be received by VHS for the transferred assets as provided in Health

& Safety Code Section 32121(p)."[30]  With the Fair Consideration Opinion, the terms and

conditions of the MOU/TS were reduced to an Asset Sale Agreement ("ASA") between VHS and

PHH.

---

[24] AR00901. V&IG's appraisal of Hemet Hospital states a value of $27,330,000 as of August 5, 2009. V&IG increased this valuation by $500,000 in its Fair Consideration Opinion.

[25] AR00473.

[26] AR00474.

[27] AR01247. V&IG's appraisal of the Skilled Nursing Facility states a value of $4,550,000 as of August 5, 2009. V&IG reduced this valuation by $50,000 in its Fair Consideration Opinion.

[28] AR01093.

[29] AR00703.

[30] AR01602.

- 11 -

1        4. Asset Sale Agreement

2        On October 5, 2009, VHS posted public notice that its Board of Directors would meet on

3    October 6, 2009, to consider approval of the ASA between VHS and PHH.  On October 6, 2009,

4    the VHS Board of Directors, at the conclusion of a public session, voted 6-1 to approve the ASA

5    substantially in the form presented to the directors.  Cherry, Hippert, Dreier, Holmes, Rao, and

6    Wilson voted to approve the ASA.  The ASA was executed on October 14, 2009.

7        On November 2, 2009, VHS filed a disclosure statement and proposed plan of adjustment

8    predicated upon the asset sale alternatives set forth in the ASA.  At the election on December 15,

9    2009, VHS's proposal to sell substantially all of its assets to PHH received voter approval by a

10   wide margin.[31]  On December 16, 2009, VHS filed its First Amended Plan for the Adjustment of

11   Debts of Valley Health System Dated December 17, 2009 ("First Amended Plan"), together with

12   a First Amended Disclosure Statement With Respect to the Plan for the Adjustment of Debts of

13   Valley Health System Dated December 17, 2009 ("First Amended Disclosure Statement")

14   deleting any reference to the Alternate Sale.[32]  By order entered on December 23, 2009, the court

15   _____

16   [31] The Riverside County Registrar of Voters certified the election results as 87.07% in favor of
     the sale and 12.93% in opposition to the sale.  See Exhibit 247.

17

18   [32] The ASA, as incorporated into VHS's First Amended Plan, will, among other things: (a) cause
     the allowed claims of VHS's bondholders [Classes 1A and 1B] (net of reserves held by VHS) to
19   be paid in full, in cash at the time of the closing of the ASA; (b) provide VHS with $4 million
     cash to be used for payment of those administrative claims that are not being assumed by PHH at
20   closing as well as additional funds that may be needed to pay administrative expenses; (c)
     provide $1.7 million, in installments through the fourth anniversary of the closing under the
21   ASA, to the holders of allowed general unsecured claims of VHS [Class 2A], which sum may be
     adjusted upward or downward, depending on the total amount of administrative claims that are
22   not assumed by PHH at closing; (d) assume substantially all of VHS's post-petition obligations;
     (e) cause the 5% unsecured promissory note of VHS payable to Select VHS Acquisition
23   Company, LLC in the approximate amount of $8.9 million that is entitled to administrative
     priority status, to be satisfied; (f) pay VHS the sum of $400,000 per year for a period of five years
24   to sustain it as a California Local Health Care District; (g) assume VHS's obligations for accrued
     employee paid time off; (h) assume VHS's obligations for accrued extended sick leave; (i)
25   maintain core services, such as basic emergency services for at least five years as provided for in
     the ASA; (j) cause certain disputed claims filed in VHS's bankruptcy case, which PHH estimates
26

27

                                                - 12 -

1  approved VHS's First Amended Disclosure Statement, established confirmation procedures, and

2  set a hearing on confirmation of VHS's First Amended Plan for February 9, 2010.

3  F.      The Challenge Actions

4        Due to the 90-day exclusivity agreement that preceded the MOU/TS and ASA, Prime was

5  blocked from negotiating the terms of a competing offer to purchase the assets of VHS.  As a

6  result, Prime took steps to prevent consummation of the sale between VHS and PHH (the

7  "Challenge Actions").

8        1.  The Measure P Action

9        On October 15, 2009, Lewis filed a complaint against Barbara Dunmore, Registrar of

10  Voters for the County of Riverside, in Case No. RIC538119, styled Lewis v. Dunmore, in the

11  Superior Court of California, County of Riverside, seeking to enjoin Dunmore from placing

12  Measure P on the ballot for the election on December 15, 2009.  Lewis asserted that the language

13  of Measure P, as adopted by VHS's Board of Directors, allegedly was false and misleading.

14  Lewis's complaint named VHS and Cherry, its Chairman of the Board, as the "Real Parties in

15  Interest."[33]  On October 23, 2009, the Superior Court denied Lewis's request for a hearing on

16  shortened time and the election went forward on December 15, 2009.

17        2.  The Public Records Act Action

18        On October 27, 2009, Prime filed a complaint in Case No. RIC538931, styled Prime

19  Healthcare Management, Inc. v. Valley Health System, et al., in the Superior Court of California,

20  County of Riverside, to compel the disclosure of documents concerning the sale to PHH

21  contemplated by the ASA, including certain reports completed by The Peira Group (the "Peira

22  _____

23  to total approximately $55 million, to be assumed by PHH and withdrawn; (k) employ

24  substantially all of VHS's employees; (l) assume the collective bargaining agreements with SEIU
    and CNA; (m) accept an immediate assignment of the executory contracts and unexpired leases

25  that PHH notifies VHS to assume; and (n) pay the premiums for error and omissions tail
    insurance for VHS ($3.75 million) and director and officer tail insurance ($450,000).

26

27  [33] Lewis did not seek relief from the automatic stay before proceeding with the state court action.

- 13 -

1  Reports") and the "Evaluation Material" referred to in the letter agreement between VHS and

2  PHH dated July 27, 2009, pursuant to the California Public Records Act.[34]  At an expedited

3  hearing on November 23, 2009, the state court ordered VHS to produce the Peira Reports for

4  inspection and copying by Prime not later than December 4, 2009.  On December 3, 2009, the

5  Fourth District Court of Appeal issued a stay of the trial court's order.

6      3. The CEQA Action

7      On November 6, 2009, the petitioners filed a Verified Petition for Writ of Mandate;

8  Complaint for Declaratory Relief and Injunctive Relief in Case No. RIC539783, styled <u>Prime</u>

9  <u>Healthcare Management, Inc., et al. v. Valley Health System, et al.</u>, in the Superior Court of

10 California, County of Riverside.  In their complaint, the petitioners allege, in pertinent part, that

11 the ASA between VHS and PHH constitutes a "project" within the scope of the California

12 Environmental Quality Act ("CEQA"),[35] and that VHS abused its discretion by failing to perform

13 an environmental analysis pursuant to CEQA before placing the ASA on the ballot for voter

14 approval.[36]  The petitioners further allege that because PHH would likely develop the agricultural

15 property adjacent to the Menifee Hospital, VHS abused its discretion by failing to obtain

16 planning agency approval for the proposed sale in violation of California Government Code §

17

18 ─────────────────────

19 [34] Cal. Gov't Code § 6250, <u>et seq.</u>  Prime's lawsuit was preceded by a "Notification of Intent to
   File State Court Action Against Debtor for Violation of California Public Records Act" filed
20 with this court on October 27, 2009.  Prime did not seek relief from the automatic stay before
   commencing the lawsuit, reasoning that its claims are based upon or arise out of VHS's acts or
21 omissions taken after the petition date.

22 [35] Cal. Pub. Res. Code § 21000, <u>et seq.</u>

23
   [36] Between October 12-18, 2009, Prime executed written agreements with Lewis, Lloyd, and
24 Fazekas under the terms of which Prime agreed to indemnify and hold Lewis, Lloyd, and Fazekas
   each harmless "from and against any and all liability, loss, fines, penalties, damage, claims or
25 causes of action and expenses associated therewith (including, without limitation, court costs and
   attorneys' fees) caused directly or indirectly by [each of them] serving as a plaintiff in an action
26 against Valley Health System and its Board of Directors."  <u>See</u> Exhibits 248:1, 249:2, and 250:2.

27

- 14 -

65402.[37]  On December 3, 2009, VHS filed a notice with the state court removing the action to

this court under Adversary No. 6:09-ap-01708-PC.

### 4. The Government Code § 1090 Action

On October 13, 2009, the petitioners filed a motion seeking relief from the automatic stay

to file a complaint for an injunction and declaratory judgment in state court specifically to

"obtain an order voiding the ASA and requiring a fair and open sale process before the scheduled

voter referendum on December 15, 2009."[38]  The petitioners alleged that "cause" existed for

relief from the stay because (a) the VHS Board of Directors illegally approved a sale of

substantially all of its assets to PHH without entertaining bids by other potential purchasers; (b)

at the time the ASA was approved, certain members of VHS's Board of Directors had a financial

interest in the transaction because they were employed by, or derived financial benefits from,

Chaudhuri, one of the principals of PHH, in violation of California Government Code § 1090;

and (c) VHS failed to obtain approval from the Riverside Local Agency Formation Commission

("Riverside LAFCO") of its decision to exit the hospital business in violation of the Cortese-

Knox-Hertzberg Local Government Reorganization Act of 2000, California Government Code §

56000, et seq. ("Cortese-Knox").

After an expedited hearing on November 2, 2009, and a continued hearing on November

12, 2009, the court denied the petitioners' request for relief from the automatic stay by order

entered on November 23, 2009 (the "November 23rd Order").  Before the November 23rd Order

was entered, the petitioners' filed a document entitled "Renewed Motion for Relief from the

Automatic Stay" re-urging its request for stay relief to commence the Government Code § 1090

_____

[37]  The petitioners' lawsuit was preceded by a "Notification of Intent to File State Court Action
Against Debtor for Violation of the California Environmental Quality Act" filed with this court
on November 3, 2009.  The petitioners did not seek relief from the automatic stay before
commencing the lawsuit.

[38]  The petitioners' Memorandum of Points and Authorities in Support of Motion for Relief from
Automatic Stay to Pursue State Court Litigation, 2:20-22.

- 15 -

1   Action and belatedly seeking modification of the stay to purse the CEQA Action. On November

2   30, 2009, the court denied the petitioners' request for an expedited hearing on the "renewed"

3   motion. On December 7, 2009, the petitioners filed a notice of appeal with respect to the

4   November 23rd Order and a statement electing to have the appeal adjudicated by the district

5   court.

6       On January 20, 2010, VHS and the petitioners filed a Stipulation to Withdraw Renewed

7   Motion for Relief from Stay, Dismiss Appeal and To Adjudicate Issues Raised by Challenge

8   Actions ("Stipulation") pursuant to which the petitioners withdrew the "renewed" motion and

9   agreed to dismiss their appeal of the November 23rd Order. VHS and the petitioners also

10  stipulated to this court's jurisdiction to adjudicate the claims raised in the Challenge Actions in

11  conjunction with confirmation of VHS's First Amended Plan.[39] An order approving the

12  _____

13  [39] Pursuant to the Stipulation, VHS and the petitioners agreed that:

14      C. Subject to paragraph D. below, the Bankruptcy Court shall hear and decide: (1) all of
        the causes of action set forth in the Challenge Actions, including those set forth in the
15      First Amended Complaint, and (2) all grounds for opposing the Sale . . . . The
        Bankruptcy Court shall have the authority to make any findings and orders and to grant
16      any relief that could be granted by a state court of competent jurisdiction in ruling on [the
        petitioners'] claims . . . that (1) the PHH transaction does not provide "fair value" for
17      [VHS's] assets; (2) member(s) of the VHS board who voted to approve the PHH
        transaction had conflict(s) of interest prohibited by California Government Code section
18      1090 et seq.; (3) the PHH transaction required approval by LAFCO under Government
        Code section 56824.12; (4) VHS violated CEQA in connection with the PHH transaction;
19      and (5) the VHS board breached its fiduciary duty in approving the ASA with a "no shop"
        provision as set forth in section 4.7 thereof (collectively, the "State Law Claims").
20
21      D. To the extent that [the petitioners] assert any grounds for opposing the Sale (other
        than the State Law Claims) that challenge the feasibility of [VHS's First Amended Plan]
22      or otherwise raise issues of bankruptcy law: (1) nothing herein contained shall constitute
        an admission or concession that any of the [petitioners] have standing or qualify as
23      "parties in interest" for purposes of appearing or being heard in connection with [VHS's]
        Plan, (2) such objections shall be governed by and decided under applicable provisions of
24      the Bankruptcy Code and cases decided thereunder, and (3) [VHS] reserves all rights to
        oppose, defend against and dispute any such Plan objections and the bankruptcy court's
25      authority to grant any relief related thereto other than to deny confirmation of its Plan.
26
27
                                          - 16 -

1   stipulation was entered on January 22, 2010.  The appeal pending before the district court under

2   Case No. EDCV-09-02264 SVW was dismissed on January 29, 2010.  On February 1, 2010,

3   VHS lodged the 1,822-page administrative record relating to VHS's administrative proceedings

4   for its challenged approval of the ASA.

5   G.     The Confirmation Hearing

6          On February 9, 2010, the court commenced a hearing on confirmation of VHS's First

7   Amended Plan.  The petitioners timely filed an objection to confirmation, arguing that VHS's

8   First Amended Plan was neither "in the best interest of creditors" nor "feasible" as required by §

9   943(b)(7).  The petitioners argued that the plan was not feasible for two reasons not tied to the

10  Challenge Actions: "First, PHH may be prohibited from owning the health care facilities

11  comprising the bulk of VHS' assets in light of pending federal health care legislation which sets

12  forth a deadline by which a physician-owned hospital must have a Medicare provider agreement

13  in place in order to avail itself of the exception permitting physician ownership of a hospital.

14  Second, it is not clear that PHH has or will be able to obtain the financing necessary to effectuate

15  the proposed purchase of substantially all of VHS' assets."[40]  Beckman Coulter, Inc., Key

16  Equipment Finance, Inc., and U.S. Bank, which had also filed timely objections to confirmation

17  of VHS's First Amended Plan, withdrew their objections prior to the confirmation hearing.

18         At the hearing, the court determined that VHS's First Amended Plan satisfied the

19  requirements of § 943(b)(1) through (6).[41]  The court overruled the petitioners' objection

20  _____

21  Stipulation, 2:13-3:5.  The Stipulation is silent as to the petitioners' claim that the sale
    contemplated by VHS's First Amended Plan violates California Government Code § 65402.

22
    [40] Objection to Confirmation of First Amended Plan for the Adjustment of Debts of Valley

23  Health System Dated December 17, 2009 by Save the Hospitals, Inc.; Prime Healthcare Services,
    Inc.; Albert L. Lewis, Jr.; John Lloyd; and Edward J. Fazekas, 3:7-12.  The petitioners do not

24  allege in their objection that the sale contemplated by VHS's First Amended Plan violates
    California Government Code § 65402.

25
26  [41] Section 943 sets forth seven requirements for confirmation of a plan in chapter 9.  11 U.S.C. §
    943(b).  Section 943(b)(1) also requires that the plan comply with certain chapter 11

27

- 17 -

1  premised on § 943(b)(7) in part, finding that the plan is in the best interests of creditors[42] and that

2  the mere existence of pending federal health care legislation did not render the plan infeasible.[43]

3  The court continued the confirmation hearing to February 22, 2010, for an evidentiary hearing

4  with respect to the remaining prong of the petitioners' feasibility objection and the merits of the

5  petitioners' claims in the Challenge Actions. Prior to the continued hearing, VHS made four

6  adjustments to the First Amended Plan pursuant to 11 U.S.C. § 942.[44]

7  ─────────────

8  confirmation standards made applicable to chapter 9 cases by § 901. 11 U.S.C. § 943(b)(1).
   Section 901(a) incorporates the plan confirmation requirements of §§ 1129(a)(2), (a)(3), (a)(6),

9  (a)(8), (a)(10), (b)(1), (b)(2)(A), and (b)(2)(B). 11 U.S.C. § 901(a). The debtor bears the burden
   of satisfying the confirmation requirements of § 943(b) by a preponderance of the evidence. In re

10 Pierce County Hous. Auth., 414 B.R. 702, 715 (Bankr. W.D. Wash. 2009); In re Mount Carbon
   Metro. Dist., 242 B.R. 18, 31 (Bankr. D. Colo. 1999). Once these standards are met, the court

11 must confirm the plan. Pierce County, 414 B.R. at 715; see 6 Alan N. Resnick & Henry J.
   Sommer, Collier on Bankruptcy ¶ 943.03, at 943-7 (15th ed. Rev. 2009).

12

13 [42] With respect to the "best interest" requirement of § 943(b)(7), the court determined that
   VHS's First Amended Plan provides "a better alternative for creditors than what they already

14 have" and is fair and equitable. See Mount Carbon, 242 B.R. at 34.

15 [43] The court hereby adopts and incorporates herein by reference its findings of fact and

16 conclusions of law regarding confirmation of VHS's First Amended Plan stated orally and
   recorded in open court at the confirmation hearing on February 9, 2010, pursuant to F.R.Civ.P.

17 52(a)(1), as incorporated into FRBP 7052 and applied to contested matters by FRBP 9014(c).

18
        In their objection to confirmation, the petitioners did not identify the specific federal
19 health care legislation "which sets forth a deadline by which a physician-owned hospital must
   have a Medicare provider agreement in place in order to avail itself of the exception permitting

20 physician ownership of a hospital." Objection to Confirmation of First Amended Plan for the
   Adjustment of Debts of Valley Health System Dated December 17, 2009 by Save the Hospitals,

21 Inc.; Prime Healthcare Services, Inc.; Albert L. Lewis, Jr.; John Lloyd; and Edward J. Fazekas,
   3:7-10. The court notes that a deadline of December 31, 2010 may be applicable under the

22 Health Care and Education Reconciliation Act of 2010, H.R. 4872, 111th Cong. § 1106 (2010)

23 (final version).

24 [44] Modification of First Amended Plan for the Adjustment of Debts of Valley Health System
   Dated December 17, 2009. The plan modification did not require further disclosure nor did it

25 adversely change the treatment of the claims of any creditors other than those who had

26 voluntarily agreed to subordinate their claims on an individualized basis. VHS's First Amended
   Plan, as modified, henceforth is VHS's Modified First Amended Plan.

27

- 18 -

1       At the continued hearing on February 22, 2010, the court denied VHS's request that the

2  petitioners' remaining confirmation objection be overruled as brought in bad faith[45] and

3  _____

4  [45] Prior to January 25, 2010, none of the petitioners were creditors of VHS nor did they have any
discernable interest in VHS's bankruptcy case other than as a potential purchaser of assets from
5  VHS. VHS had specifically reserved its right to challenge the petitioners' standing to object to
6  its plan prior to commencement of the confirmation hearing on February 9, 2010. Cf. Calpine
Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 531 (3d
7  Cir. 1999) ("Courts that have considered appellate standing in the context of the sale or other
disposition of estate assets have generally held that creditors have standing to appeal, but
8  disappointed prospective purchasers do not."); Simantob v. Claims Prosecutor, LLC (In re
9  Lahijani), 325 B.R. 282, 290 n.13 (9th Cir. BAP 2005) (stating that "disappointed prospective
bidders who are not creditors usually do not have standing to appeal").

10

       The deadline to file objections to confirmation of VHS's First Amended Plan was
11  January 25, 2010. In an apparent effort to preempt any issue concerning standing, Prime
12  purchased a claim in the case. On January 22, 2010, Prime purchased a Proof of Claim filed by
B.P. Cabinets, Inc. on July 17, 2008 (Claims Docket # 88-1), which evidenced an unsecured non-
13  priority claim in the amount of $4,290 for the replacement of countertops at the Hemet Valley
Hospital on or about October 15, 2007. On January 25, 2010, Prime filed a request for issuance
14  of a notice of the transferred claim pursuant to FRBP 3001(e), together with its objection to
15  confirmation of VHS's First Amended Plan.

16       The court denied VHS's request to overrule the petitioners' remaining feasibility
objection as brought in bad faith based upon findings of fact and conclusions of law stated orally
17  and recorded in open court at the hearing on February 22, 2010. The court's findings of fact and
conclusions of law are adopted and incorporated herein by reference. In its ruling, the court
18  noted that § 1109(b) states that "[a] party in interest, including the debtor, the trustee, a creditors'
19  committee, an equity security holders' committee, a creditor, an equity security holder, or any
indenture trustee, may raise and may appear and be heard on any issue" in a chapter 11 case. 11
20  U.S.C. § 1109(b). Section 1109(b) is applicable to chapter 9 cases. See 11 U.S.C. § 901(a).
21  Save the Hospitals, Inc., Lewis, Lloyd, and Fazekas had no standing to object to confirmation.
While it would not have been a stretch to find that Prime – which sought unsuccessfully to
22  purchase the assets of VHS being sold under the Modified First Amended Plan and which
purchased the B.P. Cabinets' unsecured claim on the eve of the confirmation hearing for the
23  admitted purpose of obtaining "an interest in the bankruptcy case" so it could object to the plan –
did so for an improper purpose, the court noted that "[t]here is no per se rule denying 'party in
24  interest' status to the purchaser of a claim against a [debtor]." In re Zaleha, 162 B.R. 309, 313
25  (Bankr. D. Idaho 1993). Prime did not purchase the claim for the specific purpose of controlling
the vote of a class of claims to block confirmation of the plan. See Figter Ltd. v. Teachers Ins. &
26  Annuity Ass'n of Am. (In re Figter), 118 F.3d 635, 639 (9th Cir. 1997) (observing that courts
"have been sensitive to situations where a company, which was not a preexisting creditor, has

27

- 19 -

1   proceeded to consider VHS's evidence regarding the ability of PHH to obtain the funds necessary

2   to consummate the purchase of VHS's assets under the Modified First Amended Plan.  On

3   February 23, 2010, the court overruled the petitioners' remaining feasibility objection not tied to

4   the Challenge Actions, finding that VHS's Modified First Amended Plan is feasible under §

5   943(b)(7) in that it offers a reasonable prospect of success and is workable.[46]  The court then

6   considered testimony and evidence regarding the Challenge Actions.  At the conclusion of the

7   hearing on February 26, 2010, the matter was taken under submission.

8                                   II. DISCUSSION

9         This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(a) and

10  1334(b).  The issues before the court involve both core and non-core matters.  Confirmation of a

11  plan of adjustment under chapter 9 is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (L), and

12  (O).  The Challenge Actions involve the State Law Claims.  To the extent that the Challenge

13  Actions are non-core, the parties have stipulated to the jurisdiction of this court to adjudicate the

14  Challenge Actions in conjunction with confirmation.[47]  Venue is appropriate in this court.  28

15  U.S.C. § 1409(a).

16

17

18

19  purchased a claim for the purpose of blocking an action against it.").  As the holder of an
    unsecured claim, Prime's interest in the proceeding is within the zone of interests that Congress
20  intended to protect with respect to the particular issues raised under § 943(b)(7).  Finally,
    whether or not Prime purchased the claim for the sole purpose of permitting it to object to
21  confirmation, the court has an independent obligation to determine that a proposed plan meets
    the confirmation requirements of § 943(b), notwithstanding creditor approval.  Mount Carbon,
22  242 B.R. at 36.

23  [46]   The court hereby adopts and incorporates herein by reference its findings of fact and
    conclusions of law regarding confirmation of VHS's Modified First Amended Plan stated orally
24  and recorded in open court at the continued confirmation hearing on February 23, 2010, pursuant
    to F.R.Civ.P. 52(a)(1), as incorporated into FRBP 7052 and applied to contested matters by
25  FRBP 9014(c).

26
    [47]   See Stipulation, supra note 39.
27

- 20 -

A.    <u>VHS's Board of Directors Did Not Violate a Fiduciary Duty by Approving the ASA with an Unconditional "No Shop" Provision</u>

Petitioners claim that VHS's Board of Directors elected to "disable itself from even considering better offers for the purchase of its assets by agreeing to an airtight 'no shop' clause in the ASA" and that its decision to do so "violates its fiduciary duties."[48] Section 4.7 of the ASA contains the following provision:

> No Shop. Provided that Purchaser is not in material breach or default of this Agreement, for which Seller has provided Purchaser with notice specifying such material breach or default and the reasonable opportunity to cure such material breach or default, Seller shall not, prior to the earlier of the Closing or termination of this Agreement, without the prior written consent of Purchaser: (i) offer for sale, lease or other disposition, the assets of the Hospital Businesses or the Assets (or any portion thereof); (ii) solicit offers or consider unsolicited offers to acquire (by sale, lease or otherwise) all or any material portion of any of the Hospital Businesses or the Assets; (iii) hold discussions with any party (other than Purchaser) looking toward such an offer or solicitation other than to acknowledge receipt; or (iv) enter into any agreement with any party (other than Purchaser) with respect to the sale or other disposition of any of the Hospital Businesses or the Assets.

AR01768. VHS declined to consider an offer from Prime due to the "no shop" clause in the ASA.[49] Petitioners claim that the VHS Board of Directors had a fiduciary duty both to VHS's creditors and the constituents of the heath care district to maximize the benefits of any asset sale by considering competing offers. However, the petitioners are unable to identify any statute or case law imposing such a fiduciary duty on directors of a California health care district. Nevertheless, the petitioners argue that the VHS Board of Directors considered itself bound by fiduciary duties, pointing to Hippert's statement at the Board of Directors meeting on July 29, 2009, that the sale of VHS's assets must be considered "if we are to carry out the fiduciary responsibilities each of us pledged to do when we were elected to serve on its Board."[50] VHS, on

---

[48] Plaintiffs' Trial Brief, 24:24-26.

[49] By letter dated August 13, 2009, Prime expressed an interest in purchasing substantially all of the assets of VHS for an unspecified amount. AR00386. At the hearing, Prime made an offer of proof that Prime's offer represented a better alternative for VHS's creditors and the public than the ASA.

[50] AR00026.

- 21 -

1  the other hand, asserts that it was under no statutory or regulatory restriction which precluded it

2  from approving a sale agreement containing a "no shop" provision.

3        A typical "no shop" clause prohibits a seller from soliciting or considering new or

4  alternative bids for assets subject to an existing asset sale agreement.[51]  Outside of bankruptcy, no

5  shop clauses and other lock-up agreements are not per se invalid but rather are evaluated on a

6  case by case basis and viewed in the context of the entire negotiated transaction.  See, e.g., Cottle

7  v. Storer Commc'n, Inc., 849 F.2d 570, 575 (11th Cir. 1988) ("While lock-ups in a takeover

8  situation are not per se illegal, they may be illegal in particular cases."); Jewel Cos., Inc. v. Pay

9  Less Drug Stores Nw., Inc., 741 F.2d 1555, 1562 (9th Cir. 1984) (holding that under California

10  law, a corporation's board of directors may enter into an exclusive merger agreement with the

11  board of directors of another corporation pending submission of the agreement to shareholders

12  for approval); Paramount Commc'ns, Inc. v. QVC Network, Inc., 637 A.2d 34, 49 n.20 (Del.

13  1994) (holding that a no-shop clause, when combined with the sale of control and other

14  protective provisions, was invalid because it prevented the directors "from carrying out their

15  fiduciary duties in considering unsolicited bids or in negotiating for the best value reasonably

16  available to stockholders"); Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173,

17  176 (Del. 1986) ("In our view, lock-ups and related agreements are permitted under Delaware

18  law where their adoption is untainted by director interest or other breaches of fiduciary duty.").

19  Courts apply the business judgment rule[52] to determine whether a corporation's board of

20

---

21  [51] See generally George V. Varallo & Srinivas M. Raju, A Process Based Model for Analyzing

22  Deal Protection Measures, 55 Bus. Law 1609, 1616-18 (2000).

23  [52] California's business judgment rule is codified in California Corporations Code § 309(a),
    which states:
24

25      A director shall perform the duties of a director, including duties as a member of any
        committee of the board upon which the director may serve, in good faith, in a manner
26      such director believes to be in the best interests of the corporation and its shareholders
        and with such care, including reasonable inquiry, as an ordinarily prudent person in a like
27

- 22 -

1  directors' decision to adopt a no-shop clause in a particular transaction is fair and reasonable to

2  the corporation and its shareholders. See, e.g., Cottle, 849 F.2d at 577 ("The business judgment

3  rule thus prevents us from second guessing the directors' decision to grant the lock-up."); Jewel

4  Cos., 741 F.2d at 1562 ("In light of California's statutory scheme preserving the board's

5  traditional management function in the case of corporate control transactions, we see no reason to

6  conclude that the drafters of the Corporate Code intended to deprive a corporate board of the

7  authority to agree to refrain from negotiating or accepting competing offers until the shareholders

8  have considered an initial offer."); Revlon, Inc., 506 A.2d at 185 (holding that the board's

9  decision to grant an asset option lock-up with a no-shop provision represented a breach of the

10  directors' duty of care under the circumstances of the case, and was "not entitled to the deference

11  accorded it by the business judgment rule").

12       In the chapter 11 context, a debtor in possession stands in the shoes of a trustee and is a

13  fiduciary for the estate and its creditors. 11 U.S.C. § 1107(a); see, e.g., Thompson v. Margen (In

14  re McConville), 110 F.3d 47, 50 (9th Cir. 1997) (stating that chapter 11 debtors in possession

15  "were fiduciaries of their own estate owing a duty of care and loyalty to the estate's creditors"),

16  cert. denied, 522 U.S. 966 (1997); Woodson v. Fireman's Fund Ins. Co. (In re Woodson), 839

17  F.2d 610, 614 (9th Cir. 1988) ("As debtor in possession he is the trustee of his own estate and

18  therefore stands in a fiduciary relationship to his creditors.") (footnote omitted); Devers v. Bank

19  of Sheridan, Montana (In re Devers), 759 F.2d 751, 754 (9th Cir. 1985) ("A debtor-in-possession

20  has the duty to protect and conserve property in his possession for the benefit of creditors.").

21       When the debtor is a corporation, the debtor in possession's fiduciary obligations to the

22

23  _____

24       position would use under similar circumstances.

25  Cal. Corp. Code § 309(a). "The general purpose of the business judgment rule is to afford
    directors broad discretion in making corporate decisions and to allow these decisions to be made
26  without judicial second-guessing in hindsight." F.D.I.C. v. Castetter, 184 F.3d 1040, 1044 (9th
    Cir. 1999).

27

- 23 -

1   corporation, its creditors and shareholders, fall upon the officers and directors. <u>See</u> <u>Commodity</u>

2   <u>Futures Trading Comm'n v. Weintraub</u>, 471 U.S. 343, 355 (1985) (stating that "the debtor's

3   directors bear essentially the same fiduciary obligation to creditors and shareholders as would the

4   trustee for a debtor out of possession"); <u>Wolf v. Weinstein</u>, 372 U.S. 633, 649 (1963) (observing

5   that "so long as the Debtor remains in possession, it is clear that the <u>corporation</u> bears essentially

6   the same fiduciary obligation to the creditors as does the trustee for the debtor out of

7   possession") (emphasis in original); <u>Holta v. Zerbetz (In re Anchorage Nautical Tours, Inc.)</u>, 145

8   B.R. 637, 643 (9th Cir. BAP 1992) ("When the debtor is a corporation, corporate officers and

9   directors are considered to be fiduciaries both to the corporate debtor in possession and to the

10   creditors."). Corporate officers, as fiduciaries, must protect and preserve estate assets held in

11   trust for the benefit of creditors. <u>Holta</u>, 145 B.R. at 643; <u>Hirsch v. Penn. Textile Corp. (In re</u>

12   <u>Centennial Textiles, Inc.)</u>, 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998) ("As fiduciaries, the debtor

13   in possession and its managers are obligated to treat all parties to the case fairly, maximize the

14   value of the estate, and protect and conserve the debtor's property.") (internal citations omitted).

15       Not surprisingly, courts have scrutinized deal protection measures, such as break-up

16   fees,[53] no-shop clauses, and window shop provisions,[54] built into asset sales for which approval is

17   sought by a chapter 11 debtor in possession under § 363. <u>See, e.g.</u>, <u>In re Reliant Energy</u>

18   <u>Channelview LP</u>, 594 F.3d 200, 210 (3d Cir. 2010) (holding that "[t]he Bankruptcy Court did not

19   abuse its discretion when it concluded that an award of a break-up fee was not necessary to

20   preserve the value of the estate"); <u>O'Brien Envtl. Energy, Inc.</u>, 181 F.3d at 535 (stating that it is

21

22   [53] A break-up fee "'is an incentive payment to an unsuccessful bidder who placed the estate

23   property in a sales configuration mode . . . to attract other bidders to the auction.'" <u>Official</u>
<u>Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)</u>, 147

24   B.R. 650, 659 (S.D.N.Y. 1992), <u>appeal dism'd</u>, 3 F.3d 149 (2d Cir. 1993) (citation omitted).

25   [54] "A window shop clause is a promise not to solicit a later, better offer, but which permits a

26   board to look at such an offer, provide information to the offeror, and, under appropriate
circumstances, accept the offer. <u>Id.</u> at 655.

27

1    permissible to offer a break-up fee and reimbursement of expenses to induce an initial bid,

2    provided the allowance of the fee is necessary to preserve the value of the estate and does not

3    give an advantage to a favored purchaser over other bidders by increasing the cost of

4    acquisition); Integrated Res., Inc., 147 B.R. at 664 (upholding bankruptcy court's decision to

5    approve an agreement negotiated by a disinterested board of directors after discussions with 30

6    potential bidders and before the debtors selected a purchaser and agreed to a break-up fee and

7    window shop provision).  In Pacificorp Ky. Energy Corp. v. Big Rivers Elec. Corp. (In re Big

8    Rivers Elec. Corp.), 233 B.R. 739 (W.D. Ky. 1998), a district court held that a chapter 11 debtor

9    in possession could not enter into an agreement with a "no shop" clause, preventing the debtor

10   from actively soliciting or entertaining competing offers with other entities.  Id. at 752.  The

11   bankruptcy court had ruled that the agreement violated public policy because the "no shop"

12   clause interfered with the debtor's fiduciary obligation to maximize the estate's value.  In re Big

13   Rivers Elec. Corp., 233 B.R. 726, 736 (Bankr. W.D. Ky. 1998).  The district court affirmed on

14   this issue, noting that "[t]his prohibition violates the underlying policy of the Bankruptcy Code to

15   maximize the value of the estate for the creditors by stifling the bidding process for the assets of

16   the debtor."  Big Rivers Elec. Corp., 233 B.R. at 753.

17          Unlike chapter 11, there is no concept of a debtor in possession in chapter 9.[55]  Section

18   541, which defines "property of the estate," is not incorporated into chapter 9.[56]  Nor is § 363,

19   which regulates the use, sale or lease of property, applicable to a chapter 9 case.  See 11 U.S.C. §

20   901(a).  By virtue of § 904, a debtor in chapter 9 retains title to, possession of, and complete

21   control over its property and its operations, and is not restricted in its ability to sell, use, or lease

22

23   [55] The term "'trustee', when used in a section that is made applicable to a case under [chapter 9]
     by section 103(e) or 901 . . . , means debtor, except as provided in section 926 . . . ."  11 U.S.C. §
24   902(5).

25   [56] 11 U.S.C. § 901(a).  The term "'property of the estate', when used in a section that is made
26   applicable in a case under [chapter 9] by section 103(e) or 901 . . . , means property of the
     debtor."  11 U.S.C. § 902(1).
27

- 25 -

1    its property.[57]

2        VHS is neither a chapter 11 debtor in possession nor a corporation.  VHS is a California

3    health care district in chapter 9.  VHS exists by virtue of the LHCDL, and its powers are

4    enumerated in California Health & Safety Code § 32121.  VHS is authorized by statute "[t]o

5    transfer, at fair market value, any part of its assets to one or more nonprofit corporations to

6    operate and maintain the assets."  Cal. Health & Safety Code § 32121(p)(1).  There is nothing in

7    § 32121 nor any other section of the LHCDL imposing fiduciary obligations on the board of

8    directors of a local hospital district.[58]  Furthermore, § 32121(p)(1), by its terms, does not require

9    _____

10   [57] Section 904 states:

11       Notwithstanding any power of the court, unless the debtor consents or the plan so
12       provides, the court may not, by any stay, order, or decree, in the case or otherwise,
         interfere with –

13

14           (1) any of the political or governmental powers of the debtor;
             (2) any of the property or revenues of the debtor; or
15           (3) the debtor's use or enjoyment of any income-producing property.

16   11 U.S.C. § 904 (emphasis added).  Section 105(a) is not applicable to chapter 9 cases.  11
     U.S.C. § 901(a).  To the extent that the court has power to issue certain orders under a specific
17   provision of the Code incorporated into chapter 9, that authority is equally limited by § 904.

18   [58] Arguably, the VHS directors as public officials each bear the same fiduciary relationship
19   towards their constituents as a "trustee bears to his cestui que trust, and should therefore act with
     the utmost good faith."  See Hobbs, Wall & Co. v. Moran, 109 Cal. App. 316, 319 (1930).  "'A
20   public office is a public trust created in the interest and for the benefit of the people.  Public
     officers are obligated . . . to discharge their responsibilities with integrity and fidelity . . . . [T]hey
21   may not exploit or prostitute their official position for their private benefits.  When public
     officials are influenced in the performance of their public duties by base and improper
22   considerations of personal advantage, they violate their oath of office and vitiate the trust reposed
23   in them, and the public is injured by being deprived of their loyalty and honest services.  It is
     therefore the general policy of this state that public officers shall not have a personal interest in
24   any contract made in their official capacity.'"  Breakzone Billiards v. City of Torrance, 81
25   Cal.App.4th 1205, 1232 (2000) (quoting Terry v. Bender, 143 Cal.App.3d 198, 206 (1956)).
     Section 1090 of the California Government Code was enacted for the specific purpose of
26   "ferreting out any financial conflicts of interest, other than remote or minimal ones, that might
     impair public officials from discharging their fiduciary duties with undivided loyalty and
27

- 26 -

1   competitive bidding.

2          Competitive bidding in California is governed by statute.  Wilson v. L.A. County Metro.

3   Transp. Auth., 23 Cal.4th 305, 313 (2000).  No public entity in California is bound to engage in

4   competitive bidding absent a statutory mandate to do so.  Constr. Indus. Force Account Council

5   v. Amador Water Agency, 71 Cal.App.4th 810, 815 (1999).  "While there are 'powerful purposes

6   served by competitive bidding [e.g., preventing waste, favoritism, and corruption], there is no all-

7   pervasive public policy that requires all public entities to engage in that practice.  Rather, the

8   Legislature imposes competitive bidding requirements on public entities within its purview when

9   the Legislature determines it is in the public interest to do so.'"  Id. (quoting San Diego Serv.

10  Auth. for Freeway Emergencies v. Superior Court, 198 Cal.App.3d 1466, 1469 (1988)).

11         When the California legislature intends to require competitive bidding, it knows how to

12  draft legislation to accomplish that result.  See, e.g., Cal. Health & Safety Code § 32319(a) ("The

13  board of directors may sell the bonds pursuant to the resolution . . . [b]y giving notice inviting

14  sealed bids and selling to the highest responsible bidder.");  Cal. Health & Safety Code § 32311

15  ("At the time appointed, the board of directors shall open the proposals, and may sell the bonds

16  or any portion thereof to the highest responsible bidder or bidders.");  Cal. Gov't Code § 43627

17  ("Before selling the bonds, or any part thereof, the legislative body shall give notice inviting

18  sealed bids in such a manner as the legislative body may prescribe.  If satisfactory bids are

19  received, the bonds offered for sale shall be awarded to the highest responsible bidder.");  Cal.

20  Pub. Res. Code § 5790.7(b) ("The board of directors shall award the sale of bonds to the highest

21  responsible bidder.");  Cal. Educ. Code § 15148 ("If satisfactory bids are received, the bonds

22  offered for sale shall be awarded to the highest responsible bidder or bidders . . . .");  Cal. Harb. &

23  Nav. Code § 72(b) ("At the time and place fixed in the notice, the legislative body shall meet and

24  consider all bids that have been submitted.  The lease shall be awarded to the highest responsible

25  _____

26  allegiance to the public entities they are obligated to serve."  Lexin v. Superior Court, 47
    Cal.App.4th 1050, 1073 (2010).
27

- 27 -

1   bidder . . . ."). The fact that California Health & Safety Code § 32121(p)(1) is silent with respect

2   to competitive bidding must be accorded meaning, particularly given the unambiguous language

3   of the statute. Cf. Gozlon-Peretz v. United States, 498 U.S. 395, 404 (1991) ("'[W]here

4   Congress includes particular language in one section of a statute but omits it in another section of

5   the same Act, it is generally presumed that Congress acts intentionally and purposely in the

6   disparate inclusion or exclusion.'") (quoting Russello v. United States, 464 U.S. 16, 23 (1983);

7   Progressive West Ins. Co. v. Preciado, 479 F.3d 1014, 1018 (9th Cir. 2007) ("'Faced with

8   statutory silence . . . , we presume that Congress is aware of the legal context in which it is

9   legislating.'") (quoting Abrego v. Dow Chem. Co., 443 F.3d 676, 683-84 (9th Cir. 2006) (per

10   curiam).

11          The VHS Board of Directors must exercise the authority granted under California Health

12   & Safety Code § 32121 in the public interest.[59] Its decisions may be reviewed by writ of mandate

13   and set aside for abuse of discretion. Cal. Civ. Proc. Code § 1094.5. Directors are subject to

14   civil and criminal liability for contracts made by them in their official capacity in which they hold

15   a personal or financial interest. Cal. Gov't Code §§ 1090, 1097. They can be removed for

16   willful or corrupt misconduct in office. Id. § 3060. Any contract approved by the board of

17   directors that is tainted by a conflict of interest may be declared void. Id. § 1092(a). But the

18   petitioners have failed to establish that the VHS Board of Directors in approving the ASA with a

19   "no-shop" provision either breached a specific fiduciary duty imposed by law or violated any

20   statutory obligation to submit the proposed sale of assets to a competitive bidding process.

21   B.     No Member of VHS's Board of Directors Who Voted to Approve the ASA Was
            "Financially Interested" in the Contract in Violation of California Government Code §
22          1090

23          Petitioners accuse Cherry, Dreier, and Rao, three of VHS's seven directors, of public

24

25

26   _____

27   [59] See supra note 58.

- 28 -

1  corruption.[60]  Petitioners charge that PHH is, in fact, a front for Chaudhuri, an influential

2  physician who lives and works in Riverside County, and that Cherry, Dreier, and Rao violated

3  the public trust by approving the ASA in their official capacities in violation of California

4  Government Code § 1090 primarily to line the pockets of Chaudhuri and professional

5  corporations in which Chaudhuri owns an interest.  To establish that each of these directors has

6  an impermissible "financial interest" in the ASA in violation of § 1090, the petitioners ask the

7  court to draw inferences from evidence of a web of business relationships and personal contacts

8  involving Cherry, Dreier, Rao, and these professional corporations.  In particular, the petitioners

9  point out that some of these professional corporations have filed proofs of claim against VHS.[61]

10  As part of the consideration for the purchase of VHS's assets, PHH agreed to assume liability for

11  certain claims and to indemnify and hold VHS harmless for the payment of such claims.[62]

12  ───────────────

13  [60] Petitioners do not allege that Hippert, O'Donnell, Holmes, or Wilson were financially
    interested in the ASA at the time it was approved by VHS or that they otherwise engaged in
14  conduct in violation of California Government Code § 1090.

15  [61] The proofs of claim include: (1) Claim # 134-1 filed by HCMG in an "unknown" amount on
16  August 22, 2008, based upon an alleged breach of a Risk Sharing Agreement between the Hemet
    Hospital and HCMG dated December 29, 1994; (2) Claim # 135-1 filed by LHIO in an
17  "unknown" amount on August 22, 2008, based upon an alleged breach of an Information
    Technology Services Agreement between LHIO and VHS dated May 22, 2006; (3) Claim # 136-
18  1 filed by HCMG in an "unknown" amount on August 22, 2008, based upon an alleged breach of
19  a Risk Sharing Cooperation and Support Agreement between VHS and HCMG dated March 27,
    2006; and (4) Claim # 168-1 filed by Menifee Valley Community Medical Group, Inc. in an
20  "unknown" amount on August 22, 2008, based upon an alleged breach of a Risk Sharing
    Cooperation and Support Agreement between VHS and Menifee Valley Community Medical
21  Group, Inc. dated March 27, 2006.

22  [62] Section 1.2.1 **Purchaser's Estimate of Purchase Consideration** states, in pertinent part:

23
       "(v) Assumed Rejection Claims.  The satisfaction or assumption by Purchaser of, and the
24     full and complete release of Seller from any liability under, the rejection and/or breach
25     claims filed by KM Strategic Management, Inc. ("KM"), Hemet Community Medical
       Group ("HCMG"), Menifee Valley Community Medical Group ("MVCMG"), LHIO,
26     LLC ("LHIO"), and any claims of constituent members thereof which are derivative from
       such rejection and/or breach claims of KM, HCMG, MVCMG or LHIO, which Purchaser
27

- 29 -

1   Petitioners maintain that Cherry, Dreier, and Rao each had a conflict of interest when they voted

2   to approve the ASA notwithstanding a business relationship with one or more of these claimants.

3   VHS does not materially dispute the connections traced by the petitioners, but denies the

4   inferences made by the petitioners and argues that the interest, if any, of each of the targeted

5   directors under the circumstances of this case is too remote and speculative to constitute a

6   prohibited conflict of interest under California Government Code § 1090.

7       Section 1090 of the California Government Code states that:

8           Members of the Legislature, state, county, district, judicial district, and city
            officers or employees shall not be financially interested in any contract made by them in
9           their official capacity, or by any body or board of which they are members. Nor shall
            state, county, district, judicial district, and city officers or employees be purchasers at any
10          sale or vendors at any purchase made by them in their official capacity.

11          As used in this article, "district" means any agency of the state formed pursuant to
            general law or special act, for the local performance of governmental or proprietary
12          functions within limited boundaries.

13  Cal. Gov't Code § 1090. Section 1090 "codifies the long-standing common law rule that barred

14  public officials from being personally financially interested in the contracts they formed in their

15  official capacities." Lexin, 47 Cal.4th at 1072; see Breakzone Billiards, 81 Cal.App. at 1230

16  (stating that "[t]he purpose of this section is to prohibit self-dealing" by public officials);

17  Thomson v. Call, 38 Cal.3d 633, 645 (1985) ("[T]he policy goals of section 1090 support the rule

18  that public officers 'are denied the right to make contracts in their official capacity with

19  themselves or to become interested in contracts thus made.'") (quoting Stockton P.& S. Co. v.

20  Wheeler, 68 Cal.App. 592, 602 (1924)) (emphasis in original).

21      To establish a violation of § 1090, the plaintiff must establish that (1) the defendant

22

23  _____

24          contends constitutes an assumption and release of claims worth approximately
            $55,000,000 ("Assumed Rejection Claims") as detailed more fully in claim numbers 134,
25          135, 136, and 168 and any amendments thereto, and indemnifying, defending and holding
            Seller harmless with respect to the Assumed Rejection Claims; . . . ."

26

27  AR01732-AR01733.

- 30 -

1   government official or employee participated in an official capacity in the making of a contract;

2   (2) the defendant had a cognizable financial interest in the contract; and (3) if raised as an

3   affirmative defense, that the cognizable financial interest does not fall within the exceptions set

4   forth in either California Government Code § 1091 or § 1091.5.[63]  Lexin, 47 Cal.4th at 1074.

5   "[A]n official has a financial interest in a contract if he might profit from it."  People v. Honig,

6   48 Cal.App.4th 289, 333 (1996).  Section 1090 is construed liberally to embrace both direct and

7   indirect financial interests.[64]  See, e.g., Breakzone Billiards, 81 Cal.App.4th at 1230 ("This

8   statutory prong of the conflict of interest doctrine requires that the official have some interest in

9   the outcome, whether direct or indirect."); Honig, 48 Cal.App.4th at 323 ("This section has long

10   been interpreted as prohibiting an official from having any financial interest in a contract,

11   whether direct or indirect."); Terry v. Bender, 143 Cal.App.2d 198, 208 (1956) ("The fact that

12   [the public official's] interest might be small or indirect is immaterial so long as it is such as

13   deprives the [public] of his overriding fidelity to it and places him in the compromising situation

14   ───────────

15   [63] VHS asserts that neither Cherry, Dreier, or Rao possess a cognizable financial interest in the
ASA.  Therefore, VHS has not alleged a defense under either California Government Code §§
16   1091 or 1091.5.

17   [64] Courts have approved the following jury instruction for use in prosecuting criminal violations
of §§ 1090 and 1097:
18

19       The phrase "financially interested" as used in Government Code section 1090 means any
financial interest which might interfere with a state officer's unqualified devotion to his
20       public duty.  The interest may be direct or indirect.  It includes any monetary or
proprietary benefit, or gain of any sort or the contingent possibility of monetary or
21       proprietary benefits.  The interest is direct when the state officer, in his official capacity,
does business with himself in his private capacity.  The interest is indirect when the state
22       officer, or agency he directs, enters into a contract in his or its official capacity with an
individual or entity, which individual or entity, by reason of the state officer's
23       relationship to the individual or entity at the time the contract is entered into, is in a
position to render actual or potential pecuniary benefits directly or indirectly to the state
24       officer based on the contract the individual or entity has received.
25

26   Honig, 48 Cal.App.4th at 322-23.

27

1  where, in the exercise of his official judgment or discretion, he may be influenced by personal

2  considerations rather than the public good."). "Where the interest is remote and speculative, no

3  conflict of interest is held to be present under the statute." Breakzone Billiards, 81 Cal.App.4th

4  at 1230. A contract made in violation of § 1090 is void. See, e.g., Lexin, 47 Cal.4th at 1073

5  ("Where a prohibited interest is found, the affected contract is void from its inception.");

6  Thomson, 38 Cal.3d at 646 n.15 ("California courts have generally held that a contract in which a

7  public officer is interested is void, not merely voidable.") (emphasis in original).

8       California courts have long recognized that an impermissible conflict of interest arises

9  when a public official on behalf of a public entity participates in making a contract with another

10  entity at which the public official is employed or in which the public official owns an interest.

11  See, e.g., Miller v. City of Martinez, 28 Cal.App.2d 364, 368 (1938); Hobbs, Wall & Co., 109

12  Cal.App. at 321; Stockton Plumbing & Supply Co. v. Wheeler, 68 Cal.App. 592, 602 (1924).

13  Petitioners rely on this line of cases as authority for their charge of public corruption against

14  Cherry, Rao, and Dreier. However, these cases are inapposite.

15       In Stockton Plumbing & Supply Co. v. Wheeler, Charlesworth, a city councilman, was

16  employed as a sheet metal foreman at Stockton Plumbing and Supply Company ("Stockton

17  Plumbing"). Stockton Plumbing & Supply Co., 68 Cal.App. at 595. The City of Stockton

18  planned to build a memorial civic auditorium. Id. at 594. Stockton Plumbing was the lowest

19  responsible bidder for the performance of plumbing, heating, and ventilating work on the project.

20  Id. at 595. Charlesworth, as a member of the "Building Committee" of the city council,

21  supervised a revision of plans for the new auditorium, but was not present at the city council

22  meeting at which the construction contract was awarded. Id. The sole question was whether

23  Charlesworth was "interested" in the contract. Id. at 600. In holding that the contract was void

24  due to Charlesworth's conflict of interest, the court stated:

25       In this case Charlesworth was the sheet metal foreman of the petitioner's establishment
        and the contract proposed to be awarded to petitioner was connected directly with that
26       department of the petitioner's business. Under these circumstances, it would be
        exceedingly strange if Charlesworth were not to a considerable extent desirous of the
27

- 32 -

1   awarding of the contract to his employer. . . . While it may truly be said that he would not
    derive direct pecuniary gain from the contract, he certainly would indirectly be so
2   benefited, since upon the success of petitioner's business financially primarily depends
    the continued tenure of his position and the compensation which he receives for
3   performing the service required of him as the foreman of the department referred to.

4   Id. at 602.

5       In Hobbs, Wall & Co., Dressler, a city councilman, was employed as manager of Hobbs,

6   Wall & Co., which had sold goods to the city for $249.66. Dressler "was not a stockholder in the

7   corporation and had no direct pecuniary interest in it." Hobbs, Wall & Co., 109 Cal. App. at 317.

8   The city council, including Dressler, voted to pay the claims. J.J. Moran ("Moran"), the city

9   treasurer, refused to pay the warrants issued and presented for payment of the claims. Id. Hobbs,

10  Wall & Co. sought a writ of mandate to compel Moran to pay the warrants. Id. The trial court

11  denied the writ, holding that "Dressler, as the manager of the business from which the supplies

12  were purchased, was indirectly interested in the transaction, and that it was therefore illegal." Id.

13  The court of appeal affirmed the judgment, stating that "Dressler, as manager, had such an

14  interest in his employer's mercantile business as to preclude him from participating, as a member

15  of the council, in the allowance of the claims." Id. at 321.

16      In Miller v. City of Martinez, Severns, a city councilman, was employed by Shell Oil

17  Company ("Shell") as manager of its Martinez office. Miller, 28 Cal.App.2d at 365-66. Severns

18  also owned shares of stock in Shell. Id. at 366. The city council, including Severns, voted to

19  approve payment of Shell's claims for petroleum products and other merchandise purchased by

20  the city and ordered warrants drawn on the city treasury for payment of the sum of $4,639.89. Id.

21  Miller, a taxpayer and resident of the City of Martinez, filed suit to recover the amounts paid

22  alleging that the claims were void due to Severns' conflict of interest. Id. at 365. The trial court

23  entered judgment for the defendants, holding that the complaint failed to state a cause of action.

24  Id. The court of appeal reversed, stating that "[c]ases are numerous in which it has been held that

25  one who is an employee of another, or a corporation or firm, and at the same time a member of

26  the city council of a municipality is ineligible as such official to make or assist in making a

27

- 33 -

1 │ contract with the person or corporation in whose employment he is, and that a contract so made

2 │ is void upon the principle that such act would contravene public policy." Id. at 368.

3 │     In this case, PHH is a Delaware corporation qualified to do business in California.[65]

4 │ PHH's sole shareholder is PHH, LLC, a Delaware limited liability company qualified to do

5 │ business in California.  PHH, LLC is managed by an Executive Committee and a Managing

6 │ Member.  Chaudhuri is the Managing Member of PHH, LLC.[66]  Neither Cherry, Dreier, or Rao

7 │ are employees of PHH or PHH, LLC nor do they own an interest in either PHH or PHH, LLC.

8 │     The court agrees with VHS and PHH that the case of Hotchkiss v. Moran, 109 Cal.App.

9 │ 321 (1930), which is the companion case of Hobbs, Wall & Co., is more directly in point.  In that

10 │ case, Hotchkiss Electric Light Company ("Hotchkiss Electric") sold electricity to Crescent City

11 │ and was owed the sum of $305.82.  Hotchkiss, 109 Cal.App. at 323.  J.M. Hotchkiss

12 │ ("Hotchkiss"), the president of Hotchkiss Electric, was also a stockholder in Hobbs, Wall &

13 │ Company.  Id. at 322.  Dressler, who was employed as a manager of Hobbs, Wall & Company,

14 │ was a member of the Crescent City council and chairman of the finance committee.  Id. at 322-

15 │ 23.  Dressler was not a stockholder in Hobbs, Wall & Company nor a stockholder or employee of

16 │ Hotchkiss Electric.  Id. at 322.  The city council, including Dressler, voted to pay the claim of

17 │ Hotchkiss Electric.  Id. at 323.  Moran, the city treasurer, refused to pay the warrants issued and

18 │ ————————————

19 │ [65] See supra note 6.

20 │ [66] To fund a portion of the purchase of VHS's assets by PHH under the ASA, PHH, LLC intends
   │ to undertake a legally compliant, exempt private offering to local community physicians who are
21 │ accredited investors utilizing a private placement memorandum  "Subscription Process."  The
   │ primary investors will be local community physicians on the medical staffs of Hemet Hospital
22 │ and Menifee Hospital.  At the closing of the sale of assets by VHS to PHH, investors in PHH,
   │ LLC will receive ownership interests in PHH in proportion to the amount invested.  Until this
23 │ syndication is completed, it is unknown what percentage any particular investor will have in
   │ PHH or PHH, LLC.  At the confirmation hearing on February 22, 2010, the court determined that
24 │ PHH would have the $56,150,000 needed to meet its obligations under the ASA.  However,
   │ Chaudhuri has agreed to invest, loan, or contribute funds necessary to permit PHH to meet its
25 │ obligations on the Sale Closing Date under the ASA to the extent PHH's offerings are
26 │ insufficient to fund the transaction.
27 │

1  presented for payment of the claim.  Id.  Hotchkiss sought a writ of mandate, and the trial court

2  ordered a writ of mandate to issue directing Moran to pay the warrants.  Id.  The court of appeal

3  affirmed, holding that "Dressler was not employed with or interested in the electric lighting

4  company, directly or indirectly."  Id.  In so holding, the court stated:

5     It may not reasonably be said a contract for lighting a city violates the Municipal
      Corporation Act merely because the councilman who participates in the transaction is the
6     manager of a mercantile business in which a prominent stockholder of the electric
      company is also a stockholder.  The interest of the councilman under such circumstances
7     is too remote and speculative upon which to assume the contract will be thereby affected.

8  Id.; see Breakzone Billiards, 81 Cal.App.4th at 1230-31 ("Where the interest is remote and

9  speculative, no conflict of interest is held to be presented under the statute.  This has been the

10 rule since Hotchkiss v. Moran . . . .").

11      Petitioners presented extensive evidence at trial of contractual or employment

12 relationships between Cherry, Rao, and Dreier's husband, Dr. Ralph G. Dreier, M.D. ("Dr.

13 Dreier") and professional corporations in which Chaudhuri is an officer, director, or shareholder.

14 But whether any of these connections place Cherry, Rao, or Dreier in a position to receive,

15 directly or indirectly, an actual or pecuniary benefit based on the contract with PHH is, at best,

16 remote and speculative.

17      1. Chaudhuri and Related Entities

18      In addition to serving as the Managing Member of PHH, LLC, Chaudhuri is an officer,

19 director, or shareholder in each of the following professional corporations that provide medical

20 services to Riverside County:  HCMG; Menifee Valley Community Medical Group, Inc. (the

21 "Menifee Medical Group"); Temecula Valley Physicians Medical Group, Inc. (the "Temecula

22 Medical Group"); Devonshire Surgical Medical Group, Inc. ("Devonshire"); and Hemet

23 Healthcare Surgery Center, Inc. ("Hemet Surgery").

24      HCMG is a California professional corporation which operates as an independent

25 physicians association ("IPA").  HCMG contracts to provide medical care to health maintenance

26 organization ("HMO") enrollees residing in Hemet, San Jacinto, Sun City, Menifee, Lake

27

- 35 -

1  Elsinore, Wildomar, Canyon Lake, Corona, Temecula, Murrieta, Idyllwild, Anza, and the

2  surrounding unincorporated areas of Riverside County.  HCMG is co-owned by approximately

3  45 physicians.  Chaudhuri is Chairman of the Board of Directors of HCMG and owns a 38%

4  interest in the corporation.  Chaudhuri has authority to terminate an HCMG contract with any

5  physician, subject to approval of HCMG's board of directors.  Six of the initial investors in PHH,

6  who collectively have committed to invest in excess of $20 million in PHH, own 9% of the

7  equity in HCMG.  Another 15 of the 49 physicians who have issued checks for $1,000 to PHH,

8  other than Chaudhuri, collectively own 23% of the equity in HCMG.  HCMG, however, is not an

9  investor in PHH or PHH, LLC.

10    The Menifee Medical Group is a California professional corporation and a HCMG group

11  provider, operating as an IPA that accesses health plan contracts through HCMG for HMO

12  enrollees in the Menifee/Sun City area.  Chaudhuri is the Chairman of the Board of Directors and

13  CEO of Menifee Medical Group.  Chaudhuri has authority to terminate Menifee Medical

14  Group's contract with any physician, subject to approval of Menifee Medical Group's board of

15  directors.  Chaudhuri is also the sole shareholder of the Menifee Medical Group.  The Menifee

16  Medical Group is not an investor in PHH or PHH, LLC.

17    The Temecula Medical Group is a California professional corporation and a HCMG

18  group provider, operating as an IPA that accesses health plan contracts through HCMG for HMO

19  enrollees in Temecula, Lake Elsinore, Canyon Lake, Wildomar, Murrieta, and the surrounding

20  unincorporated areas of Riverside County.  Chaudhuri is the Chairman of the Board of Directors

21  of Temecula Medical Group.  Chaudhuri has authority to terminate Temecula Medical Group's

22  contract with any physician, subject to approval of Temecula Medical Group's board of directors.

23  Chaudhuri is also the majority (90%) shareholder of the Temecula Medical Group.  Temecula

24  Medical Group is not an investor in PHH or PHH, LLC.

25    Devonshire is a surgical group comprised of independent contractor surgeons which

26  provide general, vascular and thoracic services to HCMG and its group provider, Menifee

27

- 36 -

1   Medical Group.  Chaudhuri is a one-third minority shareholder of Devonshire.  David Sizemore,

2   M.D. ("Sizemore") is President of Devonshire.  Chaudhuri is not an officer of the corporation.

3   However, Devonshire is managed by KM Strategic Management, LLC ("KM"), which is owned

4   by Chaudhuri and Mike Foutz.  While each of the principals of KM are committed to invest in

5   PHH, Devonshire is not an investor in PHH or PHH, LLC.

6        Hemet Surgery is a California professional corporation that operates an ambulatory

7   surgery facility in Hemet.  Hemet Surgery contracts directly with HMOs, PPOs, Medicare,

8   MediCal, private insurers, and individuals to provide outpatient surgical services in the Hemet,

9   San Jacinto, Menifee, and Sun City areas.  Hemet Surgery does not contract directly with

10  HCMG.  Hemet Surgery is co-owned by six physicians, including Chaudhuri.  Chaudhuri is a

11  member of the board of directors of Hemet Surgery.  At all times relevant to this case, Kuan

12  Chen, M.D. ("Chen") has served as the President of Hemet Surgery.  Chen, Chaudhuri, and

13  Sizemore are on Hemet Surgery's board of directors.  Hemet Surgery is not an investor in PHH

14  or PHH, LLC.

15       2.  Cherry

16       Petitioners contend that "PHH, by virtue of being controlled by the same group of

17  individuals responsible, directly or indirectly, for virtually all of Cherry's salary paid by

18  Temecula Medical Group and [HCMG], is in a position to render pecuniary benefits to Cherry

19  based on the contract (i.e., the ASA) it received."[67]  Petitioners seek a finding that "Cherry had a

20  conflict of interest because he voted to approve the ASA that will compromise a claim of his

21  employer and benefit the Chairman of his employer."[68]

22       Cherry is a physician who has served as a member of VHS's Board of Directors since

23  November 2002.  Cherry conducts a private practice in the Menifee/Temecula area through

24

25  [67]  Plaintiffs' Trial Brief, 10:20-23.

26  [68]  Petitioners' Proposed Findings of Fact and Conclusions of Law, 18:16-18.

27

- 37 -

1   William H. Cherry, M.D., Inc., a wholly-owned professional corporation. Cherry's practice

2   includes providing services for HMOs. Cherry provides primary health care services to health

3   plan enrollees of HCMG pursuant to a Primary Care Professional Service Agreement effective

4   April 1, 2002.[69] He is one of 125 primary care physicians, 900 specialists and 7,500 providers

5   who have agreements with HCMG. The contract with HCMG permits Cherry to access the

6   HMO network for his HMO patients. Cherry currently has 11,040 patient records. Cherry also

7   provides primary care services for HCMG's group provider, Temecula Medical Group, in the

8   Temecula area pursuant to an IPA Primary Care Physician Provider Agreement dated June 1,

9   2004.[70] Cherry accesses a network of medical specialists for his patients through his independent

10  provider agreement with the Temecula Medical Group. He provides these services through

11  William H. Cherry, Inc. and Same Day Medical Care, Inc. For services provided to HMO

12  enrollees, Cherry is compensated through a per member per month capitation fee via a

13  relationship between HCMG and insurance companies. Finally, Cherry is one of fifteen Medical

14  Directors for HCMG pursuant to a Medical Director Agreement with HCMG dated August 1,

15  2005.[71] Cherry serves as a medical director on behalf of HCMG over the geographic service area

16

17  [69] Section 8.1 entitled "Immediate Termination" authorizes HCMG to terminate the contract
18  immediately if the physician engages in "conduct or activity which substantially jeopardizes the
    Group's business reputation." Exhibit 100, Cherry 00073.

19
    [70] Section 6.15 entitled "Disparagement" states: "PCP shall refrain from making or publishing
20  disparaging statements concerning the Company, its directors, officers, shareholders and
    providers and the Company's management . . . and its directors, officers, employees and
21  shareholders." Exhibit 102, Cherry 00007. Section 12.2(c) entitled "Immediate Termination by
    Company" further states, in pertinent part, that the Company may immediately terminate the
22  contract upon written notice if the PCP has "made or published disparaging remarks about the
23  Company." Exhibit 102, Cherry 00013.

24  [71] Section 1.4 of the contract entitled "Public Support for Group / No Disparagement" states:
    "Physician shall at all times publicly and privately support the Group, its directors, officers and
25  representatives." Exhibit 103, Cherry 00025. Section 3.2 entitled "Termination by Group"
    authorizes termination of the physician for cause upon 30 days written notice and without cause
26  upon 90 days written notice to the physician. Exhibit 103, Cherry 00026.

27

- 38 -

1  of Menifee Medical Group. Cherry's compensation as a medical director has not changed since

2  the inception of the contract.

3       At the time the ASA was approved by VHS, Cherry was an independent contractor of

4  Temecula Medical Group and HCMG. Cherry has been an outspoken critic of Chaudhuri,

5  notwithstanding the non-disparagement clauses contained in his contracts with HCMG and

6  Temecula Medical Group. There is no credible evidence that Cherry was unduly influenced by

7  Chaudhuri by virtue of his contractual relationships with HCMG and Temecula Medical Group.

8  Nor is there evidence that Chaudhuri or any other individual either directed Cherry to vote in

9  favor of the ASA or promised consideration to Cherry in exchange for a favorable vote on the

10 ASA. Cherry is not an investor in PHH or PHH, LLC and has no cognizable financial interest in

11 the ASA, PHH or PHH, LLC.[72]

12      3. Rao

13      Rao has served as a member of VHS's Board of Directors since December 2008. Rao is

14 employed by Hemet Surgery as its Administrator. He is an "at will" employee of Hemet Surgery.

15 Petitioners assert that "PHH, by virtue of being controlled by the same group of individuals

16 responsible for Rao's continued employment, salary and bonus at Hemet Surgery, is in a position

17 to render pecuniary benefits to Rao based on the contract (i.e., the ASA) it received."[73]

18 Petitioners seek a finding that Rao had an impermissible conflict of interest under California

19 Government Code § 1090 when he voted to approve the ASA "because he knew that Chaudhuri,

20 the former CEO and significant shareholder of his sole employer, stood to benefit from the

21

22 [72] Indeed, Cherry submitted a statement under penalty of perjury to VHS dated July 20, 2009,
   stating, in pertinent part, that he "will not own any stock or invest in either PHH or any other
23 entity which proposes to purchase any assets of Valley Health System;" that he has "no desire to
   own any stock or to invest in either PHH or any other entity which proposes to enter into a joint
24 venture with Valley Health System;" and that he "will not be an officer, director, partner,
   manager, or employee of any entity which chooses to either purchase the assets or enter into a
25 joint venture with Valley Health System." Exhibit 244:1

26
   [73] Plaintiffs' Trial Brief, 11:14-16.
27

- 39 -

1  assumption of the Assumed Rejection Claims, and from ownership and control of PHH."[74]

2      Chaudhuri is one of 6 minority shareholders of Hemet Surgery. Hemet Surgery contracts

3  directly with HMOs. The HMOs refer their patients directly to Hemet Surgery for outpatient

4  surgery services. Hemet Surgery does not contract with HCMG. Rao is not an investor in PHH

5  or PHH LLC, and has no direct or indirect financial interest in the ASA, PHH, or PHH, LLC.

6  There is no evidence that Chaudhuri or any other individual either directed Rao to vote in favor

7  of the ASA or promised consideration to Rao in exchange for a favorable vote on the ASA. Nor

8  is there credible evidence that Rao was unduly influenced by Chaudhuri due to his employment

9  as Administrator of Hemet Surgery. Chaudhuri is an investor in Hemet Surgery, but does not

10  exercise any operational control over Hemet Surgery and does not hold any management

11  position.

12      4. Dreier

13      Dreier has served as a member of VHS's Board of Directors since June 2009. Petitioners

14  ask the court to find that Dreier had an impermissible conflict of interest under California

15  Government Code § 1090 when she voted to approve the ASA because her husband, Dr. Dreier,

16  a local general surgeon, provides services to Devonshire pursuant to a contract that authorizes

17  Devonshire to terminate the agreement if Dr. Dreier makes disparaging remarks about HCMG or

18  KM.[75] Dreier is not employed by Devonshire, HCMG, or any of the other entities in which

19  Chaudhuri is an officer, director or shareholder.[76] Given her husband's contract with

20  Devonshire, however, the petitioners reason that "PHH, by virtue of being controlled by the same

21

22  ─────────────

23  [74] Petitioners' Proposed Findings of Fact and Conclusions of Law, 29:5-7.

24  [75] Petitioners' Proposed Findings of Fact and Conclusions of Law, 22:18-20.

25  [76] Dr. Dreier submitted a statement under penalty of perjury to VHS dated July 22, 2009, in
conjunction with his spouse's appointment to the VHS Board of Directors confirming that he

26  "would not be an owner, director or officer of PHH" and that he was "willing to forgo any
involvement in PHH" to permit her to serve on the board of directors. Exhibit 246:1.

27

- 40 -

1 group of individuals responsible for Mrs. Dreier's salary, is in a position to render pecuniary

2 benefits to Mrs. Dreier based on the contract (i.e., the ASA) it received."[77]

3      Dr. Dreier is a respected surgeon with over 40 years of surgical experience in the Hemet

4 area. On June 1, 2004, Dr. Dreier agreed to provide Devonshire surgical services on a non-

5 exclusive basis pursuant to a Physician Services Agreement dated June 1, 2004.[78] Devonshire

6 paid Dr. Dreier $20,000 per month for services provided under this contract. Dr. Dreier's

7 contract with Devonshire was executed more than five years prior to his wife accepting a position

8 on the VHS Board of Directors. Prior to June 1, 2004, Dr. Dreier had a contract to provide

9 surgical services to HCMG members through the Hemet Surgeons' Group, Inc. Dr. Dreier was

10 paid $20,000 per month for his services under his employment agreement with Hemet Surgeons'

11 Group, Inc. Dr. Dreier's compensation under his contract with Devonshire was increased to

12 $25,000 per month in 2007 based upon patient encounter data[79] which established that additional

13 compensation was warranted given the number of surgeries performed by Dr. Dreier. Neither

14 Dreier nor her husband, Dr Dreier, own an equity interest in Devonshire.

15      At the time the ASA was approved by VHS, Dr. Dreier was an independent contractor of

16 Devonshire. Dreier and her husband are not investors in PHH or PHH, LLC. Neither Dreier or

17 her husband possess a direct or indirect financial interest in the ASA, PHH, or PHH, LLC. There

18

19 ─────────────────

[77] Plaintiffs' Trial Brief, 9:16-18.

20

21 [78] Section 11 entitled "No Disparagement" states: "The parties recognize that the success of the Group depends upon sound and mutual supportive relationship with HCMG, its management

22 company, its Board of Directors, Officers, and representatives. Accordingly, Physician agrees that he shall not make disparaging remarks regarding HCMG, its directors, officers,

23 representatives, or its subcontracted management company, KM Strategic Management, LLC or its directors, officers, employees or representatives and shall endeavor at all times to be

24 supportive of the aforesaid entities and persons. Group likewise agrees that it shall make no disparaging remarks regarding Physician and it shall, at all times, endeavor to be supportive of

25 Physician." Exhibit 24, Dreier 0003.

26

[79] See Exhibit 245.

27

- 41 -

1    is no evidence that Chaudhuri or any other individual either directed Dreier to vote in favor of the

2    ASA or promised consideration to Dreier or her husband, Dr. Dreier, in exchange for a favorable

3    vote on the ASA. Nor is there credible evidence that Dreier was unduly influenced by Chaudhuri

4    due to her husband's contractual relationship with Devonshire. Chaudhuri is an investor in

5    Devonshire, but does not exercise any operational control over Devonshire and is not an officer

6    of the company. The fact that Dr. Dreier has not publicly criticized Devonshire, HCMG, or

7    Chaudhuri in the past five years does not support a finding that either he or his spouse has a

8    cognizable financial interest in the ASA.

9        Because the petitioners have failed to establish that either Cherry, Rao, or Dreier had a

10   cognizable financial interest in the ASA at the time it was approved by VHS's Board of

11   Directors, the petitioners' challenge pursuant to California Government Code § 1090 will be

12   dismissed.[80]

13   C.    The PHH Transaction Provides "Fair Value" for VHS's Assets

14       Petitioners' charge that V&IG was not "independent" and that its Fair Consideration

15   Opinion was not rendered "in accordance with applicable governmental and industry standards

16

17   [80] Had the ASA been tainted by the vote of directors "financially interested" in the transaction in
     violation of § 1090, VHS and PHH reason that the election on December 15, 2009, at which
18   voters approved the proposed sale of VHS's assets to PHH by a wide margin, would have
     validated the otherwise void contract, citing City of San Diego v. Furgatch, 2002 WL 1575109
19   (Cal.App.4th Dist.). The court disagrees. Furgatch and its progeny stand for the proposition that
     "void municipal contracts that are fully within the powers of the public entity may be effectively
20   ratified if done so in the manner prescribed for the making of the contract." Id. at *12; see Los
     Angeles Dredging Co. v Long Beach, 210 Cal. 348, 359-60 (1930). In Furgatch, a city council
21   member who was financially interested in certain contracts approved by the city council resigned
     her office due to allegations of misconduct. A newly composed city council adopted "ordinances
22   designed to reexecute and readopt the alleged ineffective contracts previously consummated."
     Furgatch, 2002 WL 1575109, at *12. The city then filed an in rem action to validate the
23   ratification ordinances pursuant to California Code of Civil Procedure § 860, et seq. Id. at *1.
     The trial court granted summary judgment for the city and the court of appeals affirmed, holding
24   that summary judgment was proper because as a matter of law, void contracts under sections
     1090 and 1092 . . . can be legally ratified." Id. It was ratification by the a city council free of
25   conflicts of interest, not the election, that breathed new life into the otherwise void contracts.
26
27

- 42 -

1  for appraisal and valuation" as required by California Health & Safety Code § 32121(p)(1).[81]

2  Petitioners allege specifically that:

3      V&IG . . . understood that their job was to justify the bargain basement price to be paid
       by [Chaudhuri], and they initially came in with appraised values that were so low that
4      they surprised VHS's General Counsel, John Marshall ("Marshall").  Marshall instructed
       VHS to prepare higher values and to use those higher values in their appraisals; in
5      violation of the applicable independence rules, V&IG followed his orders.  Indeed,
       Marshall himself drafted the text of key passages in V&IG's fair consideration opinion,
6      and V&IG accepted his text without question.  Notably, V&IG also failed to value many
       of the assets being transferred to PHH, made fundamental errors in valuing the assets it
7      did appraise, and made no effort at all to determine the present value of consideration to
       be paid by PHH under the ASA.
8
   Plaintiff's Trial Brief, 2:5-14.  Petitioners believe that, as a result, VHS is receiving less than
9
   "fair value" for the assets to be sold to PHH.  VHS counters that V&IG is a qualified,
10
   independent valuator which properly appraised VHS's assets by applying accepted industry and
11
   governmental standards of valuation to reach its conclusion that VHS is receiving fair and
12
   reasonable consideration for the assets being transferred under the ASA.
13
       Section 32121(p)(1) of the California Health & Safety Code authorizes VHS, as a local
14
   health care district:
15
       To transfer, at fair market value, any part of its assets to one or more nonprofit
16     corporations to operate and maintain the assets.  A transfer pursuant to this paragraph
       shall be deemed to be at fair market value if an independent consultant, with expertise in
17     methods of appraisal and valuation and in accordance with applicable governmental and
       industry standards for appraisal and valuation, determines that fair and reasonable
18     consideration is to be received by the district for the transferred district assets.  Before the
       district transfers, pursuant to this paragraph, 50 percent or more of the district's assets to
19     one or more nonprofit corporations, in sum or by increment, the elected board shall, by
       resolution, submit to the voters of the district a measure proposing the transfer.  The
20     measure shall be placed on the ballot of a special election held upon the request of the
       district or the ballot of the next regularly scheduled election occurring at least 88 days
21     after the resolution of the board.  If a majority of the voters voting on the measure vote in
       its favor, the transfer shall be approved.  The campaign disclosure requirements
22     applicable to local measures provided under Chapter 4 (commencing with Section 84100)
       of Title 9 of the Government Code shall apply to this election.
23
   Cal. Health & Safety Code § 32121(p)(1) (emphasis added).  Section 32121(p)(1) authorizes
24

25 ───────────────────────
   [81]  Petitioners do not dispute the fact that V&IG has expertise in methods of appraisal and
26 valuation and is otherwise qualified to render an opinion regarding fair market value for purposes
   of California Health & Safety Code § 32121(p)(1).  See supra note 23.
27
                                    - 43 -

1   VHS to transfer its assets to PHH, a non-profit corporation, for the purpose of operating and

2   maintaining the assets, so long as it does so at fair market value. Id. An appraisal or professional

3   opinion as to value is not a condition for a transfer of assets under § 32121(p)(1). Id. However,

4   a transfer under § 32121(p)(1) is deemed at fair market value if "an independent consultant, with

5   expertise in methods of appraisal and valuation and in accordance with applicable governmental

6   and industry standards for appraisal and valuation, determines that fair and reasonable

7   consideration is to be received by the district" for the assets. Id.

8         1. V&IG Was an Independent Consultant

9         Petitioners assert that V&IG was not independent, claiming that (a) V&IG was instructed

10   by Marshall to assign high values in its appraisals of VHS's assets; and (b) V&IG accepted

11   without inquiry text prepared by Marshall for V&IG's Fair Consideration Opinion describing the

12   assets to be transferred and concluding that fair value was to be received by VHS for the assets

13   under the ASA.

14         (a) Scope of Work

15         The Scope of Work Rule set forth in the Uniform Standards of Professional Appraisal

16   Practice ("USPAP") states:

17         For each appraisal, appraisal review, and appraisal consulting assignment, an appraiser
       must:

18

19              1.    identify the problem to be solved;
                2.    determine and perform the scope of work necessary to develop credible
                      assignment results; and

20              3.    disclose the scope of work in the report.

21         An appraiser must properly identify the problem to be solved in order to determine the
       appropriate scope of work. The appraiser must be prepared to demonstrate that the scope

22       of work is sufficient to produce credible results.

23   Exhibit 124:22. With regard to Problem Identification, the Scope of Work further states:

24         An appraiser must gather and analyze information about those assignment elements that
       are necessary to properly identify the appraisal, appraisal review or appraisal consulting

25       problem to be solved.

26   Id. In the comment to "Problem Identification," USPAP provides the following guidance for an

27

                                              - 44 -

1    appraiser:

2     In an appraisal assignment, for example, identification of the problem to be solved
      requires the appraiser to identify the following assignment elements:

3

   * client and any other intended users;
4       * intended use of the appraiser's opinions and conclusions;
         * type and definition of value;
5       * effective date of the appraiser's opinions and conclusions;
         * subject of the assignment and its relevant characteristics; and
6       * assignment conditions

7     This information provides the appraiser with the basis for determining the type and extent
      of research and analyses to include in the development of an appraisal. Similar
8    information is necessary for problem identification in appraisal review and appraisal
      consulting assignments.

9
 Communication with the client is required to establish most of the information necessary
10   for problem identification. However, the identification of relevant characteristics is a
      judgment made by the appraiser that requires competency in that type of assignment.

11
      Id. (emphasis added). Finally, USPAP's Scope of Work Acceptability requirement provides, in
12
      pertinent part, that "[a]n appraiser must not allow the intended use of an assignment or a client's
13
      objectives to cause the assignment results to be biased." Id. at 23. Jean-Pierre Lomonaco
14
      ("Lomonaco"),[82] who performed the appraisals for VHS on behalf of V&IG, testified that it is
15
      consistent with USPAP to speak to the client about the property to be appraised and to accept
16
      direction from a client regarding the scope of the work to be performed.
17
       On July 3, 2009, Marc Lussier ("Lussier"), Chief Executive Officer of V&IG, emailed to
18

19   _____

      [82] Lomonaco is the President of V&IG, Culver City, California. He is a member of the Appraisal
20   Institute ("MAI"), and a certified general real estate appraiser licensed in Arizona, California,
      Colorado, Georgia, Illinois, Maryland, Massachusetts, Michigan, Ohio, Oregon, Pennsylvania,
21   Texas, Utah, and Washington. He graduated from the University of Southern California with a
      Bachelor of Science degree in Finance with an emphasis on real estate. According to his resume,
22   Lomonaco's "[e]xperience includes appraisal and marketing feasibility assignments for a wide
      range of property types in the senior housing and healthcare related industry. Property types
23   included senior apartments, independent living, congregate, assisted living, skilled nursing,
      Alzheimer's, medical office buildings, surgery centers, dialysis centers, rehabilitation hospitals,
24   psychiatric hospitals, speciality hospitals, and general acute care hospitals. Assignments have
      been conducted throughout the United States." Exhibit 3A:18. Lomonaco oversaw the
25   preparation of all of the appraisals underlying the Fair Consideration Opinion and was qualified
26   to sign the Fair Consideration Opinion.

27
         - 45 -

Marshall, at Marshall's request, a proposed engagement letter for appraisal of the Hemet

Hospital, Menifee Hospital, Menifee – Adjacent Vacant Parcels, Skilled Nursing Facility, Hemet

Valley Medical Arts Building, and the Five Accessory Buildings. After July 3, 2009, Marshall

and Lussier communicated through a series of emails regarding the language of the engagement

letter and scope of the work to be performed by V&IG. Marshall asked that one or more spelling

errors be corrected, the signature block for VHS revised, and the tense of a word used in the draft

engagement letter changed from singular to plural. Marshall also proposed language to expand

the description of "Other Hemet Assets" used in the letter, as well as the following language

regarding the purpose of the appraisal:

> Purpose: The purpose should be to 'determine the market value of the facilities for (a) internal planning, (b) bankruptcy purposes, and (c) possible sale of some or all of such assets.' I would then add at the end of that paragraph: Sale of fifty percent or more of the District's assets will require that such transfer be at fair market value and an opinion that the proposed transaction will receive fair and reasonable consideration, pursuant to Section 32121(p) of the California Local Health Care District Law.

Exhibit 71:3. Marshall's suggestions were incorporated into the final draft of the engagement

letter between VHS and V&IG dated July 9, 2009, which was accepted by VHS on July 13,

2009.[83]

Lussier worked with Marshall to identify the scope and purpose of the appraisals to be

undertaken by V&IG for VHS, as permitted by USPAP's Scope of Work Rule. There is nothing

in the testimony of either Lussier or Marshall nor the documentary evidence to support a finding

that Marshall's clarification concerning the purpose of the appraisals in the engagement letter

---

[83] Exhibit 9:2. The engagement letter signed by the parties states, in pertinent part:

> "The purpose of the appraisal is to determine the market value of the facilities for (a) internal planning, (b) bankruptcy purposes and (c) and possible sale of some or all of such assets; therefore the value conclusion will be market value and will be in compliance with USPAP and FIRREA standards. We understand that a Sale of fifty percent or more of the District's assets will require that such transfer be at fair market value and an opinion that the proposed transaction will receive fair and reasonable consideration, pursuant to Section 32121(p) of the California Local Health Care District Law."

- 46 -

1  prevented V&IG from developing credible assignment results or affected the scope of work's

2  acceptability by causing "the assignment results to be biased."[84]  Nor does the evidentiary record

3  support a finding that V&IG, from the outset, understood its "job was to justify the bargain

4  basement price to be paid by" PHH, Chaudhuri, or any other potential purchaser of VHS's assets,

5  as alleged by petitioners.

6      (b)  Marshall Did Not Instruct V&IG to Produce an Appraisal Containing a
   Predetermined Opinion or Conclusion

7  The Conduct section of USPAP's Ethics Rule states, in pertinent part, that:

8
9  An appraiser must perform assignments ethically and competently, in accordance with
   USPAP. . . .

10  An appraiser must perform assignments with impartiality, objectivity, and independence,
    and without accommodation of personal interests . . . .

11
12  An appraiser must not accept an assignment that includes the reporting of predetermined
    opinions and conclusions.

13  Exhibit 124:17.

14      By email dated August 7, 2009, Marshall asked Lussier if he was ready to "discuss

15  preliminary numbers on the appraisal, and particularly Hemet."[85]  In response, Lussier emailed

16  Marshall a "Schedule of Preliminary Value Conclusions" later that day.[86]  Marshall testified he

17  told Lussier that "VHS had entered into an exclusivity agreement with PHH, but that no number

18  had been proposed by PHH" for the purchase of its assets and that "he needed to have [V&IG's]

19  preliminary numbers so when an offer came in, [VHS] would know whether it was in the

20  ballpark or not."  Marshall further testified that he advised Lussier by telephone that the numbers

21  seemed low and asked Lussier: "Are you able to give me a range between the low number you

22  considered and the high number you considered so that if, as, and when we get an offer from

23

24  [84] See Exhibit 124:23.

25  [85] Exhibit 75.

26  [86] Exhibit 76:2.
27

- 47 -

1   PHH we could evaluate that offer in terms of the appraisal range." Lussier testified that he told

2   Marshall the preliminary values were liquidation numbers. Marshall testified that he did not

3   recall any discussion on August 7, 2009, regarding liquidation.

4        On August 10, 2009, Lussier emailed Marshall a "Schedule of Preliminary Value

5   Conclusions" containing the following range of value for each of the properties being appraised

6   by V&IG for VHS:

7   | Property | Low Value | High Value |
    |----------|-----------|------------|
8   | Hemet Hospital | $19,270,000 | $28,530,000 |
    | Menifee Hospital | $20,330,000 | $26,110,000 |
9   | Menifee Parcels | $ 4,570,000 | $ 6,830,000 |
    | Skilled Nursing Facility | $ 3,800,000 | $ 4,450,000 |
10  | Medical Arts Building | $ 7,340,000 | $ 8,810,000 |
    | Accessory Buildings | $ 2,730,000 | $ 3,410,000 |

11
    Exhibit 77:2. In conjunction with the range of values transmitted by Lussier, Marshall did not
12
    recall whether Lussier referred to the low values as "liquidation" values or the high values as
13
    "going concern" values. Lussier's accompanying email to Marshall states: "This analysis has not
14
    considered a value in Liquidation."[87] Marshall denies that he directed Lussier or anyone at V&IG
15
    to "come up" with a higher number for VHS's assets.
16
         Lomonaco formulated the range of values given by V&IG to Marshall on August 10,
17
    2009. Lomonaco testified that it was typical to prepare a range of low and high values for a
18
    client depending on the scope of the assignment. Lomonaco acknowledged, however, that it
19
    would be inappropriate for the client to determine whether to issue an appraisal at the low end or
20
    the high end of that range.
21
         On or about September 4, 2009, V&IG delivered to Marshall a box containing a draft of
22
    an appraisal prepared by Lomonaco for each of the properties. Lomonaco valued the Menifee
23
    Parcels at the "high value," and the Skilled Nursing Facility, Medical Arts Building, and
24
    Accessory Buildings just under the "high value" of the range of values previously provided by
25

26  _____

27  [87] Id. at 1.

- 48 -

1   Lussier to Marshall on August 10, 2009.  Only the draft appraisals of Hemet Hospital and

2   Menifee Hospital carried a value in the lower range of those V&IG had provided to Marshall on

3   August 10, 2009.  Lomonaco testified that he did not have a conversation with Marshall or

4   anyone at VHS regarding the drafts.  Lomonaco's testimony was consistent with that of Marshall,

5   who testified that he did not have any further contact with V&IG until the end of the month.

6         On September 30, 2009, Marshall advised Lussier by email that VHS was "on a fast

7   track" and that VHS might "need (a) final appraisals with the high values (or perhaps with the

8   ranges) and (b) opinion per Health Care District Law, by Monday."[88]  Marshall does not deny

9   sending the email and Lussier does not deny receiving the email.  However, Lussier testified that

10  Marshall did not, at any time, ask V&IG to assign a specific number for the valuation of Hemet

11  Hospital or Menifee Hospital or otherwise suggest a value for the assets being appraised by

12  V&IG for VHS.  Lomonaco did not recall any contact with VHS, including Marshall, before

13  completing the appraisals on October 5, 2009, nor did he recall any conversations with Lussier

14  regarding Marshall's email dated September 30, 2009.  When pressed on cross examination

15  about his email dated September 30, 2009, Marshall testified that Lussier responded to the email

16  by providing "the number that he [Lussier] was comfortable using in connection with this

17  transaction."

18        On October 5, 2009, V&IG delivered a final appraisal on each of the properties to VHS

19  which contained the following values:

20  | Property | Final Appraised Value |
    |---|---|
    | Hemet Hospital | $27,830,000 |
    | Menifee Hospital | $25,800,000 |
    | Menifee Parcels | $ 6,830,000 |
    | Skilled Nursing Facility | $ 4,550,000 |
    | Medical Arts Building | $ 8,700,000 |
    | Accessory Buildings | $ 3,300,000 |

    See supra notes 24-29.

---

[88]  Exhibit 32.

- 49 -

1   (1) <u>Final Appraisal of Hemet Hospital</u>

2    In its final appraisal, V&IG used the Income Capitalization Approach[89] to calculate

3 Hemet Hospital's total net revenue at $120,802,500, or $1,638 per adjusted patient day, and its

4 total expenses at $112,677,263, or $1,528 per adjusted patient day, resulting in earnings before

5 the deduction of interest, income taxes, depreciation and amortization ("EBITDA") of

6 $8,135,238.[90]  V&IG then determined that a 16% capitalization rate for Hemet Hospital was

7 appropriate "[b]ased on [V&IG's] knowledge of the subject's financial history, the EBITDA

8 trends and future prospects for the subject and the demand for acute-care beds in the subject's

9 market area."[91]  V&IG calculated the net as-is value of Hemet Hospital at $27,330,000 by

10 applying the 16% capitalization rate to EBITDA to arrive at a value indication of $50,850,000,

11 and then deducting $23,520,000 for estimated earthquake retrofit costs to comply with SB

12 1953.[92]

13    V&IG arrived at the same net as-is value of $27,330,000 for Hemet Hospital using the the

14 Sales Comparison Approach.[93]  V&IG compared the EBITDA multiple of four companies which

15

---

16 [89] "The Income Capitalization Approach involves an estimate of a property's capacity to produce
17 income.  This method involves estimating market rent for the subject property, typical vacancy
 and credit loss rates and expenses.  From this, an estimate of the net operating income can be
18 generated.  There are two primary methods to value the income stream of a property, one is the
 Direct Capitalization Method that capitalizes the net operating income by a single rate derived
19 from the market.  The second method is a Discounted Cash Flow Analysis which projects the
 income and expense streams for a specified holding period.  The ultimate reversion from the sale
20 of the property at the end of the holding period is also considered."  Exhibit 3A:84.

21 [90] <u>Id.</u> at 112.

22
 [91] <u>Id.</u> at 113.
23

24 [92] <u>Id.</u> at 113-14.

25 [93] "The Sales Comparison Approach involves a search for recent sales and current listings of
 comparable properties and an analysis of the selected data as they relate to the subject.  The two
26 indicators of value employed in this approach are the price per bed and the earnings before
 interest, taxes, depreciation and amortization multipliers (EBITDA).  In valuing hospitals, the
27

- 50 -

1   it considered to have a reasonable degree of comparability with Hemet Hospital – Community

2   Health Systems, Health Management Associates, Inc., Universal Health Services, and Lifepoint

3   Hospitals. V&IG observed that "a multiplier in the range of 4 to 8 times EBITDA is considered

4   reasonable by most of the investor-owned chains."[94] Based upon its analysis of Hemet Hospital's

5   revenue under the Income Capitalization Approach and its finding that it had a stabilized

6   EBITDA of $8,135,238, V&IG determined that Hemet Hospital's gross value, before deduction

7   of SB 1953 costs, "would be reasonably represented by an EBITDA multiple of 6.25."[95] V&IG

8   calculated the net as-is value of Hemet Hospital at $27,330,000 by applying a multiplier of 6.25

9   to EBITDA to arrive at a value indication of $50,850,000, and then deducting $23,520,000 for

10  estimated earthquake retrofit costs to comply with SB 1953.

11       V&IG's final valuation of Hemet Hospital at $27,830,000 represented an increase in

12  excess of a $9 million from the value set forth in its draft appraisal dated September 4, 2009.[96]

13  The increased value is directly attributable to two changes: (a) an increase in the EBITDA

14  multiplier from 5 to 6.5; and (b) a reduction in the capitalization rate from 20% to 16%.[97]

15       (2) Final Appraisal of Menifee Hospital

16       V&IG used the Income Capitalization Approach in its final appraisal of Menifee Hospital

17  to calculate Menifee Hospital's total net revenue at $46,280,000, or $1,780 per adjusted patient

18  day, and its total expenses at $42,111,800, or $1,620 per adjusted patient day, resulting in

19  _____

20  most common unit of comparison is the EBITDA. The first method is based on selecting an
    EBITDA multiplier, which is derived from the market data, and multiplying it by the subject's
21  estimated EBITDA. The second method, price per bed, is used as a check of reasonableness.
    Based upon these two techniques, an estimate of value via the Sales Comparison Approach is
22  determined." Id. at 84.

23  [94] Id.

24  [95] Id. at 99.

25  [96] See Exhibit 81:2.

26
    [97] Compare Exhibit 81:12 with Exhibit 3A:14.
27

                                              - 51 -

1    EBITDA of $4,168,200. V&IG used the same 16% capitalization rate applied to Hemet

2    Hospital. V&IG then calculated the net as-is value of Menifee Hospital at $25,800,000 by

3    applying the 16% capitalization rate to EBITDA to arrive at a value indication of $26,050,000,

4    and then deducting $250,000 for estimated earthquake retrofit costs to comply with SB 1953.[98]

5          V&IG arrived at the same net as-is value of $25,800,000 for Menifee Hospital using the

6    the Sales Comparison Approach. Based upon its analysis of Menifee Hospital's revenue under

7    the Income Capitalization Approach and its determination that it had a stabilized EBITDA of

8    $4,168,200, V&IG calculated the net as-is value of Menifee Hospital at $25,800,000 by applying

9    a 6.25 multiplier to EBITDA to arrive at a value indication of $26,050,000 and deducting

10   $250,000 for estimated earthquake retrofit costs.

11         With respect to Menifee Hospital, V&IG used an EBITDA multiplier of 6.25 and a 16%

12   capitalization rate in <u>both</u> its draft appraisal and final appraisal. However, V&IG's final

13   valuation of Menifee Hospital at $25,800,000 represented an increase of $5.4 million from the

14   value set forth in its draft appraisal dated August 21, 2009.[99] The difference was attributable to a

15   reduction in the management fee from 8.5% to 6.5% of net revenue, the capitalization of which

16   produced an increase in value of $5,470,000.[100]

17         Lomonaco testified that he was familiar with USPAP and that he followed USPAP in

18   conducting V&IG's appraisal of each of the six assets for VHS. Lomonaco admitted that he did

19   work to increase the values between the draft appraisals and the final appraisals, testifying that he

20   took another look at the historical operations of the hospitals and compared those to what a

21   typical market participant would expect. Lomonaco testified that a typical management fee for a

22   hospital like Menifee Hospital "was in the neighborhood of 2% to 4%" and that a high

23

24   [98] <u>Id.</u> at 113-14.

25   [99] <u>See</u> Exhibit 82:2.

26
     [100] <u>Compare</u> Exhibit 3B:110 <u>with</u> Exhibit 82:110
27

                                              - 52 -

1　management fee was indicative of "some overlap in ownership and control between the hospital

2　and the management company."[101]  With regard to the EBITDA multiplier, Lomonaco testified

3　that he determined the appropriate multiplier after considering a number of factors, including

4　diversification risks and industry surveys that were documented in the appraisal.  Lomonaco

5　further testified that he reconsidered his SB 1953 analysis between the draft and final appraisals.

6　Because of a change in attitude among market participants regarding SB 1953 retrofit costs since

7　the initial regulations were enacted following the Northridge earthquake, Lomonaco concluded

8　that he had applied too conservative and stringent a method with respect the SB 1953 issues

9　facing the Hemet Hospital.  On reconsideration, Lomonaco determined that a 16% capitalization

10　rate for Hemet Hospital was reasonable.

11　　　　　(3) Fair Consideration Opinion

12　　　　　On October 5, 2009, Marshall emailed Lussier a copy of the ASA for the purpose of

13　permitting Lussier to review the assets to be sold and consideration to be received by VHS from

14　PHH.[102]  Marshall testified that he discussed with Lussier each of the elements under § 1.2.1 of

15　the ASA, entitled "Purchaser's Estimate of Purchase Consideration."[103]  Marshall testified that he

16　had provided Lussier with the financial statements for VHS for the period ending August 31,

17　2009, which changed the consideration in the ASA from $156,000,000 to $169,773,000.

18　Marshall testified on cross-examination, however, that he did not recall whether he discussed

19　with Lussier that the payments under § 1.2.1(a)(iv) and (ix) were over a period of years.

20　　　　　On October 5, 2009, Lussier emailed Marshall a draft of V&IG's Fair Consideration

21　Opinion.  On October 6, 2009, Marshall provided Lussier with proposed language for the

22

---

23　[101] Lomonaco observed in his final appraisal of Menifee Hospital: "The district's operations are

24　managed by Valley Health Care Management Services, which is 50% owned by the district and
50% owned by a physician owner." Exhibit 3B:65.

25　[102] Exhibit 96.

26
[103] Id. at 15.

27
　　　　　　　　　　　　　　- 53 -

1  consideration description on page 1 of the Fair Consideration Opinion, i.e., "approximately

2  $169[.]773 million, including the assumption of approximately $55 million in disputed

3  claims."[104]  Marshall also provided Lussier with a proposed description of assets included in the

4  transaction based on his discussions with Lussier of the ASA – assets which were either

5  subsumed in the appraisals performed by V&IG or disclosed in VHS's financial statements.[105]

6  Marshall testified that he also discussed with Lussier proposed language for a reference to VHS's

7  financial statements under paragraph (f) on page 4, together with suggested language for the

8  bullet point on page 5 of the Fair Consideration Opinion.[106]  Several drafts of the Fair

9  Consideration Opinion were exchanged between Lussier and Marshall.  Notwithstanding the

10  proposed language, Marshall testified that he did not instruct Lussier to either include specific

11  language in the Fair Consideration Opinion or make a particular conclusion in the Fair

12  Consideration Opinion.  Marshall testified that Lussier never told him that he would have to do

13  some additional work to determine if the assets in the description provided by Marshall were

14  covered by an appraisal or the financial statements.

15     Lomonaco testified that he exercised independent judgment in reaching the conclusions

16  set forth in each of V&IG's final appraisals, that the appraisals were prepared in a manner

17  consistent with USPAP, and that the value stated in each of the final appraisals is an accurate

18  statement of the value of the asset appraised on the date of valuation.  Petitioners do not quarrel

19  with V&IG's appraisals of the Menifee Parcels, Skilled Nursing Facility, Medical Arts Building,

20  or the Accessory Buildings which formed a basis for the Fair Consideration Opinion and resulted

21  in valuations either at or just under the "high value" of the range of values provided by Lussier to

22  Marshall on August 10, 2009.  Petitioners do not suggest that V&IG used an inappropriate

23

24  [104] Exhibit 97:3.

25  [105] Id. at 4.

26  [106] Id. at 7.

27

- 54 -

1    valuation approach in its appraisal of either Hemet Hospital or Menifee Hospital. Nor do

2    petitioners attack the 6.5 EBITDA multiplier or 16% capitalization rate as applied to Menifee

3    Hospital. Petitioner's argument boils down to a disagreement with Lomonaco's adjustment of

4    the EBITDA multiplier and capitalization rate to 6.5 and 16%, respectively, as applied to Hemet

5    Hospital and reduction of the management fee at Menifee Hospital. There is no credible

6    evidence, however, that Lomonaco was improperly influenced by Marshall or anyone at VHS in

7    making those determinations.

8         Had VHS's sale of assets to PHH had been a "sweetheart deal" as claimed by petitioners,

9    VHS would likely have accepted the preliminary numbers received by Marshall on August 7,

10   2009. Instead, VHS took action to maximize the value of the assets being transferred under the

11   ASA by encouraging V&IG to consider a range of values and other factors affecting the market

12   value of the properties. In doing so, VHS and V&IG did not run afoul of USPAP. In sum,

13   petitioners have not establish by a preponderance of the evidence that V&IG was not independent

14   for purposes of California Health & Safety Code § 32121(p)(1).

15        2. V&IG Did Not Fail to Follow Accepted Industry and Governmental Standards

16        Petitioners claim that V&IG failed to adhere to applicable standards by, among other

17   things, using incorrect stock price data, making arithmetic errors, and failing to value, test or

18   make appropriate inquiry concerning the Assumed Rejection Claims,[107] VHS's accounts

19   receivable and other assets.

20        USPAP Standard 9 defines the parameters for appraising an interest in an ongoing

21   business. Standards Rule 9-1 states:

22        In developing an appraisal of an interest in a business enterprise or intangible asset, an
         appraiser must: (a) be aware of, understand, and correctly employ those recognized
23        approaches, methods and procedures that are necessary to produce a credible appraisal;
         (b) not commit a substantial error of omission or commission that significantly affects an
24        appraisal; and (c) not render appraisal services in a careless or negligent manner, such as
         by making a series of errors that, although individually might not significantly affect the

25

26   _____

[107] See supra notes 60 & 61.

27

                                    - 55 -

1    results of an appraisal, in the aggregate affect the credibility of those results.

2    Exhibit 124:78.  Standards Rule 9-5 further states:

3        In developing an appraisal of an interest in a business enterprise or intangible asset, an
         appraiser must: (a) reconcile the quality and quantity of data available and analyzed
4        within the approaches, methods, and procedures used; and (b) reconcile the applicability
         and relevance of the approaches, methods and procedures used to arrive at value
5        conclusion(s).

6    Id. at 81.  The comment to Standards Rule 9-5 explains that "[t]he value conclusion is the result

7    of the appraiser's judgment and not necessarily the result of a mathematical process."  Id.

8        USPAP Standard 1, which sets forth the requirements for creating an appraisal of real

9    property, states that "[i]n developing a real property appraisal, an appraiser must identify the

10   problem to be solved, determine the scope of the work necessary to solve the problem, and

11   correctly complete research and analyses necessary to produce a credible appraisal."  Id. at 25.

12   Standards Rule 1-1 further states:

13       In developing a real property appraisal, an appraiser must (a) be aware of, understand, and
         correctly employ those recognized methods and techniques that are necessary to produce
14       a credible appraisal; (b) not commit a substantial error of omission or commission that
         significantly affects an appraisal; and (c) not render appraisal services in a careless or
15       negligent manner, such as by making a series of errors that, although individually might
         not significantly affect the results of an appraisal, in the aggregate affects the credibility
16       of those results.

17   Id. at 25.

18       Lomonaco admits using 2009 stock prices with 2008 asset data to derive the EBITDA

19   multiplier necessary to determine a sales comparison value for the Hemet Hospital and Menifee

20   Hospital.  Lomonico testified at trial that he intended to use 2008 stock prices with 2008 data, but

21   acknowledged that doing so was an error.  Lomonaco pointed out in his testimony, however, that

22   the stock price was not the sole data point used in determining an EBITDA multiplier.  The

23   evidence as to whether Lomonaco's admitted error was, in fact, a significant material error was

24   conflicting.

25       As disclosed in the Fair Consideration Opinion, V&IG did not make an independent

26

27

- 56 -

1  determination of the value of an number of assets to be transferred pursuant to the ASA.[108]

2  V&IG did not value VHS's accounts receivable, relying instead on VHS's financial statements

3  for the period ending August 31, 2009.[109]  Petitioners argue that the accounts receivable actually

4  transferred under the ASA may include "unbilled" or "unreported" amounts that might not

5  appear on the financial statements.[110]  Lussier testified that he did not make an independent

6  determination whether the value of the accounts receivable being transferred by VHS under the

7  ASA was the same as the amount of accounts receivable reflected in the financial statements.

8  There is, however, no evidence of "unbilled" or "unreported amounts" as of the valuation date

9  that would impact materially the conclusion reached in the Fair Consideration Opinion.

10        Likewise, V&IG did not undertake an independent appraisal of furniture, fixtures, and

11  equipment to be transferred under the ASA.  V&IG's engagement letter states that:

12       A detailed inventory and valuation of Furniture, Fixtures & Equipment is beyond the
         scope of this engagement.  The value will be incorporated into the appraisal based upon
13       its current net book value.

14  Exhibit 9:3.  Lussier admitted that the furniture, fixtures, and equipment were not valued

15  separately, testifying at trial that those underlying assets were "incorporated into the value of the

16  whole."

17        Nor did V&IG seek to determine whether a purchaser might be able to negotiate a rate for

18

19  _____

20  [108] Exhibit 27:5   Paragraph (f) on page 4 of the Fair Consideration Opinion states, in pertinent
    part, that V&IG "[r]eviewed the financial statements, including income statements, balance
21  sheets and statements of cash flows, for the two months ended August 31, 2009, for VHS,
    including the Assets and Liabilities to be transferred in the Transaction.  V&IG has not made an
22  independent determination of the value of the other assets (cash, accounts receivable, inventories,
    notes receivable and prepaids) or liabilities (accounts payable, pre-petition liabilities, accrued
23  PTO, payroll liabilities, payables to third party payors, workers' compensation and malpractice
    liability).  We assume these amounts to be true and correct as stated in the August 2009
24  financials."

25  [109] Id.

26
    [110] See Exhibit 96:9.
27

-57-

1   D&O and E&O tail insurance lower than the amounts set forth in the ASA.  For purposes of the

2   Fair Consideration Opinion, Lussier reasoned that there was a value equivalency since both VHS

3   and the purchaser would be under an obligation to maintain D&O and E&O tail insurance.  There

4   was no evidence that PHH qualified for D&O insurance or E&O insurance at rates lower than

5   VHS.  Lussier admitted that V&IG did not make an independent determination as to whether a

6   lease of real property transferred under the ASA was above or below market value due to the

7   duration of the lease.  However, there was no evidence of whether a particular lease being

8   transferred pursuant to the ASA was, in fact, below market nor whether the failure to value such

9   lease should have altered the conclusion reached by V&IG concerning the consideration to be

10  received by VHS under the ASA.

11         During his testimony at trial, Lomonaco acknowledged that USPAP requires that an

12  appraisal include a present value calculation for consideration to be received in the future.

13  However, V&IG did consider whether it should discount to net present value the Annual Support

14  Grants to be paid to VHS or the Creditors Commitment of $21,000,000 under the ASA.[111]

15         With respect to the Assumed Rejection Claims, the Fair Consideration Opinion states:

16         Likewise, we have not made an independent determination of the valuation of the
           approximately $55 million in disputed claims, the assumption of which forms part of the
17         purchase price.  However, even substantially discounting such claims, the consideration
           to be received by the District constitutes fair and reasonable consideration for the assets
18         to be transferred.

19  Exhibit 27:5.  Lomonaco testified that he had discussions with Lussier about the final opinion,

20  but that he did not have any discussion with Lussier regarding the above statement in the Fair

21  Consideration Opinion.  Nor did Lomonaco recall a discussion with Lussier about running a test

22  calculation under which the Assumed Rejection Claims would be valued at zero for purposes of

23  determining whether the amount of consideration to be paid by the purchaser is worth more than

24  the assets being transferred.  Lussier testified that he did not know the nature of the claims or

25

26  _____

27  [111] Id. at 15-16.

- 58 -

1   who was asserting the claims. Lussier's testimony as to whether he ran a zero value test to

2   determine the value of the claims was conflicting.

3         Petitioners argue that V&IG should have assigned no value to the Assumed Rejection

4   Claims in the Fair Consideration Opinion because it did not investigate the claims. According to

5   his testimony at trial, Lussier assumed the Assumed Rejection Claims were worth 10 percent of

6   the stated amount for purposes of the Fair Consideration Opinion. He further testified that he did

7   not discuss his 10 percent conclusion with Lomonaco or Marshall. Lussier testified that, prior to

8   reaching his conclusion, he spoke with Marshall regarding the Assumed Rejection Claims and

9   explained that he was having difficulty valuing the assets. Marshall testified that the Assumed

10  Rejection Claims filed by HCMG and Menifee Medical Group were based upon VHS's

11  termination without cause of certain risk pool agreements pursuant to which the IPAs had been

12  receiving income of $1 million per month. Marshall testified that he discussed each of the

13  Assumed Rejection Claims with Lussier, stating that the LHIO and KM claims were worth

14  "nothing" because they were the "subject of litigation" but that he believed the HCMG and

15  Menifee Medical Group claims were "worth a substantial sum." On cross-examination, Marshall

16  testified that he voiced his opinion to Lussier that the discounted value of the disputed claims

17  was probably more than 10 percent of the total amount of the claims, but that he could not

18  quantify it to a certainty. Lussier testified that he relied on his discussions with Marshall in

19  valuing the Assumed Rejection Claims at 10 percent of the stated amount. Marshall testified that

20  he did not direct Lussier to attach a particular value to the Assumed Rejection Claims.

21  Marshall's testimony was consistent with that of Lussier, who testified at trial that Marshall did

22  not give him a specific valuation for the claims.

23        3. <u>VHS is Receiving Fair and Reasonable Consideration for the Transferred Assets</u>

24        V&IG is a nationally recognized health care and financial consulting business composed

25  of licensed and experienced real estate appraisers, financial analysts, and health care

26  professionals. Both VHS and Prime have engaged the professional services of V&IG in the past

27

- 59 -

1  to resolve health care-related valuation issues.  Neither VHS nor Prime disputes V&IG's

2  expertise in methods of appraisal and valuation and qualifications to render an opinion regarding

3  fair market value for purposes of California Health & Safety Code § 32121(p)(1).  VHS is

4  authorized by statute to transfer its assets to a non-profit corporation for the purpose of operating

5  and maintaining the assets, so long as it does so at fair market value.  Cal. Health & Safety Code

6  § 32121(p)(1).  At the request of VHS, V&IG appraised the Hemet Hospital, Menifee Hospital,

7  Menifee Parcels, Skilled Nursing Facility, and Medical Arts Building, reviewed the ASA, and

8  issued its Fair Consideration Opinion concluding that fair and reasonable consideration is to be

9  received by VHS for the assets being transferred to PHH under the ASA.  A transfer under §

10  32121(p)(1) is deemed at fair market value if "an independent consultant, with expertise in

11  methods of appraisal and valuation and in accordance with applicable governmental and industry

12  standards for appraisal and valuation, determines that fair and reasonable consideration is to be

13  received by the district" for the assets. Id.

14         V&IG acknowledges that mistakes were made.  V&IG admittedly made errors in

15  conducting the appraisals of Hemet Hospital and Menifee Hospital.  V&IG could have been more

16  thorough in the analysis that preceded its Fair Consideration Opinion.  However, diving a value

17  conclusion, as stated in USPAP, is not simply a mathematical calculation.[112]  It is "the result of

18  the appraiser's judgment."[113]  V&IG reconciled "the quality and quantity of data available and

19  analyzed within the approaches, methods, and procedures used; and . . . [reconciled] the

20  applicability and relevance of the approaches, methods, and procedures used to arrive at value

21  conclusions."[114]  Petitioners do not quarrel with V&IG's appraisals of the Menifee Parcels,

22  Skilled Nursing Facility, Medical Arts Building, or the Accessory Buildings, nor the bulk of the

23

24  [112] Id. at 81.

25  [113] Id.

26
   [114] See Exhibit 124:81.
27

- 60 -

1  conclusions reached by V&IG in its appraisals of Hemet Hospital and Menifee Hospital.

2  Petitioners disagree with V&IG's adjustment of the EBITDA multiplier and capitalization rate to

3  6.5 and 16%, respectively, as applied to Hemet Hospital and reduction of the management fee at

4  Menifee Hospital.  However, the weight of the evidence supports a finding that Lomonaco

5  exercised independent judgment in reaching those conclusions based on his analysis of the data

6  available and in accordance with USPAP.  In the court's view, the errors or omissions identified

7  by the petitioners, either individually or in the aggregate, do not significantly affect the results or

8  credibility of an appraisal by V&IG or the integrity of its Fair Consideration Opinion.

9      V&IG determined that fair and reasonable consideration is to be received by VHS from

10 PHH under the ASA "in accordance with applicable governmental and industry standards for

11 appraisal and valuation" as required by § 32121(p)(1).  The weight of the evidence does not

12 support a finding that VHS either prevented V&IG from developing credible assignment results

13 or instructed V&IG to produce either an appraisal or the Fair Consideration Opinion with a

14 predetermined opinion or conclusion.  There is no evidence that anyone by or on behalf of PHH

15 communicated with anyone at V&IG, including Lussier or Lomonaco, regarding the appraisals or

16 the Fair Consideration Opinion.  Petitioners do not challenge in this proceeding VHS's

17 compliance with the campaign disclosure requirements incorporated into § 32121(p)(1).  Finally,

18 the court is compelled to give deference to the fact that the transaction was approved by VHS's

19 constituents at an election by an overwhelming majority of the voters, as required by §

20 32121(p)(1).

21      Accordingly, the court finds that the consideration to be received by VHS from PHH for

22 the assets to be transferred pursuant to the ASA constitutes fair and reasonable consideration for

23 the transferred assets as required by California Health & Safety Code § 32121(p)(1).  The

24 petitioner's challenge under California Health & Safety Code § 32121(p)(1) will be dismissed.

25 D.    VHS Did Not Violate CEQA in Connection with the PHH Transaction

26      Petitioners assert that VHS's proposed sale of assets to PHH is a "project" within the

27

- 61 -

1  scope of CEQA,[115] and that "VHS failed to comply with CEQA [because] it sold substantially all

2  of its assets to PHH without conducting any environmental review whatsoever."[116] They argue

3  that the sale may cause a reasonably foreseeable indirect physical change in the environment in

4  violation of CEQA because there is "[e]very indication in the record that PHH intends to

5  develop" the vacant parcels of land adjacent to Menifee Hospital "with medical office buildings

6  and hospital-supporting uses."[117] VHS and PHH maintain that CEQA was not violated, pointing

7  to the 1,822-page administrative record that preceded the VHS Board of Directors' approval of

8  the ASA and arguing there is no evidence that PHH ever submitted any specific plan or proposal

9  to VHS to develop the vacant parcels. VHS and PHH argue that the proposed sale of assets

10  contemplated by the ASA is not a "project" subject to CEQA nor is there any credible evidence

11  to support the conclusion that VHS's approval of the ASA would result in direct or reasonably

12  foreseeable indirect physical change to the environment. VHS and PHH further argue that the

13  petitioners not only lack standing to challenge the ASA under CEQA, but are barred from

14  asserting a challenge due to their failure to exhaust administrative remedies.

15      1. Lewis, Lloyd, and Fazekas Have Standing to Bring the CEQA Mandamus Action

16      Standing is a jurisdictional issue that may be raised at any time during the proceedings.

17  See Common Cause v. Board of Supervisors, 49 Cal.3d 432, 438-39 (1989). In cases under

18  CEQA, standing requirements are liberally construed. Save the Plastic Bag Coalition v. City of

19  Manhattan Beach, 181 Cal.App.4th 521, 2010 WL 298001, *7 (2010).

20      Prime, Lewis, Lloyd, and Fazekas filed a petition for a writ of mandate to invalidate

21  VHS's decision to approve the ASA as a violation of CEQA. A writ of mandate may be issued

22

23  [115] "Project," as defined in CEQA, includes "an activity directly undertaken by a public agency"
"which may cause either a direct physical change in the environment or a reasonably foreseeable
24  indirect physical change in the environment." Cal. Pub. Res. Code § 21065(a).

25  [116] Plaintiffs' Trial Brief, 20:8-10.

26  [117] Id., 20:25-27.

27

- 62 -

1    only upon the verified petition of a "beneficially interested" party. Cal. Civ. Proc. Code § 1086.

2    To establish a beneficial interest, the petitioner must have "some special interest to be served or

3    some particular right to be preserved or protected over and above the interest held in common

4    with the public at large." Carsten v. Psychology Examining Comm., 27 Cal.3d 793, 796 (1980).

5    "This standard is applicable to proceedings in administrative mandate, and it applies in actions

6    based upon CEQA." Waste Mgmt. of Alameda County, Inc. v. County of Alameda, 79

7    Cal.App.4th 1223, 1232-33 (2000) (internal citation omitted). There is, however, a public

8    right/duty exception to the beneficial interest standard. See Bozung v. Local Agency Formation

9    Comm., 13 Cal.3d 263, 272 (1975) (finding that "plaintiffs have standing 'to procure

10   enforcement of a public duty, . . .'") (citation omitted); Save the Plastic Bag Coalition, at *9

11   (concluding that "plaintiff has standing to seek a writ of mandate pursuant to the public

12   right/duty exception to the beneficial interest requirement").

13        In paragraph 10 of their complaint, Prime, Lewis, Lloyd, and Fazekas state: "All

14   Petitioners have a beneficial interest in the subject matter of this Petition and will be adversely

15   affected by the potential environmental impacts of the approval of the ASA." It is undisputed

16   that Lewis, Lloyd, and Fazekas are residents of Riverside County, California, and each reside in

17   communities within the geographic boundaries served by the VHS district. "Such allegations are

18   sufficient to satisfy the liberal standing requirements for private individuals acting in the public

19   interest to institute proceedings to enforce the provisions of CEQA." Kane v. Redevelopment

20   Agency, 179 Cal.App.3d 899, 904 (1986). "Effects of environmental abuse are not contained by

21   political lines; strict rules of standing that might be appropriate in other contexts have no

22   application where broad and long-term effects are involved." Bozung, 13 Cal.3d at 272.

23   Therefore, Lewis, Lloyd, and Fazekas have standing "to seek a writ of mandate pursuant to the

24   public right/duty exception to the beneficial interest requirement." Save the Plastic Bag

25   Coalition, at *9.

26        VHS and PHH assert that Prime lacks standing because it is no more than an economic

27

- 63 -

1   competitor. <u>See, e.g.</u>, <u>Waste Mgmt.</u>, 79 Cal.App.4th at 1235 ("[C]ommercial and competitive

2   interests are not within the zone of interests CEQA was intended to preserve or protect and

3   cannot serve as a beneficial interest for purposes of the standing requirement."); <u>Regency</u>

4   <u>Outdoor Advertising, Inc. v. City of West Hollywood</u>, 153 Cal.App.4th 825, 829-30 (2007)

5   (holding that an outdoor advertising company did not have standing because it had no beneficial

6   interest and was urging CEQA review to pursue its commercial interests against competitiors).

7   However, the court need only find that one petitioner has standing to proceed. <u>See, e.g.</u>, <u>Watt v.</u>

8   <u>Energy Action Educ. Found.</u>, 454 U.S. 151, 160 (1981) ("There are three groups of plaintiffs in

9   this litigation . . . . Because we find [that one of the groups] has standing, we do not consider the

10  standing of the other plaintiffs."); <u>Laub v. U.S. Dept. of Interior</u>, 342 F.3d 1080, 1086 (9th Cir.

11  2003) ("Because the individual plaintiffs have standing, we need not consider whether the farm

12  bureau has standing."). Having determined that Lewis, Lloyd, and Fazekas each have standing

13  and the petitioners having raised the same questions of fact and law concerning the review of a

14  single administrative action, the standing objections of VHS and PHH are overruled.

15      2. <u>Prime, Lewis, Lloyd, and Fazekas Failed to Exhaust Administrative Remedies</u>

16      "Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of

17  a CEQA action." <u>Bakersfield Citizens for Local Control v. City of Bakersfield</u>, 124 Cal.App.4th

18  1184, 1199 (2004). Section 21177 of the California Public Resources Code states, in pertinent

19  part:

20          (a) No action or proceeding may be brought pursuant to Section 21167 unless the alleged
            grounds for noncompliance with this division were presented to the public agency orally
21          or in writing by any person during the public comment period provided by this division or
            prior to the close of the public hearing on the project before the issuance of the notice of
22          determination.

23          (b) No person shall maintain an action or proceeding unless that person objected to the
            approval of the project orally or in writing during the public comment period provided by
24          this division or prior to the close of the public hearing on the project before the issuance
            of the notice of determination. . . .
25
            (e) This section does not apply to any alleged grounds for noncompliance with this
26          division for which there was no public hearing or <u>other opportunity for members of the</u>
            <u>public to raise those objections orally or in writing prior to the approval of the project</u>, or
27

- 64 -

1       if the public agency failed to give the notice required by law.

2 Cal. Pub. Res. Code § 21177 (emphasis added). "The purpose of the rule of exhaustion of

3 administrative remedies is to provide an administrative agency with the opportunity to decide

4 matters in its area of expertise prior to judicial review." <u>Napa Citizens for Honest Gov't v. Napa</u>

5 <u>County Bd. of Supervisors</u>, 91 Cal.App.4th 342, 384 (2001). "[T]he decision making body 'is

6 entitled to learn the contentions of interested parties before litigation is instituted.'" <u>Corona-</u>

7 <u>Norco Unified School Dist. v. City of Corona</u>, 17 Cal.App.4th 985, 997 (1993) (quoting <u>Citizens</u>

8 <u>Ass'n for Sensible Dev. of Bishop Area v. County of Inyo</u>, 172 Cal.App.3d 151, 162-63 (1985)).

9 "It is no hardship . . . to require a layman to make known what facts are contested." <u>Citizens</u>

10 <u>Ass'n for Sensible Dev.</u>, 172 Cal. App.3d at 163.

11       VHS and PHH contend that Prime, Lewis, Lloyd, and Fazekas did not exhaust their

12 administrative remedies because they failed to raise their CEQA objections during the VHS

13 administrative proceedings, and therefore, are now barred from challenging approval of the ASA

14 under CEQA. Prime, Lewis, Lloyd, and Fazekas dismiss the exhaustion requirement as

15 inapplicable, arguing that VHS made a determination that the proposed ASA was not a project

16 subject to CEQA but did not file a notice of determination nor permit public comment on its

17 proposed decision.

18       VHS held several public meetings at which VHS's Board of Directors considered, and

19 ultimately approved, the sale of assets to PHH. They were not public hearings held pursuant to

20 CEQA, but they were either regular or special meetings of the VHS Board of Directors duly

21 noticed under the Brown Act and open to the public.

22       On June 29, 2009, the VHS Board of Directors announced at a public meeting its

23 intention to explore a sale of its assets as part of a "dual track in addressing [VHS's] severe

24 financial problems." AR00026. Not less than four duly noticed public meetings were held after

25 June 26, 2009, at which VHS's Board of Directors considered a sale of its assets prior to

26 approval of the ASA – July 15, 2009; July 27, 2009; September 16, 2009; and October 6, 2009.

27

- 65 -

1   At three of these meetings, VHS considered PHH's proposal to purchase VHS's assets and its

2   plan to manage the assets in a manner that would keep the hospitals open to the public and

3   operated at a greater level of efficiency and profitability. Members of the public were given an

4   opportunity to address VHS's Board of Directors at each of these meetings and comment on the

5   issue.

6        On July 27, 2009, at least 23 participants at the meeting spoke regarding VHS's potential

7   sale of its assets and the proposed letter agreement with PHH. According to the minutes of the

8   July 27th meeting, "[s]everal members of the public expressed their concern that the Board is

9   entering into an exclusivity agreement to negotiate with only one party and asked why the Board

10  would preclude other interested parties from submitting proposals." AR00201. Sarrao and

11  Fazekas attended the meeting and objected to the proposed letter agreement. AR00209;

12  AR00217. However, no person who addressed VHS's Board of Directors at the meeting raised

13  objections or offered evidence suggesting that PHH's purchase of VHS's assets would impact the

14  environment or result in a violation of either CEQA or California Government Code § 65402.

15       At least 16 individuals addressed the VHS Board of Directors at the meeting on

16  September 16, 2009, regarding VHS's potential sale of its assets and the proposed MOU/TS.

17  According to the minutes of the September 16th meeting, Dr. Alex Denes, speaking on behalf of

18  PHH, addressed the attendees and described PHH's membership and goals. Dr. Denes stated that

19  approximately 130 local doctors had committed to join PHH. Dr. Denes explained that if PHH

20  was able to purchase the assets of VHS, PHH would promote a "community-based hospital

21  system and access to heathcare services." AR01397. PHH, according to Dr. Denes, would

22  "continue the mission of public service," "[lift] VHS out of bankruptcy and [keep] local hospitals

23  and emergency rooms open." Id. No person who addressed VHS's Board of Directors at the

24  meeting raised objections or offered evidence suggesting that PHH's purchase of VHS's assets

25  would impact the environment or result in a violation of either CEQA or California Government

26

27

- 66 -

1  Code § 65402.[118]

2      On October 6, 2009, the VHS Board of Directors considered approval of the ASA

3  between VHS and PHH. At least 18 participants spoke at the meeting, including representatives

4  for PHH and Prime. Troy Schell ("Schell"), Assistant General Counsel for Prime Healthcare

5  Services, Inc., stated that the decision to sell VHS's assets to PHH was "horribly flawed" and

6  violated the "Cortese Statute." AR01612; AR01650-AR01652. Neither Schell nor any other

7  person in attendance, however, raised any objection or offered evidence suggesting that PHH's

8  purchase of VHS's assets would impact the environment or result in a violation of either CEQA

9  or California Government Code § 65402.

10      CEQA's exhaustion requirement applies because the "the public meetings held

11 constituted 'an other opportunity for members of the public to raise . . . objections orally or in

12 writing prior to the approval of the project.'" Mani Bros. Real Estate Group v. City of L.A., 153

13 Cal.App.4th 1385, 1395 (2007) (emphasis in original); see Friends of Mammoth v. Board of

14 Supervisors of Mono County, 8 Cal.3d 247, 267 (1972) (holding that the agency "is entitled to

15 learn the contentions of interested parties before litigation is instituted . . . ," but it is sufficient if

16 other members of the public raised the issues to be litigated because then the agency would have

17 had "its opportunity to act and to render the litigation unnecessary, if it had chosen to do so").

18      It is undisputed that Lewis and Lloyd did not attend or participate in any of the public

19 meetings that preceded VHS's approval of the ASA. Prime and Fazekas attended one or more of

20 the meetings, but neither objected, either orally or in writing, that VHS's proposed sale of assets

21 to PHH would cause an environmental impact or result in a violation of either CEQA or

22 California Government Code § 65402. Because Prime, Lewis, Lloyd, and Fazekas had ample

23

24 [118] By letter dated September 21, 2009, Prime requested that VHS disclose 11 categories of

25 documents pursuant to California Government Code § 6250, et seq., including documents
regarding the MOU/TS and ongoing negotiations between VHS and PHH. None of the

26 documents requested by Prime concerned the environmental impact, if any, of the proposed sale.
AR01563-AR01564.

27

- 67 -

1   opportunity during the administrative proceedings to raise their objections, but failed to give

2   VHS the "'opportunity to receive and respond to articulated factual issues and legal theories

3   before its actions [were] subjected to judicial review,'" they are now barred from challenging the

4   transaction under either CEQA or California Government Code § 65402.[119] See Mani Bros. Real

5   Estate Group, 153 Cal.App.4th at 1396 (quoting Coalition for Student Action v. City of

6   Fullerton, 153 Cal.App.3d 1194, 1198 (1984)).  Notwithstanding their failure to properly exhaust

7   administrative remedies, the challenges asserted by Prime, Lewis, Lloyd, and Fazekas pursuant to

8   CEQA and California Government Code § 65402 fail on the merits.

9          3.  VHS's Sale of Assets to PHH Does Not Constitute a "Project" Subject to CEQA

10         "A party may seek to set aside an administrative decision for failure to comply with

11   CEQA by petitioning for either administrative mandamus or traditional mandamus."  Western

12   States Petroleum Ass'n v. Superior Court, 9 Cal.4th 559, 566 (1995) (internal citations omitted).

13   Judicial review of the agency's decision is limited to "whether there was a prejudicial abuse of

14   discretion."  Cal. Pub. Res. Code § 21168.5.  "Abuse of discretion is established if the agency has

15   not proceeded in a manner required by law or if the determination or decision is not supported by

16   substantial evidence."  Id.  When a quasi-legislative administrative decision is attacked on the

17   grounds that the agency "has not proceeded in an manner required by law," judicial review is

18

19

20   ────────────────────

21   [119] The cases cited by the petitioners can be distinguished on the facts:  Santa Teresa Citizen
    Action Group v. City of San Jose, 114 Cal.App.4th 689, 702 (2003) (finding that the exhaustion
22   requirement did not apply because "there was no clearly defined administrative procedure for
    petitioners to resolve their concerns about the project as it was finally configured"); Azuza Land
23   Reclamation Co. v. Main San Gabriel Basin Watermaster, 52 Cal.App.4th 1165, 1209 (1997)
    (noting that "the State Board admitted that Watermaster had exhausted its administrative
24   remedies before seeking judicial review") (emphasis in original); Castaic Lake Water Agency v.
    City of Santa Clarita, 41 Cal.App.4th 1257, 1266 (1995) (holding that the trial court's finding
25   that petitioner failed to exhaust administrative remedies was error because the board ignored
    petitioner's request for a delay in the proceedings before concluding that the project was
26   exempt).

27

- 68 -

1   confined to the administrative record and matters properly subject to judicial notice.[120] <u>See</u>

2   <u>Western States Petroleum Ass'n</u>, 9 Cal.4th at 576; <u>Carrancho v. Cal. Air Res. Bd.</u>, 111

3   Cal.App.4th 1255, 1269 (2003). "In dealing with an agency's conclusion that the action in

4   question was not a project within the meaning of CEQA, however, the trial court can employ its

5   own analysis of undisputed facts in the record and decide the question as a matter of law without

6   deference to the agency's decision." <u>Friends of the Sierra</u>, 147 Cal.App.4th at 652.

7        Petitioners argue that the proposed sale of assets to PHH under the ASA is an activity

8   undertaken by VHS that may cause a reasonably foreseeable indirect physical change to the

9   environment, and therefore, is a "project" for purposes of CEQA. They point to the following in

10  the 1,822-page administrative record as evidence of PHH's announced development plan with

11  respect to the vacant parcels adjacent to Menifee Hospital:

12      ●    PHH announced its intention in a letter to VHS to develop the vacant parcels with
             medical office buildings and hospital supporting uses: "PHH, with its physician
13           shareholders, have a goal to work with real estate partners to construct a medical
             arts building at the Menifee medical campus in order to return physicians and
14           services to the Menifee area." AR00369.

15      ●    The appraisal for the vacant land states that the highest and best use for the land is
             as "medical or institutional use" – <u>i.e.</u>, precisely the type of building PHH said it
16           plans to build at Menifee. AR00552; AR00554 ("the excess land site could be
             sold or used for expansion of the hospital.").
17
        ●    There are existing plans to expand Menifee, which PHH will be able to use for its
18           development plans. AR00543 ("There is a contingency expansion plan to add
             approximately 107,000 square feet dependent on population growth in the area
19           and the development of medical office buildings in the subject's immediate
             vicinity.").
20
    Plaintiff's Trial Brief, 21:1-14. Petitioners contend that PHH's stated goal for the future of
21
    Menifee Hospital, coupled with the VHS's existing contingency expansion plan, is sufficient to
22

23

24  [129] In conjunction with its decision to grant VHS's motion for protective order, the court
    previously determined that VHS's decision to sell its assets to PHH was a quasi-legislative
25  administrative decision, not a ministerial or informal action that would permit the consideration
    of extra-record evidence on judicial review. <u>See Friends of the Sierra R.R. v. Tuolumne Park &</u>
26  <u>Recreation Dist.</u>, 147 Cal.App.4th 643, 652 (2007) ("There is no doubt that a public agency's
    decision to sell a piece of property it wishes to dispose of is nonadjudicatory in character . . . .").
27

- 69 -

1   support a finding that PHH has a development plan for Menifee Hospital, that an indirect

2   physical change to the environment is reasonably foreseeable as a result of such development

3   plan, and therefore, the sale of the assets to PHH is a "project" within the regulatory scheme of

4   CEQA.  In support of their contention, the petitioners rely on <u>Laurel Heights Improvement Ass'n</u>

5   <u>v. Regents of the Univ. of Cal.</u>, 47 Cal.3d 376 (1998).  According to the petitioners, <u>Laurel</u>

6   <u>Heights</u> compels the conclusion that VHS was required by CEQA to "analyze the impacts of that

7   development, including potential traffic, air pollution, destruction of agricultural land, and other

8   impacts," before approving the ASA and its failure to do so violated the statute.[121]

9         In <u>Laurel Heights</u>, the University of California at San Francisco ("UCSF") had identified

10   serious space constraints impacting its Schools of Medicine, Nursing, Pharmacy, and Dentistry at

11   UCSF's Parnassus campus in a long range plan prepared in 1982.  <u>Laurel Heights</u>, 47 Cal.3d at

12   388.  To address the space issue, UCSF purchased a complex known as the Presidio Corporate

13   Center in Laurel Heights – a 10-acre site that included an existing 340,000 square-foot building

14   and a 13,000 square-foot annex.  <u>Id.</u>  Initially, UCSF believed that the transaction was exempt

15   from CEQA, reasoning that the purchase would not affect the environment because "the

16   relocation to Laurel Heights would involve only the acquisition and operation of an existing

17   facility and negligible or no expansion of existing use at the facility."  <u>Id.</u> However, UCSF

18   reconsidered its own decision given its plan to relocate the School of Pharmacy's biomedical

19   research units to Laurel Heights.  <u>Id.</u> at 388-89.

20         UCSF prepared a draft environmental impact report ("EIR") which disclosed that the

21   biomedical research units to be relocated would handle hazardous substances, including

22   substances that were toxic, carcinogenic, and radioactive.  <u>Id.</u> at 389.  According to the draft EIR,

23   a relocation to Laurel Height would impact the environment in a number of ways, such as "direct

24   and cumulative effects on air quality caused by laboratory emissions vented into the outside air

25

26   _____

27   [121] <u>Id.</u>, 22:7-8.

- 70 -

1 | and effects on human health from exposure to hazardous chemicals" as well as "noise, traffic

2 | congestion, and parking." Id. UCSF certified the final EIR following a public meeting held after

3 | expiration of a 45-day notice and comment period. Id. The Laurel Heights Neighborhood

4 | Improvement Association ("Association"), which was concerned that the research to be

5 | conducted at the location presented an unacceptable risk to the residential neighborhood,

6 | petitioned for a writ of mandate to set aside UCSF's EIR approval. Id. The trial court denied the

7 | petition, holding that UCSF had "certified the EIR in a manner required by law and that their

8 | action was supported by substantial evidence." Id. The court of appeal reversed, finding, in

9 | pertinent part, that "the EIR did not adequately describe the 'project' within the meaning of

10 | CEQA because the EIR did not discuss future cumulative effects of the relocation of additional

11 | UCSF operations to the Laurel Heights site." Id. The California Supreme Court affirmed on that

12 | point,[122] holding that "a public agency's approval of a project or future portions of a project is not

13 | a prerequisite for an environmental impact report under CEQA." Id. at 395. The court further

14 | held that "an EIR must include an analysis of the environmental effects of future expansion or

15 | other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the

16 | future expansion or action will be significant in that it will likely change the scope or nature of

17 | the initial project or its environmental effects." Id. at 396. In so holding, the court observed:

18 |        A basic tenet of CEQA is that an environmental analysis "should be prepared as early as
         feasible in the planning process to enable environmental considerations to influence
19 |     project program and design and yet late enough to provide meaningful information for
         environmental assessment." [UCSF] correctly note[s] that "where future development is
20 |     unspecified and uncertain, no purpose can be served by requiring an EIR to engage in
         sheer speculation as to future environmental consequences." We agree that
21 |     environmental resources and the public fisc may be ill served if the environmental review
         is too early. On the other hand, the later the environmental review process begins, the

22 |

23 | _____

24 | [122] The California Supreme Court affirmed "the Court of Appeal's decision that the EIR should
have addressed anticipated future uses and their environmental effects and that the discussion of

25 | project alternatives [was] inadequate under CEQA." Id. at 427. The court also affirmed "the
Court of Appeal's decision that the Association [was] entitled to its attorneys fees," but reversed

26 | and remanded with respect to "the Court of Appeal's decision that the Regents' finding as to
mitigation [was] inadequate." Id. at 427-28.

27 |

1   more bureaucratic and financial momentum there is behind a proposed project, thus
2   providing a strong incentive to ignore environmental concerns that could be dealt with
    more easily at an early stage of the project. This problem may be exacerbated where, as
3   here, the public agency prepares <u>and</u> approves the EIR for its own project. For that
    reason, "EIRs should be prepared as early in the planning process as possible to enable
4   environmental considerations to influence project, program or design."

5   <u>Id.</u> at 395 (emphasis in original) (internal citations omitted).

6       <u>Laurel Heights</u> is distinguishable on the facts. In <u>Laurel Heights</u>, it was undisputed that

7   UCSF's relocation to the Laurel Heights neighborhood was a "project" within the scope of

8   CEQA. <u>Id.</u> at 391 n.3 ("The Regents do not dispute that the University of California is a 'public

9   agency' and that the relocation to Laurel Heights is a 'project' under CEQA.") (citations

10  omitted). In this case, VHS and PHH deny that the proposed ASA is a "project" subject to the

11  requirements of CEQA. In <u>Laurel Heights</u>, UCSF had disclosed in the EIR, as well as public

12  announcements, newsletters, and correspondence, its commitment to develop the Laurel Heights

13  facility "as a biomedical research facility, with cross-disciplinary programs from all schools"

14  once the site became fully available in 1995. <u>Id.</u> at 397. There was evidence that "[t]he

15  anticipated eventual use of the entire Laurel Heights facility would include an increase in the

16  amount of space used from approximately 100,000 square feet to 354,000 square feet and an

17  increase in occupants from approximately 460 to 860." <u>Id.</u> at 398. Given its long-term plan and

18  the foreseeable change in the scope of the project, the court concluded that UCSF could "provide

19  meaningful, reliable data in the EIR as to future activity at Laurel Heights and thus must do so."

20  <u>Id.</u> No such facts exist in this case.

21      <u>Friends of the Sierra</u>, on the other hand, is directly in point. In that case, the Tuolumne

22  Park and Recreation District ("TPRD") sold a tract of land to the Tuolumne Band of Me-Wuk

23  Indians (the "Tribe"), which included a historic railroad right-of-way that ran across a portion of

24  the Tribe's 300-acre property. <u>Friends of the Sierra</u>, 147 Cal.App.4th at 649. The TPRD did not

25  undertake a CEQA review of the transaction, despite having been advised by Friends of the

26  Sierra Railroad ("FSR"), a preservation group, that the sale was subject to CEQA because of the

27  historical significance of the right-of-way. <u>Id.</u> at 649-50. Indeed, there was no evidence that the

- 72 -

1  TPRD ever formally considered the necessity of a CEQA review or formally decided that the sale

2  did not merit such a review. Id. at 650. After the TPRD transferred the property to the Tribe

3  pursuant to a duly adopted resolution, FSR filed a petition for a writ of mandate seeking an order

4  setting aside the transfer and compelling the TPRD to conduct an environmental review pursuant

5  to CEQA before selling the property. Id. The trial court denied the petition, holding that "the

6  transfer was not a 'project' within the meaning of CEQA." Id. at 650-51. In so holding, the

7  court concluded that the evidence in the record did not support a finding that transfer of title to

8  the right-of-way would cause a reasonably foreseeable indirect physical change to the

9  environment "because the view that the Tribe might carry out development plans impacting the

10  historical resource was 'based on sheer speculation . . . and any attempt to analyze undisclosed

11  plans would necessarily be purely hypothetical and premature.'" Id. at 651. The court of appeals

12  affirmed, stating that "the lack of announced development plans meant that no identifiable

13  impact on the historical resource itself . . . was foreseeable." Id. at 661-62. The court explained:

14      It is true that development of the [subject] property by the Tribe is reasonably foreseeable.
    It is also reasonable to infer that the Tribe acquired the right-of-way crossing in order to

15      facilitate this development. Further, it is possible that the development eventually
    undertaken could have a variety of CEQA-cognizable impacts on the historical resource. .

16      . .

17      The reasonably foreseeable likelihood of some development on the [subject] property,
    combined with the possibility that the development could impact the historical resource

18      included within the larger property, does not trigger CEQA review. CEQA review has to
    happen far enough down the road toward an environmental impact to allow meaningful

19      consideration in the review process of alternatives that could mitigate the impact. If
    TPRD knew, for instance, that the Tribe intended to damage the historical resource by

20      building a structure in the right-of-way, or knew of a plan to devote the right-of-way to a
    use inconsistent with the county's general plan, it could have rejected the deal or

21      conditioned the transfer on the Tribe's covenant not to do those things. As it was, no
    specific plans were on the table. The Tribe has not proposed any development that would

22      affect the historical resource. The only statement it has made on the subject is its letter
    requesting a determination of consistency with the county general plan, in which it said it

23      'proposes' to use the right-of-way for public hiking trails.

24  Id. at 656-57 (emphasis in original). The court rejected FSR's argument that CEQA review was

25  improperly avoided by the Tribe, noting that the County of Tuolumne would have the

26  opportunity in the future "to engage in CEQA review if development plans became concrete."

27

- 73 -

1   Id. at 660.  "The fact that future review will have to be performed by another agency cannot

2   convert a meaningless review process into a meaningful one or convert a nonproject into a

3   project."  Id. at 661.

4          In this case, the court concludes that VHS's sale of assets to PHH pursuant to the ASA is

5   not a "project" for purposes of CEQA.  See, e.g., Friends of the Sierra, 147 Cal.App.4th at 657

6   n.2 ("The parties frame the issue as whether there is a project; their dispute in essence is over

7   whether there is a sufficient causal relationship between the land transfer and the anticipated

8   future development and whether enough was known about that development at the time of the

9   transfer to allow for meaningful environmental review."); Kaufman & Broad-South Bay, Inc. v.

10  Morgan Hill Unified School Dist., 9 Cal.App.4th 464, 471 (1992) ("'Where it can be seen with

11  certainty that there is no possibility that the activity in question may have a significant effect on

12  the environment, the activity is not subject to CEQA.'") (citation omitted).  The fact that the

13  VHS Board of Directors may not have either formally considered the necessity of a CEQA

14  review or formally determined that the ASA was not a "project" subject to CEQA prior to

15  approval of the ASA was not an abuse of discretion.  See Friends of the Sierra, 147 Cal.App.4th

16  at 657.

17         Nor is there evidence in the administrative record that VHS's approval of the ASA will

18  potentially cause either a direct physical change in the environment or a reasonably foreseeable

19  indirect physical change in the environment.  There is, however, substantial evidence in the

20  record that the purpose of the ASA was to maintain the operational status quo by keeping the

21  hospitals operating and open to the public.  While PHH may have a long-term "goal" for the

22  establishment of a medical arts building near the Menifee Hospital,[123] there is no credible

23

24  [123] In a letter to Cherry dated July 27, 2009, Sreenivasa R. Nakka, M.D., President of PHH,
    discussed "some of the substantial benefits" that would result from a sale of VHS's assets to
25  PHH.  AR000368.  Dr. Nakka also identified the following five "goals" of PHH:

26
        1. PHH, with its physician shareholders have a goal to expand the cardiac care initiative
27

- 74 -

1   evidence of a present commitment by PHH to such a project or that "the project is well enough

2   defined to allow for meaningful evaluation." See Save Tara v. City of W. Hollywood, 45 Cal.4th

3   116, 130 (2008) (recognizing the "two considerations of legislative policy important to the

4   timing of mandated EIR preparation: (1) that CEQA not be interpreted to require an EIR before

5   the project is well enough defined to allow for meaningful environmental evaluation; and (2) that

6   CEQA not be interpreted as allowing an EIR to be delayed beyond the time when it can, as a

7   practical matter, serve its intended function of informing and guiding decision makers."). The

8   administrative record is devoid of any evidence that PHH has formulated a reasonably definite

9   _____

10   by expanding its 13 year association with Catholic Healthcare West with the goal that we
      become a Center of Excellence in Southern California similar to CHW's Centers of
11   Excellence at City of Hope and UCLA. An agreement documenting CHW's association
      with PHH is currently under review with CHW's legal counsel.
12

13   2. PHH, with its physician shareholders, have a goal to provide new resources for
      surgical and other state of the art medical procedures and infrastructure. One of our
14   primary goals is to modernize the entire VHS system.

15   3. PHH, with its physician shareholders, have a goal to develop state of the art out-
16   patient facilities such as surgery centers in order to provide faster and more appropriate
      patient care for the community.
17

18   4. PHH, with its physician shareholders, have a goal to develop a comprehensive
      integrated healthcare delivery system to provide a Local Healthcare Information
19   Organization eliminating costly duplication of tests, providing electronic medical records
      and providing necessary patient documentation for better financial reimbursements from
20   the payer network.

21   5. PHH, with its physician shareholders, have a goal to work with real estate partners to
22   construct a medical arts building at the Menifee medical campus in order to return
      physicians and services to the Menifee area. Many physicians and ancillary services have
23   migrated south along the I-215 corridor.

24   AR00369 (emphasis added). Interestingly, Prime's counsel did not accord much weight to Dr.
25   Nakka's letter earlier in the litigation, admitting in final argument that he had once referred to the
      letter as an example of the "irrelevant fluff" that VHS had allegedly "stuffed" into the
26   administrative record. See Opposition to Motion for Protective Order and for Order Excluding
      Extra-Record Evidence in Mandamus Proceeding, 4:17-20.
27

- 75 -

1   proposal as to the future use of the vacant land adjacent to Menifee Hospital upon which the

2   court could base a finding that an indirect physical change to the environment is reasonably

3   foreseeable as a result of VHS's approval of the ASA.[124]  VHS's approval of the ASA results in

4   nothing more than a change of ownership of VHS's assets.  If at some future date PHH presents a

5   specific plan or concrete proposal to develop the 20-acre parcel presently used by VHS as an

6   orchard into a medical arts building, the future use of the property as a medical arts building

7   would then be ripe for CEQA review and one or more of the petitioners would then have the

8   opportunity to express their concerns over PHH's future use of the property without engaging "in

9   sheer speculation as to future environmental consequences."  See Laurel Heights, 47 Cal.3d at

10  395.  Based on the foregoing, the court finds that the VHS Board of Directors proceeded in a

11  manner required by law and its decision is supported by substantial evidence.  The petitioners'

12  CEQA challenge will be dismissed.

13      4.  Petitioners Have Failed to Establish a Violation of California Government Code §
        65402

14

15      Petitioners claim that VHS never gave the cities of Hemet and Sun City or the County of

16

17  _____

    [124] There is nothing in the ASA binding PHH to develop one or more of the three vacant parcels
18  adjacent to Menifee Hospital as a medical arts building at any time in the future.  AR01721-
    AR01822.  In its appraisal of Menifee Hospital and the Menifee – Adjacent Vacant Parcels dated
19  August 21, 2009, V&IG concluded that "the excess land site could be sold or used for expansion
    of the hospital."  AR00554.  However, there is nothing in V&IG's valuation of the front surplus
20  parcel, rear surplus parcel, or orchard site concerning any present or future plan for expansion of
    the hospital or development of the site.  V&IG notes in its appraisal of Menifee Hospital that
21  "[t]he fourth floor is currently in shell condition and will be built out based on the hospital's
    future needs."  AR00543.  The hospital was built in 1982 and currently has 84 beds.  According
22  to the appraisal, the fourth floor can be finished to accommodate another 24 beds.  V&IG also
    notes that "[t]here is a contingency expansion plan to add approximately 107,000 square feet
23  dependent on population growth in the area and the development of medical office buildings in
    the subject's immediate vicinity."  Id.  It is clear from the text of this statement that it refers to an
24  existing plan created by VHS for the expansion of Menifee Hospital that pre-dated the ASA and
    was contingent upon both a demand for services by an increased population and medical
25  professionals relocating in the vicinity of the hospital.  This statement cannot be interpreted as an
    announced plan by PHH for development of the site beyond its current use.
26

27

- 76 -

1 Riverside an opportunity to review its proposed sale of assets under the ASA to determine

2 whether the sale would be consistent with the terms of the general plan, if any, adopted in each of

3 these jurisdictions, and that VHS's failure to do so violated California Government Code §

4 65402.

5       Section 65402(c) states, in pertinent part, that "[a] local agency shall not . . . dispose of

6 any real property . . . in any county or city, if such county or city has adopted a general plan or

7 part thereof and such general plan or part thereof is applicable thereto, until the location, purpose

8 and extent of such . . . disposition . . . [has] been submitted to and reported upon by the planning

9 agency having jurisdiction, as to conformity with said adopted general plan or part thereof." Cal.

10 Gov't. Code § 65402(c). Petitioners did not specifically identify VHS's alleged violation of §

11 65402 as one of the Challenge Actions,[125] but they included the claim as a disputed issue in the

12 Joint Pretrial Order signed on February 22, 2010.[126] Nevertheless, the petitioners failed to submit

13 evidence at the hearing concerning either the existence of a general plan in the cities of Hemet or

14 Sun City or the County of Riverside or, more importantly, the specific provisions of each general

15 plan ostensibly applicable to VHS's proposed sale of assets to PHH. Even if the petitioners had

16 succeeded in identifying an applicable general plan or component thereof, the procedure

17 specified in § 65402 is purely advisory. Cal. Gov't. Code § 65402(c) ("If the planning agency

18 disapproves the location, purpose or extent of such . . . disposition, . . . the disapproval may be

19 overruled by the local agency."); see Envtl. Defense Fund, Inc. v. Coastside County Water Dist.,

20 27 Cal.App.3d 695, 702 (1972) (stating that "the planning agency has been given no power under

21 the act to 'veto' the project and to prevent its construction"). Finally, § 65402 merely requires

22 VHS to consult with the local planning agencies at some point before ultimately "disposing" of

23 its property. If § 65402(c) is indeed applicable, VHS can still submit the proposed sale of its

24

25 [125] See Stipulation supra note 39.

26 [126] Joint Pre-Trial Order, 35:1-3.

27

1  assets to the appropriate agency at any time prior to a transfer of the assets to PHH.  Accordingly,

2  the petitioners' challenge under California Government Code § 65402 will be dismissed.

3  E.    VHS's ASA With PHH Did Not Require Approval by the Riverside LAFCO

4        It is undisputed that VHS is a special district located within the geographic boundaries of

5  the Riverside LAFCO, and that the VHS Board of Directors did not apply to the Riverside

6  LAFCO for approval of its proposed sale of assets to PHH.  Petitioners do not cite any authority

7  for the proposition that a California health care district, which elects to sell 50% or more of the

8  district's assets pursuant to the authority granted under the LHCDL, California Health & Safety

9  Code § 32121(p)(1), must also comply with Cortese-Knox.  Petitioners argue, however, that

10 VHS was required to comply with Cortese-Knox[127]

11

12 [127] The specific provision of Cortese-Knox allegedly violated by VHS is California Government
13 Code § 56824.12, which states:

14        (a)  A proposal by a special district to provide a new or different function or class
15 of services or divestiture of the power to provide particular functions or classes of
   services within all or part of the jurisdictional boundaries of a special district, pursuant to
16 subdivision (b) of Section 56654, shall be made by the adoption of a resolution of
   application by the legislative body of the special district and shall include all of the
17 matters specified for a petition in Section 56700, except paragraph (6) of subdivision (a)
   of Section 56700, and be submitted with a plan for services prepared pursuant to Section
18 56653.  The plan for services for purposes of this article shall also include all of the
19 following information:

20        (1)  The total estimated cost to provide the new or different function or class of
   services within the special district's jurisdictional boundaries.
21
22        (2)  The estimated cost of the new or different function or class of services to
   customers within the special district's jurisdictional boundaries.  The estimated
23 costs may be identified by customer class.

24        (3)  An identification of existing providers, if any, of the new or different function
25 or class of services proposed to be provided and the potential fiscal impact to the
   customers of those existing providers.
26
27        (4)  A written summary of whether the new or different function or class of

- 78 -

1  because VHS's sale of substantially all of its assets to PHH results in a "divestiture of the power

2  to provide particular functions or classes of services within . . . the jurisdictional boundaries of

3  [the] district." Cal. Gov't Code § 56824.12(a). Petitioners argue that, in addition to satisfying

4  the requirements of California Health & Safety Code § 32121(p)(1), the VHS Board of Directors

5  was required to adopt a resolution containing specified information concerning the proposed

6  ASA with PHH, conduct a public hearing on the resolution, and give any interested person an

7  opportunity to appear and provide oral or written testimony on the resolution.

8      Cortese-Knox provides for the creation of local agency formation commissions

9  ("LAFCOs") "to control the process of municipality expansion." Sierra Club v. San Joaquin

10 _____

11     services or divestiture of the power to provide particular functions or classes of
12     services, within all or part of the jurisdictional boundaries of a special district,
       pursuant to subdivision (b) of Section 56654, will involve the activation or
13     divestiture of the power to provide a particular service or services, service
       function or functions, or class of service or services.
14

15     (5) A plan for financing the establishment of the new or different function or class
       of services within the special district's jurisdictional boundaries.
16

17     (6) Alternatives for the establishment of the new or different functions or class of
       services within the special district's jurisdictional boundaries.

18     (b) The clerk of the legislative body adopting a resolution of application shall file
19     a certified copy of that resolution with the executive officer. Except as provided in
       subdivision (c), the commission shall process resolutions of application adopted pursuant
20     to this article in accordance with Section 56824.14.

21     (c)(1) Prior to submitting a resolution of application pursuant to this article to the
22     commission, the legislative body of the special district shall conduct a public hearing on
       the resolution. Notice of the hearing shall be published pursuant to Section 56153 and
23     56154.

24     (2) Any affected local agency, affected county, or any interested person who
25     wishes to appear at the hearing shall be given an opportunity to provide oral or
       written testimony on the resolution.
26

Cal. Gov't Code § 56824.12.
27
                                    - 79 -

1 | Local Agency Formation Comm'n, 21 Cal.4th 489, 495 (1999). Cortese-Knox authorized the

2 | formation of LAFCOs to curb "urban sprawl," preserve "open-space and prime agricultural

3 | lands, efficiently [provide] government services" and encourage "the orderly formation and

4 | development of local agencies based upon local conditions and circumstances." Cal. Gov't Code

5 | § 56301. Cortese-Knox is intended to promote "planned, well-ordered, efficient urban

6 | development patterns with appropriate consideration of preserving open-space and agricultural

7 | lands within those patterns." Cal. Gov't Code § 56300(a). Pursuant to Cortese-Knox, LAFCOs

8 | are authorized "[t]o review and approve or disapprove with or without amendment, wholly,

9 | partially, or conditionally, proposals for changes of organization or reorganization,"[128] including

10 | the consolidation of districts, the dissolution or merger of a district, and the creation of subsidiary

11 | districts. Cal. Gov't Code § 56375(a)(1) & (2) (emphasis added). Cortese-Knox is a

12 | "comprehensive scheme governing district formation and dissolution." Las Tunas Beach

13 | Geologic Hazard Abatement Dist. v. Superior Court, 38 Cal.App.4th 1002, 1008 (1995).

14 | However, "Cortese-Knox is not the sole statutory scheme pertaining to district formation." Id. at

15 | 1009. Nor is Cortese-Knox the only statute governing "district changes of organization." Id. at

16 | 1011. It must be construed in light of "other, more specific statutes, pertaining to [such] changes

17 | of organization." Id.

18 |     Cortese-Knox's broad definition of "district" includes a local health care district,[129] such

19 |

20 | [128] "Change of organization," as used in Cortese-Knox, includes "[a] proposal for the exercise of
21 | new or different functions or classes of services, or divestiture of the power to provide particular
   | functions or classes of services, within all or part of the jurisdictional boundaries of a special
22 | district." Cal. Gov't Code § 56021(h). The term "function" means "any power granted by law to
   | a local agency or a county to provide designated governmental or proprietary services or facilities
23 | for the use, benefit, or protection of persons or property." Cal. Gov't Code § 56040 (emphasis
24 | added).

25 | [129] "District" or "special district," as used in Cortese-Knox, means "an agency of the state,
   | formed pursuant to general law or special act, for the local performance of governmental or
26 | proprietary functions within limited boundaries." Cal. Gov't Code § 56036(a). A hospital
   | district is not one of the governmental entities specifically excluded from the definition of

27 |

- 80 -

1  as VHS. However, the general provisions of Cortese-Knox applicable to district formation do

2  not apply to the creation of a local health care district because such districts must be formed

3  pursuant to the specific procedures set forth in the LHCDL, California Health & Safety Code §

4  32000, et seq. Cf. Las Tunas Beach, 38 Cal.App.4th at 1010 (stating that "the general provisions

5  of Cortese-Knox pertaining to district formation do not apply to the formation of a [Geologic

6  Hazard Abatement District ("GHAD")] because the law dealing with GHAD's contains its own

7  more specific formation procedures . . .") (emphasis in original). To the extent that a change of

8  organization is not specifically covered by the LHCDL, Cortese Knox applies "thereby filling any

9  gaps in the legislative scheme." See Id. at 1013.

10       In this case, the court finds that VHS's sale of assets to PHH pursuant to the ASA does

11  not constitute a "change of organization" within the meaning of Cortese-Knox. Consummation

12  of the transaction with PHH will result in a transfer of assets, but it will not change the structure

13  of VHS nor divest VHS of the power to provide health care services within the district. VHS

14  will continue to retain its status as a local health care district after the sale of assets to PHH

15  pursuant to the ASA.[130] The LHCDL mandates a specific statutory procedure for the sale of

16  assets by a local health care district. VHS complied with that procedure when it negotiated and

17  executed the ASA. The LHCDL specifically authorizes VHS to "transfer, at fair market value,

18

19  ───────────────

"district" or "special district" contained in the statute. Id.

20

21  [130] VHS will provide charitable community services similar to other health care districts that no
    longer operate hospitals. Pursuant to § 1.7 of the ASA, VHS retains, among other things, all of
22  the assets of Hemet Hospital Foundation, Menifee Valley Medical Center Foundation (a/k/a
    Foundation for the Menifee Valley Medical Center), Moreno Valley Community Health
23  Foundation, Hemet Valley Hospital Auxiliary, Menifee Valley Medical Center Auxiliary, and the
    Moreno Valley Community Hospital Auxiliary, together with approximately $807,000 in funds
24  received from the Estate of Beatrice Brown which are restricted to charitable use for services to
    disabled children. Furthermore, PHH must "[p]rovide $400,000 per year to [VHS], commencing
25  on the Sale Closing Date, for a period of five (5) years for use by the District, among other
    things, to pay its ongoing operating expenses, including payroll and professional fees, and to fund
26  any necessary elections . . . ." Modified First Amended Plan, 19:13-15.

27

- 81 -

1  any part of its assets to one or more nonprofit corporations to operate and maintain the assets."

2  Cal. Health & Safety Code § 32121(p)(1). Because the sale to PHH involves more than 50% of

3  its VHS's assets, VHS by resolution scheduled a special election and submitted to voters of the

4  district a measure proposing the transfer as required by the LHCDL. Id. The proposed transfer

5  was approved after receiving the affirmative vote of an overwhelming majority of the voters in

6  the district. Id. To the extent the requirements of Cortese-Knox may conflict with the exclusive

7  procedure for the transfer of assets contained in the LHCDL, the more specific provisions of the

8  LHCDL control. For these reasons, the court finds that VHS was not required to obtain approval

9  of the ASA from the Riverside LAFCO prior to a sale or transfer of assets to PHH pursuant to the

10  LHCDL, California Health & Safety Code § 32121(p)(1).

11                                   III.  CONCLUSION

12       For the reasons stated above, the court concludes that VHS is entitled to an order

13  overruling the petitioners' remaining feasibility objection and confirming VHS's Modified First

14  Amended Plan, together with a judgment dismissing each of the Challenge Actions with

15  prejudice.

16       VHS's counsel is directed to lodge a proposed order confirming VHS's Modified First

17  Amended Plan and a judgment with respect to Challenge Actions consistent with this opinion.

18  Dated:  April 8, 2010

19                                        PETER H. CARROLL
                                          United States Bankruptcy Judge

20

21

22

23

24

25

26

27

- 82 -

| In re: | | |
|---|---|---|
| | | CHAPTER: |
| | Debtor(s). | CASE NUMBER: |

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*)   MEMORANDUM DECISION RE: CONFIRMATION OF FIRST AMENDED PLAN OF ADJUSTMENT OF DEBTS OF VALLEY HEALTH SYSTEM DATED DECEMBER 17, 2009, AS MODIFIED ON FEBRUARY 19, 2010, AND ADJUDICATION OF THE CHALLENGE ACTIONS  was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I. SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of   4/8/2010                                        , the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

⊠  Service information continued on attached page

**II. SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States Mail, first class, postage prepaid, to the following person(s) and/or entity(ies) at the address(es) indicated below:

⊠  Service information continued on attached page

**III. TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s), and/or email address(es) indicated below:

☐  Service information continued on attached page

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| In re: | | |
|---|---|---|
| | | CHAPTER: |
| | Debtor(s). | CASE NUMBER: |

**ADDITIONAL SERVICE INFORMATION** (if needed):

**SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

- Andrew K Alper    aalper@frandzel.com, efiling@frandzel.com;ekidder@frandzel.com
- Terri H Andersen    terri.andersen@usdoj.gov
- Kathryn M Barnes    kbarnes@thelen.com
- Mark Bradshaw    mbradshaw@shbllp.com
- Michael E Busch    michael.busch@fnf.com
- Traci L Cotton    tcotton@utsystem.edu
- Jennifer Witherell Crastz    jcrastz@hemar-rousso.com
- Melissa Davis    mdavis@shbllp.com
- Timothy J Farris    timothy.j.farris@usdoj.gov
- H Alexander Fisch    afisch@stutman.com
- Yolanda Flores-Burt    yflores1@sbcglobal.net
- Heather Fowler    heather.fowler@lw.com, colleen.rico@lw.com
- Roger F Friedman    rfriedman@rutan.com
- Fred Gaines    fgaines@gaineslaw.com
- Peter J Gurfein    pgurfein@akingump.com
- Mark S Horoupian    mhoroupian@sulmeyerlaw.com
- Allan H Ickowitz    aickowitz@nossaman.com
- Jeffrey L Kandel    jkandel@pszjlaw.com
- Sheri Kanesaka    kanesaka@gmail.com
- Q Scott Kaye    qskaye@mwe.com
- John W Kim    jkim@nossaman.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                    111                                              **F 9021-1.1**

| In re: | | |
|---|---|---|
| | | CHAPTER: |
| | Debtor(s). | CASE NUMBER: |

- Bradford Klein    brad.e.klein@gmail.com

- Robert A Klyman    robert.klyman@lw.com

- Stuart I Koenig    Skoenig@cmkllp.com

- Jean LeBlanc    jleblanc@mwe.com

- Paul J Leeds    reisingc@higgslaw.com

- Dana N Levitt    dlevitt@mwe.com, WSmith@mwe.com

- Michael S Lurey    michael.lurey@lw.com, colleen.rico@lw.com

- Samuel R Maizel    smaizel@pszjlaw.com, smaizel@pszjlaw.com

- David J Mccarty    dmccarty@sheppardmullin.com, pibsen@sheppardmullin.com

- Neeta Menon    nmenon@stutman.com

- Thomas J Polis    tom@polis-law.com

- Uzzi O Raanan    uor@dgdk.com

- Christian L Raisner    bankruptcycourtnotices@unioncounsel.net, craisner@unioncounsel.net

- Christopher O Rivas    crivas@reedsmith.com

- Stephanie M Seidl    sseidl@sheppardmullin.com

- Leonard M Shulman    lshulman@shbllp.com

- Gerald N Sims    jerrys@psdslaw.com

- Nathan M Smith    nathan.smith@lw.com

- Adam M Starr    starra@gtlaw.com

- Jason D Strabo    jstrabo@venable.com, losangelestrialdocket@mwe.com

- Derrick Talerico    dtalerico@loeb.com, kpresson@loeb.com;ljurich@loeb.com

- Wayne R Terry    wterry@hemar-rousso.com

- United States Trustee (RS)    ustpregion16.rs.ecf@usdoj.gov

- Andrea M Valdez    avaldez@fulbright.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                    112                                    F 9021-1.1

| In re: | | CHAPTER: |
|---|---|---|
| | Debtor(s). | CASE NUMBER: |

- David M Wiseblood    dwiseblood@seyfarth.com

**SERVED BY THE COURT VIA U.S. MAIL**

Gary E. Klausner
Stutman, Treister & Glatt
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067

Daniel K. Spradlin
Woodruff Spradlin & Smart
555 Anton Blvd., #1200
Costa Mesa, CA 92626-7670

M. Lois Bobak
Woodruff Spradlin & Smart
555 Anton Blvd., #1200
Costa Mesa, CA 92626

R.D. Kirwan
Akin Gump Strauss
2029 Century Park East, #2400
Los Angeles, CA 90067-3010

Carlyle W. Hall, Jr.
Akin Gump Strauss
2029 Century Park East, #2400
Los Angeles, CA 90067

Mark W. Rappel
Latham & Watkins, LLP
355 S. Grand Avenue
Los Angeles, CA 90071-1560

Robert A. Klyman
Latham & Watkins, LLP
355 S. Grand Avenue
Los Angeles, CA 90071-1560

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009    113    F 9021-1.1

| In re: | | |
|---|---|---|
| | | CHAPTER: |
| | Debtor(s). | CASE NUMBER: |

Daniel P. Brunton
Latham & Watkins, LLP
600 W. Broadway, Suite 1800
San Diego, CA  92101-3375

Peter J. Mort
41250 Gallop Ln.
Murrieta, CA  92562

Nathan F Coco
McDermott Will & Emery LLP
227 W Monroe St
Chicago, IL 60606-5096

Jay N Hartz
Hooper Lundy & Bookman Inc
1875 Century Park East Suite 1600
Los Angeles, CA 90067-2517

Robert A Davis
1105 E Florida Ave
Hemet, CA 92543

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_January 2009_                    114                    **F 9021-1.1**

# Exhibit 3



TABLE OF CONTENTS

| | Page |
|---|---|
| **ARTICLE I - DEFINITIONS; SALE AND TRANSFER OF ASSETS; CONSIDERATION; CLOSING** | **1** |
| 1.1 Definitions | 1 |
| 1.2 Purchase Consideration | 7 |
| 1.3 Closing Date; Closing Escrow | 10 |
| 1.4 Items to be Delivered by Seller at Closing | 12 |
| 1.5 Items to be Delivered by Purchaser at Closing | 14 |
| 1.6 Transfer of Seller Assets | 16 |
| 1.7 Excluded Assets | 18 |
| 1.8 Assumed Obligations | 20 |
| 1.9 Excluded Liabilities | 21 |
| 1.10 Disclaimer of Warranties | 23 |
| 1.11 Risk of Loss | 25 |
| 1.12 Casualty | 25 |
| 1.13 Condemnation | 25 |
| 1.14 Development and Review of Schedules, Exhibits and Other Materials | 26 |
| **ARTICLE II - REPRESENTATIONS AND WARRANTIES OF SELLER** | **27** |
| 2.1 Authorization | 27 |
| 2.2 Binding Agreement | 27 |
| 2.3 Organization and Good Standing; No Violation | 27 |
| 2.4 Contracts and Leases | 28 |
| 2.5 Required Consents | 28 |
| 2.6 Compliance With Laws and Contracts | 29 |
| 2.7 Title to Personal property | 30 |
| 2.8 Hospital Businesses Operations | 30 |
| 2.9 Brokers and Finders | 31 |
| 2.10 Financial Statements | 31 |
| 2.11 Legal Proceedings and Liabilities | 33 |
| 2.12 Seller Plans | 33 |
| 2.13 Personnel | 33 |
| 2.14 Insurance | 34 |
| 2.15 Taxes | 34 |
| 2.16 U.S. Persons | 34 |
| 2.17 Real Property | 34 |
| 2.18 Accuracy of Documents; Delivery and Inspection | 36 |
| 2.19 No Negotiations with Third Parties | 36 |
| 2.20 Statements Not Misleading | 37 |
| 2.21 Adverse Actions | 37 |
| 2.22 *[Intentionally Omitted]* | |
| 2.23 Continuing Accuracy | 37 |

P:\Base\PHH\FINAL-ASA 10 12 09.DOC

(i)

1070030.2



# ASSET SALE AGREEMENT

### BY AND BETWEEN

### VALLEY HEALTH SYSTEM,
a California Local Health Care District

### "Seller"

### AND

### PHYSICIANS FOR HEALTHY HOSPITALS, INC.,
a Delaware corporation

### "Purchaser"

### DATED: October 14, 2009

116

| TABLE OF CONTENTS | Page |
|---|---|
| **ARTICLE III - REPRESENTATIONS AND WARRANTIES OF PURCHASER......37** | |
| 3.1 Authorization........ | 37 |
| 3.2 Binding Agreement........ | 37 |
| 3.3 Organization ad Good Standing........ | 38 |
| 3.4 No Violation........ | 38 |
| 3.5 Brokers and Finders........ | 38 |
| 3.6 "As Is"........ | 38 |
| 3.7 Legal Proceedings........ | 39 |
| 3.8 Chapter 9 Proceeding........ | 39 |
| 3.9 Purchaser Knowledge........ | 39 |
| 3.10 Disclosures........ | 39 |
| 3.11 No Improper Payments or Offers........ | 40 |
| 3.12 Compliance With Law Laws........ | 40 |
| 3.13 Accuracy of Financial and Organization Information........ | 40 |
| **ARTICLE IV - COVENANTS OF SELLER........40** | |
| 4.1 Access and Information; Inspections........ | 40 |
| 4.2 Conduct of Business........ | 41 |
| 4.3 Negative Covenants........ | 41 |
| 4.4 Cooperation........ | 43 |
| 4.5 Contract Consents........ | 43 |
| 4.6 Additional Financial Information........ | 43 |
| 4.7 No-Shop........ | 43 |
| 4.8 Seller's Efforts to Close........ | 43 |
| 4.9 Title Matters........ | 44 |
| 4.10 Termination of Hospital Businesses' Employees........ | 44 |
| 4.11 Notice of Developments........ | 44 |
| 4.12 Termination Cost Reports; Filing Cost Reports; Amounts Due To or From Third Party Payors........ | 45 |
| 4.13 Tail Insurance Coverage........ | 46 |
| 4.14 Public Approval........ | 47 |
| 4.15 Confidentiality........ | 48 |
| 4.16 Plan of Adjustment........ | 48 |
| **ARTICLE V - COVENANTS OF PURCHASER........48** | |
| 5.1 Purchaser's Efforts to Close........ | 48 |
| 5.2 Required Governmental Approvals........ | 48 |
| 5.3 Estoppel Certificates........ | 49 |
| 5.4 Certain Employee Matters........ | 49 |
| 5.5 Use of Business Names........ | 51 |
| 5.6 Excluded Assets........ | 51 |
| 5.7 Confidentiality........ | 52 |
| 5.8 Contract Consents........ | 52 |

| TABLE OF CONTENTS | Page |
|---|---|
| 5.9 Other Covenants........ | 52 |
| 5.10 No Liens Caused by Purchaser........ | 54 |
| 5.11 Purchaser's Costs........ | 54 |
| 5.12 ALTA Survey........ | 54 |
| 5.13 Insurance........ | 54 |
| 5.14 Releases........ | 55 |
| 5.15 Plan of Adjustment........ | 58 |
| 5.16 Defense of Claims Challenging Transaction........ | 58 |
| **ARTILVE VI - CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER........59** | |
| 6.1 Signing and Delivery of Instruments........ | 59 |
| 6.2 Unfavorable Action or Proceeding........ | 59 |
| 6.3 Performance of Covenants........ | 59 |
| 6.4 Governmental Authorizations........ | 59 |
| 6.5 Representations........ | 60 |
| 6.6 Schedules........ | 60 |
| 6.7 Public Approval........ | 60 |
| 6.8 Capital Requirements........ | 60 |
| 6.9 Plan of Adjustment........ | 61 |
| **ARTICLE VII - CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER..61** | |
| 7.1 Governmental Authorizations........ | 62 |
| 7.2 Signing and Delivery of Instruments........ | 62 |
| 7.3 Performance of Covenants........ | 62 |
| 7.4 Unfavorable Action or Proceeding........ | 62 |
| 7.5 Material Adverse Effect........ | 62 |
| 7.6 Title Insurance Policy........ | 62 |
| 7.7 Representations........ | 62 |
| 7.8 Exhibits and Schedules........ | 62 |
| 7.9 Permits and Program Participation........ | 63 |
| 7.10 Tax Matters........ | 63 |
| 7.11 Public Approval........ | 63 |
| 7.12 Plan of Adjustment........ | 63 |
| **ARTICLE VIII - TERMINATION........63** | |
| 8.1 Termination........ | 63 |
| 8.2 Termination Consequences........ | 65 |
| **ARTICLE IX - POST-CLOSING MATTERS........66** | |
| 9.1 Excluded Assets and Excluded Liabilities........ | 66 |
| 9.2 Preservation and Access to Records After the Closing........ | 68 |

## ASSET SALE AGREEMENT

This Asset Sale Agreement (the "**Agreement**") is dated effective as of October 14, 2009 (the "**Effective Date**") by and between VALLEY HEALTH SYSTEM, a California Local Health Care District ("**Seller**") and PHYSICIANS FOR HEALTHY HOSPITALS, INC., a Delaware corporation ("**Purchaser**").

### R E C I T A L S:

A.  Seller (i) engages in the business of delivering acute care, skilled nursing, and behavioral health services to the public through the hospitals known as Hemet Valley Medical Center and Menifee Valley Medical Center, and a skilled nursing facility known as Hemet Valley Healthcare Center (the "**SNF**"), at which it currently operates a chemical dependency program and Surge Retreat, as further identified on Schedule A-1 (collectively, the "**Hospitals**"; as to an individual hospital, a "**Hospital**"), (ii) owns one administrative/medical office building, as specifically identified on Schedule A-2, and known as the Medical Arts Building (the "**MAB**"), (iii) owns and operates other healthcare businesses incident to the operation of the Hospitals as specifically identified on Schedule A-3 (the "**Other Businesses**") (the Hospitals, MAB and the Other Businesses are referred to in this Agreement collectively as the "**Hospital Businesses**").

B.  Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, substantially all of the assets with respect to the operation of the Hospital Businesses, for the consideration and upon the terms and conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises and covenants contained in this Agreement, and for their mutual reliance, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS; SALE AND TRANSFER OF ASSETS; CONSIDERATION; CLOSING

1.1  **Definitions.**

1.1.1  **Certain Defined Terms.** For purposes of this Agreement, and the Related Agreements except as may otherwise be expressly stated therein, the following terms shall have the following meanings (whether or not such term is capitalized when used in this Agreement):

(a)  "**Accounts Receivable**" shall be defined as all accounts and other receivables arising from the rendering of services to, or other rights to payment from, inpatients and outpatients at the Hospitals, the SNF, and the other Hospital Businesses, billed and unbilled, recorded and unrecorded, (without any adjustment to the PEPC whatsoever, including for contractual allowances, bad debt allowances or reserves, and patient credit balances) as of the Effective Time (calculated in a manner consistent with Seller's accounting policies and procedures in effect as of the Closing Date) for services, goods or other items provided by Seller while owner of the Hospital Businesses, including without limitation all claims, rights, interests and proceeds (whether received in cash or by credit to amounts otherwise due to a third party)

- 1 -

---

## TABLE OF CONTENTS

Page

9.3  Provision of Benefits of Certain Contracts, Defense of Related Claims ... 70
9.4  Closing of Financials ... 70
9.5  Employee Transition ... 71
9.6  Medicare Bad Debts. ... 71
9.7  Covenant Not to Compete. ... 71

ARTICLE X - SURVIVAL AND INDEMNIFICATION ... 73
10.1  Survival ... 73
10.2  Indemnification of Purchaser by Seller. ... 73
10.3  Indemnification of Seller by Purchaser. ... 75
10.4  Method of Asserting Claims. ... 76
10.5  Exclusive ... 79

ARTICLE XI - TAX AND COST REPORT MATTERS ... 79
11.1  Tax Matters; Allocation of PEPC ... 79
11.2  Cost Report Matters ... 79
11.3  Tax and Medicare Effect ... 80
11.4  [Intentionally Omitted]
11.5  Misdirected Payments, etc. ... 80

ARTICLE XII - MISCELLANEOUS PROVISIONS ... 81
12.1  Further Assurances and Cooperation ... 81
12.2  Successors and Assigns ... 81
12.3  Governing Law; Venue ... 81
12.4  Amendments ... 82
12.5  Exhibits, Schedules and Disclosure Schedule ... 82
12.6  Notices ... 82
12.7  Headings ... 83
12.8  Confidentiality and Publicity. ... 83
12.9  Fair Meaning ... 84
12.10  Gender and Number; Construction ... 84
12.11  Third Party Beneficiary. ... 85
12.12  Expenses and Attorneys' Fees ... 85
12.13  No Offset ... 85
12.14  Counterparts ... 85
12.15  Entire Agreement ... 85
12.16  No Waiver ... 85
12.17  Severability ... 86
12.18  Dispute Resolution ... 86

SCHEDULE 1.3.2 - TERM SHEET FOR ALTERNATIVE TRANSACTION ... 90

(iv)

118

with respect to amounts overpaid by Seller to any third party with respect to periods prior to the Effective Time (e.g. such overpaid amounts may be determined by billing audits undertaken by Seller or Seller's consultants) and all payments to be received for all disproportionate share Medi-Cal payments (if any) in connection with the Hospitals, but excluding reserves and other amounts held by the Bond Trustees of the Existing Bonds and amounts internally reserved by Seller for payment of the current and long term portion of interest and principal of the Existing Bonds which is payable semi-annually (which shall separately be applied by Seller to pay off the Existing Bonds as detailed in Sections 1.2.1(a)(i) and 1.4.18 and elsewhere in this Agreement).

(b)    "**Accrued Paid Time Off Amount**" shall mean the accrued paid time off liabilities of Seller, as of the Closing Date, with respect to its employees, as identified in the Baseline Financials and any subsequently accrued paid time off liabilities to the extent incurred in the ordinary course of business and consistent with the accounting principles utilized in the Baseline Financials.

(c)    "**Adjusted Current Liabilities**" shall consist of the current liabilities of Seller as defined and classified on the Baseline Financials other than the line items related to (i) *Pre-Petition liabilities*, and (ii) the current portion of the (A) *Notes Payable*, (B) *1993 Bonds* and (C) *1996 Bonds*.

(d)    "**Administrative Claim**" means any claim for an administrative expense of the kind described in Sections 503(b) or 507(a)(2) of the Bankruptcy Code, including professional fees and expenses by any professional entitled to be compensated for services rendered to the Seller.

(e)    "**Affiliate**" shall mean any Person directly or indirectly controlling, controlled by or under common control with or of a second Person, including Immediate Family Members of such Persons. The term "control" (including the terms, "controlled by" and "under common control with") means the possession of a Controlling Interest in another Person.

(f)    "**Alternative Assets**" and "**Alternative Transaction**" shall have the meaning set forth at Section 1.3.2.

(g)    "**Bankruptcy Court**" shall mean the United States bankruptcy court in which Seller's Chapter 9 Proceeding is pending, such court being the United States Bankruptcy Court, Central District of California, Riverside Division.

(h)    "**Baseline Financials**" shall mean the preliminary financial statements of the Seller dated as of August 31, 2009 and attached hereto as Schedule 1.1.1(h).

(i)    "**Benefit Plan**" shall mean with respect to Seller, a governmental pension plan as defined under Section 3(32) of ERISA or a retirement or pension plan (except for Social Security); the Seller Plan, as defined in Section 2.12, including the defined benefit plan; thrift, savings, medical (including any union-sponsored health and welfare plan), hospitalization, vision, dental, life, disability, training or apprentice plan, or other welfare benefit plan, policy or agreement; deferred compensation, change in control or severance pay plan, policy or agreement, or any other performance, bonus, incentive or benefit plan, policy or agreement, or any similar or related trust, fund, arrangement, policy, agreement or understanding.

119

(j)    "**Chapter 9 Proceeding**" shall mean the proceeding filed by Seller pursuant to Chapter 9 of the U.S. Bankruptcy Code on December 13, 2007 in the United States Bankruptcy Court, Central District of California, Riverside Division, Case No. 6:07-bk-18293-PC.

(k)    "**Claims Fund**" shall have the meaning set forth at Section 1.2.4.1

(l)    "**Controlling Interest**" in another Person shall mean:

(i)    in the case where such other Person is a corporation, the Person and/or its Affiliates owns or controls at least a majority of the outstanding shares having the voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time shares of any other class or classes of such corporation might have voting power by reason of the happenings of any contingency, unless the contingency has been satisfied); or

(ii)    in the case where such other Person is a general or limited partnership, the Person and/or any of his/her/its Affiliates is a general partner or owns or controls (of record or beneficially) a majority interest in a general partner, or is or owns an interest in a partner that has authority to bind the partnership, in all other cases; or

(iii)    in the case where such other Person is a limited liability company, the Person and/or any of its Affiliates (i) is or owns, a managing member or manager of the limited liability company, or (ii) owns or controls at least a majority of the outstanding membership interests having the voting power to elect or appoint the managing member or members, or (iii) in the case of a limited liability company managed by a board of directors, management committee or like body, owns or controls at least a majority of the outstanding membership interests having by the terms thereof ordinary voting power to elect or appoint a majority of the managers or members of such body (irrespective of whether at the time membership units of any other class or classes of such corporation might have voting power by reason of the happening of any contingency, unless the contingency has occurred and then only for as long as it continues); or

(iv)    regardless of the form of the entity, such other Person in fact controls the decisions of such entity, directly or indirectly.

(m)    "**Current Assets**" shall mean the *Total Current Assets* of Seller as defined and classified on the Baseline Financials.

(n)    "**Current Liabilities**" shall consist of *Total Current Liabilities* of Seller as defined and classified on the Baseline Financials other than the line item related to *Pre-Petition Liabilities*.

(o)    "**Deposit**" shall have the meaning set forth in Section 1.2.3.

(p)    "**Environmental Regulations**" shall mean all Laws and all policies and guidelines relating to the use, handling, treatment, storage, transportation, or Release of Hazardous Substances or otherwise relating to the protection of the environment or industrial

hygiene (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata).

(q) **"Force Majeure"** shall mean an act of God, war declared or undeclared, general army mobilization, blockade, revolution, riot, insurrection, civil commotion, sabotage, lightning, fire, earthquake, storm, flood, explosion, telecommunications disruption, electricity blackout, personnel strike, and any other cause whether of the kind specifically enumerated above or otherwise which is not reasonably within the control of the party affected.

(r) **"General Unsecured Creditors"** shall mean those Persons holding allowed pre-petition, non-priority unsecured claims against Seller.

(s) **"Hazardous Substances"** shall mean any substance, material or waste which is now or any time in the future listed, identified or defined in or pursuant to any Law as "hazardous substances," "hazardous waste," "toxic substances," "toxic pollutant," "infectious waste" or similarly identified substances, materials or mixtures (including, without limitation, medical wastes, asbestos in any form, formaldehyde, radon, radioactive substance, hydrocarbons, petroleum, gasoline, crude oil or any products, by-products or fractions thereof, polychlorinated biphenyls, industrial solvents, flammables, or explosives) or which is either now or anytime in the future: (i) potentially injurious to the public health, safety or welfare of the environment, (ii) potentially injurious to, or may impair the value or beneficial use of, the Real Property (or any improvements thereon), (iii) regulated or monitored by, or required to be remediated at the behest of, any governmental agency, or (iv) a basis for a claim or liability of any owner or operator of the Real Property to any governmental agency or Person under any applicable Law (including the Environmental Regulations).

(t) **"Immediate Family Member"** of an individual shall mean the husband, wife, natural or adoptive parent, child, sibling, stepparent, stepchild, stepbrother, stepsister, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, grandparent, grandchild or spouse of a grandparent or grandchild of such individual.

(u) **"Laws"** or **"Legal Requirements"** shall mean the common law and all statutes, rules, regulations, ordinances, orders, codes, permits, licenses, policies, guidelines, and agreements with or of federal, state, and local governmental and regulatory authorities (including, any of the same which terminate, disqualify, or otherwise adversely affect a Person's (including any party hereto) reimbursement or right to payment from, or participation with, any Payor, including the following subset (collectively, **"Health Care Laws"**): the Stark Law (42 U.S.C. § 1395nn), the Medicare and Medicaid Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the False Claim Act (including 31 U.S.C. §§ 3729 et seq. and 18 U.S.C. §§ 2, 371, 666, 3013, and 3571), California's Physicians Ownership and Referral Act of 1993 (California Bus. & Prof. Code §§ 650.01 et seq.), California Business & Professions Code §650 or similar statute and prohibitions against fee splitting, together with all amendments thereto) or any applicable accreditation agencies (including, but not limited to, the Joint Commission) and any order, writ, injunction or decree issued by any court, arbitrator or governmental agency or in connection with any judicial, administrative or other non-judicial proceeding (including, without limitation, arbitration or reference). Laws shall include those Laws now or hereafter in effect and to Laws as amended, consolidated, supplemented or replaced from time to time, and all rules and regulations promulgated thereunder.

120

- 4 -

(v) **"Liens"** shall mean liens, encumbrances (including security interests of any kind whatsoever), covenants, conditions, restrictions, easements, encroachments, rights of way, charges or other rights, options, claims or interests of any third party whatsoever.

(w) **"Material Adverse Effect"** shall mean any event, occurrence, Force Majeure, or matter, outside Purchaser's sole control, having a material and adverse impact or effect which constitutes through the Closing relating to the business operations, property, or financial condition of the Hospital Businesses, taken as a whole, or which otherwise materially interferes with Purchaser's ability to operate the Hospital Businesses after Closing or to obtain financing relating to the Transaction, as defined in Section 1.2.3, as a result of the foregoing, all of which is outside the control of Purchaser, but excluding changes in general economic, legislative, or regulatory conditions or changes in the healthcare market affecting hospitals generally or other Payors affecting hospitals generally. However, changes in existing Laws or new Laws which become effective prior to the Effective Time which would prohibit ownership by physicians or medical groups of the Hospital Businesses, or restrict referral by physicians or medical groups to the Hospital Businesses in which such physicians or medical groups have a financial interest (including an ownership interest), in whole or in substantial part, shall constitute a Material Adverse Effect. Purchaser acknowledges that Seller's filing of the Chapter 9 Proceeding is not, in and of itself, a Materially Adverse Effect as defined in this Agreement; provided, that (i) Seller takes no action in the Chapter 9 Proceeding to reject or otherwise terminate this Agreement or any Related Agreement, contrary to its or their terms; and (ii) Seller or the Bankruptcy Court takes no action to interfere with Purchaser's rights under this Agreement, or the orderly Closing of the transactions contemplated herein, or which otherwise causes a Material Adverse Effect. Notwithstanding anything to the contrary in this Agreement, the Parties agree that the failure to obtain Public Approval shall not, in and of itself, constitute a Material Adverse Effect and shall not entitle Purchaser to a refund of any portion of the Deposit. Without limiting the preceding, a Material Adverse Effect shall include a decrease, as of the Closing, by an amount which is greater than $2,000,000, after being normalized, if necessary, for the payroll impact relating to an additional pay period, by which (x) Current Assets exceed Current Liabilities, as compared to the amount by which Current Assets exceed Current Liabilities reflected in the Baseline Financials, (which net excess, utilizing the Baseline Financials was $13,632,865).

(x) **"Payor"** shall mean Medicare, Medicaid, TRICARE/CHAMPUS, any other third party payor (including an insurance company or plan administrator), any Person financially responsible for payment of all or any portion of the billings generated by the Hospital Businesses, or any health care provider (such as a health maintenance organization, preferred provider organization, exclusive provider organization, or any other managed care program), or any fiscal intermediary of any of the foregoing.

(y) **"Person"** shall mean any individual (including Immediate Family (including Immediate Family), partnership, corporation, limited liability company, trust, unincorporated association, joint venture or any other entity of any kind whatsoever, whether for profit or not for profit, and any governmental agency.

(z) **"Plan of Adjustment"** shall have the meaning set forth in Section 4.16.

- 5 -

does not include any material modifications of the terms or conditions of this Agreement, the initiation of litigation or other judicial or administrative process, any change in the organizational structure of an entity, any changes in the officers, directors, members, managers, or the equivalent of an entity, the provision of any consideration to any third party or the suffering of any economic detriment to a party's ongoing operations for the procurement of any consent, authorization or approval required under this Agreement except for (i) the reasonable costs associated with gathering and supplying data or other information or making any filings; (ii) the reasonable fees and expenses of counsel and consultants; and (iii) the reasonable and customary fees and charges of governmental authorities and accreditation organizations.

(bb) **"Release"** shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment or as otherwise defined in or pursuant to any Environmental Regulation.

(cc) **"Select Administrative Note"** shall mean that certain Promissory Note, dated June 20, 2008, provided by Seller to Select VHS Acquisition Company, LLC, in the original principal amount of $7,968,500, and approved as an administrative claim in the Chapter 9 Proceeding.

(dd) **"Seller's Knowledge"** shall mean the actual (and not merely constructive) knowledge, without duty of further inquiry, of (i) William Cherry, the Chairman of the Board of Directors of Seller, (ii) Michelle Bird, Vice President, Human Resources of Seller, (iii) Keith Garrison, Facilities Administrator of Seller, (iv) Mark Palmer, Administrator, Hemet Valley Medical Center of Seller, (v) Richard DiCapo, Administrator, Menifee Valley Medical Center of Seller, (vi) Joel Bergenfeld, Interim Chief Executive Officer of Seller, (vii) Michael Bernstein, Interim Chief Financial Officer of Seller, and (viii) Melanie Van Winkle, Vice President, Finance of Seller, or their successors.

**1.1.2 Other Defined Terms.** The terms listed in Schedule 1.1.2 are defined elsewhere in this Agreement and, for ease of reference, the section containing the definition of each such term is set forth opposite such term.

**1.1.3 Certain References.** As used in this Agreement, and unless the context requires otherwise:

(a) References to "include" or "including" mean including, without limitation;

(b) References to "hereof," "herein," "hereto" and derivative or similar words refer to this Agreement;

- 6 -

references to that document as amended, consolidated, supplemented or replaced by the parties thereto from time to time;

(d) References to time are references to Pacific time (Standard or Daylight Savings, as applicable);

(e) References to "Parties" are references to Seller and Purchaser and their successors and assigns and such Parties are sometimes referred to individually as a Party;

(f) The gender of all words includes the masculine, feminine and neuter, and the number of all words includes the singular and plural; and

To the extent included in this Agreement, the Table of Contents, the divisions of this Agreement into Articles, Sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

**1.2 Purchase Consideration.**

**1.2.1 Purchaser's Estimate of Purchase Consideration.**

(a) The aggregate purchase consideration to be paid and provided by Purchaser to Seller shall consist of the following payments and assumptions of liabilities, the aggregate value of which Purchaser estimates to be approximately One Hundred Sixty-Nine Seven Hundred Seventy Three Million Dollars ($169,773,000) (**"Purchaser's Estimate of Purchase Consideration"** or **"PEPC"**):

(i) **Cash Purchase Portion.** Payment of an amount sufficient to pay off the Existing Bonds described in Schedule 1.2.1(b), after application of all reserves held by the Bond Trustee in connection with the Existing Bonds and any reserves held internally by Seller for payment of interest and principal on the Existing Bonds. It is the intent of the parties that Purchaser shall pay Seller an amount necessary to pay off the Existing Bonds and to obtain the Bond Releases. As of the date of this Agreement, the outstanding principal and unpaid interest on the Existing Bonds is currently estimated at approximately $44,700,000 less reserves, which are anticipated to be reduced by withdrawals by the Bond Trustee to cover its fees and expenses as incurred (the **"Cash Purchase Portion"**); and

(ii) **Select Note Satisfaction.** The satisfaction or assumption by Purchaser, of, and the full and complete release of Seller from any further liability under, the Select Administrative Note, with a current approximate balance, including accrued interest, of $8,400,000 (**"Select Note Satisfaction"**); and

(iii) **Assumed Other Liabilities.** Assumption by Purchaser, for the benefit of Seller, of (A) Adjusted Current Liabilities, (B) other liabilities on the Baseline Financials classified under long term debt as *Capitalized Leases and Other L/T Debt* and (C) other liabilities on the Baseline Financials classified as *Workers' Comp - Long Term*, (Section 1.2.1(a)(iii)(B) and Section 1.2.1(a)(iii)(C) are collectively referred to as **"Other Liabilities"**), all of which, based on the Baseline Financials, collectively result in an assumed liability of

- 7 -

approximately $31,100,000 (collectively, the "**Assumed Other Liabilities**"). In connection with the assumption of the Assumed Other Liabilities, Purchaser also is agreeing to indemnify, defend and hold Seller harmless with respect to the Assumed Other Liabilities; and

(iv)   **Creditors Commitment**.  A commitment by Purchaser in the total amount of $21,000,000 (which amount shall not be subject to offset by Purchaser for any reason whatsoever), subject to payment of up to $4,000,000 or more to pay Seller's Administrative Claims as detailed in Section 1.2.4, with the remainder to be paid to the General Unsecured Creditors not included in Assumed Other Liabilities, over four (4) years in four (4) equal annual payments on each successive anniversary of the Closing("**Creditors Commitment**"); and

(v)   **Assumed Rejection Claims**.  The satisfaction or assumption by Purchaser of, and the full and complete release of Seller from any liability under, the rejection and/or breach claims filed by KM Strategic Management, Inc. ("**KM**"), Hemet Community Medical Group ("**HCMG**"), Menifee Valley Community Medical Group ("**MVCMG**"), LHIO, LLC ("**LHIO**"), and any claims of constituent members thereof which are derivative from such rejection and/or breach claims by KM, HCMG, MVCMG or LHIO, which Purchaser contends constitutes an assumption and release of claims worth approximately $55,000,000 ("**Assumed Rejection Claims**") as detailed more fully in claim numbers 134, 135, 136, and 168 and any amendments thereto, and indemnifying, defending and holding Seller harmless with respect to the Assumed Rejection Claims; and

(vi)   **Assumed Contracts**.  The satisfaction or assumption and release, if such release can be obtained, or indemnification of Seller by Purchaser, of the Assumed Contracts, as defined in Section 1.6.6; and

(vii)   **D&O Tail Payment**.  Payment by Purchaser, on Seller's behalf, of the premium for Seller's directors and officers tail insurance ("**D&O**") under substantially the same coverage, terms and conditions and policy limits as exists prior to the Closing Date, but without deductibles, as customarily modified from claims made to tail coverage in a single premium amount estimated at Four Hundred Fifty Thousand Dollars ($450,000) ("**D&O Tail Payment**"), as provided in Section 4.13(b); and

(viii)   **E&O Tail Insurance Payment**.  Payment by Purchaser, on Seller's behalf, of the premium for general liability and medical malpractice tail insurance ("**E&O**") under substantially the same coverage, terms and conditions and policy limits as exists prior to the Closing Date, but without deductibles, as customarily modified from claims made to tail coverage in a single premium amount estimated at Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000) ("**E&O Tail Insurance Payment**") as provided in Section 4.13(a);

(ix)   **Annual Support Grants (Community Benefit)**.  Payment by Purchaser of the Annual Support Grants (as provided in Section 5.9.1(b) of this Agreement) of up to $400,000 per year for five (5) years (total up to $2,000,000), which amount shall not be subject to offset by Purchaser for any reason whatsoever; and

- 8 -

---

(x)   **ESL Benefits**.  Assumption by Purchaser of the accrued ESL Benefits to Seller's Employees pursuant to Section 1.8.11, estimated at a maximum of approximately $3,373,000.

(b)   If the Transaction does not become the Alternative Transaction and the Agreement is not terminated as provided in Article VIII, the Purchaser shall cause the Escrow to deliver to the Bond Trustees, at Closing, Purchaser's payment of the Cash Purchase Portion on Seller's behalf for all of the existing bond indebtedness to which Seller is subject, or which is secured by or otherwise affects any of the Assets, as further described in Schedule 1.2.1(b) (the "**Existing Bonds**") as needed to obtain the Bond Release; or

(c)   If the Transaction under this Agreement becomes the Alternative Transaction, as detailed in Section 1.3.2 of this Agreement, whereby Purchaser purchases Menifee Valley Medical Center, then the Parties shall execute a separate asset purchase agreement which shall contain those terms set forth in Schedule 1.3.2 (the "**Definitive Alternative Agreement**"); provided, however, if the Parties are unable to reach agreement on the Definitive Alternative Agreement, the terms of this Agreement, including without limitation, Schedule 1.3.2 shall remain legally binding and enforceable on the Parties with respect to the Alternative Transaction addressed in Section 1.3.2.

1.2.2   **Opening of Escrow**.  Within five (5) business days after the execution of this Agreement, the Parties shall open an escrow with the Bank of Hemet (the "**Escrow**").  The Parties shall also execute and deliver to Escrow mutually acceptable escrow instructions as the Parties determine are necessary in order to consummate such transactions and as the Title Company and the Escrow shall require in order to clarify their respective duties and responsibilities (the "**Escrow Instructions**") along with a duly executed copy of this Agreement.

1.2.3   **Deposit**.  Within five (5) business days after the opening of Escrow, (i) the Parties shall effect the transfer to the applicable account at Escrow the One Million Dollars ($1,000,000) previously deposited by Purchaser in connection with the exclusive dealing agreement between Seller and Purchaser, and (ii) Purchaser shall wire transfer to Escrow an additional One Million Dollars ($1,000,000), in immediately available funds, which shall collectively constitute the good faith deposit in the amount of Two Million Dollars ($2,000,000) (the "**Deposit**"), all of which shall, in the event of Closing, be credited as part of the PEPC in connection with the transactions contemplated by this Agreement and the Related Agreements (collectively, the "**Transaction**"). The Escrow shall hold the Deposit pursuant to the terms of mutually acceptable Escrow Instructions in substantially the form attached as Exhibit 1.2.3 which Seller, Purchaser and the Title Company shall execute as soon as possible after the execution of this Agreement.  The Escrow Instructions shall be consistent with the terms of this Agreement, and in the event of any conflict between the Escrow Instructions and this Agreement, this Agreement shall prevail.  The Deposit shall be repaid to Purchaser or retained by Seller as provided in Article VIII.

1.2.4   **Administrative Claims Fund**.

1.2.4.1   **Claims Fund**.  Concurrent with the Closing, Purchaser shall have deposited $4,000,000 into a segregated interest bearing trust account to be maintained by Seller separate and apart from any other bank accounts, to be used only for the purposes and for the benefit of the parties described in this Section 1.2.4 (the "**Claims Fund**") and to make funds available to

- 9 -

pay Seller's post-petition obligations, including those Administrative Claims which are not included within the Assumed Other Liabilities ("**Covered Claims**"). "Covered Claims" do not include any claims relating to Seller's defined benefit plan.

**1.2.4.2 Procedure for Payment.** Seller shall provide to Purchaser and to the official committee of unsecured creditors or any post-confirmation representative of the General Unsecured Creditors (collectively, the "**Committee**") a list of the Covered Claims which Seller proposes to be paid from the Claims Fund. Purchaser and the Committee shall have ten (10) business days from receipt thereof to review such list and to notify Seller, in writing, if Purchaser or the Committee objects to payment of any such claims. Seller and Purchaser or the Committee, as the case may be, shall meet and confer in good faith, within ten (10) business days of receipt of Purchaser's or the Committee's objection, to resolve any such issues. In the event that such dispute cannot be resolved within such period, Seller may notify Purchaser and the Committee, as applicable, in writing, of Seller's intent to pay such claims ten (10) business days after the date of such notice. Purchaser or the Committee may object to such payment by filing an appropriate pleading in the Chapter 9 Proceeding within such ten (10) business day period, seeking adjudication of such dispute by the Bankruptcy Court. Unless Purchaser or the Committee files such an objection with the Bankruptcy Court, Seller shall be entitled to pay any such proposed expenses. If such an objection is filed, such matter shall be resolved by the Bankruptcy Court.

**1.2.4.3 Additional Administrative Claims Fund.** In the event that, after the Closing, the Claims Fund is insufficient to satisfy all Covered Claims, Seller may notify Purchaser and the Committee in writing. Within ten (10) business days after Seller shall have given such notice to Purchaser and the Committee, Purchaser shall agree to deposit such additional funds ("**Additional Funds**") as may be required to pay all of such Covered Claims, which sum shall be subtracted from the next payments owed pursuant to the Creditors Commitment. The Additional Funds shall be paid at the time that the next payment becomes due pursuant to the Creditors Commitment. The foregoing notwithstanding, if either Purchaser or the Committee objects to payment of such additional Covered Claims, Purchaser or the Committee may file an objection with the Bankruptcy Court within such ten (10) business day period, seeking adjudication of such dispute by the Bankruptcy Court. Unless Purchaser or the Committee files such an objection with the Bankruptcy Court, Purchaser shall deposit such Additional Funds from the next payments owed pursuant to the Creditors Commitment and Seller may use such Additional Funds to pay such Covered Claims.

**1.2.4.4 Obligations Unconditional.** Purchaser's obligation to pay the Claims Fund and the Additional Funds, up to and including the total amount of the Creditors Commitment, shall be absolute and unconditional, and shall not be subject to any claim or offset which Purchaser may assert against Seller for any reason whatsoever.

**1.2.4.5 Disposition of Remaining Claims Funds.** Upon the expiration of thirty-six (36) months following the Closing Date, any remaining Claims Funds, including all interest earned, as to which Covered Claims are not then pending, shall be paid to the General Unsecured Creditors pursuant to a Bankruptcy Court approved Plan of Adjustment.

**1.3 Closing Date; Closing Escrow.**

**1.3.1** If the Approval Election results in the receipt of Public Approval (as these terms are defined in Section 4.14), the Parties shall, after the results of the Approval Election are

certified by the Register of Voters of Riverside County (the "**Election Results Date**"), seek to proceed to the closing of the transactions contemplated in this Agreement ("**Closing**") by January 31, 2010, or within forty-five (45) days after the Election Results Date, if later (the date for the Closing shall be referred to in this Agreement as the "**Closing Date**"), provided that all conditions precedent and other matters required to be completed by or on the Closing Date have been or will be completed by or on the Closing Date. If such conditions and other matters are not completed, such Closing Date shall be extended until such conditions and other matters are completed; provided, however, if the Closing has not occurred on or before April 30, 2010, either Party may terminate this Agreement subject the Party's termination rights as provided in Article VIII.

**1.3.2** If, in the Approval Election, the voters do not vote to provide the Public Approval, then the transactions pursuant to this Agreement will be structured and proceed to Closing as an alternative transaction (the "**Alternative Transaction**"), as addressed in Section 1.2.1(e) and more fully described in Schedule 1.3.2.

**1.3.3 [Intentionally Omitted]**

**1.3.4 [Intentionally Omitted]**

**1.3.5** The Closing with respect to the Assets shall be deemed to have occurred and to be effective as between the parties as of 12:01 a.m. (determined by reference to the local time zone in which the Hospitals are located) on the day immediately following the Closing Date (the "**Effective Time**"). The Title Company and/or the Escrow, as the case may be, shall make the deliveries and perform the acts as detailed in the Escrow Instructions, as may be amended, the disbursement agreements, and any other agreements executed by the Parties, which are consistent with the terms of this Agreement.

**1.3.6** In the event the Parties are prepared to proceed with the Transaction and Purchaser has not yet obtained a new license from the California Department of Public Health ("**CDPH**") and Medicare and Medi-Cal certification by the Centers for Medicare Services("**CMS**") of any other Material Licenses, as defined in Section 5.2.2, by the Closing Date, upon either Party's written election, the Closing shall nevertheless occur, but Seller and Purchaser shall, to the extent legally permissible, enter into (a) a lease of the Seller's Hospital(s) in substantially the form of Exhibit 1.3.6-A attached hereto, whereby Purchaser shall lease such Hospital(s) to Seller (the "**Leaseback Agreement**"), and (b) a Management Agreement in substantially the form of Exhibit 1.3.6-B attached hereto, whereby Seller shall engage Purchaser to manage the Hospital(s) (the "**Management Agreement**"), both of which (the Leaseback Agreement and the Management Agreement together shall be referred to collectively as the "**Lease and Management Agreement**"), shall remain in effect for the period between the Effective Time and the last to occur of receipt of all CDPH licenses for the Hospitals and Purchaser's receipt of CMS Medicare certification for each of the Hospital(s) ("**Lease/Management Termination Events**"). The Lease and Management Agreement shall terminate as to each Hospital effective (i) as such Lease/Management Termination Events occur for such Hospital CDPH licenses and CMS Medicare certification are received, or (ii) nine (9) months from the Closing Date, whichever shall first occur. The Parties agree that the Lease shall be at a rate of $1.00 per month, and the Management Agreement shall provide that Purchaser shall be paid a management fee equivalent to all profits and that Purchaser shall bear all obligations and risks of loss relating to the Hospital(s) and/or Hospital Business(es). Purchaser shall also be responsible for all claims, liabilities and losses incurred by Seller under the Lease and Management

Agreement as well as any insurance necessary to properly cover the Assets, the Personal Property, the Owned Real Property and the Hospital Businesses. The Lease and Management Agreement shall at all times be subject to Seller's obligation, as licensee, to remain ultimately responsible for Hospital operations to the extent legally required so that the Lease and Management Agreement shall not be deemed to constitute a change in ownership. Furthermore, Purchaser agrees under the Lease and Management agreements to indemnify, defend and hold Seller harmless from any and all losses incurred during the period of the effectiveness of the Lease and Management Agreement. Purchaser and Seller shall reasonably cooperate with each other in seeking any approvals required under applicable Laws in order to undertake the Lease and Management Agreement, if the parties elect to proceed in such fashion. If the CDPH or CMS shall require or request any changes to the Lease and Management Agreement to comply with applicable Laws and to avoid a change in ownership of the Hospitals prior to the Lease/Management Termination Events, then the Parties agree to work cooperatively to revise the Lease and Management Agreement to address such changes while maintaining, to the fullest extent possible, the intent of the parties thereunder. If the Parties enter into the Lease and Management Agreement, then the Licenses, as defined in Section 1.6.4, to the extent assignable, shall be transferred at the termination of the Lease and Management Agreement as opposed to the Closing.

**1.4    Items to be Delivered by Seller at Closing.** At or before the Closing, Seller shall deliver, or cause to be delivered, to Purchaser or to Escrow, the following, duly executed by Seller where appropriate, unless otherwise waived by Purchaser:

**1.4.1**    General Assignment, Bill of Sale and Assumption of Liabilities in substantially the form of Exhibit 1.4.1 attached hereto (the **"Bills of Sale"**);

**1.4.2**    Assignment and Assumption of Real Estate Leases in the form of Exhibit 1.4.2 attached hereto with respect to each Leased Real Property (the **"Real Estate Assignments"**);

**1.4.3**    Grant Deed(s) in the form of Exhibit 1.4.3 attached hereto (**"Grant Deeds"**);

**1.4.4**    Favorable original certificate of good standing, or comparable status, of Seller, issued by the California Secretary of State, dated no earlier than a date which is thirty (30) calendar days prior to the Closing Date;

**1.4.5**    [Intentionally Omitted]

**1.4.6**    Creation of the trust account for the Claims Fund;

**1.4.7**    A certificate of the Chairman of the Board of Seller certifying to Purchaser that to the Seller's Knowledge, as of the Closing, (a) there are no facts except as specifically disclosed in writing in such certificate or in other documents delivered to or examined by the Purchaser which would cause Seller to be in material breach of its representations and warranties under this Agreement, (b) Seller is in compliance with Seller's covenants set forth in this Agreement, and (c) that all of the conditions contained in Article VI have been satisfied except those, if any, waived in writing by Seller;

**1.4.8**    A certificate of the Secretary of the Board of Directors of Seller certifying to Purchaser (a) the incumbency of the officers of Seller on the Effective Date and on the Closing Date

- 12 -

and bearing the authentic signatures of all such officers of Seller who shall execute this Agreement and any additional documents contemplated by this Agreement, and (b) the due adoption and text of the resolutions of Seller authorizing (i) the transfer of the Assets and delegation of the Assumed Obligations by Seller to Purchaser, (ii) the execution, delivery and performance of this Agreement and all ancillary documents and instruments by Seller, and (iii) that Seller's Board of Directors has adopted a special resolution scheduling the election seeking the Public Approval pursuant to Section 4.14, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

**1.4.9**    UCC termination statements prepared by Purchaser and acceptable to Seller for any and all financing statements (which do not correspond to an Assumed Obligation) filed with respect to the Assets, including, without limitation, any UCC termination statements required to effectuate the Bond Release, and the release of any capital lease obligations (if any) which are not assumed by Purchaser hereunder;

**1.4.10**    Limited Power of Attorney prepared by Purchaser and acceptable to Seller for use of pharmacy license, DEA and Other Registration Numbers, and DEA Order Forms, in the form contemplated pursuant to 42 C.F.R. § 1305.05 (the **"Power of Attorney"**);

**1.4.11**    Copies of all third party consents, or of Bankruptcy Court orders if applicable, which are required to be obtained by Seller in connection with the assignment to and assumption of the Assumed Contracts and Assumed Leases by Purchaser;

**1.4.12**    The Lease and Management Agreement, executed by Seller, if applicable;

**1.4.13**    The Post-Closing Seller's Lease, as detailed in Section 5.9.1;

**1.4.14**    Proof reasonably acceptable to Purchaser that Seller has obtained and has in place the insurance required to be obtained by Seller pursuant to Section 4.13 of this Agreement, provided that Purchaser has paid the related premiums as provided in Sections 12.1(a)(vii) and (viii) and Section 4.13 of this Agreement;

**1.4.15**    Proof reasonably acceptable to Purchaser that Seller has obtained and has in place the required Public Approval, if obtained, to be sought by Seller pursuant to Section 4.14 of this Agreement;

**1.4.16**    In the event that the required Public Approval has been obtained, payment by the Purchaser (to be deposited and paid from the Escrow, as addressed above) to or as otherwise instructed by the trustees (collectively, the **"Bond Trustee"**) of the Existing Bonds, of the full amount required after application of all remaining reserves to cause Seller and all of the Assets to be fully released from any further obligations under the Existing Bonds, whether by defeasance, redemption or otherwise (**"Bond Release"**) after application of the Cash Purchase Portion and the applicable reserves, and delivery of such other documents as needed to effectuate the Bond Release, to the effect that the Assets shall be free and clear of any security interest on, or related to, the Existing Bonds and the Purchaser shall have no obligation therefore; and Purchaser shall be subject to no covenants or restrictions under, or as a result of, any Seller bond documents, as well as any other documents reasonably requested by Purchaser to effect the foregoing. Such amounts shall be payable by wire transfer, from the Cash Purchase Portion pursuant to the Bond Trustee's reasonable instructions (the **"Bond Release Documents"**). In the event that the Bond Trustee will not give the

- 13 -

1070039-2

1070039-2
F:\Bond\PHI\FINAL-ASA 10.12.09.DOC

Bond Release, Purchaser may rely upon the opinion of Seller's bond counsel that all amounts necessary to release the Existing Bonds have been duly paid or tendered and that the Assets and the proceeds thereof are not subject to any liens or restrictions imposed pursuant to the Existing Bonds;

**1.4.17** An opinion of an independent consultant with expertise in methods of appraisal and valuation and in accordance with applicable governmental and industry standards for appraisal and valuation, determining that fair and reasonable consideration is to be received by Seller for the Assets, or Alternative Assets, as applicable, pursuant to California Health & Safety Code Section 32121(p)(1);

**1.4.18** Such documents, other than payments, needed to be signed and delivered by Seller in order to effectuate the Bond Release; and

**1.4.19** Such other instruments, certificates, consents or other documents which are reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms of this Agreement.

For purposes of this Agreement, the deliverable documents referred to in Section 1.4 and elsewhere in this Agreement are collectively referred to in this Agreement as "**Related Agreements.**"

**1.5    Items to be Delivered by Purchaser at Closing.** At or before the Closing, Purchaser shall execute and deliver or cause to be delivered to Seller or Escrow the following, duly executed by Purchaser where appropriate, unless otherwise waived in writing by Seller:

**1.5.1** The Cash Purchase Portion for the Bond Release Documents pursuant to Section 1.2.1(a)(i) and any Bond Release Documents pursuant to Section 1.4.16 which are required to be signed and delivered by Purchaser, including appropriate escrow instructions regarding disbursement of the funds needed for the Bond Release payment, out of the Cash Purchase Portion funds consistent with the terms of this Agreement.

**1.5.2** A certificate of a duly authorized officer of Purchaser certifying to Seller (a) compliance with Purchaser's representations, warranties and covenants set forth in this Agreement, (b) that Purchaser has obtained all material licenses, permits, certificates of need and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement or that Purchaser shall agree and execute the Leaseback Agreement and Management Agreement, and (c) that all of the conditions contained in Article VII have been satisfied except those, if any, waived in writing by Purchaser;

**1.5.3** A certificate of the Secretary or other officer of Purchaser certifying to Seller (a) the incumbency of the officers of Purchaser on the Effective Date and on the Closing Date and bearing the authentic signatures of all such officers who shall execute this Agreement and any additional documents contemplated by this Agreement and (b) the adoption and text of the resolutions of the Members or Managers of Purchaser authorizing the execution, delivery and performance of this Agreement and all ancillary documents and instruments by Purchaser, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

- 14 -

125

**1.5.4** [Intentionall Omitted]

**1.5.5** Favorable original certificates of good standing, or comparable status, of Purchaser issued by the California Secretary of State dated no earlier than a date which is thirty (30) calendar days prior to the Closing Date;

**1.5.6** The Bills of Sale;

**1.5.7** The Real Estate Assignments;

**1.5.8** The Power of Attorney;

**1.5.9** Documents reasonably satisfactory to Seller evidencing the assumption and release (as may be applicable pursuant to Sections 5.8 and 9.3) of the Assumed Other Liabilities and Assumed Obligations;

**1.5.10** The Lease and Management Agreement, executed by Purchaser, if applicable;

**1.5.11** The Post-Closing Seller's Lease as detailed in Section 5.9.1(a);

**1.5.12** Payment of the Claims Fund;

**1.5.13** An assumption and release (from all holders of the Select Administrative Note) of Seller from any obligations relating to the Select Administrative Note which are reasonably acceptable to Seller;

**1.5.14** An assumption and release of Seller relating to the Assumed Rejection Claims, as detailed in Section 1.2.1(a)(v) which are reasonably acceptable to Seller;

**1.5.15** Payment of the Annual Support Grants, as detailed in Section 5.9.1(b), by Purchaser for the first year, which amount shall not be subject to offset by Purchaser for any reason whatsoever;

**1.5.16** No later than December 4, 2009 ("**First Organizational Update**"), and again five (5) days prior to the Closing Date ("**Second Organizational Update**"), an organizational chart for the Purchaser and each of the Purchasing Group Companies, setting forth its officers, directors and board of directors or managers, as applicable, and a list of all physicians who have invested at least Ten Thousand Dollars ($10,000) in such an entity ("**Listed PHH Physicians**").

**1.5.17** [intentionally left blank]

**1.5.18** Payment of the D&O and E&O premiums, as detailed in Section 1.2.1(a)(vii) and Section 1.2.1(a)(viii) respectively;

**1.5.19** Documentation, in a form reasonably acceptable to Seller, containing Purchaser's absolute and unconditional promise to pay to Seller, the total sum of $21,000,000, reduced by the Claims Fund and the Additional Fund as provided for in Section 1.2.4, payable in four (4) equal annual installments commencing on the first anniversary of the Closing Date, with the

- 15 -

remainder, after the payment of Administrative Claims, to be available to the General Unsecured Creditors; and

1.5.20   Such other instruments, certificates, consents or other documents which are reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms of this Agreement.

1.6   **Transfer of Seller Assets.** On the Closing Date, for the consideration and in reliance on the representations and warranties of the Parties set forth in this Agreement, Seller shall sell, assign, transfer, convey, as applicable, and deliver to Purchaser, and Purchaser shall acquire and assume, all of Seller's right, title and interest in and to, and all of Seller's obligations related to, the following assets and properties, as such assets and properties, as such assets shall exist on the Closing Date with respect to the operation of the Hospital Businesses, such transfer being deemed to be effective at the Effective Time (collectively, the "**Assets**"):

1.6.1   All of the real property that is owned by Seller, including, without limitation, any real property used in connection with the operation of the Hospital Businesses as described in Schedule 1.6.1, together with all buildings, improvements and fixtures located thereupon and all landscaping, utility lines, roads, driveways, fences, parking areas, contiguous and adjacent entry rights, construction in progress, and all other improvements located thereon and all rights, privileges and easements appurtenant to the foregoing, subject to the non-monetary obligations on the preliminary report approved by Purchaser, as detailed in Schedule 1.6.1-A (collectively, the "**Owned Real Property**");

1.6.2   All leases of real property in which Seller is the lessor or lessee, as detailed on Schedule 1.6.2 (the "**Leased Real Property**", which collectively with the Owned Real Property") shall hereinafter be referred to as the "**Real Property**");

1.6.3   All of the tangible personal property owned by Seller, including, without limitation, with respect to the operation of the Hospital Businesses, including all equipment, furniture, fixtures, machinery, vehicles, office furnishings, and leasehold improvements (the "**Personal Property**"), including, without limitation, the Personal Property described in Schedule 1.6.3, with the exception of (i) any and all Personal Property described in Sections 1.7 or 1.9 and (ii) any personal property located in the "Board Executive Conference Room," and the "Board Offices" as referenced in Section 5.9.1;

1.6.4   Subject to Section 1.3.6, all of Seller's rights, to the extent lawfully transferable, to all licenses, Medicare, Medicaid and other provider numbers and agreements, permits, approvals, certificates of need, certificates of exemption, franchises, accreditations and registrations and other governmental licenses, permits or approvals issued to such Seller with respect to the operation of the Hospital Businesses and all applications or registrations relating to any of the foregoing (the "**Licenses**"), including, without limitation, as described in Schedule 1.6.4-A except for those Licenses that Purchaser elects prior to the Effective Date, in its sole discretion, not to take or delay assignment of as identified in Schedule 1.6.4-B (the "**Excluded Licenses**");

1.6.5   All of Seller's interest, to the extent lawfully transferable and subject to Section 9.3 of this Agreement, in and to all personal property leases with respect to the operation of the Hospital Businesses, including, without limitation, as described in Schedule 1.6.5 (the "**Personal Property Leases**" which together with the Leased Real Property shall be known as the "**Leases**");

- 16 -

1079092

Bankruptcy Code §365, all of Seller's interest, to the extent lawfully transferable (and subject to the related terms at Section 9.3 of this Agreement), in and to all contracts and agreements (including, but not limited to, purchase orders) with respect to the operation of the Hospital Businesses or the Assets (the "**Contracts**") agreed to be assumed by Purchaser as set forth on Schedule 1.6.6 ("**Assumed Contracts**"); provided, however, the term "Assumed Contracts" as used in this Agreement shall exclude any Contracts not listed on Schedule 1.6.6 (the "**Excluded Contracts**");

1.6.7   Except as excluded under Section 1.7, all of Seller's advance payments, prepayments, prepaid expenses, deposits and the like, except for any prepaid insurance premiums, which exist as of the Effective Time, which were made with respect to the operation of any Hospital Businesses which are determined by Purchaser to be useable by and transferable to Purchaser, the categories and amounts of which are set forth on Schedule 1.6.7 (the "**Prepaids**");

1.6.8   Except as excluded under Section 1.7, all of Seller's inventories of supplies, drugs, food, janitorial maintenance, shop and office supplies and other disposables and consumables located at any of the Hospital Businesses, or used with respect to the operation of any of the Hospital Businesses (the "**Inventory**") which are existing as of the Effective Time;

1.6.9   Except as excluded under Section 1.7 and the Leaseback Agreement (if then existing or the termination thereof), all of Seller's documents, records, operating manuals, files and computer software with respect to the operation of any of the Hospital Businesses, to the extent lawfully transferable and subject to privacy issues, the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"), and Sections 9.3 and 12.8 of this Agreement, including, without limitation, all of Seller's patient records, medical records, employee records, financial records with respect to the operation of any of the Hospital Businesses, equipment records, construction plans and specifications, and medical and administrative libraries, and the Transferred Records, both subject to reasonable and customary records retention requirements and rights of access in order to fulfill Seller's legal obligations, as further addressed in this Agreement;

1.6.10   To the extent transferable and subject to Section 9.3 of this Agreement, all of Seller's unexpired warranties and covenants and covenants not to compete received from third parties with respect to the Assets including, without limitation, such warranties and covenants as are set forth in any construction agreement, lease agreement, equipment purchase agreement, consulting agreement, agreement for architectural and engineering services or purchase and sale agreement;

1.6.11   **[Intentionally Omitted];**

1.6.12   Except as provided under Section 1.7 or Schedule 1.6.12, all of Seller's claims, choses in action, rights of recovery, rights of offset, recoupment, rights to refunds and similar rights pertaining to the Assets;

1.6.13   Except as excluded under Section 1.7, to the extent transferable and subject to Section 9.3 of this Agreement, all proprietary materials, documents, trademarks, patents, information, media, methods, processes, inventions and technology owned by Seller which are functionally related to the Hospital Businesses, and any and all rights to use the same, including, but not limited to, all of Seller's telephone numbers, intangible assets of an intellectual property nature, all proprietary computer software, all clinical and policy and procedure manuals, and all

- 17 -

1079092

promotional, marketing and recruiting materials and all applications or registrations relating to any of the foregoing, all subject to any existing limitations;

1.6.14  To the extent transferable and subject to Section 9.3 of this Agreement, any and all of Seller's rights respecting computer and data processing hardware that are proprietary to Seller and licenses for software which are functionally related to the Hospital Businesses, and any of Seller's computer and data processing hardware, whether or not located at the Hospital, that is part of a computer system used by any of the Hospital Businesses, whether or not the central processing unit therefor is located at the Hospital, as set forth on Schedule 1.6.14;

1.6.15  All of Seller's other intangible assets related to the Hospital Businesses, not otherwise listed above, including without limitation the goodwill of the businesses evidenced by the Assets and Seller's rights under that certain covenant not to compete provided to Seller by Kaiser Foundation Hospitals ("Kaiser") pursuant to that certain First Amendment to Asset Sale Agreement, by and among Seller, Select VHS Acquisition Company, LLC and Kaiser, to the extent that such covenant may be transferable (such covenant is assignable only if Purchaser enters into agreements for the provision of beds to Kaiser patients at mutually agreeable rates);

1.6.16  All of Seller's insurance proceeds arising in connection with property damage to the Assets occurring after the Effective Date and prior to the Effective Time, to the extent not expended on the repair or restoration of the Assets;

1.6.17  Except as provided under Section 1.7 below, the Seller's names, symbols and telephone numbers used with respect to the operation of the Hospital Businesses, including, without limitation, the names of the Hospital Businesses set forth on Schedule 1.6.17 and all variants thereof;

1.6.18  All Accounts Receivable and other Current Assets (with the exception of the items in the Excluded Assets, as detailed in Section 1.7) of Seller with respect to the operation of any of the Hospital Businesses (which are not otherwise specifically described above in this Section 1.6); and

1.6.19  The assets of VHSSC which are to be transferred by VHSSC to Seller, subject to approval of the VHSSC Board of Directors, including, (i) the stock ownership interest in Professional Medical Management Group, Inc. ("ProMed"), subject to applicable contractual rights, and (ii) one-half of the cash or cash equivalents of VHSSC.  As of the date of this Agreement, it is contemplated that the other one-half of the remaining cash or cash equivalents may be given or otherwise transferred by VHSSC to Ramona Community Services Corporation, a California nonprofit corporation (which does business as Ramona VNA and Hospice) ("RCSC").  There shall be no adjustment to the PEPC by reason of such gift or transfer to RCSC.

1.7  **Excluded Assets.**  Notwithstanding anything to the contrary in Section 1.6, Seller shall retain all assets owned directly or indirectly by it (or any of Seller's affiliates) which are not among the Assets, including, without limitation, the following assets of Seller (collectively, the "**Excluded Assets**");

1.7.1  All cash and other consideration received by, or promised to, Seller as part of the PEPC;

1.7.2  Any rights of Seller in Seller's defined benefit plan;

127

- 18 -

1.7.3  The names Valley Health System, VHS or world-wide web addresses (including, without limitation, any world-wide web address containing "valleyhealthsystem.com," "valleyhealthsystem.org," "vhs.com," "vhs.org"), all abbreviations and variations thereof, and trademarks, trade names, service marks, copyrights and any applications therefor, symbols and logos related thereto, including those as detailed in Schedule 5.5, together with any promotional material, stationery, supplies or other items of inventory bearing such names or symbols or abbreviations or variations thereof;

1.7.4  The portions of Inventory, Prepaids and other Assets disposed of, expended or canceled, as the case may be, by Seller after the Effective Date and prior to the Effective Time in the ordinary course of business and otherwise in accordance with the terms of this Agreement;

1.7.5  All claims, rights, interests and proceeds with respect to state or local tax refunds (including but not limited to property tax) resulting from periods prior to the Effective Time, and the right to pursue appeals of same;

1.7.6  All rights, claims and choses in action of Seller and its Affiliates with respect to any Excluded Contracts and investments in Seller's Affiliates which Purchaser does not purchase, as listed at Schedule 1.7.6;

1.7.7  All of the assets of the Hemet Hospital Foundation, Menifee Valley Medical Center Foundation (aka Foundation for the Menifee Valley Medical Center) and Moreno Valley Community Health Foundation (collectively, the "**Foundations**");

1.7.8  All assets related to the Hospital auxiliaries, including the Hemet Valley Hospital Auxiliary, the Menifee Valley Medical Center Auxiliary, and the Moreno Valley Community Hospital Auxiliary (collectively, the "**Auxiliaries**");

1.7.9  All of the corporate minutes and organizational documents relating to Seller, VHSSC, the Foundations or the Auxiliaries, all attorney-client privileged documents relating to Seller;

1.7.10  Any affirmative defenses, counterclaims, rights of offset or recoupment, or any other defenses to any claims which may be asserted by any Person against Seller in connection with any Excluded Liabilities, as detailed in Section 1.9, or otherwise; provided further that Seller and Purchaser shall each have the non-exclusive right to assert any affirmative defenses, counterclaims, rights of offset or recoupment, or any other defense to any claims that may be asserted against either of them, to the extent that such affirmative defense, counterclaim, offset, recoupment or other defense relates to any asset, contract, right, obligation or interest retained by Seller or transferred to Purchaser, respectively;

1.7.11  Restricted funds included within Seller's Current Assets, held by Seller from the Estate of Beatrice Brown (for which the current balance is approximately $807,000 which are restricted to charitable use for services to crippled children, and which amount (as adjusted through the Closing Date), which shall be retained by Seller;

1.7.12  As detailed in Section 1.6.19, one-half of the cash or cash equivalents of VHSSC (which is included within Seller's Current Assets), which as of the date of this Agreement is contemplated to be distributed to RCSC;

- 19 -

1.7.13 Any portion of the current or long term debt service reserve funds relating to Seller's Existing Bonds held by or for the benefit of Seller (including all funds held by the Bond Trustees of the Existing Bonds and reserves held internally by Seller for payment of interest and principal on the Existing Bonds during the current semi-annual period) which shall be used to pay off the Existing Bonds; and

1.7.14 Any assets identified in Schedule 1.7.14, which are mutually agreed upon by the Parties.

1.8 **Assumed Obligations.** On the Closing Date, Seller shall assign, and Purchaser shall assume and agree to discharge (or if such obligations are not to be discharged at that time, Purchaser shall use its best efforts to obtain a release of Seller from and shall indemnify, defend and hold Seller harmless from) the following liabilities and obligations of Seller, except to the extent included in the list of Excluded Liabilities, below (collectively, the "**Assumed Obligations**"):

1.8.1 All Assumed Other Liabilities of Seller as of the Closing, including the repayment schedules from Medicare attached hereto as Schedule 1.8.1, but excluding any liabilities related to the Existing Bonds (which are to be paid in full from the Cash Purchase Portion), or as otherwise provided at Sections 1.9.11 or 1.9.12;

1.8.2 Any Severance Liabilities owing to Seller's Employees to whom Purchaser has not extended an offer of employment, consistent with the terms and conditions of Seller's current severance policy and employment agreements, and any Accrued Paid Time Off Amounts owing to Seller's Employees, as defined in Section 5.4.1, (i.e., for such employees who do not apply, or are not hired by Purchaser, or who are hired by Purchaser but do not consent to the transfer of liability for such Accrued Paid Time Off Amounts to Purchaser);

1.8.3 All obligations and liabilities of Seller in connection with the Contracts, to the extent that (i) Purchaser obtains a direct or indirect benefit from such Contracts even though not included within Assumed Contracts, as further addressed in Section 9.3.1 or (ii) such Contracts are Assumed Contracts, including any obligations to make cure payments required to be paid under the Chapter 9 Proceeding in order for Purchaser to assume any Contract which Purchaser is required or elects to assume pursuant to this Agreement. Notwithstanding the foregoing, in the event that Purchaser is unable as a matter of law to assume the capital lease obligations which are part of the Assumed Contracts (e.g., such financing is available only to tax exempt entities), Purchaser agrees to refinance or pay in full the capital lease obligations as of the Closing;

1.8.4 All unpaid real and personal property Taxes, as defined in Section 2.15.1, if any, that are attributable to the Assets;

1.8.5 All utilities furnished to all of the Assets;

1.8.6 All obligations and liabilities under the union contracts and memoranda of understanding with the unions which are referenced in Schedule 1.8.6 and Schedule 2.13.2;

1.8.7 All of the obligations and liabilities relating to the Assets, the Real Property and the operations or practices of the Hospital Businesses which hereafter may relate that in any way are based upon, relate to or arise out of the ownership or operation of the Assets, the Real Property or the Hospital Businesses after the Closing Date;

- 20 -

128

1.8.8 All obligations and liabilities of Seller now existing or which may hereafter exist by reason of any liability to refund any payment or reimbursement received by Seller from any Payor which is attributable to any period of time, unless such refund resulted from criminally fraudulent or criminally illegal billing practices by Seller;

1.8.9 All other obligations of Seller which are expressly assumed by Purchaser as part of the PEPC as set forth in Section 1.2.1 or elsewhere in this Agreement;

1.8.10 All present, future and contingent workers compensation claims of Seller's Employees;

1.8.11 All accrued extended sick leave and frozen sick pay benefits (the "**ESL Benefits**") for Seller's Employees who become Hired Employees, as defined in Section 5.4.1, under Seller's ESL Benefit plans (which provides for accrual of ESL Benefits separate and apart from Accrued Paid Time Off and is payable only in the event of sickness after exhaustion of Accrued Paid Time Off and is provided on the understanding and condition that the ESL Benefits are not payable to Seller's Employees upon termination of employment of Seller's Employees, and is not carried as a Current Liability on the Baseline Financials);

1.8.12 Any other obligations and liabilities identified in Schedule 1.8.12 which are mutually agreed upon by the parties.

1.9 **Excluded Liabilities.** Purchaser shall not assume or become obligated for any obligation or liability of Seller not expressly assumed pursuant to Section 1.8, of any nature whatsoever (whether express or implied, fixed or contingent, liquidated or un-liquidated, known or unknown, due or to become due) (the "**Excluded Liabilities**"), which Excluded Liabilities shall include, without limiting the generality of the foregoing, the following:

1.9.1 Obligations or liabilities of Seller or any Affiliate of Seller now existing or which may hereafter exist to refund any payment or reimbursement received by Seller from any Payor, based on claims of criminally fraudulent or criminally illegal billing (but not including any improper or allegedly improper billing which is not criminally fraudulent or criminally illegal), which is attributable to any period of time ending prior to the Effective Time;

1.9.2 Any Severance Liabilities not listed at Schedule 1.1.1.(ee);

1.9.3 Fines, penalties and interest thereon now existing or which may hereafter exist by reason of any violation of Laws by Seller or by any employee, agent or independent contractor of any of the foregoing, relating to the ownership, use or operation of the Assets prior to the Effective Time;

1.9.4 Obligations and liabilities of Seller arising from or in connection with any litigation described in Section 2.11 or any claims for personal injury (including sickness, trauma, disease, pain and suffering, loss of future earnings, punitive damages and the like), property damage and any other damage or injury in existence or arising out of an event or circumstance which occurred or existed prior to the Effective Time, whether or not any claim has been made or litigation has been instituted with respect thereto, and whether or not any such claim is covered partially or fully by insurance;

- 21 -

**1.9.5** Except as provided in Section 1.8.3 (with respect to cure payments), Section 12.12, or elsewhere in this Agreement, obligations and liabilities of Seller incurred in connection with obtaining any required consent, authorization or approval under this Agreement necessary for Seller to sell, convey, assign, transfer or deliver any Asset to Purchaser under this Agreement, subject to Section 9.3;

**1.9.6** Obligations and liabilities of Seller or any Affiliate of Seller now existing or which may hereafter exist, for any Taxes, including, but not limited to any Taxes for which Seller would otherwise be liable that may arise as a result of the consummation of the transactions contemplated by this Agreement or any Related Agreement, except (i) real and personal property Taxes, (ii) sales and use taxes for periods prior to the Closing which are included in the Baseline Financials, and (iii) as otherwise provided in Section 12.12

**1.9.7** All of the obligations and liabilities that are based upon or arise out of the assets or businesses of Seller or any Affiliate of Seller which are not being transferred to Purchaser under this Agreement, including without limitation those related to the Excluded Assets, unless Purchaser is actually receiving the benefit of the assets or businesses not being transferred (e.g., because a third party will not grant a consent), in which case, the Parties agree that Seller shall not be liable for these obligations and liabilities and Purchaser shall indemnify, defend and hold Seller harmless from any liability, obligation or claim related thereto to the extent that Purchaser is receiving a benefit from the asset or business not transferred;

**1.9.8** Except as otherwise provided in Section 1.8 above, liabilities and obligations to any employees of Seller arising out of claims, actions or omissions occurring prior to the Effective Time (i) under any employment, wage and hour, equal opportunity, discrimination, or immigration and naturalization Legal Requirements, including without limitation under the National Labor Relations Act ("**NLRA**"), Title VII of the Civil Rights Act ("**CRA**"), the Fair Labor Standards Act ("**FLSA**"), the Age Discrimination in Employment Act ("**ADEA**"), the Vocational Rehabilitation Act of 1973 ("**VRA**"), the Public Health Service Act ("**PHSA**"), the Consolidated Omnibus Budget Reconciliation Act ("**COBRA**") (to the extent applicable to Seller) Worker Adjustment and Retraining Notification Act (and California Assembly Bill AB2957, as codified at California Labor Code Sections 1400 through 1408) (collectively, "**WARN**") (to the extent applicable to Seller), with respect to periods prior to the Closing Date, and any other federal or state employment Legal Requirements; or (ii) under any collective bargaining or labor agreements or labor Legal Requirements or arrangements, except as otherwise expressly provided in this Agreement; provided, however, the Assumed Obligations shall include all present, future and contingent Workers Compensation claims as provided in Section 1.8.10 above;

**1.9.9** All of Seller's liabilities and obligations, if any, relating to Benefit Plans accruing prior to the Effective Time, except as otherwise provided in Section 1.8;

**1.9.10** All Current Liabilities which are not recorded on Seller's books consistent with accounting principles applied to the Baseline Financials, but excluding (i) all obligations under Assumed Contracts, and (ii) all obligations under the ESL Benefits which are assumed by Purchaser as described in Section 1.8.11 above; and

**1.9.11** Any liabilities relating to the Existing Bonds, which Purchaser has agreed to pay as part of the PEPC; and

**1.9.12** Any liability or obligation arising from any attempt by Seller to formally reject in the Chapter 9 Proceeding any Contracts which are not Assumed Contracts, including, without limitation, existing labor agreements, whether or not such liability or obligation arises before or after the Effective Time.

The Excluded Liabilities shall remain the sole responsibility of Seller subject to the limitations provided in this Agreement.

**1.10 Disclaimer of Warranties.**

**1.10.1** As a material part of the consideration and as an inducement to Seller to enter into this Agreement, Purchaser agrees as follows:

Except as expressly set forth elsewhere in this Agreement, the Assets transferred to Purchaser shall be sold by Seller and purchased by Purchaser at the Effective Time "AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR OCCUPANCY OR HABITATION, with respect to the Real Property, land, buildings and improvements, and WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, with respect to the physical condition of the Personal Property and Inventory, and with no warranties with respect to the current financial condition of the Hospital Businesses, any and all of which warranties (both express and implied) Seller hereby disclaims.

Seller's Initials: _____    Purchaser's Initials: _____

All of the foregoing real and personal property shall be further subject to normal wear and tear on the land, buildings, improvements and equipment and normal and customary use of the inventory and supplies in the ordinary course of business up to the Effective Time. Notwithstanding the foregoing and without limiting the various limitations set forth in this Section 1.10, Seller discloses that it has identified the construction projects set forth in Schedule 1.10.1 which Seller believes will require completion during the current fiscal year following the Closing Date.

**1.10.2** Without limiting the foregoing, Purchaser acknowledges that Purchaser will be given the opportunity, at its sole cost and expense, to conduct such environmental inspections and surveys as Purchaser may deem necessary (the "**Environmental Surveys**"). If Purchaser is dissatisfied with the results of any Environmental Survey, or related investigation, conducted by Purchaser, Purchaser shall notify Seller in writing by December 4, 2009 that Purchaser is terminating this Agreement. Failure by Purchaser to give such written notice by December 4, 2009 shall be deemed to constitute approval by Purchaser of the Environmental Surveys, or a waiver by Purchaser of such condition. Seller shall have no obligation to undertake any such environmental remediation work. Notwithstanding anything to the contrary in this Agreement, Purchaser acknowledges that a portion of the hospital located in Hemet and the child care center in Hemet were built prior to 1982 and contain asbestos and also may not be in compliance with current applicable seismic Legal Requirements. Purchaser agrees to take the Real Property subject to said conditions and to relieve,

defend, indemnify and hold Seller harmless with respect to any liability related thereto, except to the extent of any liability resulting from Seller's negligence or intentional misconduct.

1.10.3  Without limiting the foregoing, Purchaser will be given the opportunity, at its sole cost and expense, to obtain such appraisals as Purchaser and its lenders and other financing sources may deem necessary (the "**Purchaser's Appraisals**"), and to complete such Purchaser's Appraisals no later than the Closing ("**Appraisal Period**"). Seller shall provide Purchaser and its agents reasonable access to the Real Property and the Hospitals as reasonably necessary for conducting the surveys and appraisals. Subject to Section 1.4.17 which the Parties acknowledge is for the protection of Seller, the Parties agree that there shall be no financing contingency applicable to the Transaction.

1.10.4  Except as expressly set forth elsewhere in this Agreement, any and all information and documents furnished to Purchaser by or on behalf of Seller relating to the Real Property shall be deemed furnished as a courtesy to Purchaser but without any warranty of any kind from or on behalf of Seller, except for any representations expressly made by Seller elsewhere in this Agreement. Purchaser hereby represents and warrants to Seller that Purchaser has performed, or will perform, an independent general inspection and investigation of the Real Property and has also investigated and has knowledge of operative or proposed governmental laws and regulations including without limitation, land use laws and regulations to which the Real Property may be subject. Purchaser further represents that, except for any representations expressly made by Seller and any other Purchaser inspection and approval rights set forth elsewhere in this Agreement, and right to receipt of title insurance as addressed elsewhere in this Agreement, it shall acquire the Real Property solely upon the basis of its independent inspection and investigation of the Real Property, including without limitation, (i) the quality, nature, habitability, occupancy, merchantability, use, operation, value, marketability, adequacy or physical condition of the Real Property or any aspect or portion thereof, including, without limitation, structural elements, foundation, roof, appurtenances, access, landscaping, parking facilities, electrical, mechanical, HVAC, plumbing, sewage, and utility systems, facilities and appliances, soils, geology and groundwater, or whether the Real Property lies within a special flood hazard area, an area of potential flooding, a very high fire hazard severity zone, a wildland fire area, an earthquake fault zone or a seismic hazard zone or is not structurally or non-structurally in compliance with existing or future applicable seismic law standards, (ii) the dimensions or lot size of the Real Property or the square footage of the Improvements thereon or of any tenant space therein, (iii) the development or income potential, or rights of or relating to, the Real Property or its use, habitability, occupancy, merchantability, or fitness, or the suitability, value or adequacy of such Real Property for any particular purpose, (iv) the zoning or other legal status of the Real Property or any other public or private restrictions on the use of the Real Property, (v) the compliance of the Real Property or its operation with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any governmental or regulatory agency or authority or of any other person or entity (including, without limitation, the Americans With Disabilities Act), (vi) the ability of Purchaser to obtain any necessary governmental approvals, licenses or permits for Purchaser's intended use or development of the Real Property, (vii) the presence or absence of Hazardous Materials on, in, under, above or about the Real Property or any adjoining or neighboring property, (viii) the quality of any labor and materials used in any Improvements, (ix) the condition of title to the Real Property, (x) any other agreements affecting the Real Property or the intentions of any party with respect to the negotiation and/or execution of any lease or contract with respect to the Real Property, (xi) Seller's ownership of the Real Property or

any portion thereof, or (xii) the economics of, or the income and expenses, revenue or expense projections or other financial matters, relating to the operation of the Real Property.

1.11  **Risk of Loss.** Subject to Sections 1.12 and 1.13, the risk of loss or damage to any of the Assets, including the Personal Property, Real Property, the Hospital Businesses and any other property transfer which is contemplated by this Agreement, shall remain with Seller until the Effective Time. Seller shall maintain its insurance policies covering the Assets, including the Personal Property, Owned Real Property, the Hospital Businesses and all other property through the Effective Time.

1.12  **Casualty.** If prior to the Closing, all or any part of the Assets or the Real Property are destroyed or damaged by fire or the elements or by any other cause where (a) such damage or destruction in the aggregate ("**Aggregate Damage**") does not exceed Two Million Five Hundred Thousand Dollars ($2,500,000.00), whether or not covered in whole or in part by insurance, and (b) such damage or destruction in the aggregate which is not covered by Seller's insurance does not exceed One Million Dollars ($1,000,000) in either case, the "**Damage Threshold**"), the duties and obligations of the Parties under this Agreement shall not be affected, the PEPC shall not be adjusted, and the Closing shall proceed as scheduled pursuant to the terms of this Agreement; provided, however, at the Closing, Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any insurance proceeds on account of such damage or destruction, but without further adjustment to the PEPC. Solely for purposes of the foregoing determination, "**Aggregate Damage**" shall also include the estimated costs of environmental remediation as set forth in Section 1.10.2. If prior to the Closing, all or any part of the Assets or the Real Property are destroyed or damaged by fire or the elements or by any other cause where the Aggregate Damage exceeds either Damage Threshold, Purchaser may elect to either (i) purchase the Assets and the Closing shall proceed as scheduled on the terms set forth in this Agreement, without adjustment to the PEPC (provided, however, at the Closing, Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any insurance proceeds on account of such damage or destruction), or (ii) terminate this Agreement upon written notice to Seller ("**Termination Notice**"), whereupon Purchaser shall be entitled to a refund of the entire Deposit. The Purchaser shall make such election within fifteen (15) business days following the occurrence of the casualty giving rise to such Aggregate Damages. Unless Seller challenges any valuation determinations made by Purchaser under this Agreement within ten (10) business days of Seller's receipt of the same, such valuation determinations shall be deemed to have been accepted by Seller and shall be conclusive and final on Seller. If, however, Seller timely challenges any such determinations, then unless otherwise resolved by agreement of the Parties within ten (10) business days from the date of Seller's challenge, such valuation determination shall be deemed in dispute and shall be resolved pursuant to the dispute resolution provisions of Section 12.18 (except that the provisions of Section 12.18.1 shall not apply).

1.13  **Condemnation.** From the date of this Agreement until the Effective Time, in the event that any portion of the Assets or the Real Property, including access thereto or parking therefor, is taken, reduced or restricted by any pending, threatened or contemplated condemnation or eminent domain proceeding or otherwise, Seller shall promptly notify Purchaser of the same and Purchaser may, in its sole and absolute discretion, within ten (10) days after receipt of notice from Seller (i) terminate this Agreement in its entirety without penalty, in which case the Deposit shall be paid back to Purchaser, or (ii) agree to consummate the transaction notwithstanding such condemnation or eminent domain, in which event, (a) Purchaser shall accept the Assets and Real Property subject to such condemnation or eminent domain proceeding or without the portion of the

Assets or Real Property taken in such proceeding, (b) Purchaser shall retain all of the right, title and interest of Seller, as owner of the Assets or Real Property, as the case may be, in and to such proceeding and the proceeds of the award made in such proceedings, and (c) Seller shall promptly turn over to Purchaser the proceeds of any award, as and when received, or payment made pending the making of the award, already received by Seller. If Purchaser does not provide a termination notice to Seller within the ten (10) day period specified above, Purchaser shall be deemed to have elected to consummate the transaction notwithstanding such condemnation or eminent domain proceeding, in which event, Seller shall pay, transfer and assign to Purchaser at Closing, the proceeds, or the right to receive the proceeds, relating to any applicable award as detailed in this Agreement. In no event shall a condemnation result in a reduction of PEPC without the express written approval of Seller.

**1.14 Development and Review of Schedules, Exhibits and Other Materials.** The Parties agree to the further actions and provisions related to this Agreement, which are scheduled to take place during the forty-five (45) days following the Effective Time ("**Schedules Period**"):

1.14.1 During the Schedules Period, Seller shall provide Purchaser with copies of all Contracts (except to the extent that Purchaser and Seller otherwise agree to exclude certain non-material Contracts), as well as the estimated cure payments required under the Chapter 9 Proceeding for each such Contract to be paid in order to assume such Contracts ("**Cure Payments**"). Purchaser shall determine which Contracts it elects to assume and shall notify Seller of the same, in writing, within ten (10) days after the end of the Schedules Period.

1.14.2 Seller shall, within the Schedules Period, estimate the Administrative Claims ("**New Administrative Claims**") which will be incurred by Seller as a result of its rejecting those post-petition Contracts which Purchaser has not elected to assume ("**Rejected Contracts**") and shall notify Purchaser of same in writing. If, as a result of the New Administrative Claims, the Covered Claims are estimated to exceed the original Claims Fund, then Purchaser shall have the right to: (i) nonetheless close the Transaction, and at Closing, Purchaser shall immediately pay the additional amounts needed for the Claims Fund in excess of $4,000,000 to cover the New Administrative Claims; (ii) elect to assume some of the Rejected Contracts sufficient to reduce the New Administrative Claims to bring Covered Claims within the amount of the original Claims Fund; or (iii) elect, by written notice to Seller prior to the end of the Schedules Period, to terminate this Agreement.

1.14.3 Seller will complete and deliver Seller's disclosure schedules, and the remaining diligence materials related thereto and otherwise requested not later than 45 days after the Effective Date. If Purchaser disapproves of any such materials, it may elect to terminate this Agreement by written notice provided to Seller prior to the end of the Schedules Period or 10 days after the last materials are provided to Purchaser under Section 1.14.2.

1.14.4 Seller and Purchaser shall work together diligently to finalize the other Exhibits and Schedules to this Agreement and to develop and agree upon the Definitive Alternative Agreement consistent with Schedule 1.3.2. Once the Parties reach agreement on the form of the Definitive Alternative Agreement, the Parties agree to replace the terms of Schedule 1.3.2 with the form of the Definitive Alternative Agreement, which will govern the Alternative Transaction, if applicable.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as disclosed in any of the disclosure schedules related to the following representations or in Schedule 2, as of the Effective Date, as may be amended pursuant to the terms of this Agreement (collectively, the "**Seller's Disclosure Schedule**"), as an inducement to Purchaser to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Seller hereby represents, warrants and covenants to Purchaser, as to the following matters. Except as otherwise provided in this Agreement, Seller shall be deemed to remake all of the following representations, warranties and covenants as of the Closing Date.

**2.1 Authorization.** Except as otherwise provided in Schedule 2.1, Seller has full power and authority to enter into this Agreement and the Related Agreements and full power and authority to carry out the transactions contemplated hereby and thereby, subject only to (i) the requirement to seek and receive the Public Approval of the transaction contemplated in connection with this Agreement through the holding of an Approval Election, as further addressed at Section 4.14 (the "**Public Approval Requirement**"), and (ii) the requirement that Seller receive, prior to the Closing, an opinion from an independent appraiser that the consideration received by Seller under the terms of this Agreement will constitute fair and reasonable compensation for the Assets pursuant to the requirements of California Health and Safety Code Section 32121(p)(1) and in accordance with applicable governmental and industry standards for appraisals and valuations. Notwithstanding the receipt of an opinion from an independent appraiser as detailed above, Seller makes no representation or warranty with respect to the value of the Assets or the consideration being delivered by Purchaser with respect to this Transaction. Purchaser acknowledges that it is relying solely on its own evaluation of the Assets, the Transaction and the Alternative Transaction.

**2.2 Binding Agreement.** Except as otherwise provided in Schedule 2.2 and subject to Section 2.1, Seller has the full power and the authority to execute, deliver and perform the obligations and covenants set forth in this Agreement and all Related Agreements to which it is a party and to carry out the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the Related Agreements by Seller and the consummation of the transactions contemplated hereby or thereby have been (or will be by the Closing Date) duly authorized by all necessary action on the part of Seller. Except as set forth in Section 2.1 and Schedule 2.2, no other action on the part of the Seller is necessary to authorize the execution, delivery and performance of this Agreement and the Related Agreements, all documents necessary to give effect to this Agreement and all transactions contemplated hereby and thereby. Except as set forth in Schedule 2.1 and as provided in Section 2.1, this Agreement and the Related Agreements have been duly and validly executed and delivered by Seller and, assuming due and valid execution by Purchaser, this Agreement constitutes a valid and binding obligation of Seller enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of specific performance, injunctive relief, or other equitable remedies.

**2.3 Organization and Good Standing; No Violation.**

**2.3.1** Seller is duly organized and validly existing under the laws of the State of California. Except as disclosed in Schedule 2.3.1, Seller (i) has full power and authority to own,

131

operate and lease its properties and to carry on its businesses as now conducted, and (ii) is duly qualified to do business and is in good standing in each jurisdiction in which the property owned or leased by it or the operations of the Hospital Businesses make such qualification necessary. The organization of Seller does not violate any state or federal Law applicable to Seller.

2.3.2   Except as set forth in Sections 2.1 and 2.2 and as provided in Schedule 2.3.2, the execution, delivery and performance of this Agreement and all Related Agreements and the consummation of the transactions contemplated hereby and thereby, to the Seller's Knowledge, does not and will not, with the passage of time or the giving of notice or both (a) violate any state or federal Law applicable to Seller, (b) violate or conflict with, or result in a substantial and material breach of, or constitute a material default under (with or without notice or lapse of time, or both), or result in the acceleration of, or the creation of, any indebtedness, mortgage, Lien, restriction, charge, security interest, claim, right of another, or other encumbrance upon any of the Assets whatsoever, under any of the terms, conditions, or provisions of any note, bond, mortgage, indenture, lease, license, franchise, agreement or other instrument or obligation to which Seller is a party or by which any of the Assets are or will be bound or (c) violate or conflict with any provision of the charter or organizational documents of Seller.

2.4   Contracts and Leases.

2.4.1   With the exception of the Excluded Contracts, to Seller's Knowledge, Schedule 2.4.1, which may incorporate various other schedules, taken together as a whole, contains a list of substantially all of the Leases with respect to Real Property or Personal Property which are with a physician or other referral source for any of the Hospitals or are secured by a lien covering material Assets, or which (i) require lease payments by Seller with respect to the operation of any Hospital Businesses of a yearly payment in excess of Fifty Thousand Dollars ($50,000.00), and (ii) either have a remaining term in excess of one (1) year or cannot be terminated by Seller upon notice of one hundred eighty (180) calendar days or less without penalty or acceleration of any obligation (each a "Material Leases"; collectively, "Material Leases").

2.4.2   With the exception of the Excluded Contracts, to Seller's Knowledge, Schedule 2.4.2 contains a list of substantially all Contracts which is with a physician or other referral source for any of the Hospitals or which is secured by a lien covering material Assets or which (i) require the payment by Seller with respect to the operation of any Hospital Businesses of a yearly payment in excess of Fifty Thousand Dollars ($50,000.00), and (ii) either have a remaining term in excess of one (1) year or cannot be terminated by Seller upon notice of one hundred eighty (180) calendar days or less without penalty or acceleration of any obligation (each a "Material Contract"; collectively, "Material Contracts").

2.4.3   Schedule 1.2.1(b) contains a complete and accurate list of the Existing Bonds which constitutes all of the bond indebtedness to which Seller is currently subject. Schedule 1.2.1(b) also contains an accurate list, as of the date given on the schedule, of the then current redemption or pay-off amounts, as applicable, for each of such bond issuances.

2.5   Required Consents. Except as set forth in Section 2.1, the Liens granted to secure the Existing Bonds, and on Schedule 2.5, to Seller's Knowledge, Seller is not a party to or bound by, nor are any of the Assets subject to, any mortgage, Lien, deed of trust, Material Lease, Material Contract, or any material order, judgment or decree which (a) requires the consent of another to the

- 28 -

execution of this Agreement and the Related Agreements or (b) requires the consent of another to consummate the transactions contemplated by this Agreement and the Related Agreements.

2.6   Compliance With Laws and Contracts.

2.6.1   Compliance With Laws. Except as set forth in Schedule 2.6.1, to Seller's Knowledge, Seller, with respect to the operation of the Hospital Businesses, is in material compliance with all applicable substantive Laws, except where the failure to be in such compliance would not have a Material Adverse Effect on the Assets or the business of the Hospital Businesses. Except as set forth in Schedule 2.6.1, to Seller's Knowledge, Seller, with respect to the operation of the Hospital Businesses, has not been charged with or given notice of, and to the Seller's Knowledge, Seller, with respect to the operation of the Hospital Businesses, is not under investigation with respect to, any material violation of, or any obligation to take remedial action under, any applicable (i) Law, (ii) material license, certificate or certificate of need issued, or (iii) order, judgment or decree entered, by any federal, state, local or foreign court or governmental authority relating to the Hospital Businesses or the business of the Hospital Businesses. Notwithstanding the foregoing, except as set forth in Section 2.6.2, no provision of this Section 2.6.1 shall be deemed a representation or warranty by Seller as to compliance with any Environmental Laws.

2.6.2   Environmental Laws. Except as disclosed in Schedule 2.6.2 or in any Phase I or Phase II study done by the Purchaser, to Seller's Knowledge, Seller's ownership and operation of the respective Hospital Businesses and the Assets are and have been in material compliance with all Environmental Laws, except where such failure would result in an estimated cost of remediation in excess of $1,000,000. In the event that the estimated cost of remediation exceeds $1,000,000, then the Purchaser shall have the right to terminate this Agreement as its sole remedy. Except as disclosed in Schedule 2.6.2 or in any Phase I or Phase II study done by the Purchaser, to Seller's Knowledge, Seller has obtained all licenses, permits and approvals necessary or required under all applicable Environmental Laws (the "Environmental Permits") for the ownership and operation of its respective Hospitals and the Assets. Except as disclosed in Schedule 2.6.2 or in any Phase I or Phase II study done by the Purchaser, to Seller's Knowledge, all such Environmental Permits are in effect and, to Seller's Knowledge, no action to revoke or modify any of such Environmental Permits is pending. Except as disclosed in Schedule 2.6.2, to Seller's Knowledge, there is not now pending or, to Seller's Knowledge, threatened, any claim, investigation or enforcement action by any governmental authority (whether judicial, executive or administrative) concerning Seller's potential liability under Environmental Laws in connection with the ownership or operation of the Hospitals or the Assets. Except as disclosed in Schedule 2.6.2 or in any Phase I or Phase II study done by the Purchaser, to Seller's Knowledge, there has not been a Release or threatened Release of any Hazardous Substance at, upon, in, under or from the Hospitals or the Assets at any time. For the purposes of this Agreement, the term "Environmental Laws" shall mean all state, federal or local laws, ordinances, codes or regulations relating to Hazardous Substances or to the protection of the environment, including, without limitation, laws and regulations relating to the handling, storage, transportation, treatment and disposal of medical and biological waste. The foregoing notwithstanding, Purchaser acknowledges that portions of Homet Valley Medical Center and of the Child Care Center in Hemet were constructed prior to 1982 and contain asbestos or asbestos-containing materials ("ACM"); provided that, to Seller's Knowledge, the ACM have been handled and managed at all times in compliance with all applicable Laws.

- 29 -

**2.6.3    Compliance With Contracts.** Except as set forth on Schedule 2.6.3, and except for defaults occurring with respect to pre-petition obligations which are the subject of Seller's Chapter 9 Bankruptcy Proceeding and as to which Seller has the benefit of the automatic stay under the Bankruptcy Code, to Seller's Knowledge, (a) Seller has not received written notice that any Person intends to cancel or terminate any Material Contract or exercise any right, remedy or other option thereunder, and (b) Seller has not waived in writing any material right under any Material Contract.

**2.7    Title to Personal Property.**

**2.7.1    Title.** Except for the Personal Property which is leased from third parties by Seller, Seller has good and valid title to its Personal Property and is able to operate the Hospital Businesses in their current form.

**2.7.2    Inventory.** The Inventory, as defined in Section 1.6.8, with respect to each of the Hospital Businesses, is, and at the Closing Date will be, maintained in sufficient quantities to operate the Hospital Businesses in the ordinary course of business as currently conducted.

**2.8    Hospital Businesses Operations.**

**2.8.1    Licensure.** Except as provided in Schedule 2.8.1, to the Seller's Knowledge, all licenses, certifications and certificates of need which are necessary to operate the business of each of the respective Hospital Businesses by Seller are valid and in good standing, except where the failure to have such licenses, certifications and certificates of need would not have a Material Adverse Effect. Seller is duly licensed by the State of California to operate the Hospitals as general acute care hospitals having the number of beds as set forth in each Hospital's current general acute care hospital license (provided, that some of such beds are currently not being utilized), and other Hospital Businesses, as respective licensees, in compliance with applicable licensing requirements.

**2.8.2    The Joint Commission.** Each Hospital and, if required, each of the other Hospital Businesses is duly accredited by the Joint Commission ("**The Joint Commission**") for the period set forth in Schedule 2.8.2.

**2.8.3    Government Payor Programs.** Each Hospital and, if applicable, each of the other Hospital Businesses is certified for participation in the Medicare and Medicaid programs, and has current and valid provider contracts with each of such programs, except where the failure to have such contracts would not have a Material Adverse Effect. Except as set forth in Schedule 2.8.3-A, to the Seller's Knowledge, Seller has not received notices from the regulatory authorities which enforce the statutory or regulatory provisions in respect of any of the Medicare or Medicaid programs of any noncompliance or pending or threatened investigations with respect to the operation of any of the Hospital Businesses. Notices of Program Reimbursement have been issued by the applicable fiscal intermediary with respect to the cost reports of the Hospital Businesses for Medicare and Medicaid (if required) through the periods set forth in Schedule 2.8.3-B. To Seller's Knowledge, Seller has not received notice of any material dispute between any of the Hospital Businesses and the applicable governmental agency or private entity, or their intermediaries or representatives, regarding such cost reports for periods subsequent to the periods specified in Schedule 2.8.3-B. To Seller's Knowledge, there are no pending or threatened material claims by any of such programs against any of the Hospital Businesses with respect to the Audit Periods or any period thereafter, and the Hospital Businesses have not been subject to loss of waiver of liability or

utilization review denials with respect to any such program during the past two years. Schedule 2.8.3-A also contains a description of Seller's policies and procedures for reporting bad debts to Medicare and each other Payor, and for the collection and waiver of co-payments and deductibles of Medicare and each other Payor. Schedule 2.8.3-A also contains the Medicare net book value of each of the Assets (or, if more convenient and reasonably acceptable to Purchaser, category of Assets) as of the date of the 2004 and 2005 Financials and 2006 Financials.

**2.8.4    Medical Staff Investigations.** Except as set forth on Schedule 2.8.4 or with respect to investigations being conducted internally by the medical staff which have not risen to level of disclosure to the Seller, to the Seller's Knowledge, there exists no pending or threatened investigation by Seller of any member of the medical staff of any of the Hospital Businesses for a violation or alleged violation of any policy of Seller.

**2.8.5    Revenues and Properties.** Except as set forth on Schedule 2.8.5, Seller has not granted nor permitted any security interest in or on the revenues, assets or properties of the Assets.

**2.8.6    No Other Assets.** The only material assets or property used in connection with or necessary for the Hospital Businesses which are not being transferred to Purchaser, if any, are set forth on Schedule 2.8.6.

**2.9    Brokers and Finders.** Neither Seller nor any affiliate thereof, nor any officer or director thereof, has engaged any finder or broker in connection with the transactions contemplated under this Agreement and Seller shall be solely responsible for any fees or commissions payable to any such broker, finder or investment banker by reason of the actions (or alleged actions) of Seller, its Affiliates or any of its officers or directors.

**2.10    Financial Statements.**

**2.10.1    The following have been or will be prepared from the books and records of** Seller: the financial statements of Seller with respect to the operation of each of the Hospital Businesses for the years ending June 30, 2007 and June 30, 2008, for which audits are currently in progress but are not completed (the "**2007 & 2008 Financials**"), and the unaudited financial statements of Seller with respect to the operation of each of the Hospital Businesses for the year ending June 30, 2009, and for the unaudited financial statements of Seller with respect to the operation of each of the Hospitals for the months subsequent to June 30, 2009 as made available pursuant to Section 4.6 (the "**Interim Financials**") (the 2007 & 2008 Financials and the Interim Financials are collectively referred to in this Agreement as the "**Financial Statements**"). The 2007 & 2008 and the Interim Financials through August 31, 2009 are attached as Schedule 2.10.1 and Seller acknowledges that, to Seller's Knowledge, the unaudited Baseline Financials are true, correct and accurate in all material respects. Except as provided in Schedule 2.10.1, to the Seller's Knowledge, subject to adjustments and only meant to give a snapshot of the interim period, the Financial Statements have been prepared from, and are in accordance with, the books and records of Seller and, with the exception possibly of the Interim Financials, present fairly the financial position and results of operations of Seller as of the dates and for the periods indicated, except where variations therefrom are noted in footnotes to such financial statements. Purchaser expressly acknowledges that notwithstanding the delivery of such Financial Statements, the future performance of the Hospital Businesses and the Assets are subject to risks and uncertainties that could cause future results to differ from past results. Seller does not undertake any, and specifically

disclaims any obligation to make any forward-looking financial statements or projections, especially in light of losses which have been suffered by Seller over the past few months.

2.10.2 **Changes Since Interim Financials.** Since August 31, 2009, other than as contemplated or permitted by this Agreement, Seller has conducted the Hospital Businesses and the Assets only in the ordinary and normal course, and except as shown on Schedule 2.10.2, there has not been, to Seller's Knowledge:

(a) Any entry into or termination by Seller of any commitment, contract, agreement or transaction (including, without limitation, any borrowing or lending transaction or capital expenditure) related to the Hospital Businesses or the Assets except for transactions in the ordinary course of business;

(b) Any condemnation, casualty, physical damage, destruction or physical loss respecting, or change in the physical condition of, the Real Property or the Personal Property has had an adverse effect on the prospects, financial condition or results of operation of any of the Hospital Businesses;

(c) Any transfer of, or rights granted under, any contract which would have been an assumed Contract on the date of the Interim Financials, except for transactions in the ordinary course of business;

(d) Other than in the ordinary course of business, (i) any sale or other disposition of any asset included in the Interim Financials having a net book value in excess of Fifty Thousand Dollars ($50,000.00), or (ii) any material mortgage, pledge or imposition of any lien or other encumbrances on any such asset, or (iii) any sale or other extraordinary disposition of Inventory included in the Interim Statements;

(e) Any change, or any request or application for a change in, the provider number of the Hospital Businesses, or any creation, modification or termination of any agreement with any Payor, or any change in the method of accounting with respect to the Hospital Businesses (except as noted in footnotes to such Financial Statements), or any change in or modification of the medical staff bylaws of either Hospital;

(f) Any material amendment (other than general amendments which the carrier makes for a category of policy) or termination of any Insurance Policy or failure to renew any Insurance Policy covering or relating to the Hospital Businesses or the Assets;

(g) Any material breach or default by Seller under any contract that would have been an assumed Contract on the date of the Interim Statements;

(h) Any Material Adverse Effect;

(i) Any increase made in the compensation levels or benefits (severance or otherwise) of the employees of the Hospital Businesses, except in the ordinary course of business; or

(j) Any change in the relationship between the Hospital Businesses, on the one hand, and the medical staff, on the other hand, or any adverse action taken by either of them against the Hospital Businesses.

2.11 **Legal Proceedings and Liabilities.** Except as set forth on Schedule 2.11, and with the exception of Seller's pending Chapter 9 proceeding and the claims, objections and proceedings therein, to Seller's Knowledge, there are no claims, proceedings or investigations pending or, to the Seller's Knowledge, threatened relating to or affecting Seller with respect to the operation of the Hospital Businesses or any of the Assets before any court or governmental body (whether judicial, executive or administrative) in which an adverse determination would have a Material Adverse Effect. Except as set forth on Schedule 2.11, to Seller's Knowledge, Seller is not subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generically) applicable to it or its assets, including the Assets, which would have a Material Adverse Effect. To the Seller's Knowledge, Seller is not subject to any liabilities with respect to the operation of the Hospital Businesses which are not reflected in the Financial Statements. Schedule 2.11-A contains an estimate of Seller's current incurred by not reported liabilities ("IBNR"), if any, and an accurate description of the methodology used by Seller to calculate such IBNR, all of which are subject to adjustment by the auditors.

2.12 **Seller Plans.** Schedule 2.12 contains a list of each pension, profit sharing, bonus, deferred compensation, or other retirement plan or arrangement of Seller, including Seller's defined benefit plan (collectively, the **"Seller Plans"**).

2.13 **Personnel.**

2.13.1 **Hospital Personnel.** Schedule 2.13.1 sets forth a materially complete list (as of the date set forth therein) of positions, designation of the employees identified in Seller's handbook (i.e. full time employees, regular part-time employees, non-benefit employees, irregular part-time employees, temporary employees, per diem employees, and weekend contract employees), and current annual salaries or wage rates, bonus and other compensation and/or benefit arrangements, the paid time off pay, and period of service credited for vesting as of the date thereof of all full-time and part-time employees of Seller with respect to the operation of the Hospital Businesses and indicating whether such employee's is a part-time, full-time or per diem employee.

2.13.2 **Employee Relations.** Except as disclosed on Schedule 2.13.2, (a) neither Seller nor any of the Hospital Businesses is a party to any agreement with any union, trade association or other employee organization with respect to the employees of the Hospital Businesses, and (b) to Seller's Knowledge, since June 30, 2008, (i) no demand has been made for recognition by a labor organization with respect to any employees of the Hospital Businesses, (ii) no union organizing activities by or with respect to any such employees are taking place, (iii) there are currently no disputes, grievances, charges, complaints or proceedings involving any of the employees of any of the Hospital Businesses, (iv) the Hospital Businesses have not suffered any strikes (including wildcat strikes), slowdowns, walkouts, or lockouts or any other interruptions of disruptions of operations as a result of labor disturbances with respect to employees of the Hospital Businesses, (v) no union representation question exists with respect to any employees of the Hospital Businesses, and (vi) no collective bargaining agreement is currently being negotiated by Seller with respect to the employees of the Hospital Businesses. Seller shall promptly notify Purchaser of any such actions occurring after the Effective Date and prior to the Closing Date.

2.13.3   **Agreements with Employees.** Schedule 2.13.3 sets forth a complete list of all material agreements or arrangements with individual employees of Seller, including, without limitation, all employment, severance, bonus or retention agreements.

2.14   **Insurance.** To Seller's Knowledge, Seller maintains, and has maintained, without interruption, at all times during Seller's respective ownership of the Hospital Businesses, self-insurance and policies or binders of insurance covering such risks and events, including personal injury, property damage, malpractice and general liability, to provide adequate and sufficient insurance coverage for all the assets and operations of the Hospital Businesses. Schedule 2.14 contains a list of all such insurance maintained by Seller with respect to the operation of the Hospital Businesses as of the Effective Date, and such Schedule shall be modified and supplemented as of the Closing Date.

2.15   **Taxes.**

2.15.1   **Definitions.** "**Tax Return**" means any return, declaration, report, claim, election, notice, or information return or statement or other document (including, without limitation, any related or supporting information, schedules, or exhibits) filed or required to be filed with any federal, state, local or foreign governmental authority or other authority in connection with any Tax or estimated Tax. "**Tax**" and "**Taxes**" mean any and all federal, state, local and foreign taxes, assessments and other governmental charges, duties, impositions, levies and liabilities, including, without limitation, taxes based upon, measured by, or with respect to income, net income, gross income, earnings, profits, or gross receipts, or any sales, use, ad valorem, transfer, franchise, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, windfall profits, environmental, alternative, add-on minimum, custom duties, capital stock, social security (or similar), unemployment, disability, gains, recapture, estimate, or other taxes, fees, assessments, or charges of any kind whatsoever, together with any interest, penalty, and addition thereto.

2.15.2   **Filing and Payment.** To the Seller's Knowledge, Seller has duly filed all federal, state and local Tax Returns required to be filed by it, if any, (all of which are true and correct in all material respects) and has duly paid or made provision for the payment of all Taxes, if any, (including any interest or penalties and amounts due state unemployment authorities) which are due and payable, whether or not in connection with such returns. To Seller's Knowledge, Seller (with respect to the operation of the Hospital Businesses) has withheld proper and accurate amounts from its employees' compensation, and made deposits of all such withholdings, in material compliance with all withholding and similar provisions of the Code and any and all other applicable laws. Except as set forth on Schedule 2.15, there are no liens for Taxes upon the Assets, except for statutory liens for current Taxes not yet due and payable or which may hereafter be paid without penalty or which are being contested in good faith by appropriate proceedings. To Seller's Knowledge, no claim by any taxing authority with respect to the Hospital Businesses (or operation thereof) or the Assets is pending in a jurisdiction where Seller does not file Tax Returns.

2.16   **U.S. Persons.** Seller is not a "**foreign person**" for purposes of Section 1445 of the Code or any other Laws requiring withholding of amounts paid to foreign persons.

2.17   **Real Property.** Except as otherwise set forth in this Agreement, the Schedules to this Agreement, the opinion and appraisals required pursuant to California Health & Safety Code Section 32121(p)(1) and referenced in Section 2.1 above, and the reports with respect to seismic compliance,

- 34 -

which reports have been provided to Purchaser, during the preceding five (5) years, Seller has not received any written notice, or to Seller's Knowledge any oral notification, from any federal, state or local regulatory agency, or from any architect or engineer engaged by Seller during such five (5) year period, that (i) any improvements on any of the Real Property (including any construction-in-progress) have not been constructed substantially in accordance with the plans and specifications submitted to any governmental authorities in connection with such construction, (ii) any such improvements are not substantially in accordance with any zoning change applications and any applications for building permits related thereto, (iii) any such improvements are not in compliance with any material environment, safety, building, fire, land use, zoning, parking or access requirements, or (iv) the continued use, occupancy and operation of such improvements as currently used, occupied and operated by Seller does not constitute a prior nonconforming use permitted under such Laws. Purchaser acknowledges, however, that Seller is engaged in ongoing evaluation of requirements for compliance with the Alfred E. Alquist Hospital Seismic Safety Act of 1983 (Health & Safety Code Section 130000 et seq.), and has provided to Purchaser reports relating thereto.

Seller owns fee simple title to the Real Property described on Schedule 1.6.1. On the Closing Date, subject to Section 1.10, Seller shall convey to Purchaser title to the Real Property by means of a grant deed, subject to (i) any title exceptions and survey matters approved (or deemed approved) by Purchaser in accordance with this Agreement, (ii) any title exceptions caused by Purchaser, Purchaser's Affiliates, or its or their agents, representatives or employees, (iii) all real estate taxes and assessments for the then applicable tax fiscal year in which the Closing occurs, and (iv) general real estate taxes and assessments for subsequent years not yet due and payable. Except as disclosed on Schedule 2.17 and subject to Section 1.10, Seller has not created nor may it assert any rights with respect to any Liens that will interfere with Purchaser's use and enjoyment of the Real Property after the Closing and:

(a)   to Seller's Knowledge, no work has been performed on any of the Real Property and no materials have been furnished which could give rise to a mechanic's, materialman's or similar lien which has not been paid for or released at the sole cost and expense of Seller by Seller's execution and delivery to Purchaser of an indemnity reasonably satisfactory to Purchaser and recording at Seller's sole cost and expense a release bond in the form and manner required by California Civil Code § 3143;

(b)   Seller has not received any written notice and to Seller's Knowledge, has no knowledge of any proceeding or action pending to change the zoning of, or other land use (including parking) restrictions affecting, the Real Property;

(c)   to Seller's Knowledge, except as set forth in Schedule 2.17(c), there is no study, investigation or other proceeding pending, or to Seller's Knowledge, threatened by or before any governmental agency or authority, administrative or otherwise, or any nongovernmental entity related to the Real Property, which if commenced or concluded, in any way might or could have any Materially Adverse Effect;

(d)   the Real Property comprises all of the real property owned or leased by Seller, including, without limitation, all real property which is associated with or employed in the operation of the Hospital Businesses;

(e)   Seller has not received notice of condemnation or similar proceeding relating to the Real Property or any part thereof;

- 35 -

(f)    to the Seller's Knowledge, no part of the Real Property contains, is located within or abuts any flood plain, navigable water or other body of water, tideland, wetland, marshland or any other area which is subject to special state, federal or municipal regulation, control or protection. Within ten (10) days after the Effective Date, Purchaser agrees to engage the services of a natural hazard disclosure expert (the "**Natural Hazard Expert**"), to examine the maps and other information specifically made available to the public by government agencies for the purposes of enabling Seller to fulfill its disclosure obligations, if and to the extent such obligations exist, with respect to the natural hazards referred to in California Civil Code Section 1102.6a and to report the result of its examination to Purchaser and Seller in writing. The written report prepared by the Natural Hazard Expert regarding the results of its full examination will fully and completely discharge Seller from its disclosure obligations referred to in this Agreement, if and to the extent any such obligations exist, and, for the purpose of this Agreement, the provisions of Civil Code Section 1102.4 regarding non-liability of Seller for errors or omissions not within its personal knowledge shall be deemed to apply and the Natural Hazard Expert shall be deemed to be an expert, dealing with matters within the scope of its expertise with respect to the examination and written report regarding the natural hazards referred to above;

(g)    except for those tenants in possession of the Real Property under Leases or Contracts and as otherwise disclosed on Schedule 2.17(a), to the Seller's Knowledge, there are no Persons in possession of, or claiming any possession to, adverse or not, or other interest in, any portion of the Real Property other than Seller, whether as lessees, tenants at sufferance, trespassers or otherwise;

(h)    to Seller's Knowledge, all essential utilities, including water, sewer, gas, electricity and telephone service, are available to the Real Property, as currently developed by Seller, and to Seller's Knowledge there are no conditions existing which could result in the termination or reduction of the current access from the Real Property to existing roadways; and

(i)    to Seller's Knowledge, Seller possesses all licenses, permits, and other governmental consents and approvals necessary for the operation of such systems and the portions of the Hospital Businesses not pertaining to the provision of healthcare services (such as the coffee shop and the gift shop).

2.18    **Accuracy of Documents; Delivery and Inspection.** To Seller's Knowledge, Seller has furnished to Purchaser true and complete copies of all agreements, documents and other items listed in the Schedules or requested by Purchaser in writing. All documents delivered to Purchaser for Purchaser's review pursuant to the terms of this Agreement and any Related Agreement are true and complete copies (unless omissions are apparent from the documents so furnished) of all such documents.

2.19    **No Negotiations with Third Parties.** Except as described at Schedule 2.19, Seller has not entered into any negotiations, letters of intent, or understandings which are presently in effect, with any other Person with respect to the sale or other disposition of any of the Assets (other than Inventory in the ordinary course of business). Except as described in Schedule 2.19, Seller is not a party to any presently effective executory agreement with any Person (other than Purchaser) with respect to any such sale or disposition.

by Seller in this Agreement or any Related Agreement, or any statement of Seller, certificate or schedule furnished or to be furnished to Purchaser pursuant to this Agreement or any Related Agreement at the Closing, contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained in this Agreement and therein not misleading. Except as disclosed in this Agreement, to Seller's Knowledge, there have been no events or transactions or facts coming to the attention of Seller which could have a Material Adverse Effect after the Closing, or which should be disclosed in order not to make any statement, representation or warranty contained in this Agreement or in any Related Agreement or any Schedule delivered pursuant hereto misleading.

2.21    **Adverse Actions.** Except as disclosed in Schedule 2.21, neither Seller nor its officers or directors (i) has been subjected to any adverse actions in connection with any licenses or permits issued by any governmental agencies or bodies, including without limitation any license or permits needed to operate an acute care hospital or any of the other Hospital Businesses, or (ii) has been excluded from participation in the Medicare or Medicaid programs or been subject to any adverse actions or sanctions under such programs.

2.22    [Intentionally omitted]

2.23    **Continuing Accuracy.** To the Knowledge of Seller, the copy of each certificate, document or other instrument or agreement furnished or to be furnished by Seller is a true, accurate and complete copy of the original thereof. The representations and warranties of Seller set forth in this Article II shall be true and correct on the Closing Date as if made again on and as of the Closing Date. Seller shall be entitled to update the Schedules up to and through the Closing, subject to the termination rights set forth in Article VIII.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as otherwise disclosed in any of the disclosure schedules related to the following representations, warranties and covenants of Purchaser or in Schedule 3 (the "**Purchaser's Disclosure Schedules**"), as an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Purchaser hereby represents, warrants and covenants to Seller as to the following matters as of the Effective Date and shall be deemed to remake all of the following representations, warranties and covenants as of the Closing Date. In the event of any assignment of any of the rights, duties, obligations or Assets by Purchaser to a third party after the Closing, Purchaser agrees that as party of said assignment, Purchaser's successor or assignee shall be required to make the following representations and warranties for itself.

3.1    **Authorization.** Purchaser has full organizational power and authority to enter into this Agreement and Purchaser has full corporate power and authority to carry out the transactions contemplated hereby.

3.2    **Binding Agreement.** Purchaser has the full power and authority to execute, deliver and perform the obligations and covenants set forth in this Agreement and all Related Agreements and to carry out the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the Related Agreements by Purchaser and the consummation of the transactions contemplated hereby or thereby have been (or will be by the Closing Date) duly

authorized by all necessary action on the part of Purchaser. All organizational and other actions required to be taken by Purchaser to authorize the execution, delivery and performance of this Agreement, all documents executed by Purchaser which are necessary to give effect to this Agreement and the Related Agreements, and all transactions contemplated hereby, have been duly and properly taken or obtained by Purchaser. No other organizational or other action on the part of Purchaser is necessary to authorize the execution, delivery and performance of this Agreement and the Related Agreements, all documents necessary to give effect to this Agreement, the Related Agreements and all transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Purchaser and, assuming due and valid execution by Seller, this Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

3.3    **Organization and Good Standing.** Purchaser (i) is a Corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, (ii) qualified to do business and in good standing in the State of California and wherever else it may do business, and (iii) has full corporate power and authority to own, operate and lease its properties and to carry on its business as now conducted and as contemplated to be conducted after the Closing.

3.4    **No Violation.** The execution, delivery and performance of this Agreement and all Related Agreements and the consummation of the transactions contemplated hereby and thereby to does not and will not, with the passage of time or the giving of notice or both (a) violate any state or federal Law applicable to Purchaser, (b) violate or conflict with, or result in a breach of, or constitute a default under (with or without notice or lapse of time, or both), or result in the acceleration of, or the creation of any indebtedness, mortgage, Lien, restriction, charge, security interest, claim, right of another, or other encumbrance upon any of the Assets whatsoever, under any of the terms, conditions, or provisions of any note, bond, mortgage, indenture, lease, license, franchise, agreement or other instrument or obligation to which Purchaser or its Affiliates are a party or by which any of the Assets are or will be bound or (c) violate or conflict with any provision of the charter or organizational documents of Purchaser or its Affiliates.

3.5    **Brokers and Finders.** Except as described on Schedule 3.5, neither Purchaser nor any Affiliate thereof nor any officer or director thereof has engaged any finder or broker in connection with the transactions contemplated under this Agreement.

3.6    **"As Is."** Purchaser acknowledges that it is purchasing the Assets on as "AS IS, WHERE IS" basis (as more particularly described in Section 1.10 and throughout Article II and this Agreement), and that Purchaser is not relying on any representation or warranty (expressed or implied, oral or otherwise) made on behalf of Seller other than as expressly set forth in this Agreement. Prior to Closing, Purchaser and its respective agents will have been given the opportunity to (i) conduct such inspections as Purchaser may have determined to be necessary, (ii) fully observe the physical characteristics and condition of the Assets and Real Property, and (iii) perform such investigations of the suitability of Purchaser's intended use of the Assets and Real Property as Purchaser shall determine to be necessary, including without limitation, the suitability of the topography; the availability of water rights or utilities; any natural hazard of any kind or nature, including without limitation, flood hazard, earthquake fault or seismic hazard, or fire risk or nature; the present and future zoning, subdivision and any and all other land use matters; the condition of the

- 38 -

137

soil, subsoil or groundwater of the Real Property and any and all other environmental matters; the purpose(s) to which the Real Property is suited; drainage; flooding; access to public roads; and proposed routes or roads or extensions relative to the Real Property. Purchaser acknowledges and understand that it will have no recourse whatsoever against Seller or Seller's Affiliates except as otherwise expressly set forth in this Agreement. Additionally, Purchaser and its Affiliates represent and warrant to Seller that notwithstanding the receipt of an opinion from an independent appraiser as detailed in Section 2.1 of this Agreement, Seller is making no representation or warranty with respect to the value of the Assets or the consideration being delivered to Purchaser with respect to the Transaction. Purchaser and its Affiliates also acknowledge they are not relying upon any representations or warranties of Seller as to the valuation of the Assets as set forth in the opinion being delivered by the independent appraiser engaged by Seller pursuant to Section 4.15 of this Agreement.

3.7    **Legal Proceedings.** Except as described on Schedule 3.7, to Purchaser's Knowledge, there are no claims, proceedings or investigations pending or, to Purchaser's Knowledge, threatened relating to or affecting Purchaser before any court or governmental body (whether judicial, executive or administrative) in which an adverse determination would materially adversely affect the properties, or business condition (financial or otherwise) of Purchaser. To Purchaser's Knowledge, Purchaser is not subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generally) applicable to Purchaser or any Affiliate of Purchaser which adversely affects the condition (financial or otherwise), operations or business of Purchaser or any Affiliate of Purchaser.

3.8    **Chapter 9 Proceeding.** Purchaser acknowledges that Seller has filed the Chapter 9 Proceeding, which remains pending as of the Effective Date, and may remain pending as of the Effective Time. Purchaser acknowledges that the filing of the Chapter 9 Proceeding shall not, in and of itself, be deemed to constitute a violation of this Agreement, and that actions taken by Seller in compliance with, or in anticipation of, motions or orders in the Chapter 9 Proceeding shall not constitute violations of Seller's covenant to operate the Hospital Businesses in the ordinary course, nor shall any payment made pursuant to or as authorized by the Bankruptcy Court in such proceeding be deemed to constitute a payment other than in the ordinary course of Seller's business.

3.9    **Purchaser Knowledge.** References in this Agreement to "Purchaser's Knowledge" or "the best Knowledge of Purchaser" or similar terms means the actual (but not merely constructive or imputed) knowledge of the managers and executive officers of Purchaser, after performing a reasonable investigation. Additionally, whenever this Agreement states that Purchaser has received any type of notice, it shall mean that one of the foregoing individuals has received actual notice, and not merely constructive or imputed notice. No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

3.10    **Disclosures.** To Purchaser's Knowledge, no representation or warranty by Purchaser in this Agreement, nor any statement, certificate or schedule furnished or to be furnished by or on behalf of Purchaser pursuant to this Agreement, nor any document or certificate delivered to Seller pursuant to this Agreement or in connection with actions contemplated hereby, contains or shall contain any untrue statement of material fact or omits or shall omit a material fact necessary to make the statements contained therein not misleading. The copy of each certificate, document or other instrument or agreement furnished or to be furnished by Purchaser is a true, accurate and complete

- 39 -

copy of the original thereof. The representations and warranties of Purchaser set forth in this Article III shall be true and correct on the Closing Date as if made again on and as of the Closing Date.

**3.11 No Improper Payments or Offers.** To Purchaser's Knowledge, no Payments or offers of consideration by Purchaser or its Affiliates to any of Seller's officers, directors or employees have been made in violation of any Legal Requirements or Seller's Conflict of Interest Code in order to induce such officer, director or employee to influence the negotiation or approval of this Agreement.

**3.12 Compliance With Law Laws.** To Purchaser's Knowledge, the organizational structure of Purchaser does not violate applicable Legal Requirements.

**3.13 Accuracy of Financial and Organization Information.** To the Purchaser's Knowledge, the information disclosed by Purchaser concerning its investors and its capital and lending sources after the Effective Date and through the Closing Date is and will be true and correct in all material respects, as detailed in the First Organizational Update and the Second Organizational Update.

## ARTICLE IV
## COVENANTS OF SELLER

**4.1 Access and Information; Inspections.**

**4.1.1 Continuing Access.** From the Effective Date through the Effective Time, Seller shall afford to the officers and agents of Purchaser (which shall include accountants, attorneys, bankers, prospective investors and assignees and other consultants and agents of Purchaser) reasonable access during normal business hours to and the right to inspect the plants, properties, books, accounts, records, contracts, commitments, cost reports and all other relevant documents and information with respect to the assets, liabilities and business of the Hospital Businesses including, without limitation, to the extent reasonably needed by Purchaser for purposes of conducting further due diligence and other pre-closing activities with respect to the Assets and Hospital Businesses, possibly including, without limitation, an Environmental Survey, review of documents and instruments regarding the Assets, and review of Financial Statements, provided appropriate non-disclosure agreements acceptable to Seller have been executed and any information learned as a result of the due diligence is shared with Seller. From the Effective Date through the Effective Time, Seller shall furnish Purchaser with such additional financial and operating data and other information in Seller's possession as to businesses and properties of the Hospital Businesses as Purchaser or its representatives may from time to time reasonably request. Purchaser's right of access and inspection shall be exercised in such a manner as not to interfere unreasonably with the operations of the Hospital Businesses. Such access may include consultations with the personnel of Seller upon prior written notice to Seller. Any access granted under this Agreement shall be subject to any limitations imposed by federal or state privacy laws, including but not limited to, HIPAA. If any of such records are not in the possession or control of the Seller, then such access shall be afforded after no less than three (3) business days prior notice. In addition, Seller shall provide such written consents and authorizations as may be necessary for Purchaser to have access to materials on file with governmental agencies. Nothing in the Agreement to the contrary shall in any manner restrict the ability of Purchaser to discuss the business and affairs of the Hospital Businesses with any governmental agency having jurisdiction over the Hospital Businesses and/or this transaction or the fiscal intermediaries administering the Hospital Businesses' Payor programs to the extent legally

1070039.2

138

permissible. Seller's covenants under this Section are made with the understanding that Purchaser and any other Person provided with access to information under this Section shall use all such information in compliance with all Laws and solely for purposes of evaluating the Transactions contemplated in this Agreement. Neither Purchaser nor any other Person shall have access to employee records, Patient Records or any other records to the extent that the disclosure of such records would be prohibited by any Law, accreditation standards, or rule or agreement (express or implied) of confidentiality.

**4.1.2 Consent.** Notwithstanding anything in this Section 4.1 to the contrary, all access and inspection activities contemplated by this Section 4.1 (including, without limitation, Purchaser's contacting any of Seller's tenants) shall be subject to the prior reasonable written approval of Seller (which approval may only be granted by the Seller's Chairman of the Board or by Seller's general counsel). Prior to Purchaser contacting any of Seller's tenants, vendors, other contracting parties, or governmental officials or contractors regarding health care violations or allegations regarding the same, Purchaser shall give Seller prior written notice thereof, including the identity of the company or persons who will perform any interviews or contacts. Seller or its representative(s) may be present at any such interview or meeting and Purchaser will reasonably cooperate and coordinate with Seller to effectuate same.

**4.2 Conduct of Business.** On and after the Effective Date and prior to the Effective Time, Seller shall, with respect to the operation of the Hospital Businesses:

**4.2.1** Carry on its businesses with respect to the operation of the Hospital Businesses in a reasonable manner under the circumstances and Seller, as further addressed below, shall be permitted to take such actions as may be necessary in order to stem the current losses, comply with orders of the Court in Seller's Chapter 9 Proceeding, and attempt to make the Hospital Businesses profitable, subject at all times to the ultimate discretion and control of Seller's Board of Directors, provided that, in any case, such activities shall be conducted in compliance with all applicable Laws;

**4.2.2** Keep in full force and effect present insurance policies and other comparable self-insurance plans such as Workers' Compensation; and

**4.2.3** Use its reasonable efforts to maintain and preserve its respective business organizations intact, and maintain its respective relationships with physicians, suppliers, customers and others having business relationships with each Hospital.

**4.3 Negative Covenants.** Except as otherwise provided in this Agreement, from the Effective Date until the Effective Time, with respect to the operation of the Hospital Businesses, Seller shall not, without prior consent of Purchaser, except as may be required by Law or as ordered by the Bankruptcy Court:

**4.3.1** Except as otherwise provided in this Agreement or the ordinary course of business, amend or terminate any Material Contract or Material Lease, or enter into any new Material Contract or Material Lease or commitment with respect thereto, or incur or agree to incur any liability pursuant to a Material Contract or Material Lease, except for Material Contracts or Material Leases which are terminable at the Closing or on not more than ninety (90) days notice after the Closing;

1070039.2

has participated or shall participate in any negotiations with respect to the Transaction set forth in this Agreement.

**4.4    Cooperation.** Seller shall reasonably cooperate with Purchaser and its representatives and attorneys: (a) in Purchaser's efforts to obtain all consents, approvals, authorizations, clearances, certificates of need and licenses required to carry out the transactions contemplated by this Agreement (including, without limitation, those of governmental and regulatory authorities) or which Purchaser reasonably deems necessary or appropriate, and (b) in the preparation of any document or other material which may be required by any governmental agency as a predicate to or result of the transactions contemplated in this Agreement; provided, however, that it shall be Purchaser's responsibility to obtain all consents, approvals, authorizations, clearances, certificates of need and licenses required to carry out the transactions contemplated by this Agreement.

**4.5    Contract Consents.** Seller shall use its Reasonable Commercial Efforts to obtain the consents and releases from the third parties under all Material Contracts and Material Leases, which, by the terms of such Material Contract or Material Lease, require such consent to the assignment thereof to Purchaser. To the extent any consents from third parties under any Contracts or Leases are not obtained as of the Closing, Seller and Purchaser shall comply with Section 9.3 and use their Reasonable Commercial Efforts to mitigate any costs, losses or damages associated with the failure to obtain such consents prior to Closing. Notwithstanding the foregoing or any contrary language in this Agreement, Seller's obtaining the consents described in this Section shall not be a condition precedent to either party's obligation to close the transaction contemplated by this Agreement and shall not be considered a breach of Seller's representations

**4.6    Additional Financial Information.** Within fifteen (15) calendar days following the end of each calendar month prior to Closing, Seller shall deliver to Purchaser complete copies of the unaudited balance sheet and related unaudited statements of income relating to Seller with respect to the operation of the Hospital Businesses for each month then ended, together with corresponding year-to-date amounts.

**4.7    No-Shop.** Provided that Purchaser is not in material breach or default of this Agreement, for which Seller has provided Purchaser with notice specifying such material breach or default and the reasonable opportunity to cure such material breach or default, Seller shall not, prior to the earlier of the Closing or termination of this Agreement, without the prior written consent of Purchaser: (i) offer for sale, lease or other disposition, the assets of the Hospital Businesses or the Assets (or any portion thereof); (ii) solicit offers or consider unsolicited offers to acquire (by sale, lease or otherwise) all or any material portion of any of the Hospital Businesses or the Assets; (iii) hold discussions with any party (other than Purchaser) looking toward such an offer or solicitation other than to acknowledge receipt; or (iv) enter into any agreement with any party (other than Purchaser) with respect to the sale or other disposition of any of the Hospital Businesses or the Assets.

**4.8    Seller's Efforts to Close.** Seller shall use its Reasonable Commercial Efforts to satisfy all of the conditions precedent set forth in Articles VI and VII to its or Purchaser's obligations under this Agreement to the extent that Seller's action or inaction can control or influence the satisfaction of such condition.

- 43 -

1070059.2                                                                                   P:\Board\PHI\FINAL ASA 10.12.09.DOC

---

**4.3.2** Increase compensation payable or to become payable or make any performance based bonus payment to or otherwise enter into one or more bonus agreements with any employee, except as contractually required as of the date of this Agreement or otherwise in the ordinary course of business;

**4.3.3** Create, assume or permit to exist any new debt, mortgage, deed of trust, pledge or other lien or encumbrance upon any of the Assets in order to meet Seller's ongoing operating expenses or otherwise in the ordinary course of business;

**4.3.4** Sell, assign, lease, or otherwise transfer or dispose of any property, plant or equipment constituting part of the Assets, except in the ordinary course of business;

**4.3.5** Take an action that would result in a Materially Adverse Effect occurring as a result of such action;

**4.3.6** Take any action that would have a Materially Adverse Effect on the maintenance in force and effect the policies of insurance held by (or programs of self-insurance maintained by) Seller and currently in effect; or

**4.3.7** Except as required by their terms, amend, terminate, fail to renew or renegotiate any Material Contract that would be an Assumed Obligation as of the date of this Agreement, except in the ordinary course of business consistent with past practices, or default (or take or omit to take any action that, with or without the giving of notice or passage of time, would constitute a default) in any of its obligations under any such Material Contracts, provided that, if required for legal reasons, Seller may renew Material Contracts or Material Leases provided they are terminable on not more than ninety (90) days notice after the Closing.

For purposes of this Section 4.3, Seller shall be deemed to have obtained Purchaser's prior consent to undertake the actions otherwise prohibited by this Section 4.3 if Seller gives Purchaser notice of a proposed action and Seller does not receive from Purchaser a written notice of objection to such action within five (5) business days after Purchaser receives Seller's written notice. Furthermore, in recognition of the fact that Purchaser has a significant interest in the operations of the Hospital Businesses through Closing, but that there is also the possibility that Seller may be unable to obtain Public Approval for this Transaction, the Parties agree to that a joint transition team, comprised of equal representatives of Seller and Purchaser (**"Transition Team"**) shall be formed. Seller shall consult with the Transition Team on a regular basis, no less than weekly, with respect to the day-to-day business affairs of the Hospital Businesses. The Transition Team shall analyze and make recommendations to the Seller's Board of Directors regarding any significant and material changes relating to the Hospital Businesses, including any changes recommended appropriate to improve the operations and practices of the Hospital Businesses. Notwithstanding that Seller agrees to grant the Transition Team the role described above pending the Closing, this does not alter, weaken, displace, or modify the ultimate right and responsibility of the Seller's Board to continue to exercise ultimate direction and control related to the operation of the Hospital Businesses as provided by law, and provided that Purchaser shall retain its termination rights under this Agreement in the event of a Material Adverse Effect as a result of any such Seller actions, as provided elsewhere in this Agreement. It is the intent of the Parties to comply with Government Code Section 1090, which prohibits government officers or employees from having a financial interest in a transaction with the governmental entity for which they act. Accordingly, no officer or employee of Seller who has an expectation to become a Hired Employee or a beneficial owner of any interest in Purchaser

- 42 -

1070059.2                                                                                   P:\Board\PHI\FINAL ASA 10.12.09.DOC

economy of the United States or matters affecting the healthcare industry in general, and (b) Seller shall promptly upon becoming aware thereof, give detailed written notice to Purchaser of the occurrence of, or the threatened occurrence of, any event which would cause or constitute a material breach, or would have caused or constituted a material breach had such event occurred or been known to Seller prior to the date of this Agreement, of any of Seller's covenants, agreements, representations, or warranties contained or referred to in this Agreement or in any Related Agreement; provided, however, that no such notice shall be deemed to cure or waive any material breach unless Purchaser specifically agrees to a cure or waiver thereof in writing.

**4.12   Termination Cost Reports; Filing Cost Reports; Amounts Due To or From Third Party Payors.**

**4.12.1   Filing Procedures.** Seller shall prepare and timely file all cost reports (including, without limitation, the terminating cost report) and all other filings which are required to be filed with Medicare, any other Payors or any governmental agency with respect to the operations of the Hospital Businesses for any and all periods ending on or prior to the Closing Date; provided, however, that in the event the Lease and Management Agreement are entered into, all references in this Section 4.12 to the "Effective Time" for purposes of such filings, or similar filing or filing issues, shall instead refer to the termination date of the Lease and Management Agreement. Prior to filing any such cost reports and filings, Seller shall deliver a copy of each to Purchaser and, if Purchaser so instructs Seller, shall not file the same without first obtaining Purchaser's approval which shall not be unreasonably withheld, delayed or conditioned. Within a reasonable period of time after filing each such cost report and other filings (but in no event later than ten days following each such filing), Seller shall provide Purchaser a copy of such filed cost report and other filings. Purchaser shall provide Seller with resources and support needed to prepare any remaining cost reports required to be filed by Seller as further addressed in Section 11.2.

**4.12.2   Retained Rights and Obligations.** Subject to the assignment and assumption covenants contained in this Agreement, Seller shall retain all rights to any amounts receivable from and remain obligated for all amounts due to Medicare and other third party payors which settle on a cost report basis with respect to cost reports or filings for periods prior to the Closing Date (as reflected thereon or as finally determined by the audit, administrative or judicial appeal, contest or other adjustment of such reports or filings). The parties acknowledge and agree that Purchaser is not hereby being assigned or assuming any of the same, to the extent prohibited by law. Purchaser shall promptly notify Seller of receipt of any notice received from Medicare or such other Payors asserting that any amounts are due to Medicare or such other Payors from Seller, and of any amounts due from Medicare or such other Payors to Seller, by reason of any event or occurrence taking place or otherwise attributable to the operations of the Hospital Businesses and the Assets prior to the Effective Time. Similarly, Seller shall notify Purchaser of any notice received by Seller from Medicare or such other Payors that Seller believes applies to or impacts the reimbursement or payment due to the Purchaser. With respect to any such amounts which may be received by Seller after the Closing Date, Seller shall remit the same to Purchaser within three (3) business days of receipt. With respect to any such amount thereof in sufficient time to pay such amounts without interest or penalty, and Seller shall so remit to Medicare or such other Payor all such amounts received by Seller from Purchaser within sufficient time to avoid the imposition of any interest charges or the withholding of any payment due from Medicare or other Payors to Purchaser. If any such withholding by Medicare or such other Payor has occurred due to the failure of Seller to remit

**4.9   Title Matters.**

**4.9.1** Seller shall cause the preliminary report of title issued by the Title Company ("**PTR**") and all Title Instruments to be delivered to Purchaser prior to or promptly after the execution of this Agreement which shall be based on an ALTA Extended Coverage Owner's Title Policy and the Surveys conducted by the Purchaser, as addressed at Section 5.12 below. Purchaser shall approve or disapprove of the PTR within ten (10) business days after the receipt of the PTR and all Title Instruments (reflecting the results of the Surveys). Seller shall remove from the title record and have the Title Company insure over any liens or encumbrances of a definite and ascertainable amount, such as mechanics liens, financing liens, bonds or assessments, on or before the Closing Date, other than the Assumed Obligations and items to be removed or prorated at the Closing. In the event of Purchaser's timely disapproval of any exceptions or defects shown on the PTR or of the ALTA Survey, as provided herein, Seller shall have five (5) business days after receipt of Purchaser's objections to give Purchaser notice either that (a) Seller has removed or will remove any objectionable exceptions from title and provide Purchaser with evidence reasonably satisfactory to Purchaser of such removal or provide Purchaser with evidence reasonably satisfactory to Purchaser that said exceptions will be removed on or before the Closing Date, or (b) Seller is unable, using Reasonable Commercial Efforts, to cause such exceptions to be removed. If Seller is unable or unwilling to cause such exceptions to be removed, unless otherwise agreed in writing by the parties, Purchaser may either (i) terminate this Agreement within five (5) business days of receipt of Seller's written notice of unwillingness or inability to cause to be removed, in which case the Deposit shall, unless title failed due to Seller's material breach of this Agreement, be repaid to Purchaser, or (ii) elect to close subject to the exceptions.

**4.9.2** Prior to the Closing Date, Seller shall deliver to Purchaser a preliminary binder or title commitment (the "**Title Commitment**") sufficient for the issuance of an ALTA Extended Coverage Owner's Title Insurance Policy with respect to the Owned Real Property (referred to in this Agreement as the "**Owner's Title Policy**" or the "**Title Policy**"), issued by Chicago Title Insurance Company, or such other title company as is mutually acceptable (the "**Title Company**"), together with true, correct and legible copies of all instruments referred to therein as conditions or exceptions to title (the "**Title Instruments**") and (if required by Purchaser or Purchaser's lenders or other financing sources as provided in Section 5.12 below) ALTA surveys of the Owned Real Property complying with the Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys for the Owned Real Property (the "**Surveys**") obtained by Purchaser. Section 12.12 shall govern which party or parties shall bear the costs and expenses of the Title Commitment, the Title Policy and the Surveys.

**4.10   Termination of Hospital Businesses' Employees.** Upon the Effective Time, the Hired Employees shall cease to be employees of Seller and shall be removed from such entities' respective payrolls. Notwithstanding any provision to the contrary contained in this Agreement, Seller shall take any steps necessary to comply with WARN requirements, to the extent applicable, and Purchaser shall cooperate with Seller with respect thereto.

**4.11   Notice of Developments.** From the date of this Agreement until the Closing, (a) Seller shall immediately notify Purchaser in writing of any material and adverse problems not previously disclosed by Seller to Purchaser with respect to the prospects, business or operations of the Hospital Businesses or the condition of the Assets of which Seller has knowledge and which specifically affect the Hospital Businesses and the Assets and not to general changes in the Laws or

such sums received from Purchaser, Seller shall reimburse Purchaser for the full amount of all payments so withheld within three (3) business days of Purchaser's written notice to Seller of such withholding. In the event that Seller fails to reimburse Purchaser, Purchaser shall have the right, in addition to any other rights which Purchaser may have pursuant to this Agreement, to offset such claim against any amounts which Purchaser may owe to Seller, without regard to the floor or ceiling set forth in Section 10.2.2 of this Agreement. In the event that any such amount is withheld from Purchaser and asserted against Seller pursuant to the foregoing sentence but is later paid or released to Purchaser, Purchaser shall release or refund to Seller, as applicable, any amount which it has claimed against and received from Seller. Seller or Purchaser shall have the right to dispute or to appeal any determinations relating to such reports, at Purchaser's cost, provided that Purchaser defends, indemnifies and hold Seller harmless of and from any and all amounts which are determined to be due to Medicare or such other third party payors, including interest and attorneys fees. Purchaser shall make available such of the Hired Employees as may be necessary in order to provide accounting and other services necessary to deal with any of the foregoing, at no cost to Seller.

**4.12.3   Effect on Purchaser; Purchaser's Right to Participate.** Seller and Purchaser hereby acknowledge that any cost reports filed by Seller for periods ending on or prior to the Closing Date may impact Purchaser's reimbursement from such Payor after the Closing Date. Seller hereby agrees that it will conduct reasonable diligence and otherwise use reasonable efforts to ensure that all such cost reports are accurate and complete in all material respects, and that it will retain all records relating to such cost reports and any settlements for the period of time required by Law. On request of Purchaser, and at Purchaser's cost, Seller shall provide Purchaser copies of such cost reports and underlying preparation data, which information Purchaser shall maintain as strictly confidential, except with respect to the Payor in question, and further subject to any applicable Laws regarding privacy of medical information. If at any time Purchaser, in its reasonable discretion, determines that any portion of such cost reports (including, without limitation, any wage index data or other matter) is incorrect or incomplete in any material respects and accordingly may impact Purchaser's reimbursement from any Payor, Seller will, at Purchaser's expense, make any reasonable correction to such report requested by Purchaser prior to the deadline for filing such corrections, provided that Seller will not make any corrections that will result in any expenditure of money by Seller (other than those to be reimbursed or assumed by Purchaser) or result in any loss of reimbursement to Seller or any other adverse economic effect on Seller. If any cost report is ever challenged, audited or otherwise examined by any Payor in a manner in which wage index data or other matter is called into question, Seller shall give Purchaser notice within a reasonable period of time of the initiation thereof and Purchaser and its representative shall have the right, at its expense, to be present at any meeting with auditors or examiners (but only with respect to such issue), unless the auditors or examiners have stated they do not want Purchaser or its representatives, present, and at any proceedings related to the appeal of such cost report (but only with respect to such issue) and to receive copies of all documents submitted to any Payor with respect thereto (but only with respect to such issue). In any event, Purchaser shall defend, indemnify and hold Seller harmless of and from any and all claims, amounts, actions and causes of action asserted against Seller in any way relating to such cost reports.

**4.13   Tail Insurance Coverage.** At the Closing, and subject to payment by Purchaser of the E&O Tail Insurance Payment and the D&O Tail Insurance Payment, Seller shall have delivered to Purchaser written proof that Seller has obtained from Seller's current or other insurers:

- 46 -

(a)   **E&O Insurance.** Comprehensive general liability and professional liability insurance coverage with respect to all claims covered thereby attributable to or arising out of the operation of the Hospital Businesses or the Assets by Seller on or before the Closing, regardless of when any such claims shall be made with coverage in an amount equal to the amount set forth in Schedule 4.13(a) with coverage terms and conditions and policy limits as exists prior to the Closing Date, but without deductibles, issued by the insurer which currently issues Seller's insurance or another insurance company reasonably acceptable to Purchaser ("**E&O Insurance**"). At the Closing, Seller shall cause the insurers to issue and deliver to Purchaser copies of certificates of insurance evidencing each insurance policy maintained by Seller under this Agreement, and Seller shall cause each such insurance policy to contain a clause requiring the insurer to give not less than 30 days prior written notice to Seller and to Purchaser prior to the cancellation or modification of any such policy for any reason whatsoever. The Parties further agree that they will use their best efforts to research and cooperate in an effort to minimize the cost of obtaining E & O Insurance, either through procuring tail coverage in the name of Seller, or prior acts "nose" coverage maintained by Purchaser, as part of its insurance, for at least two (2) years following the Closing, or some combination thereof; provided, however, that in any case Seller shall obtain a tail policy for obstetric claims, which have a statute of limitations which tolls until the affected child reaches the age of majority. If split coverage is not available, then Seller shall obtain full tail E & O coverage and at the Closing, Purchaser shall pay for the premiums of the tail insurance procured pursuant to this Section in an amount not to exceed $3,750,000 with coverage for general liability and malpractice with substantially the same coverage terms and conditions and policy limits as exists prior to the Closing Date, issued by the insurer which currently issues Seller's insurance or another insurance company reasonably acceptable to Purchaser, but without any deductibles, and Seller shall take all other steps as may be reasonably necessary to maintain such insurance policies in full force and effect. Seller shall use its reasonable commercial efforts to avoid invalidating such insurance coverage.

(b)   **D&O Insurance.** D&O insurance coverage with respect to all claims covered thereby attributable to or arising out of the operation of the Hospital Businesses or the Assets by Seller on or before the Closing, regardless of when any such claims shall be made with coverage in an amount equal to the amount set forth in Schedule 4.13(b) issued by an insurance company reasonably acceptable to Purchaser ("**D&O Insurance**"). At the Closing, Seller shall cause the insurers to issue and deliver to Purchaser copies of certificates of insurance evidencing each insurance policy maintained by Seller under this Agreement, and Seller shall cause each such insurance policy to contain a clause requiring the insurer to give not less than 30 days prior written notice to Seller and to Purchaser prior to the cancellation or modification of any such policy for any reason whatsoever.

**4.14   Public Approval.** Seller's Board of Directors has already adopted a resolution to set and schedule a public election sufficient to seek the voter approval ("**Public Approval**") required by Seller pursuant to Health & Safety Code Section 32121(p) to consummate the Transactions contemplated by this Agreement ("**Approval Election**"), as further addressed in Schedule 4.14. The Approval Election shall be scheduled and structured in a legally permissible fashion to enable such Approval Election to take place as expeditiously as possible, and Seller shall keep Purchaser fully informed of its efforts in this regard. Seller's resolution scheduled the Approval Election to occur on December 15, 2009. Seller shall use Reasonable Commercial Efforts to obtain the Public Approval, and to do so within the timeframes set forth above, to the extent permitted by applicable Legal Requirements. Seller shall incur customary costs of an election as

- 47 -

provided by law. It is understood, however, that while Seller may provide objective information, Seller may not legally expend public funds to advocate the adoption of a ballot measure. Accordingly, Purchaser shall use its Reasonable Commercial Efforts to seek approval of such ballot measure, subject to all applicable Legal Requirements and limitations, at no cost to Seller.

**4.15 Confidentiality.** Seller agrees to comply with the confidentiality provisions contained at Section 12.8, which shall remain in place during the term of this Agreement, and shall survive the Closing or termination hereof. Additionally, Seller shall continue to be bound by that certain Letter Agreement between Seller and Purchaser, dated July 27, 2009 addressing the confidentiality of evaluation materials and exclusive dealing (the **"Confidentiality Agreement"**), which shall also remain in place, to the extent consistent with the terms of this Agreement, during the term of this Agreement, except as may be required of Seller as a public entity pursuant to the Ralph M. Brown Act and the California Public Records Act (Government Code Section 6200 et seq.).

**4.16 Plan of Adjustment.** Seller shall use its best efforts to develop, undertake all necessary filings in connection with, and seek approval of, a plan of adjustment in connection with the Chapter 9 Proceedings, which is consistent with the terms of this Agreement and the transactions contemplated by this Agreement, including without limitation the characteristics, goals and components of this Agreement and the Definitive Alternative Agreement (**"Plan of Adjustment"**). The Plan of Adjustment shall be structured and pursued in the Chapter 9 Proceeding in a legally permissible fashion, to enable the possible approval of the Plan of Adjustment to take place as expeditiously as possible. Seller shall keep Purchaser fully informed of, and shall closely consult and cooperate with, Purchaser in connection with its efforts in this regard, including providing Purchaser the opportunity to review and provide reasonable input to Seller concerning all proposed filings in seeking approval of the Plan of Adjustment and Purchaser will reasonably support and cooperate with Seller on the Plan of Adjustment.

## ARTICLE V
## COVENANTS OF PURCHASER

**5.1 Purchaser's Efforts to Close.** Purchaser shall use its Reasonable Commercial Efforts to satisfy all of the conditions precedent set forth in Articles VI and VII to its or Seller's obligations under this Agreement to the extent that Purchaser's action or inaction can control or influence the satisfaction of such conditions.

**5.2 Required Governmental Approvals.**

**5.2.1 Governmental Entities and Authorizations.** For purposes of this Section 5.2, **"Government Authorizations"** shall mean all licenses, permits, certificates, no objection letters, clearances and other authorizations, consents and approvals of any Government Entity which are required to consummate any of the transactions contemplated hereby or to operate the Hospitals as currently operated under any law, including provider agreements with Medicare and Medicaid. **"Government Entities"** shall mean any local, state or federal government, including each of their respective branches, departments, agencies, commissions, boards, bureaus, courts, instrumentalities or other subdivisions, including the California Department of Public Health (**"CDPH"**) and the Center for the Medicare and Medicaid Services (**"CMS"**).

1070039.2

**5.2.2 Material Licenses.** Between the Effective Date and the Closing Date, Purchaser will: (a) use its Reasonable Commercial Efforts to obtain, as promptly as practicable, all material Government Authorizations required of Purchaser to consummate the transactions contemplated hereby; and (b) use its Reasonable Commercial Efforts with Seller in Seller's obtaining, as soon as practicable, all material Government Authorizations required of Seller to consummate the transactions contemplated hereby. Purchaser shall, no later than twenty (20) business days after the Election, submit to Seller for review all applications, licensing packages and other similar documents with all applicable Government Entities (or other third parties) which are a prerequisite to obtaining the general acute care hospital licenses from CDPH and a pharmacy license(s) from the California Board of Pharmacy (the **"Material Licenses"**). Seller shall review the applications for such Material Licenses and return to Purchaser within five (5) days for Purchaser's immediate submission to the appropriate Government Entities. Seller shall have no responsibility or liability for the content of such applications for the Material Licenses.

**5.2.3 Assumptions by Purchaser.** Purchaser may, in its reasonable determination, conclude that in order to obtain such Material Licenses, participations or accreditations, or assist Seller in obtaining such assignments, Purchaser must enter into a separate agreement or understanding with the governmental agency, accreditation agency or Payor, or the other party to an assumed Contract, responsible for issuing or granting such Material Licenses or accreditations to Purchaser, or responsible for consenting to the assignment of a contract or agreement to, and the participation or certification of, Purchaser in the Medicare, Medicaid, TRICARE/CHAMPUS or other programs of such agency. Such agreement may require Purchaser to assume for the benefit of such governmental agency, accreditation agency, Payor or the other party to an assumed Contract certain obligations and liabilities of Seller that are Excluded Liabilities or against which Seller is obligated to indemnify, or for which Seller is to otherwise obligated to reimburse, Purchaser. Alternatively, Purchaser may be required by Law to assume, or be deemed by Law to have assumed, such obligations and liabilities of Seller. If Purchaser enters into any such agreement or understanding with any such governmental agency, accreditation agency, Payor or the other party to an assumed Contract, or by Law assumes such obligations and liabilities of Seller, such agreement, understanding or assumption shall not in any manner whatsoever impair Purchaser's rights against Seller, or diminish Seller's obligations to Purchaser, under this Agreement and shall under no circumstances be claimed by Seller as a defense, waiver of waiver, estoppel, consent, operation of Law, or otherwise, against Purchaser's assertion of any claim under this Agreement against Seller, and the rights and obligations of the parties to each other under this Agreement shall be determined as if such agreement or understanding with such governmental or accreditation agency, Payor, or the other party to an assumed Contract did not exist or such assumption was not required by Law.

**5.3 Estoppel Certificates.** Purchaser shall be entitled, but not obligated, to solicit estoppel certificates from any third party to any Lease of Real Property.

**5.4 Certain Employee Matters.**

**5.4.1 Hired Employees.** Employees of the Seller as of the Closing Date are referred to herein as **"Seller's Employees."** Purchaser shall make offers of employment, effective as of the Effective Time, or as otherwise agreed by the Parties, to a substantial portion of Seller's Employees who submit full and complete applications for employment to Purchaser, if required, and successfully pass all screening and background checks as may be required by Purchaser (in compliance with all applicable Laws (collectively, **"Hospital Businesses' Employees"**). As used in

1070039.2

F:\Buou\PHH\FINAL ASA 10.12.09.DOC

the preceding sentence, a "full and complete" application shall include, without limitation, an applicant's written consent to release of personnel files and documents as described in Section 9.2.1. With regard to employees who are represented under a collective bargaining agreement which provides that Seller must require a purchaser to retain all or substantially all of such represented employees, or to recommend that Purchaser hire represented employees in good standing with Seller, Purchaser shall make offers of employment to such represented employees to the extent required under such collective bargaining agreement and such provisions shall supersede the requirements in this Section 5.4.1. Further, to the extent that such collective bargaining agreements require Seller to require Purchaser to offer comparable benefit plans in lieu of benefit plans that are specifically administered by and available only through Seller for the remainder of the term of such agreements, Purchaser shall provide such benefits to the extent so required under such collective bargaining agreements. Purchaser shall request that each union consent on release of its members' employment files to Purchaser in the same manner as non-union employees. Any of the Hospital Businesses' Employees who accept an offer of employment with Purchaser as of or after the Effective Time shall be referred to in this Agreement as the "Hired Employees." Purchaser shall make reasonable, good faith efforts to offer the Hired Employees positions with part-time or full-time status comparable to the status they held with Purchaser, and except as required by a collective bargaining agreement, at wages, benefits, and other employment conditions comparable to those provided to those Hired Employees not covered by collective bargaining agreements with Seller.

Purchaser and Seller shall use their best efforts to obtain consents from all Hired Employees to the transfer to Purchaser of the Hired Employees' Accrued Paid Time Off Amounts, to the extent permitted by law. However, Purchaser shall pay at Closing to, or for the benefit of Seller, without any offset or reduction of the PEPC, any Accrued Paid Time Off Amounts owing Hospital Businesses' Employees who are not hired by Purchaser, or who are Hired Employees but do not consent to the transfer of such Accrued Paid Time Off Amounts to Purchaser. Purchaser shall also provide to all Hired Employees their ESL Benefits, if any, as provided under Section 1.8.11.

5.4.2 **Seller Plan Disposition.** Seller agrees to comply with all Legal Requirements associated with such Benefit Plans.

5.4.3 **Benefits.** On and after the Effective Time, Hired Employees shall be eligible for a medical and hospital plan sponsored by Purchaser. To the extent permitted by Purchaser's insurers and plan administrators, Purchaser shall use Reasonable Commercial Efforts to obtain coverage providing that Hired Employees shall be given credit for periods of employment with Seller prior to the Effective Time for purposes of determining eligibility to participate and amount of benefits (including vesting of benefits), and preexisting condition limitations will be waived with respect to Hired Employees and their covered dependents unless such preexisting condition limitations were applicable prior to the Effective Time. In addition, if prior to the Effective Time a Hired Employee or his or her covered dependents paid any amounts towards a deductible or out-of-pocket maximum in Seller's medical and health plan's current fiscal year, Purchaser shall use Reasonable Commercial Efforts to obtain coverage providing that such amounts shall be applied toward satisfaction of the deductible or out-of-pocket maximum in the current fiscal year of Purchaser's medical and health plan that covers Hired Employees on and after the Effective Time, if permitted by Purchaser's insurer or plan administrator.

5.4.4 **PHSA, COBRA.** Seller shall be responsible to provide continuation coverage pursuant to the requirements of the PHSA ("PHSA Coverage") or under ERISA

(collectively, "**COBRA Coverage**") (to the extent applicable) with respect to the Hospital Businesses' Employees (and their dependents, if applicable) whose qualifying event occurred prior to the date on which such Hospital Businesses' Employees become Hired Employees. Purchaser shall be responsible to provide COBRA Coverage with respect to each of the Hired Employees (and their dependents, if applicable) whose qualifying event occurs on or after the date on which such Hospital Businesses' Employees become Hired Employees. Purchaser shall also be responsible, as a "successor employer" under applicable COBRA Regulations, to provide COBRA coverage to employees of Seller who lose group coverage as a result of Purchaser's decision not to hire such employees (but not for employees of Seller whose employment terminated prior to the Closing Date for reasons unrelated to the purchase of the Assets by Purchaser).

5.4.5 **Cooperation.** After the Closing Date, Purchaser's human resources department will give reasonable assistance to Seller, at no cost to Seller, with respect to Seller's post-Closing administration of Seller's pre-Closing employee pension benefit plans and employee health or welfare benefit plans for the Hospital Businesses' Employees. Within five (5) days after the Closing Date, Purchaser shall provide to Seller a list of all the Hospital Businesses' Employees who were offered employment by Purchaser but refused such employment.

5.4.6 **Labor Contracts.** Purchaser acknowledges Seller is a party to collective bargaining agreements as described on Schedule 2.13.2 ("**Labor Agreements**"). Purchaser shall assume such Labor Agreements, effective as of the Effective Time, and thereafter on and after the Effective Time, Purchaser shall, for the remainder of their current term abide by and comply with Seller's obligations under the Labor Agreements relating to and covering the employees of the Hospitals (whether such employees are employed by Purchaser at the Effective Time or at any time thereafter), as more specifically set forth in Schedule 2.13.2 of this Agreement, subject to all the terms and conditions in such Labor Agreements existing as of the Effective Date. All changes made by Purchaser to the terms and conditions of employment of union represented employees shall be subject to the terms of any Labor Agreements.

5.4.7 **NLRB Compliance.** On and after the Effective Time, Purchaser shall take any and all action that may be necessary to comply with the terms and provisions of the National Labor Relations Act or the Labor Management Relations Act as a result of the consummation of the transactions contemplated by this Agreement, including, without limitation, obligations thereunder to any of the Hired Employees covered by the Labor Agreements. Prior to the Effective Date, Seller shall provide to Purchaser all information requested by Purchaser and reasonably necessary for the Purchaser's understanding and implementation of employee wages, benefits, and other conditions of employment required by those union agreements.

5.5 **Use of Business Names.** Purchaser covenants that it and its affiliates shall not use in their respective trades or businesses the names or symbols described in Schedule 5.5, any abbreviations or variations thereof or service marks, symbols or logos related thereto, nor any promotional material, stationery, supplies or other items of inventory bearing either such names, symbols or abbreviations or variations thereof.

5.6 **Excluded Assets.** As soon as practicable after the Closing Date, Purchaser shall notify Seller or Seller's designee of any Excluded Assets found at any of the Hospital Businesses on and after the Effective Time.

5.7    **Confidentiality.** Purchaser agrees to comply with the confidentiality provisions set forth at Section 12.8, and the rights which shall remain in place during the term of this Agreement, and shall survive the Closing or termination hereof. Additionally, Purchaser shall continue to be bound by that certain Confidentiality Agreement, which shall also remain in place, to the extent consistent with the terms of this Agreement, during the term of this Agreement. Disclosure of Seller information by Purchaser to potential investors and financing sources with respect to Purchaser shall be permitted, subject to execution by such financing sources of a reasonable and customary confidentiality agreement.

5.8    **Contract Consents.** Purchaser shall use its Reasonable Commercial Efforts to assist Seller in seeking and obtaining the consents from the third parties under all Material Contracts and Material Leases, which, by the terms of such Material Contract or Material Lease, require such consent to the assignment thereof to Purchaser and, in connection with such consents, seek the release of Seller from any further liability thereunder to the extent of any applicable Assumed Other Liabilities of Purchaser. To the extent any consents from third parties under any Contracts or Leases are not obtained as of the Closing, Seller and Purchaser shall comply with Section 9.3 and use their Reasonable Commercial Efforts to obtain any such consents prior to Closing. Notwithstanding the foregoing, Seller's obtaining the consents and/or releases described in this Section shall not be a condition precedent to either party's obligation to close the transaction contemplated by this Agreement and shall not be considered a breach of Seller's representations. Purchaser shall use commercially reasonable efforts to obtain, as part of the assumption documents, releases of Seller by the third party obligees under Assumed Obligations, to the extent of the Assumed Obligations for each such obligee. However, receipt of such releases shall not be a condition precedent to either Party's obligation to close. Purchaser shall defend, indemnify and hold Seller harmless from any claims relating to such Assumed Obligations, whether or not the obligee has consented to such assignment.

5.9    **Other Covenants.** Purchaser recognizes that Seller has provided hospital and related services to the community for more than sixty (60) years and that Purchaser's commitment to continue to provide said services constitutes a material part of the consideration and inducement to Seller to enter into this Agreement and the Related Agreements. Accordingly, Purchaser covenants and agrees as follows:

5.9.1    **Post-Closing Lease of Board; Community Benefit Support.**

(a)    **Post-Closing Lease of Board Space.** Seller intends to maintain its existence as a California Local Healthcare District and (i) to provide certain health-related needs of the communities which it serves other than the operation of the Hospitals, and (ii) to take those actions set forth in California Health & Safety Code Section 32121.9. Purchaser desires to continue to occasionally support such services. Accordingly, notwithstanding anything to the contrary in this Agreement, commencing as of the Effective Time, and continuing for a term of at least ten (10) years, Purchaser shall lease to Seller that certain space leased by VHSSC to Seller prior to the Closing of approximately 1,755 square feet plus corridor access which comprises the "Board Executive Conference Room" (**"Board Room"**) and the "Board Offices" located on the second floor of the Medical Arts Building and further described at Schedule 5.9.1, which shall be leased by Purchaser to Seller at a cost of $1 per year, including access to phone and internet service connections (but Seller shall maintain its own internet service provider account) and reasonable access to parking for staff and visitors. However, Seller's use of the Board Room

shall be on shared, non-exclusive basis, and the parties will reasonably cooperate with each other concerning scheduling of use of the Board Room, but with reasonable priority given to Seller's use. Seller shall also have the right to utilize the existing Board public meeting room for meetings on an "as available" basis, subject to the reasonable needs of Purchaser and other tenants of Purchaser and any reasonable rules or regulations regarding such use adopted by Purchaser. Prior to the Closing, the parties shall enter into a lease which contains these terms in mutually acceptable, commercially reasonable, form (the **"Post-Closing Seller's Lease"**).

(b)    **Community Benefit Support.** In addition, Purchaser agrees to provide Four Hundred Thousand Dollars ($400,000) per year, commencing on the Closing Date, for a period five (5) years (**"Annual Support Grants"**), which amount shall not be subject to offset by Purchaser for any reason whatsoever, for use by Seller in support of Seller's community benefit and to satisfy its legal obligations. To the extent that the Seller obtains financial support from any other sources, the amount of Annual Support Grants payable by Purchaser shall be decreased in the amount equal to such other financial support except that, in any case, Purchaser's commitment shall not be less than Two Hundred Fifty Thousand Dollars ($250,000) per year during the five (5) year period of support.

5.9.2    **Obligations Unconditional.** Purchaser's obligation to provide the Annual Support Grants as provided in this Section 5.9.1 hereof, to make the payments to the unsecured creditors pursuant to the Creditors Commitment as provided in Section 1.2.1(a)(iv) and 1.5.19, and to fund the Claims Funds as provided in Section 1.2.4, shall be absolute, unconditional and not subject to any withholding, deduction, defense, offset, claim or counterclaim relating to any obligation, liability, or claimed breach by Seller of this Agreement.

5.9.3    **Maintenance of Emergency Department; Other Service Commitments.** For a period of at least five (5) years following the Closing Date, Purchaser, Purchaser's Affiliates or each of their respective successors and assigns shall continue to operate and maintain a basic twenty-four hour emergency room (as defined in Title 22, Section 70411 of the California Code of Regulations) as a supplemental licensed service under each of the Hospitals' general acute care hospital licenses, to the extent that it is commercially reasonable and viable to do so in the context of the then applicable health care environment. In the event that Purchaser, Purchaser's Affiliates or any of their respective successors and assigns is no longer operating a basic twenty-four hour emergency room for a period of 12 continuous months (other than as permitted below), then Seller shall have all remedies available at law and in equity (including rights to damages and to specific performance) in connection with such development. In addition, Purchaser shall assume and abide by the existing Seller contractual arrangements related to subacute, obstetric and chemical dependency rehabilitation services at the Hospitals. For purposes of the foregoing, Purchaser shall not be in breach of these covenants based on a closure of any Hospital, in whole or in part, even if it affects the continued operation of the Hospital's emergency department, including without limitation as the result of any retrofit, remediation, construction or similar project at such Hospital, or the closure of a Hospital provided such closure is for the purpose of replacement with a new acute care hospital. In such event, the five year covenant to operate such service shall be extended for the period of such closure.

5.9.4    **Charity Care Policies.** Purchaser shall maintain charity care policies at the Hospitals which are fully compliant with all applicable laws, as such may change from time to time,

and any operations of the Hospitals shall be conducted in a manner materially consistent with such charity care policies.

**5.9.5 No Flip Covenant.** Purchaser agrees that it will not at any time during the first three (3) years following the Closing Date, enter, sell all, or sell substantially all of, the Assets or sell or consent to the sale of all or substantially all of the ownership interests of Purchaser to any third party; provided, however, that nothing herein shall restrict in any manner (i) any reorganization of Purchaser, including without limitation as may be needed to comply with legal or regulatory requirements, (ii) Purchaser's right to assign any of its rights or obligations hereunder as otherwise permitted in Section 12.2, and (iii) any transfer of Purchaser's assets as part of any the remedies of any secured lender of Purchaser.

**5.10 No Liens Caused by Purchaser.** Prior to the Closing, the Purchaser shall, at all times, in connection with Purchaser and its employees', agents', and representatives' actions, keep the Hospital Businesses and all of the Assets free and clear of any mechanic's or materialman's claims or liens arising out of or relating to any inspections conducted by Purchaser. Upon completion of any test or inspection, Purchaser shall immediately restore the Hospital Businesses and Assets to their condition prior to such tests and inspections. Purchaser agrees to share the results of any tests or inspections with Seller. Purchaser shall also protect, indemnify, defend and hold Seller and officers, directors, managers, employees, representatives and Affiliates harmless from and against any and all losses, damages (whether general, punitive or otherwise), liabilities, claims, causes of action, judgments, liens, costs and legal or other expenses (including but not limited to reasonable attorney's fees) suffered or incurred by Seller or its officers, directors, managers, employees, representatives and Affiliates as a result of, due to, or arising from, any act or omission of the Purchaser and/or its agents or representatives in connection with Purchaser's inspections.

**5.11 Purchaser's Costs.** All costs of Purchaser's inspections shall be borne solely by Purchaser.

**5.12 ALTA Survey.** If Purchaser or Purchaser's lenders or financing sources require that the Title Commitment include Survey endorsements, then immediately upon execution of this Agreement, Purchaser shall have the right to engage a licensed surveyor to conduct and provide an ALTA survey with respect to the Real Property (each an "**ALTA Survey**," collectively, the "**ALTA Surveys**"), in forms reasonably acceptable to Purchaser and its lenders, and sufficient to enable the Title Company to rely thereon in issuing the Title Policy incorporating the ALTA Surveys. Any such ALTA Surveys shall be Purchaser and any lenders which Purchaser may designate in writing, and the Title Company, and shall plot all easements, structures, boundaries, fences, walls, and any encroachments on or by the Real Property, all to Purchaser's and its lenders' reasonable satisfaction. Purchaser shall have the right to undertake the ALTA Surveys provided they are completed no later fifty-five (55) days after the delivery of the PTR with all documents listed in "Schedule B" therein ("**Survey Date**"). Purchaser shall notify Seller in writing within five (5) days after the Survey of any defects, exceptions, liens, encroachments or encumbrances shown in the ALTA Survey of which Purchaser disapproves. Any exceptions or defects not so disapproved by Purchaser in writing within five (5) days following the Survey Date shall be deemed approved. Purchaser shall bear the cost of the Surveys.

**5.13 Insurance.** For the period commencing on the Effective Date and ending on the Effective Time, Purchaser shall maintain, and shall ensure that its agents, consultants and contractors

145

maintain, public liability and property damage insurance insuring against any liability arising out of any entry, tests or investigations of the Property pursuant to the provisions of this Agreement. Such insurance maintained by Purchaser and/or its consultants, agents and contractors (as applicable) shall be in the amount of Three Million Dollars ($3,000,000.00) combined single limit for injury to or death of one or more persons in an occurrence, and for damage to tangible property (including loss of use) in an occurrence. The policy maintained by Purchaser shall insure the contractual liability of Purchaser covering the indemnities in this Agreement and shall (i) name the Seller and Seller's successors, assigns and affiliates as additional insureds, (ii) contain a cross-liability provision, and (iii) contain a provision that "the insurance provided by Purchaser under this Agreement shall be primary and non-contributing with any other insurance available to Seller." Purchaser shall provide Seller with evidence of such insurance coverage prior to any entry, tests or investigations of the Real Property. The aforementioned insurance coverage may be obtained under a blanket policy carried by Purchaser or its agents, consultants or contractors, as the case may be. Prior to entering the Property (and on each and every occasion), Purchaser shall deliver to Seller prior written notice thereof to Seller's Chairman of the Board or general counsel and shall afford Seller a reasonable opportunity to have a representative of Seller present to accompany Purchaser while Purchaser performs its evaluations, inspections, tests and other investigations of the physical condition of the Property. If, pursuant to Section 4.13, the Parties determine that the most cost-effect approach to obtain the E&O Insurance addressed therein is to have Purchaser maintain prior acts "nose" coverage, then the insurance policy maintained by Purchaser shall include, for at least two (2) years following the Closing, such prior acts coverage with respect to professional liability for all claims attributable to or arising out of the operation of the Hospital Businesses or the Assets by Seller on or before the Closing.

**5.14 Releases.** Except for the specific representations and warranties provided in Article II of this Agreement or for a fraud committed by Seller, Purchaser, on its own behalf and on behalf of its officers, directors, managers, employees, representatives, property managers, asset managers, agents, attorneys, Purchasing Group Companies, and successors and assigns (collectively, "**Releasors**") agrees that Seller and each of its officers, directors, shareholders, partners, members, managers, trustees, employees, representatives, property managers, asset managers, agents, attorneys, affiliated and related entities, heirs, successors and assigns (collectively, the "**Releasees**") shall be, and are hereby, fully and forever released and discharged from any and all liabilities, losses, claims (including third party claims), demands, damages (of any nature whatsoever), causes of action, costs, penalties, fines, judgments, attorneys' fees, consultants' fees and costs and experts' fees (collectively, the "**Claims**") with respect to any and all Claims, whether direct or indirect, known or unknown, foreseen or unforeseen, that may arise on account of or in any way be concerned with the Real Property including, without limitation, the physical, environmental and structural condition of the Real Property or any law or regulation applicable thereto, including, without limitation, any Claim or matter (regardless of when it first appeared) relating to or arising from (i) any patent or latent defects or deficiencies with respect to the Real Property, (ii) any and all matters related to the Real Property or any portion thereof, including without limitation, the condition and/or operation of the Real Property and each part thereof, and (iii) the presence, release and/or remediation of asbestos and asbestos containing materials in, on or about the Real Property regardless of when such asbestos and asbestos containing materials were first introduced in, on or about the Real Property.

**5.14.1** Releasors hereby waive and agree not to commence any action, legal proceeding, cause of action or suits in law or equity, of whatever kind or nature, including, but not

limited to, a private right of action under the federal superfund laws, 42 U.S.C. Sections 9601 et seq. and California Health and Safety Code Sections 25300 et seq. (as such laws and statutes may be amended, supplemented or replaced from time to time), directly or indirectly, against the Releasees or their agents in connection with Claims described above and expressly waives the provisions of Section 1542 of the California Civil Code which provides:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."**

and all similar provisions or rules of law. Releasors elect to and does assume all risk for such Claims heretofore and hereafter arising, whether now known or unknown by Releasors. In this connection and to the greatest extent permitted by law, Releasors hereby agree, represent and warrant that Releasors realize and acknowledge that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Releasors further agree, represent and warrant that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Releasors nevertheless hereby intend to release, discharge and acquit Seller from any such unknown Claims, debts, and controversies which might in any way be included as a material portion of the consideration given to Seller by Releasors in exchange for Seller's performance hereunder. Without limiting the foregoing, (i) Releasors have actual knowledge of (q) a default in any of the covenants, agreements or obligations to be performed by Seller under this Agreement and/or (b) any breach or inaccuracy in any representation or warranty of Seller made in this Agreement, and Releasors nonetheless elects to proceed to Closing, then, upon the consummation of the Closing, Releasors shall be conclusively deemed to have waived any such default and/or breach or inaccuracy and shall have no Claim against Seller or hereunder with respect thereto. Notwithstanding anything to the contrary herein, Seller shall not have any liability whatsoever to Releasors with respect to any matter disclosed to or discovered by Releasors or its agents or representatives prior to the Closing Date.

5.14.2 Without limiting the generality of the foregoing, except for the specific representations and warranties provided in Article 11 of this Agreement by Seller or a fraud committed by a Seller, Releasors hereby expressly waive, release and relinquish any and all claims, causes of action, rights and remedies Releasors may now or hereafter have against the Releasees, whether known or unknown, under any Environmental Law(s) (as defined below), or common law, in equity or otherwise, with respect to (1) any past, present or future presence or existence of Hazardous Materials on, under or about the Real Property (including, without limitation, in the groundwater underlying the Real Property) or (2) any past, present or future violations of any Environmental Laws. For the purposes of this Section, the term "Environmental Laws" means any and all federal, state and local statutes, ordinances, orders, rules, regulations, guidance documents, judgments, governmental authorizations, or any other requirements of governmental authorities, as may presently exist or as may be amended or supplemented, or hereafter enacted or promulgated, relating to the presence, release, generation, use, handling, treatment, storage, transportation or

1070039.2                F:\Bond\PHH\FINAL.ASA 10.12.09.DOC

disposal of Hazardous Materials, or the protection of the environment or human, plant or animal health, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986 (42 U.S.C.A. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Oil Pollution Act (33 U.S.C. § 2701 et seq.), the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. § 11001 et seq.), the Porter-Cologne Water Quality Control Act (Cal. Wat. Code § 13020 et seq.), the Safe Drinking Water and Toxic Enforcement Act of 1986 (Cal. Health & Safety Code § 25249.5 et seq.), the Hazardous Waste Control Act (Cal. Health & Safe Code § 25100 et seq.), the Hazardous Materials Release Response Plans & Inventory Act (Cal. Health & Safety Code § 25500 et seq.), and the Carpenter-Presley-Tanner Hazardous Substances Account Act (Cal. Health & Safety Code, § 25300 et seq.). As used herein, the term "**Hazardous Material(s)**" includes, without limitation, any hazardous or toxic material, substance, irritant, chemical or waste, which is (A) defined, classified, designated, listed or otherwise considered under any Environmental Law as a "hazardous waste," "hazardous substance," "hazardous material," "extremely hazardous waste," "acutely hazardous waste," "radioactive waste," "biohazardous waste," "pollutant," "toxic pollutant," "contaminant," "restricted hazardous waste," "infectious waste," "toxic substance," or any other term or expression intended to define, list, regulate or classify substances by reason of properties harmful to health, safety or the indoor or outdoor environment, (B) toxic, ignitable, corrosive, reactive, explosive, flammable, infectious, radioactive, carcinogenic or mutagenic, and which is or becomes regulated by any local, state or federal governmental authority, (C) asbestos, (D) an oil, petroleum, petroleum based product or petroleum additive, derived substance or breakdown product, (E) urea formaldehyde foam insulation, (F) polychlorinated biphenyls (PCBs), (G) freon and other chlorofluorocarbons, (H) any drilling fluids, produced waters and other wastes associated with the exploration, development or production of crude oil, natural gas or geothermal resources, (I) lead-based paint and (J) mold, rot, fungi and bacterial matter.

5.14.3 Seller has given Releasors material concessions regarding this transaction in exchange for Releasors agreeing to the provisions of this Section 5.14. Seller and Releasors have each initialed this Section 5.14 to further indicate their awareness and acceptance of each and every provision hereof. The provisions of this Section 5.14 shall survive the Closing and shall not be deemed merged into any instrument or conveyance delivered at the Closing.

*SELLER'S INITIALS*          *PURCHASER'S INITIALS*

5.14.4 Releasors specifically acknowledge, covenant, represent and warrant that prior to Closing Date, it and its agents and representatives will have thoroughly inspected the Real Property and observed the physical characteristics and condition of the Real Property. Notwithstanding anything to the contrary contained in this Agreement, Releasors further acknowledge and agree that Releasors is purchasing the Real Property subject to all applicable laws, rules, regulations, codes, ordinances and orders. By Releasors purchasing the Real Property and upon the occurrence of the Closing Date, Releasors waive any and all right or ability to make a claim

1070039.2                F:\Bond\PHH\FINAL.ASA 10.12.09.DOC

of any kind or nature against any of the Releasees for any and all deficiencies or defects in the physical characteristics and condition of the Real Property and expressly agrees to acquire the real Property with any and all of such deficiencies and defects and subject to all matters disclosed by Seller herein or in any separate writing with respect to the Real Property. Releasors further acknowledge and agree that except for any representations expressly made by Seller in Article II of this Agreement, neither Seller or any of Seller's employees, agents or representatives have made any representations, warranties or agreements by or on behalf of Seller of any kind whatsoever, whether oral or written, express or implied, statutory or otherwise, as to any matters concerning the Real Property, the condition of the Real Property, the size (including rentable or useable square footage) of the Real Property, the size (including rentable or useable square footage) of the improvements (including without limitation, any discrepancies in the actual rentable square footage of the improvements, including any leased premises within the Improvements), the present use of the Real Property or the suitability of Releasors's intended use of the Real Property.

5.14.5   Without limiting the generality of the foregoing, Releasors expressly acknowledge and agree that Releasors is not relying on any representation or warranty of Seller, nor any officer, director, shareholder, member, manager, partner, employee, attorney, property manager, agent or broker of Seller, whether implied, presumed or expressly provided at law or otherwise, arising by virtue of any statute, common law or other legally binding right or remedy in favor of Releasors except as expressly provided in Article II above. Releasors further acknowledge and agree that, except with respect to matters covered by Seller's representations at Article II of this Agreement, Seller is not under any duty to make any inquiry regarding any matter that may or may not be known to the Seller or any officer, director, shareholder, member, manager, partner, employee, attorney, property manager, agent or broker of Seller.

_SELLER'S INITIALS_          _PURCHASER'S INITIALS_

5.14.6   Notwithstanding the preceding, none of the releases or other provisions set forth in this Section 5.14 (or any subsection thereof) shall eliminate or limit the effect of, or Seller's obligation for, Seller's express representations, warranties and covenants in this Agreement or for fraud. The provisions of this Section 5.14 and its subsections shall survive the Closing and shall not be deemed merged into any instrument or conveyance delivered at the Closing.

5.15   **Plan of Adjustment.** Purchaser shall reasonably cooperate with Seller in connection with developing a Plan of Adjustment and in connection with any filings in the Chapter 9 Proceeding, and other steps, seeking approval of the Plan of Adjustment.

5.16   **Defense of Claims Challenging Transaction.** In the event any litigation is commenced seeking to enjoin or challenge the validity of, or the Seller's authority to enter into or perform pursuant to, the transactions contemplated by the MOU or addressed in this Agreement ("**Challenging Litigation**"), Seller will tender such litigation for coverage by D&O or E&O insurance, to the extent such policies may be applicable. If, however, such Challenging Litigation, which is filed prior to the second anniversary of the Closing Date is not covered by insurance ("**Covered Litigation**"), and/or if the applicable carrier does not promptly agree to provide a defense of such Challenging Litigation, Purchaser agrees to be responsible for the reasonable legal fees and

- 58 -

F:\Bond\PHH\FINAL\03.12.09.DOC

1070030.2

costs associated with defending against the Covered Litigation; provided that Purchaser shall have the right, at its election, to control and/or participate in the defense of the Covered Litigation, with counsel mutually agreeable to Seller and Purchaser. If Purchaser elects to control the Covered Litigation, then Purchaser will have full control of such defense and proceedings, including any compromise or settlement thereof. Seller may, at its sole cost and expense, participate in, but not control any defense or settlement of any Covered Litigation controlled by the Purchaser pursuant to this Section to the extent such participation is not prejudicial, in the reasonable judgment of the Purchaser, to the Purchaser or the possible outcome of the Covered Litigation. If requested by Purchaser, Seller agrees to fully cooperate with the Purchaser and its counsel in contesting any Covered Litigation, or, if appropriate and related to the Covered Litigation in question, in making any counterclaim against the person asserting initiating the Covered Litigation, or any cross-complaint against any person (other than the Seller or any of its affiliates). Seller shall not take any such action that is prejudicial to Purchaser or its defense against the Covered Litigation. In connection with the foregoing, Purchaser also agrees to indemnify, defend and hold harmless Seller and Seller's elected directors and officers from any and all damages, liabilities, costs, expenses, obligations, or claims incurred in connection with the Covered Litigation, including but not limited to, injunctive proceedings, and which are not covered by D&O, E&O or other insurance covering Seller and its directors and officers ("**Available Insurance**"). Notwithstanding the preceding, it is agreed that Seller and its directors and officers will tender any claims which are subject to indemnity pursuant to this Section to any insurer(s) providing Available Insurance ("**Available Insurer**") prior to seeking indemnification pursuant to this Section; provided, however, that unless the Available Insurer promptly agrees to provide a defense to or for any claims covered by this indemnification, Purchaser shall immediately defend against such claims in the same manner as provided for defending against Covered Litigation as provided above.

ARTICLE VI
CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

Seller's obligation to sell the Assets and to close the transactions as contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Seller in whole or in part at or prior to the Closing:

6.1   **Signing and Delivery of Instruments.** Purchaser shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to the provisions of this Agreement and any Related Agreement.

6.2   **Unfavorable Action or Proceeding.** On the Closing Date, no orders, decrees, judgments, temporary restraining orders or injunctions of any court or governmental body shall be in effect, which could prevent the consummation of the transactions contemplated in this Agreement.

6.3   **Performance of Covenants.** Purchaser shall have in all material respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by it on or prior to the Closing Date.

6.4   **Governmental Authorizations.** Purchaser shall have obtained all material licenses, permits, certificates of need and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement including reasonable assurances that any material licenses, permits, certificates of need and

- 59 -

1070030.2          F:\Bond\PHH\FINAL\03.12.09.DOC

authorizations not actually issued as of the Closing will be issued following Closing (which may include oral assurances from appropriate governmental agencies or bodies). The foregoing notwithstanding, in the event that CDPH approval and CMS certification, or other Material Licenses, have not been obtained prior to the Closing Date, Purchaser and Seller shall nevertheless be required, at the option of either Seller or Purchaser, to complete the purchase of the Assets and the Parties shall enter into the Lease and Management Agreement as and to the extent provided in Section 1.3.6.

6.5    **Representations.** The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all respects as though such representations and warranties had been made on and as of such date, except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect on Purchaser's ability to consummate the transactions contemplated hereby, when made and on and as of the Closing Date (or the date otherwise specified in this Agreement) as though such representations and warranties had been made on and as of such date.

6.6    **Schedules.** The provisions of the schedules attached to this Agreement that were updated by Purchaser after the Effective Date, if any, shall be acceptable to Seller in its reasonable discretion, provided, however, that Purchaser shall be deemed to have obtained Seller's approval to any such material updates of the schedules if Purchaser gives Seller written notice of an update and Purchaser does not receive from Seller a written notice of objection to such action within ten (10) business days after Seller receives Purchaser's written notice.

6.7    **Public Approval.** Except with respect to the Alternative Transaction, the Seller shall have received Public Approval, through the Approval Election, as legally required for Seller to consummate the transactions contemplated by this Agreement.

6.8    **Capital Requirements.** No later than noon on December 4, 2009, Purchaser shall provide Seller, through its general counsel, John B. Marshall, Esq. as addressed below, evidence reasonably satisfactory to Seller that Purchaser has written Commitments (as defined below) from its lenders and evidence concerning Purchaser's capital investors sufficient to permit Purchaser to fund to close the transactions provided for in this Agreement. For purposes of the preceding, a lender's "Commitment" constitutes a commercially reasonable letter by such lender to make a loan to Purchaser or Purchaser's Affiliate, in such form and with such conditions and qualifications as can be reasonably expected for such a lender letter prior to payment by Purchaser of a commitment fee (which commitment fees Purchaser would not pay until the Public Approval occurs, because of their substantial cost). At Seller's reasonable request, such evidence (collectively, "**Financial Documentation**") shall include (i) the names of the lenders and/or the existing capital investors, (ii) the amount of money such lenders and/or capital investors have committed toward either the Cash Purchase Portion or the Purchaser's working capital, as well as (for any working capital loan Commitment) the general terms upon which Purchaser shall be entitled to draw down and utilize said funds, and (iii) the general terms and conditions upon which the money is being lent (for any Commitments) (collectively, "**Commitment Requirements**"). Seller and Purchaser agree that much of the information to be provided by Purchaser pursuant to this section will be of a confidential or sensitive nature, and may be subject to confidentiality covenants in favor of third parties. Accordingly, it is important for the process contemplated by this section to be one that can protect such confidentiality. Therefore, the parties agree that the Commitments and other evidence required to be provided by Purchaser hereunder shall only be provided for review by (and not for copying by) Seller's general counsel, John B. Marshall, Esq, and he will, unless otherwise approved in writing by

- 60 -

Purchaser, only be authorized to report back to Seller only his conclusions on whether these Commitments and other information and documents reasonably provide the evidence of sufficient capital as required by this Section, and that he will not be authorized to share the details, including without limitation the names of any lenders or capital investors, with Seller or its board members, officers or agents. The parties acknowledge and agree that the evidence of necessary funds may be shown through funds available to Purchaser or any Affiliate of Purchaser which will make such funds available to close the transactions contemplated by this Agreement. If Purchaser is unable, at or prior to Noon on December 4, 2009, to produce documents evidencing the availability of funds constituting the Commitment Requirements as required to close the transactions provided for in this Section which are commercially reasonably satisfactory to Seller, then Seller shall have the right, in its reasonable discretion, to terminate this Agreement upon ten (10) business days prior written notice provided to Purchaser within twenty (20) days after Purchaser has provided Seller the Financial Documentation required by this Section (which notice shall include a detailed description of Seller's basis for concluding that Purchaser has failed to provide the required evidence), during which period Purchaser shall have opportunity to cure by provision of additional evidence commercially reasonably satisfactory to Seller of capital commitments or addressing any deficiency alleged by Seller, without liability and to retain the Termination Fee as further addressed at Section 8.2, unless such failure is caused by Seller's failure to perform its material obligations under Section 4.1.1. If there are any disputes between Seller and Purchaser concerning the compliance by Purchaser with the provisions and requirements of this Section, such dispute shall be resolved pursuant to the dispute resolution provisions set forth at Section 12.18 of this Agreement. There shall be no other financing contingency to Purchaser's obligation to close the transactions contemplated in this Agreement, except as otherwise specifically set forth in this Agreement.

6.9    **Plan of Adjustment.** If, prior to the Closing, Seller has filed a Plan of Adjustment ("**Plan**") in the Chapter 9 Proceeding, as of the Closing, either;

6.9.1    such Plan shall have been confirmed; or

6.9.2    the holders of the Affiliated Claims shall have voted to accept, in writing, such Plan or agreed to accept such Plan; or

6.9.3    the holders of the Affiliated Claims shall have agreed, in writing, not to, directly or indirectly, oppose such Plan and/or sought to influence either the Unsecured Creditors Committee and/or others to vote against or otherwise oppose such Plan, and have, in fact, not done so.

For purposes of the foregoing, "**Affiliated Claims**" shall mean the claims of Hemet Community Medical Group, Menifee Valley Community Medical Group, KM Strategic Management, Inc., and the claims of LHIO, Inc. and any claims of constituent members thereof which are derivative from such claims

**ARTICLE VII
CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER**

Purchaser's obligation to purchase the Assets and to close the transactions contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Purchaser in whole or in part at or prior to the Closing.

- 61 -

**7.9   Permits and Program Participation.** Unless either Party elects to enter into the Lease and Management Agreement as provided elsewhere in this Agreement, Purchaser shall have obtained, or received reasonable assurances that it shall obtain within a reasonable time after the Effective Time (including the scheduling by Purchaser of any required surveys within seven (7) days following the Effective Time), (a) all Material Licenses, Permits and accreditations required for the transfer of the Hospital Businesses to Purchaser and for the operation of each of the Hospital Businesses by Purchaser following the Effective Time in substantially the same manner as currently operated without Purchaser being obligated to comply with any additional Legal Requirements concerning construction, structural integrity or seismic safety as a result of the transfer of the Assets to Purchaser, (b) certification of each component of the Hospital Businesses in Medicare, Medicaid, and TRICARE/CHAMPUS and its continued participation in each such program notwithstanding Purchaser's decision to obtain new provider agreements and provider numbers therefor, (c) certification of participation by each of the Hospital Businesses in the program of any other Payor reasonably required by Purchaser, and (d) certification or confirmation reasonably satisfactory to Purchaser of the Hospital Businesses' ability to continue to qualify for and maintain its exclusion from Medicare's prospective payment system, in each instance effective as of the Closing Date or as soon thereafter as is acceptable to Purchaser, so that within such a period of time after the Closing as is acceptable to Purchaser each component of the Hospital Businesses may participate in and receive reimbursement from all programs described in (b) through (d) effective as of the Closing.

**7.10   Tax Matters.** Seller shall have delivered to Purchaser a duly executed certificate of non-foreign status in the form required by Code § 1445.

**7.11   Public Approval.** The Seller shall have received a Public Approval, through the Approval Election and all such other requirements, as legally required for Seller to consummate the transactions contemplated by this Agreement.

**7.12   Plan of Adjustment.** The Plan of Adjustment shall have been approved by the Bankruptcy Court prior to Closing.

**ARTICLE VIII**
**TERMINATION**

**8.1   Termination.** This Agreement may be terminated at any time prior to Closing only as follows:

**8.1.1**   By the mutual written consent of the Parties in which case the Deposit shall be repaid as agreed upon by the Parties;

**8.1.2**   By Seller if a material breach or default under this Agreement has been committed by Purchaser and such breach has not been (i) waived in writing by Seller or (ii) cured by Purchaser to the reasonable satisfaction of Seller within thirty (30) days after service by Seller upon Purchaser of a written notice which describes the nature of such breach. In the event this Agreement is terminated based on this Section 8.1.2, Escrow shall pay to Seller the Termination Fee and the Excess Deposit to Purchaser immediately following the effective date of such termination of this Agreement; provided, however, that for purposes of this Section, if Purchaser's performance is prevented, hindered or delayed by reason of any Force Majeure, such performance obligation of Purchaser shall be excused but only for so long as and to the extent that such cause(s) prevent or delay Purchaser's performance. For purposes of this Section 8.1.2, Seller's certification of material

**7.1   Governmental Authorizations.** Purchaser shall have obtained all material licenses, permits, certificates of need, assumption of provider agreements and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement, including reasonable assurances that any material licenses, permits, certificates of need and authorizations not actually issued as of the Closing will be issued following Closing (which may include oral assurances from appropriate governmental agencies or bodies). The foregoing notwithstanding, in the event that CDPH approval and CMS certification, or other Material Licenses, have not been obtained prior to the Closing Date, Seller and Purchaser shall nevertheless be required, at the option of either Seller and Purchaser, to complete the purchase of the Assets and the Parties shall enter into the Lease and Management Agreement, as and to the extent provided in Section 1.3.6.

**7.2   Signing and Delivery of Instruments.** Seller shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to all of the provisions of this Agreement and the Related Agreements.

**7.3   Performance of Covenants.** Seller shall have in all material respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by Seller on or prior to the Closing Date.

**7.4   Unfavorable Action or Proceeding.** On the Closing Date, no orders, decrees, judgments, temporary restraining orders or injunctions of any court or governmental body shall be in effect, which could prevent the consummation of the transactions contemplated in this Agreement.

**7.5   Material Adverse Effect.** There has not been a change, or new circumstances, having a Material Adverse Effect.

**7.6   Title Insurance Policy.** Purchaser shall have received or the Title Company shall be irrevocably committed to issuing, a fully effective Title Policy including a customary survey endorsement in favor of Purchaser covering the Owned Real Property in the amount of the full insurable value of the Owned Real Property. The Owner's Title Policy shall show fee simple title to the Owned Real Property vested in Purchaser, subject only to: (a) current real estate taxes not yet due and payable; and (b) the permitted title exceptions listed in Schedule 7.6 hereto (the **"Permitted Exceptions"**).

**7.7   Representations.** Each of the representations and warranties of Seller contained in this Agreement or a Related Agreement shall be true and correct in all respects when made and on and as of the Closing Date (or the date otherwise specified in this Agreement) as though such representations and warranties had been made on and as of such date, except as to changes occurring in the ordinary course of business of the Hospital Businesses after the date of this Agreement which do not violate any covenant of Seller in this Agreement and do not have a Material Adverse Effect.

**7.8   Exhibits and Schedules.** The provisions of the Seller's Disclosure Schedule and all schedules attached to this Agreement that were updated by Seller after the Effective Date, if any, shall be acceptable to Purchaser in its reasonable discretion; provided, however, that Seller shall be deemed to have obtained Purchaser's approval to any such updates of the schedules if Seller gives Purchaser written notice of an update and Seller does not receive from Purchaser a written notice of objection to such action within ten (10) business days after Purchaser receives Seller's written notice.

breach or default shall be accepted by Escrow, without prejudice to Purchaser's right to contest the same in accordance with the terms of this Agreement;

**8.1.3** By Purchaser if a material breach or default under this Agreement has been committed by Seller and such breach has not been (i) waived in writing by Purchaser or (ii) cured by Seller to the reasonable satisfaction of Purchaser within thirty (30) days after service by Purchaser upon Seller of a written notice which describes the nature of such breach. In the event this Agreement is terminated based on this Section 8.1.3, Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination of this Agreement; provided, however, that , for purposes of this Section, any failure of Seller to close the transaction contemplated by reason of any Force Majeure, such performance obligation of Seller shall be excused but only for so long as and to the extent that such cause(s) prevent or delay Seller's performance;

**8.1.4** By Purchaser if any of the conditions in Article VII have not been satisfied as of the Closing Date or if satisfaction of any condition in Article VII is or becomes impossible and Purchaser has not waived such condition in writing on or before the Closing Date (provided that the failure to satisfy the applicable condition or conditions has occurred by reasons other than (i) the failure of Purchaser to comply with its obligations under this Agreement or (ii) Purchaser's failure to provide its closing deliveries on the Closing Date because the Purchaser is not ready, willing and able to close the transaction on the Closing Date). In the event this Agreement is terminated based on this Section 8.1.4, Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination;

**8.1.5** By Seller if any of the conditions in Article VI have not been satisfied as of the Closing Date or if satisfaction of any such condition in Article VI is or becomes impossible and Seller has not waived such condition in writing on or before the Closing Date (provided that the failure to satisfy the applicable condition or conditions has occurred by reasons other than (i) the failure of Seller to comply with its obligations under this Agreement or (ii) Seller's failure to provide its closing deliveries on the Closing Date because Seller is not ready, willing and able to close the transaction on the Closing Date). In the event this Agreement is terminated based on this Section 8.1.5, then Escrow shall pay to Seller the Deposit and the Excess Deposit to Purchaser, immediately following the effective date of such termination of this Agreement

**8.1.6** By Purchaser, upon the delivery of a timely termination by Purchaser in accordance with Sections 1.10.2 (environmental), 1.12 (Casualty), 1.13(Condemnation), and 1.14 (disapprovals during Schedules Period), in which case Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination of this Agreement;

**8.1.7** Without limiting Purchaser's other termination rights hereunder, Purchaser may elect to terminate this Agreement, without cause, upon ten (10) days written notice to Seller, in which case the Escrow shall pay the Termination Fee and the Excess Deposit to Seller following the effective date of such termination of this Agreement;

**8.1.8** By Seller, if Seller timely terminates the Agreement pursuant to Section 6.8, in which case the Escrow shall pay the Termination Fee to Seller and the Excess Deposit to Purchaser immediately following the effective date of such termination of this Agreement;

**8.1.9** By Purchaser, if Seller's Disclosure Schedule or other schedules attached to this Agreement are updated by Seller after the end of the Schedules Period, which update is not

- 64 -

acceptable to Purchaser, and Purchaser elects to terminate this Agreement, by written notice provided to Seller within ten (10) business days after Purchaser receives Seller's written notice of the disapproved Schedules update and Seller does not agree to retract the update during the notice period, in which case Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination of this Agreement;

**8.1.10** By Purchaser, if there has been a change, or new circumstances, having a Material Adverse Effect since the Effective Date, and Purchaser elects to terminate this Agreement by written notice provided to Seller within ten (10) business days after Purchaser receives written notice of the occurrence of such Material Adverse Effect, in which case Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination of this Agreement;

**8.1.11** By Seller, if at the Closing, the Purchasing Group Companies do not, directly or indirectly, include a cross-section of participating local physicians, in which case Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination of this Agreement;

**8.1.12** By Purchaser, if (i) the actual D&O Tail Payment required to be paid by Purchaser exceeds the estimated amount of Four Hundred Fifty Thousand Dollars ($450,000); (ii) or the E&O Tail Insurance Payment required to be paid by Purchaser exceeds the estimated amount of Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000), or (iii) the Administrative Claims combined with other Covered Claims exceed $4,000,000 and Purchaser chooses not to make the additional payments (from the Creditors Commitment) at Closing to meet those obligations, as addressed in Article I, in which case Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination of this Agreement;

**8.1.13** [intentionally omitted]

**8.1.14** [intentionally omitted]; or

**8.1.15** By either Purchaser or Seller if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before April 30, 2010 (the "**Termination Date**") unless such Termination Date is mutually extended by the Parties. In the event of a termination in accordance with this Section 8.1.15, Escrow will pay to Purchaser the Deposit immediately after the termination takes effect.

**8.2** **Termination Consequences.** If this Agreement is terminated pursuant to Section 8.1, (a) all further obligations of the parties under this Agreement shall terminate, except that the obligations in Sections 5.7 (Confidentiality), 12.3 (Governing Law), 12.8 (Confidentiality and Publicity), 12.12 (Expenses) and any provision in the Agreement regarding disposition of the Deposit, shall survive and (b) each party shall pay the costs and expenses incurred by it in connection with this Agreement, except as provided in Section 12.12. Notwithstanding the foregoing to the contrary, if Seller either Party shall have committed any material breach or default, then Purchaser the nonbreaching need not terminate this Agreement. If this Agreement is terminated for any reason not based on Seller's or Purchaser's failure to perform any of its respective material obligations under this Agreement, which failure is not cured within any permitted

- 65 -

150

cure period, then Purchaser agrees to reimburse to Seller the out-of-pocket expenses incurred by Seller to undertake the Approval Election, in an amount not to exceed Fifty Thousand Dollars ($50,000).

**8.2.1** NOTWITHSTANDING THE PRECEDING, OR ANY OTHER PROVISION IN THIS AGREEMENT OR THE RELATED AGREEMENTS, IF THE CLOSING DOES NOT OCCUR BASED UPON SELLER'S ELECTION TO TERMINATE IN ACCORDANCE WITH SECTION 8.1.7, OR AS A RESULT OF PURCHASER'S FAILURE TO PERFORM ANY OF ITS MATERIAL OBLIGATIONS UNDER THIS AGREEMENT WHICH FAILURE IS NOT CURED WITHIN ANY PERMITTED CURE PERIOD (OTHER THAN PURCHASER'S FAILURE TO GIVE TIMELY NOTICE OF TERMINATION UNDER SECTION 8.1 WHICH FAILURE TO GIVE NOTICE CANNOT BE CURED), THEN, AS SELLER'S SOLE REMEDY, SELLER SHALL HAVE THE RIGHT TO RECEIVE TWO MILLION DOLLARS ($2,000,000) ("**TERMINATION FEE**") FROM THE DEPOSIT AND ESCROW SHALL REPAY TO PURCHASER THE DEPOSIT AND ALL INTEREST THEREON IN EXCESS OF SUCH TERMINATION FEE ("**EXCESS DEPOSIT**").

**8.2.2** IN CONNECTION WITH SECTION 8.2.1, PURCHASER AND SELLER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES THAT SELLER MAY SUFFER IN THE EVENT PURCHASER BREACHES THIS AGREEMENT PRIOR TO THE APPROVAL ELECTION. PURCHASER AND SELLER THEREFORE AGREE THAT THE PAYMENT SET FORTH IN SECTION 8.2.1 REPRESENTS A REASONABLE ESTIMATE OF THE NET DETRIMENT THAT SELLER WOULD SUFFER IN THE EVENT THAT PURCHASER BREACHED THIS AGREEMENT PRIOR TO SUCH TIME. ACCORDINGLY, SELLER AGREES THAT THE PAYMENT SET FORTH IN SECTION 8.2.1 SHALL BE SELLER'S SOLE AND EXCLUSIVE REMEDY AT LAW OR IN EQUITY FOR THE PURCHASER'S DEFAULT AS ADDRESSED THEREIN (WHICH SHALL BE THE FULL, AGREED AND LIQUIDATED DAMAGES PURSUANT TO CALIFORNIA CIVIL CODE SECTIONS 1671, 1676 AND 1677) AND SHALL NOT CONSTITUTE A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE SECTION 3275 OR 3369. SELLER HEREBY WAIVES THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 3389 WITH RESPECT TO THE PROVISIONS OF THIS AGREEMENT.

PURCHASER INITIALS _____     SELLER INITIALS _____

## ARTICLE IX
## POST-CLOSING MATTERS

**9.1** **Excluded Assets and Excluded Liabilities.**

**9.1.1** Subject to Section 11.2 of this Agreement, any asset (including Accounts Receivable) or any liability, all other remittances and all mail and other communications that is an Excluded Asset or an Excluded Liability (a) pursuant to the terms of this Agreement, (b) as otherwise determined by the parties' mutual written agreement, or (c) absent such agreement, as

- 66 -

151

determined by adjudication by a court or similar tribunal, and which comes into the possession, custody or control of Purchaser (or its respective successors-in-interest, assigns or affiliates) shall within five (5) business days following receipt be transferred, assigned or conveyed by Purchaser (and its respective successors-in-interest, assigns and affiliates) to Seller at Seller's cost. Until such transfer, assignment and conveyance, Purchaser (and its respective successors-in-interest, assigns and affiliates) shall not have any right, title or interest in or obligation or responsibility with respect to such asset or liability except that Seller shall hold such asset in trust for the benefit of Seller. Purchaser (and its respective successors-in-interest, assigns and affiliates) shall have neither the right to offset amounts payable to Seller under this Section 9.1 against, nor the right to contest its obligation to transfer, assign and convey to Seller because of, outstanding claims, liabilities or obligations asserted by Purchaser against Seller, including, but not limited to, pursuant to the indemnification provisions of Section 10.2. If Purchaser does not remit the Excluded Assets to Seller in accordance with the first sentence of this Section 9.1, such Excluded Assets shall bear interest at the Prime Rate in effect on the calendar day upon which such payment was required to be made to Seller (the "**Excluded Asset Due Date**") plus Five percent (5%) (or the maximum rate allowed by law, whichever is less), such interest accruing on each calendar day after the Excluded Asset Due Date until payment of the Excluded Assets and all interest thereon is made to Seller. The terms of this Article IX shall not be subject to the time limitations contained in Section 10.1 of this Agreement. With respect to payment received by Purchaser on account of Transition Services, this Section 9.1 shall be subject to the provisions of Section 11.3. The terms of this Article IX shall not be subject to the time limitations contained in Section 10.1 of this Agreement.

**9.1.2** Subject to Section 11.2 of this Agreement, any asset (including Accounts Receivable) or any liability, all other remittances and all mail and other communications that is an Asset or an Assumed Obligation (a) pursuant to the terms of this Agreement, (b) as otherwise determined by the parties' mutual written agreement or (c) absent such agreement, as determined by adjudication by a court or similar tribunal, and which comes into the possession, custody or control of Seller (or its respective successors-in-interest, assigns or affiliates) shall within five (5) business days following receipt be transferred, assigned or conveyed by Seller (and its respective successors-in-interest, assigns and affiliates) to Purchaser at Purchaser's cost. Until such transfer, assignment and conveyance, Seller (and its respective successors-in-interest, assigns and affiliates) shall not have any right, title or interest in or obligation or responsibility with respect to such asset or liability except that Purchaser shall hold such asset in trust for the benefit of Purchaser. Seller (and its respective successors-in-interest, assigns and affiliates) shall have neither the right to offset amounts payable to Purchaser under this Section 9.1 against, nor the right to contest its obligation to transfer, assign and convey to Purchaser because of, outstanding claims, liabilities or obligations asserted by Purchaser against Purchaser, including, but not limited to, pursuant to the indemnification provisions of Section 10.2. If Seller does not remit the Assets to Purchaser in accordance with the first sentence of this Section 9.1, such Assets shall bear interest at the Prime Rate in effect on the calendar day upon which such payment was required to be made to Purchaser (the "**Transferred Asset Due Date**") plus Five percent (5%) (or the maximum rate allowed by law, whichever is less), such interest accruing on each calendar day after the Transferred Asset Due Date until payment of the Assets and all interest thereon is made to Purchaser. The terms of this Article IX shall not be subject to the time limitations contained in Section 10.1 of this Agreement. With respect to payment received by Purchaser on account of Transition Services, this Section 9.1 shall be subject to the provisions of Section 11.3. The terms of this Article IX shall not be subject to the time limitations contained in Section 10.1 of this Agreement.

- 67 -

**9.2     Preservation and Access to Records After the Closing.**

**9.2.1     Hospital Businesses' Records.** The term **"Hospital Businesses' Records"** shall mean all records created and/or maintained in connection with the operation of the Hospital Businesses for periods ending on or prior to the Closing Date which are of the types and categories listed in the current version of the **"Recommended Record Retention Schedule"** (**"CHA Retention Schedule"**) of the Records Retention Guide (**"CHA Guide"**) published by the California Healthcare Association, including without limitation all records, documents and other materials which are not confidential or subject to the attorney-client privilege, whether in the possession of Seller, Seller's accountants, Seller's attorneys or other professionals. The CHA Retention Schedule is set forth on Schedule 9.2.1. The term **"Transferred Records"** shall mean all Hospital Businesses' Records consisting of medical, clinical and other records directly or indirectly associated with the admission, care and treatment of patients, patient billing records, personnel records and other business records directly related to continued operations of the Hospital (but excluding the Retained Records) and all financial records of the Hospital Businesses and other financial and marketing information including, without limiting the generality of the foregoing, any such records, documents or other material whether or not privileged, except the attorney-client privilege, or confidential and whether in the possession of Seller or in the possession of its attorneys, accountants or other professionals, including the work papers of Seller's accountants. The term **"Retained Records"** shall mean the portion of the Hospital Businesses' Records consisting of Seller's minute book, tax returns and files related thereto and materials which are subject to privilege and which relate solely to the Excluded Assets.

Purchaser's application for employment described in Section 5.4.1 above shall include a request for the Hospital Businesses' Employees completing the application to affirmatively consent in writing to the release to Purchaser, within an indicated timeframe that all of such Hospital Businesses' Employees' personnel files and documents maintained by Seller. The form and content of the consent shall be approved in advance by Seller, which approval shall not be unreasonably withheld or delayed. Seller shall provide Purchaser with the employee personnel files and documents of all applying employees, including, but not limited to (a) Forms I-9 and supporting documentation, and (b) the contents of the personnel file, including disciplinary records and performance evaluations, for those Hospital Employees who consent to the release of such files and documents to Purchaser. Seller may provide Purchaser with true and correct copies of the foregoing documents, provided that Purchaser shall have the right to examine the originals of such documents. Purchaser shall promptly return to Seller all personnel files and documents of any Hospital Businesses' Employees who do not become Hired Employees, which returned files and documents shall not be Transferred Records. Any such files for Hospital Businesses' Employees who do become Hired Employees (and for whom the consents were obtained) shall be included within Transferred Records.

**9.2.2     Retention of Retained Records by Seller.** Seller shall retain the Retained Records until the expiration, for each type and category of record, of the recommended retention period set forth in the CHA Retention Schedule, as amended from time to time. Purchaser shall provide storage space for such records and shall provide personnel to retrieve such records in the any manner reasonably determined by Purchaser, at no cost to Seller. If at the expiration of any such period, any tax or Payor audit or judicial proceeding or any appeal therefrom is in process or the applicable statute of limitations has been extended, all or any portion of the Retained Records affected by such audit, proceeding or extension shall be retained until the audit is completed, a final

judgment is entered in such proceeding, or the relevant statute of limitations has expired, as the case may be (**"Retained Records Retention Period"**).

**9.2.3     Transfer and Retention of Transferred Records by Purchaser.** To the extent and in a manner permitted by Law, upon the Closing, Seller shall be deemed to have assigned and transferred to (or, if necessary, waived and released solely in favor of) Purchaser all Transferred Records and any privilege with respect thereto and shall be deemed to have consented to Purchaser's access to all such records, documents and materials. Purchaser agrees to comply with all applicable federal and state laws concerning privacy, including HIPAA, and shall use its best efforts to retain all applicable privileges. As set forth in Section 1.1.1(i), the Transferred Records are Assets. Purchaser shall retain the Transferred Records at the Hospitals (or at such other locations in Riverside County as Purchaser, in its sole discretion, shall determine from time to time) at Purchaser's cost, until the expiration, for each type and category of record, of the recommended retention period set forth in the CHA Retention Schedule, as amended from time to time. However, if at the expiration of any such period, any tax or Payor audit or judicial proceeding or any appeal therefrom is in process or the applicable statute of limitations has been extended, all or any portion of the Transferred Records affected by such audit, proceeding or extension shall be retained until the audit is completed, a final judgment is entered in such proceeding, or the relevant statute of limitations has expired, as the case may be (**"Transferred Records Retention Period"**).

**9.2.4     Access to Hospital Businesses' Records.** After the Closing each party shall grant to the other party access to the Hospital Businesses' Records in its possession for any lawful purpose approved of by the party in possession of such records, which approval shall not be unreasonably withheld, delayed or conditioned; provided that neither party shall have access to any Hospital Businesses' Records, the disclosure of which would be prohibited by any Law, accreditation standards, or rule or agreement (express or implied) of confidentiality. Notwithstanding the foregoing to the contrary, Seller, its agents and representatives shall have access to any Hospital Businesses' Records pertaining solely to the Excluded Assets that are in the possession of Purchaser except to the extent such access is prohibited by Law. Any Hospital Businesses' Records delivered to or made available to either party or its representatives shall be treated as strictly confidential and shall not be directly or indirectly divulged, disclosed or communicated to any other Person other than Seller or Purchaser, as the case may be, or its representatives who are reasonably required to have access to such information (unless Seller or Purchaser is compelled to disclose the same by judicial or administrative process), shall be returned to Purchaser or Seller, as the case may be, when such use therefor has terminated and shall not be used to the detriment of Purchaser or Seller, as the case may be. Each party shall instruct its appropriate employees to cooperate in providing access to such records to the other party and its authorized representatives as contemplated in this Agreement. Access to such records shall be, whenever reasonably possible, during normal business hours and with reasonable prior written notice of the time when such access shall be needed. Each party's employees, representatives and agents shall conduct themselves in such a manner so that the normal business activities of the other party shall not be unduly or unnecessarily disrupted.

**9.2.5     Joint Commission.** Purchaser shall cooperate with Seller, on a timely basis and as reasonably requested by Seller, in connection with the provision of all data of the Hospital Businesses and other information required by Seller for reporting to The Joint Commission for the remainder of the applicable period in which the Closing has occurred.

- 68 -

- 69 -

1070039.2

F:\Bond\PHH\FINAL ASA 10.12.09.DOC

9.3    **Provision of Benefits of Certain Contracts; Defense of Related Claims.**

9.3.1    **Inability to Obtain Consents.** If, as of the Effective Time, Seller is unable to obtain any consent to the assignment of Seller's interest in an Assumed Contract, or under any other consent needed to assign any other intangible right, notwithstanding any term in this Agreement to the contrary or if the Bankruptcy Court fails to approve such assignment, such Assumed Contract shall not be assigned to Purchaser until such consent is obtained or a new contract is obtained by Purchaser prior to or following the Closing, Seller and Purchaser shall use Reasonable Commercial Efforts to cooperate with each other in efforts to obtain any such consent (including any releases of Seller, as contemplated pursuant to Section 5.8) or new contract prior to or following the Closing. Seller also agrees to use its Reasonable Commercial Efforts to provide Purchaser the benefits of any such Assumed Contract, or other intangible interests transferred to Purchaser as part of the Assets, cooperate in any reasonable and lawful arrangement designed to provide such benefits to Purchaser, and allow Purchaser to directly enforce such Assumed Contract against the applicable third parties thereto. If Seller agrees to use Reasonable Commercial Efforts to perform, on behalf of Seller, the obligations of Seller under such Assumed Contract, or other transferred intangible interests, to the extent that Purchaser obtains all of the benefits thereunder, but only to the extent that such action would not result in a material default thereunder or in connection. Notwithstanding anything to the contrary herein, Seller shall not be liable for the failure to obtain any consents unrelated to the Assumed Contracts and Purchaser agrees to indemnify, defend and hold Seller harmless with respect to such Assumed Contracts.

9.3.1    **Defense of Certain Claims.** If, in connection with any proposed Contract assumed by Purchaser, the other party (other than Seller) challenges the proposed assumption of such Contract ("**Assumption Challenge(s)**"), Seller shall not be obligated to litigate such challenges, in order to transfer such Contract, unless Purchaser agrees to cover Seller's reasonable legal fees and costs in connection with such Assumption Challenge; provided that if Purchaser elects to cover such legal fees and costs, it will be given the opportunity to participate in any negotiations or litigation related to the Assumption Challenge, and Seller shall meet, confer and take counsel from Purchaser with respect to the handling and resolution of such litigation. In such event, Purchaser shall defend, indemnify and hold Seller harmless of and from any fees, costs, expenses and other liability with respect to such litigation related to an Assumption Challenge ("**Assumption Litigation**"), including any settlement or judgment therein. If Purchaser elects to control the Assumption Litigation, then Purchaser will have full control of such defense and proceedings, including any compromise or settlement thereof. Seller may, at its sole cost and expense, participate in, but not control, any defense or settlement of any Assumption Litigation controlled by the Purchaser pursuant to this Section to the extent such participation is not prejudicial, in the reasonable judgment of the Purchaser, to the Purchaser or the possible outcome of the Assumption Litigation. If requested by Purchaser, Seller agrees to fully cooperate with the Purchaser and its counsel in contesting any Assumption Litigation, or, if requested and related to the Assumption Litigation. Seller agrees that it shall not take any such action that is prejudicial to Purchaser or its defense against the Assumption Litigation.

9.4    **Closing of Financials.** Purchaser shall complete the standardized closing of Seller's financial records through the Closing Date including, without limitation, the closing of general ledger account reconciliations (collectively, the "**Closing of Financials**"). Purchaser shall use its good faith efforts to complete the Closing of Financials by no later than the date which is sixty (60) days after the Closing Date. Purchaser shall reasonably make available to Seller those employees of

---

Purchaser who may be necessary to complete the Closing of Financials, at no cost to Seller. Seller shall hold Purchaser harmless for any errors which are made by Seller during the course of the Closing of Financials, provided that such errors are not the result of gross negligence, fraud or intentional misconduct. In addition, Purchaser shall afford to the agents of Seller (which shall include accountants) reasonable access during normal business hours to and the right to inspect the books and records of the Hospital Businesses to verify the Closing of Financials. Seller's right of access and inspection shall be exercised in such a manner as not to interfere unreasonably with the operations of the Hospital Businesses.

9.5    **Employee Transition.** Purchaser acknowledges that Seller will, on the Closing Date, provide each of the Hospital Businesses' Employees a payroll check (with respect to all wages, salaries and Accrued Paid Time Off) covering all pay periods through the Closing Date, which check will include an amount based upon an estimate of time worked through the Closing Date (the "**Estimated Payment Amount**"), together with a payment of all other amounts required to be paid to a terminated employee or may be required by Law (including but not limited to the Accrued Paid Time Off-Amount). Within five (5) business days after the Closing Date, Seller shall deliver to Purchaser a statement setting forth, in reasonable detail, the Estimated Payment Amount for each of the Hospital Businesses' Employees. No later than the date of the next immediately following payroll for the Hired Employees which occurs after Purchaser's receipt of such statement, Purchaser shall include in the payroll check for each of the Hospital Businesses' Employees who are among the Hired Employees an amount of pay, if any, based on the actual time worked by each such employee during the applicable payroll cycle ending on the Closing Date, less the Estimated Payment Amount which Seller made to each such employee on the Closing Date (the "**Employee Settle-Up Payments**"). Seller shall reimburse Purchaser the amount of the Employee Settle-Up Payments no later than the date which is thirty (30) days after Purchaser provides a written statement to Seller which details (and evidences the payment of) the Employee Settle-Up Payments.

9.6    **Medicare Bad Debts.**

9.6.1    With respect to any service provided at the Hospital Businesses as to which Purchaser elects to take assignment of Seller's provider number, Seller shall be entitled to receive Medicare bad debt reimbursement associated with services furnished prior to the Effective Time ("**Seller's Bad Debts**"). Seller shall have the right, in its sole discretion, to require that Purchaser submit a claim for reimbursement to the Centers for Medicare & Medicaid Services ("**CMS**") for a Seller's Bad Debt on Purchaser's cost report(s) for the period in which such Seller's Bad Debt becomes uncollectible by Seller.

9.6.2    If Seller requests that Purchaser submit one or more Seller's Bad Debt claims to CMS, as contemplated by this Section 9.6, Seller shall provide to Purchaser a list of the Seller's Bad Debts to be claimed with a certification reasonably acceptable to Purchaser and Seller.

9.6.3    Purchaser shall remit to Seller the full amount of reimbursement received by Purchaser for Seller's Bad Debts within ten (10) business days of receipt of payment pursuant to an initial or a revised Notice of Program Reimbursement in which Seller's Bad Debts have been paid.

9.7    **Covenant Not to Compete.** For the twenty (20) year period commencing on the Effective Time, Seller hereby covenants and agrees as follows:

**9.7.1** Except as the parties shall otherwise mutually agree, neither Seller nor any Affiliate of Seller (nor any assignee or successor thereto other than Purchaser) shall own, manage or operate, directly or indirectly, any business, or own, directly or indirectly, any interest in any Person (whether or not such Person is a governmental agency or a not-for-profit organization), which engages in the development, ownership, operation or management of any health care provider for which a technical or facility fee is or could be paid (including, without limiting the generality of the foregoing, (i) general or acute care hospitals or specialty hospitals (ii) skilled nursing facilities or (iii) surgical centers and diagnostic imaging centers) in the territories specified in Section 9.7.3 below (all such entities other than the parties hereto are hereinafter collectively referred to as "**Competitors**" and all such health care providers are hereinafter collectively referred to as "**Healthcare Providers**"). Notwithstanding the preceding, however, Seller shall have the right to continue to provide healthcare outreach, education, non-profit clinics or similar community health support activities which do not involve services which are provided by Healthcare Providers.

**9.7.2** Neither Seller nor any Affiliate (nor any assignee or successor thereto) shall directly or indirectly (i) lend credit or money, other assets or the services of its employees or agents or disclose any information concerning the Hospital Businesses and the Assets pertaining to any period of time on or prior to the Closing for the purposes of assisting another to establish, operate or manage any Competitor or Healthcare Provider including, without limitation, providing physician staffing or management or consulting services for any Competitor or Healthcare Provider, except for those existing educational and research affiliations and institutional working arrangements (and the physician cancer services (by types of cancers being treated) associated therewith) set forth on Schedule 9.7.2 or with an Affiliate of Purchaser, or (ii) on behalf of itself or any Competitor or Healthcare Provider request or advise any present or future referring or admitting physician or supplier of the Hospital Businesses to withdraw, curtail or cancel treatment or business with the Hospital Businesses (except for medical reasons).

**9.7.3** The covenants of Seller under this Section 9.7 shall be limited to cover competition within areas within a thirty (30) mile radius of each of the Hospitals. Anything to the contrary in this Section 9.7 notwithstanding, the following shall not constitute a violation of this Section 9.7: The ownership of not more than 1% of the capital stock of any corporation whose common stock is listed on an established domestic securities market.

**9.7.4** Seller acknowledges and agrees that its covenants set forth in this Section 9.7 form part of the consideration under this Agreement and are among the inducements for Purchaser entering into and consummating this Agreement, that the provisions of this Section 9.7 are necessary to protect the interests of Purchaser and the continued goodwill of the business and operations of the Hospital Businesses, an interest in which the Purchaser is hereby acquiring, that the restrictive covenants set forth in this Agreement are reasonable in scope and duration and that the provisions of this Section 9.7 are for the benefit of, and may be enforced by, Purchaser and its Affiliates and their successors and assigns.

**9.7.5** Seller hereby agrees that a material breach of the covenants contained in this Section 9.7 will result in irreparable harm and damages to Purchaser which cannot be adequately compensated for by a monetary award and that in addition to all other remedies available in law or in equity Purchaser and its Affiliates and their successors and assigns shall be entitled to the remedy of a temporary restraining order, preliminary injunction or such other form or injunctive or equitable relief as may be issued by a court of competent jurisdiction to restrain or enjoin Seller and any

Affiliates of Seller from breaching the provisions of this Section 9.7, or otherwise to specifically enforce the provisions of this Section 9.7.

**9.7.6** Seller agrees that if any restriction contained in this Section 9.7 is held by any court of competent jurisdiction to be unenforceable or unreasonable, a lesser restriction as determined by such court to be enforceable shall be severable therefrom and enforced in its place, and the remaining restrictions contained in this Agreement shall be enforceable independently of each other. If a court or other tribunal determines that the character, duration or geographical scope of such provisions is unreasonable, then it is the intention and the agreement of the parties that such provisions will be construed (and reformed) in such a manner as to impose only those restrictions on the conduct of a Party that are reasonable in light of the circumstances as they then exist and are as necessary to assure the Purchaser of the intended benefit of this Agreement. The court or tribunal will be authorized to reform the provisions of this section to the extent necessary to eliminate or modify any provisions to the extent it determines them to be unreasonable or unenforceable.

## ARTICLE X
## SURVIVAL AND INDEMNIFICATION

**10.1 Survival.** Except as expressly set forth in this Agreement to the contrary, all representations, warranties, covenants, agreements and indemnifications of Purchaser and Seller, respectively, contained in this Agreement or in any document delivered pursuant hereto shall be deemed to be material and to have been relied upon by Purchaser and Seller, respectively, and such representations, warranties and covenants shall continue to be fully effective and enforceable following the Closing Date for one (1) year and shall not be merged into the documents evidencing the transactions contemplated by this Agreement and the Related Agreements. The foregoing notwithstanding, the following sections and articles shall continue to be fully effective and enforceable following the Closing Date without any time limitation unless otherwise expressly provided in this Agreement or provided under applicable statutes of limitation: (a) the representations contained in Section 2.1 (Seller's authority), Section 2.6.2 (Environmental), Section 2.7 (Title to Personal Property), Section 2.15 (Taxes), Section 3.1 (Purchaser's authority), Section 3.6 (As-Is) and Section 3.8 (Chapter 9 Proceeding); (b) the terms of Sections 4.12, 4.15, 5.4, 5.5, 5.7, 5.9, 5.14, 5.16 and Article IX (post-closing matters, subject to own stated terms of survival, if any) and Article XII (miscellaneous) and Section 11.2 (cost report matters); and (c) the indemnifications contained in Sections 1.3.6, 1.9.7, 1.10.2, 4.12.2, 4.12.3, 5.2.3, 5.9, 5.16, 10.2, l(c), (d), (e), and (f), and 10.3.l(c), (d), (e), (f), and (l) and any indemnification claims contained elsewhere in this Agreement. Furthermore, notwithstanding the preceding or any other term in this Agreement to the contrary, the Parties acknowledge and agree that the post-closing commitments set forth in Sections 5.9 and 5.14, and all subsections there of, shall expire based upon the terms stated therein. However, if there is an outstanding notice of a claim at the end of such period in compliance with the terms of Section 10.4, such applicable period shall not end in respect of such claim until such claim is resolved. All statements contained in any certificate or other instrument delivered pursuant hereto by or on behalf of Seller, or by or on behalf of Purchaser, shall be deemed to be representations and warranties made pursuant to this Agreement by the delivering party.

**10.2 Indemnification of Purchaser by Seller.**

**10.2.1 Indemnification.** Seller shall keep and save Purchaser, and its directors, officers, employees, agents, partners, members and other representatives, forever harmless from and

shall indemnify and defend Purchaser against any and all obligations, judgments, liabilities, penalties, violations, fees, fines, claims, losses, costs, demands, damages, liens, encumbrances and expenses including reasonable attorneys' fees (collectively, **"Damages"**), to the extent connected with or arising or resulting from: (a) any material breach of any representation or warranty of Seller under this Agreement; (b) any material breach or default by Seller of any covenant or agreement of Seller under this Agreement; (c) the Excluded Liabilities; (d) the Excluded Assets; (e) all federal, state and local Taxes relating to Seller (**"Seller Tax Claims"**); (f) any professional liability claim arising out of the business operations of the Hospital Businesses prior to the Effective Time, (b) any and all reasonable costs, expenses, and other damages incurred in enforcing Purchaser's right to indemnification under this Agreement, and (g) any other matter in which indemnification by Seller is specifically provided in this Agreement or a Related Agreement. Seller's obligations under this Section 10.2.1 shall remain subject to, and shall be limited by, the provisions contained in Section 10.2.2. No provision in this Agreement shall prevent Seller from pursuing any of its legal or equitable rights or remedies that may be granted to Seller by law or in equity against any person or legal entity other than Purchaser.

10.2.2 **Limitations of Seller's Liability.** Notwithstanding Section 10.2.1 or any other provision under this Agreement, Seller's indemnification obligations in accordance with Section 10.2.1 are limited as follows:

(a) Seller shall have no liability under Section 10.2.1 and no claim under Section 10.2.1 shall be made unless notice thereof shall have been given by or on behalf of Purchaser to Seller in the manner provided in Section 10.4, unless failure to provide such notice in a timely manner does not materially impair Seller's ability to defend its rights, mitigate damages, seek indemnification from a third party or otherwise protect its interests.

(b) Seller shall not be required to indemnify Purchaser from and against any losses under Section 10.2.1(a) above unless and until the amount of all such losses equals (or is reasonably expected to equal or exceed) Fifty Thousand and 00/100 Dollars ($50,000.00) in the aggregate (the **"Threshold Amount"**) and shall only be obligated to indemnify with respect to amounts that exceed the Threshold Amount.

(c) Seller shall have no liability under Section 10.2.1 and no claim under Section 10.2.1 shall be made (i) to the extent of any tax savings realized by Purchaser with respect thereto, (ii) for any losses to the extent of any proceeds received by Purchaser under an insurance policy covering such loss, or (iii) to the extent that Seller can prove that Purchaser had full knowledge, prior to Closing, of the issues giving rise to an indemnification claim under Section 10.2.1(a).

10.2.3 **Claims Against Third Parties.** If Purchaser is entitled to recover any sum (whether by payment, discount, credit or otherwise) from any third party in respect of any matter for which a claim of indemnity could be made against Seller under this Agreement, Purchaser shall use its Reasonable Commercial Efforts to recover such sum from such third party and any sum so recovered will reduce the amount of the claim. If Seller pays to Purchaser an amount in respect of a claim, and Purchaser subsequently recovers from a third party a sum which is referable to that claim, Purchaser shall forthwith repay to Seller so much of the amount paid by it as does not exceed the sum recovered from the third party less all reasonable costs, charges and expenses incurred by

Purchaser in obtaining payment in respect of that claim and in recovering that sum from the third party.

10.3 **Indemnification of Seller by Purchaser.**

10.3.1 **Indemnification.** Purchaser shall keep and save Seller, and Seller's respective directors, officers, employees, agents and other representatives, forever harmless from and shall indemnify and defend Seller and Seller's Affiliates against any and all Damages, to the extent connected with or arising or resulting from: (a) any breach of any representation or warranty of Purchaser under this Agreement; (b) any breach or default by Purchaser under any covenant or agreement of Purchaser under this Agreement; (c) cost reports (and all claims with respect thereto) relating to Purchaser or to the Hospital Businesses with respect to Medicare, Medicaid, or any other third-party payor for all periods beginning on and after the Effective Time; (d) the Assumed Obligations, including any liabilities related to Assumed Other Liabilities, (e) any professional liability claim arising out of the business operations of the Hospital Businesses on and after the Effective Time; (f) any act, conduct or omission of Purchaser that has accrued, arisen, occurred or come into existence at any time; (g) any other matter in which indemnification by Purchaser is specifically provided in this Agreement or a Related Agreement; (h) any securities or lender litigation involving (1) Purchaser and/or (2) any financing obtained by Purchaser which is utilized to fund, in whole or in part, the Deposit, other than to the extent arising out of any willful misconduct of Seller or its employees, or intentionally false or intentionally misleading statements of Seller or its employees, or (i) any and all reasonable costs, expenses, and other damages incurred in enforcing Seller's right to indemnification under this Agreement or the Related Agreements. No provision in this Agreement shall prevent Purchaser from pursuing any of its legal or equitable rights or remedies that may be granted to Purchaser by law or in equity against any person or legal entity other than Seller or any Affiliate of Seller.

10.3.2 **Limitations of Purchaser's Liability.** Notwithstanding Section 10.3.1 or any other provision under this Agreement, Purchaser's indemnification obligations in accordance with Section 10.3.1 are limited as follows:

(a) Purchaser shall have no liability under Section 10.3.1 and no claim under Section 10.3.1 shall be made unless notice thereof shall have been given by or on behalf of Seller to Purchaser in the manner provided in Section 10.4, unless failure to provide such notice in a timely manner does not materially impair Seller's ability to defend its rights, mitigate damages, seek indemnification from a third party or otherwise protect its interests.

(b) Purchaser shall not be required to indemnify Seller from and against any losses under Section 10.3.1 above (except as it relates to Sections 3.6 and 3.11) unless and until the amount of such losses equals (or is reasonably expected to equal or exceed) the Threshold Amount and shall only be obligated to indemnify Seller with respect to amounts which exceed the Threshold Amount.

(c) Purchaser shall have no liability under Section 10.3.1 and no claim under Section 10.3.1 shall be made (i) to the extent of any tax savings realized by Seller with respect thereto, (ii) for any losses to the extent of any proceeds received by Seller under an insurance policy covering such loss, or (iii) to the extent that Purchaser can prove that Seller had full knowledge, prior to the Closing, of the issues giving rise to an indemnification claim under Section 10.3.1(a).

**10.3.3    Claims Against Third Parties.**  If Seller is entitled to recover any sum (whether by payment, discount, credit or otherwise) from any third party in respect of any matter for which a claim of indemnity could be made against Purchaser under this Agreement, Seller shall use its Reasonable Commercial Efforts to recover such sum from such third party and any sum recovered will reduce the amount of the claim.  If Purchaser pays to Seller an amount in respect of a claim, and Seller subsequently recovers from a third party a sum which is referable to that claim, Seller shall forthwith repay to Purchaser so much of the amount paid by it as does not exceed the sum recovered from the third party less all reasonable costs, charges and expenses incurred by Seller in obtaining payment in respect of that claim and in recovering that sum from the third party.

**10.4    Method of Asserting Claims.**  All claims for indemnification by any person entitled to indemnification (the "**Indemnified Party**") under this Article X will be asserted and resolved as follows:

**10.4.1    Third Party Claims.**  In the event any claim or demand, for which a party hereto (an "**Indemnifying Party**") would be liable for the Damages to an Indemnified Party, is asserted against or sought to be collected from such Indemnified Party by a person other than Seller, Purchaser or their affiliates (a "**Third Party Claim**"), the Indemnified Party shall deliver a notice of its claim (a "**Claim Notice**") to the Indemnifying Party within thirty (30) calendar days after the Indemnified Party receives notice of such Third Party Claim; provided, that notice shall be provided to the Indemnifying Party within fifteen (15) calendar days after receipt of a complaint, petition or institution of other formal legal action by the Indemnified Party.  The Indemnified Party shall provide the Indemnifying Party with a copy of such claim and other documents received from third parties (or if such claim is not based on a claim from a Third Party, otherwise make available to the Indemnifying Party all relevant information material to the defense of such claim and within the Indemnified Party's possession.  If the Indemnified Party fails to provide the Claim Notice within such applicable time period after the Indemnified Party receives written notice of such Third Party Claim, and thereby materially impairs the Indemnifying Party's ability to protect its interests, the Indemnifying Party will not be obligated to indemnify the Indemnified Party with respect to such Third Party Claim.  The Indemnifying Party will notify the Indemnified Party within thirty (30) calendar days after receipt of the Claim Notice (the "**Notice Period**") whether the Indemnifying Party desires, at the sole cost and expense of the Indemnifying Party, to defend the Indemnified Party against such Third Party Claim.

(a)    **Indemnifying Party Control.**  If the Indemnifying Party notifies the Indemnified Party within the Notice Period that the Indemnifying Party desires to defend the Indemnified Party with respect to the Third Party Claim pursuant to this Section 10.4.1(a), then the Indemnifying Party will have the right to defend, at its sole cost and expense, such Third Party Claim by all appropriate proceedings, which proceedings will be prosecuted by the Indemnifying Party to a final conclusion or will be settled at the discretion of the Indemnifying Party.  The Indemnifying Party will have full control of such defense and proceedings, including any compromise or settlement thereof; provided, however, that the Indemnified Party may, at its sole cost and expense, file during the Notice Period any motion, answer or other pleadings that the Indemnified Party may deem necessary or appropriate to protect its interests or those of the Indemnifying Party and which is not prejudicial, in the reasonable judgment of the Indemnifying Party, to the Indemnifying Party.  Except as provided in Section 10.4.1(b) of this Agreement, if an Indemnified Party takes any such action that is prejudicial and causes a final adjudication that is

adverse to the Indemnifying Party, the Indemnifying Party will be relieved of its obligations under this Agreement with respect to the portion of such Third Party Claim prejudiced by the Indemnified Party's action.  If requested by the Indemnifying Party, the Indemnified Party agrees, at the sole cost and expense of the Indemnifying Party, to cooperate with the Indemnifying Party and its counsel in contesting any Third Party Claim that the Indemnifying Party elects to contest, or, if appropriate and related to the Third Party Claim in question, in making any counterclaim against the person asserting the Third Party Claim, or any cross-complaint against any person (other than the Indemnified Party) or any of its affiliates).  The Indemnified Party may participate in, but not control, any defense or settlement of any Third Party Claim controlled by the Indemnifying Party pursuant to this Section 10.4.1(a), and except as specifically provided in this Section 10.4.1(a), the Indemnified Party will bear its own costs and expenses with respect to such participation.

(b)    **Indemnified Party Control.**  If the Indemnifying Party fails to notify the Indemnified Party within the Notice Period that the Indemnifying Party desires to defend the Indemnified Party pursuant to this Section 10.4.1, or if the Indemnifying Party gives such notice but fails to prosecute diligently or settle the Third Party Claim, or if the Indemnifying Party fails to give any notice whatsoever within the Notice Period, then the Indemnified Party will have the right to defend, at the sole cost and expense of the Indemnifying Party, the Third Party Claim by all appropriate proceedings, which proceedings will be promptly and reasonably prosecuted by the Indemnified Party to a final conclusion or will be settled at the discretion of the Indemnified Party.  The Indemnified Party will have full control of such defense and proceedings, including any compromise or settlement thereof; provided, however, that if required by the Indemnified Party, the Indemnifying Party agrees, at the sole cost and expense of the Indemnifying Party, to cooperate with the Indemnified Party and its counsel in contesting any Third Party Claim which the Indemnified Party is contesting, or, if appropriate and related to the Third Party Claim in question, in making any counterclaim against the person asserting the Third Party Claim, or any cross-complaint against any person (other than the Indemnifying Party or any of its affiliates).  Notwithstanding the foregoing provisions of this Section 10.4.1(b), if the Indemnifying Party has notified the Indemnified Party with reasonable promptness that the Indemnifying Party disputes its liability to the Indemnified Party with respect to such Third Party Claim and if such dispute is resolved in favor of the Indemnifying Party, the Indemnifying Party will not be required to bear the costs and expenses of the Indemnified Party's defense pursuant to this Section 10.4.1(b) or of the Indemnifying Party's participation therein at the Indemnified Party's request, and the Indemnified Party will reimburse the Indemnifying Party in full for all reasonable costs and expenses incurred by the Indemnifying Party in connection with such litigation.  Subject to the above terms of this Section 10.4.1(b), the Indemnifying Party may participate in, but not control, any defense or settlement controlled by the Indemnified Party pursuant to this Section 10.4.1(b), and the Indemnifying Party will bear its own costs and expenses with respect to such participation.  The Indemnified Party shall give sufficient prior notice to the Indemnifying Party of the initiation of any discussions relating to the settlement of a Third Party Claim to allow the Indemnifying Party to participate therein.

(c)    **Settlements.**  Where the Indemnifying Party has assumed control of the defense as provided above, the Indemnifying Party shall have the right to settle or compromise any such claim in its sole and absolute discretion and without consultation with the Indemnified Party so long as such settlement or compromise does not impose any obligations on the Indemnified Party (except with respect to providing releases of the third party and receiving a release from the third party).  The Indemnified Party shall not settle or compromise the claim without satisfying one of the following conditions (otherwise the Indemnifying Party shall be released from all

1070039.2

1070039.2

F:\Book\PHH\FINAL.ASA 10.12.99.DOC

F:\Book\PHH\FINAL.ASA 10.12.99.DOC

indemnification obligations under this Agreement to the Indemnified Party with respect to such claim): (a) the Indemnified Party shall first obtain the written consent of the Indemnifying Party, or (b) the Indemnifying Party shall have failed, after written notice to it of such suit, to take action to defend the same within the 15-day period described above.

**10.4.2 Non-Third Party Claims.** In the event any Indemnified Party should have a claim against any Indemnifying Party under this Agreement that either (i) does not involve a Third Party Claim being asserted against or sought to be collected from the Indemnified Party or (ii) is a Seller Tax Claim, the Indemnified Party shall deliver an Indemnity Notice (as hereinafter defined) to the Indemnifying Party. (The term **"Indemnity Notice"** shall mean written notification of a claim for indemnity under Article X of this Agreement (which claim does not involve a Third Party Claim or is a Seller Tax Claim) by an Indemnified Party to an Indemnifying Party pursuant to this Section 10.4, specifying the nature of and specific basis for such claim and the amount or the estimated amount of such claim.) The failure by any Indemnified Party to give the Indemnity Notice shall not impair such party's rights under this Agreement except to the extent that an Indemnifying Party demonstrates that it has been prejudiced thereby.

**10.4.3 Deemed Liability.** If the Indemnifying Party does not notify the Indemnified Party within sixty (60) calendar days following its receipt of a Claim Notice or an Indemnity Notice that the Indemnifying Party disputes its liability to the Indemnified Party under this Agreement, such claim specified by the Indemnified Party will be conclusively deemed a liability of the Indemnifying Party under this Agreement and the Indemnifying Party shall pay the amount of such liability to the Indemnified Party on demand, or on such later date (i) in the case of a Third Party Claim, as the Indemnified Party suffers the Damages in respect of such Third Party Claim, (ii) in the case of an Indemnity Notice in which the amount of the claim is estimated, when the amount of such claim becomes finally determined or (iii) in the case of a Seller Tax Claim, within fifteen (15) calendar days following final determination of the item giving rise to the claim for indemnity. If the Indemnifying Party has timely disputed its liability with respect to such claim, as provided above, the Indemnifying Party and the Indemnified Party agree to proceed in good faith to negotiate a resolution of such dispute, and if not resolved through negotiations, such dispute will be resolved by adjudication by a court or similar tribunal.

**10.4.4 Access.** The Indemnified Party agrees to give the Indemnifying Party reasonable access to the books and records and employees of the Indemnified Party in connection with the matters for which indemnification is sought under this Agreement, to the extent the Indemnifying Party reasonably deems necessary in connection with its rights and obligations under this Agreement.

**10.4.5 Assistance.** The Indemnified Party shall assist and cooperate with the Indemnifying Party in the conduct of litigation, the making of settlements and the enforcement of any right of contribution to which the Indemnified Party may be entitled from any person or entity in connection with the subject matter of any litigation subject to indemnification under this Agreement. In addition, the Indemnified Party shall, upon request by the Indemnifying Party or counsel selected by the Indemnifying Party (without payment of any fees or expenses to the Indemnified Party or an employee thereof), attend hearings and trials, assist in the securing and giving of evidence, assist in obtaining the presence or cooperation of witnesses, and make available its own personnel; and shall do whatever else is reasonably necessary and appropriate in connection with such litigation. The Indemnified Party shall not make any demand upon the Indemnifying Party or counsel for the

Indemnifying Party in connection with any litigation subject to indemnification under this Agreement, except a general demand for indemnification as provided under this Agreement. If the Indemnified Party shall fail to perform such obligations as Indemnified Party under this Agreement or to cooperate with the Indemnifying Party in Indemnifying Party's defense of any suit or proceeding, such cooperation to include, without limitation, attendance at all depositions and the provision of all documents relevant to the defense of any claim, then, except where such failure does not have a Material Adverse Effect on the Indemnifying Party's defense of such claims, the Indemnifying Party shall be released from all of its obligations under this Agreement with respect to that suit or proceeding and any other claims which had been raised in such suit or proceeding.

**10.5 Exclusive.** Other than claims for fraud or equitable relief (which equitable relief claims are nevertheless subject to Section 10.1), any claim arising under this Agreement or in connection with or as a result of the transactions contemplated by this Agreement or any Damages or injury alleged to be suffered by any party as a result of the actions or failure to act by any other party shall, unless otherwise specifically stated in this Agreement, be governed solely and exclusively by the provisions of this Article X. If Seller and Purchaser cannot resolve such claim by mutual written agreement, such claim shall be determined in accordance with Section 12.18.

ARTICLE XI
TAX AND COST REPORT MATTERS

**11.1 Tax Matters; Allocation of PEPC.**

**11.1.1 Tax Matters.** After the Closing Date, the parties shall cooperate fully with each other and shall make available to each other, as reasonably requested, all information, records or documents relating to tax allocation and reporting. The Parties shall also make available to each other as reasonably required, and at the reasonable cost of the requesting party (for out-of-pocket costs and expenses only), personnel responsible for preparing or maintaining information, records and documents in connection with tax matters.

**11.1.2 Allocation of PEPC.** Purchaser will prepare the schedule allocating the PEPC among each category of Assets. To the extent that such allocation by Purchaser in consistent with applicable Laws, the Parties agree to be bound by all such reasonable allocations by Purchaser to account for and report the purchase and sale of the Assets contemplated hereby for federal and state tax purposes in accordance with such allocations, and not to take a position in tax returns, tax audits, or other tax proceedings, which is inconsistent with such allocations without the prior written consent of the other parties.

**11.2 Cost Report Matters.**

**11.2.1 Final Cost Reports.** Seller shall prepare and timely file all cost reports relating to the periods ending prior to the Effective Time or required as a result of the consummation of the transactions described in this Agreement, including, without limitation, those relating to Medicare, Medicaid, Blue Cross and other third party payors which settle on a cost report basis (the **"Seller Cost Reports"**). It is understood that, while pursuant to applicable Laws, Seller shall remain responsible for all such payments and may not assign to Purchaser any such receivable Purchaser is acquiring, all of Seller's other Accounts Receivable and assuming, as Assumed Obligations, all of Seller's obligations, and that Purchaser shall reimburse Seller all amounts which may be due and shall be entitled to the benefit of all amounts received by Seller, and shall

immediately remit to Purchaser any amounts received, and shall pursuant to Section 4.12.2 of this Agreement. Accordingly, Purchaser shall make available to Seller such of the Hired Employees as may be necessary in order to provide accounting and other services necessary to complete such Seller Cost Reports, at no cost to Seller. Purchaser shall also engage such outside consultants as may be necessary to properly deal with reviews and audits by such payors with respect to such Seller Cost Reports, consistent with prior practice of Seller, at no cost to Seller. Purchaser shall forward to Seller any and all correspondence relating to the Accounts Receivable, the Seller Cost Reports or rights to settlements and retroactive adjustments on the Seller Cost Reports ("**Agency Settlements**") within five (5) business days of receipt by Purchaser. Purchaser shall not reply to any such correspondence without Seller's written approval, which shall not be unreasonably withheld. Seller shall remit to Purchaser all amounts received with respect to periods prior to the Closing Date, and Purchaser shall remit to Seller all amounts required to be paid with respect to periods prior to the Closing Date, as provided in Section 4.12.2 of this Agreement.

11.2.2 **Right to Funds.** Seller shall retain all rights to the Seller Cost Reports and to the Accounts Receivable including, without limitation, any payables resulting therefrom or receivables relating thereto and the right to appeal any Medicare determinations relating to the Agency Settlements and the Seller Cost Reports. Seller will furnish copies of the Receivables Records to Purchaser upon request and allow Purchaser and its representatives reasonable access to such documents.

11.2.3 **Cooperation.** Upon reasonable notice and during normal business office hours, Purchaser will cooperate with Seller in regard to the preparation, filing, handling, and appeals of the Seller Cost Reports. Upon reasonable notice and during normal business office hours, Purchaser will cooperate with Seller in connection with any cost report disputes and/or other claim adjudication matters relating to governmental program reimbursement. Such cooperation shall include, at no cost to Seller, obtaining files at the Hospital Businesses and Purchaser's provision to Seller of data and statistics, including, without limitation, the items set forth on Schedule 11.2.3, and the coordination with Seller pursuant to reasonable notice of Medicare and Medicaid exit conferences or meetings.

11.3 **Tax and Medicare Effect.** Except as otherwise provided in this Agreement, neither party (nor such party's counsel or accountant) has made or is making any representations to the other party (nor such party's counsel or accountant) concerning any of the Tax or Medicare effects arising by reason of the transactions provided for in this Agreement or any Related Agreement, as each party has obtained independent professional advice with respect thereto and party upon which it has solely relied. Except as otherwise provided in this Agreement, no party shall be liable or in any way responsible to any other party because of any Tax or Medicare effect resulting from the transactions provided for in this Agreement or any Related Agreement, and each party shall be responsible for the payment of any Tax or Medicare related charge or payment for which it becomes liable by reason of the consummation of the transactions provided for in this Agreement and any Related Agreement.

11.4 **[intentionally omitted]**

11.5 **Misdirected Payments, etc.** Within thirty (30) days of receipt, Seller shall remit to Purchaser any monies received by the Seller constituting or in respect of the Assets and Assumed Obligations. Within thirty (30) days of receipt, Purchaser shall remit to Seller any monies received by Purchaser constituting or in respect of the Excluded Assets and Excluded Liabilities, provided,

- 80 -

however, (i) Purchaser shall only be obligated to remit such monies twice per calendar month during the first ninety days after the Closing Date and only once per calendar month thereafter, and (ii) for any time period while the Lease and Management Agreement is in effect, the obligation to remit such monies received by Purchaser shall be governed by the terms and provisions of the Lease and Management Agreement. If Purchaser suffers any deduction to or offset against amounts due Purchaser of funds previously paid or credited to Seller or the Hospital Businesses in respect of Excluded Liabilities, Seller shall immediately pay to Purchaser the amounts so billed or offset upon demand from Purchaser.

ARTICLE XII
MISCELLANEOUS PROVISIONS

12.1 **Further Assurances and Cooperation.** Each Party shall execute, acknowledge and deliver to the other any and all other assignments, consents, approvals, conveyances, assurances, documents and instruments reasonably requested by the other and shall take any and all other actions reasonably requested by the other for the purpose of consummating the Transaction or more effectively assigning, transferring, granting, conveying and confirming the transfer of Assets to the Purchaser of effecting or preserving any right of a Party. After consummation of the transactions contemplated in this Agreement, the parties agree to cooperate with each other and take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement, the documents referred to in this Agreement and the transactions contemplated hereby.

12.2 **Successors and Assigns.** All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by and against the respective successors and assigns of the Parties. Neither Party, however, may assign, in whole or in part, any of its rights or delegate any of its duties under this Agreement or a Related Agreement without the prior written consent of the other Party. Seller acknowledges that Purchaser may finance the purchase of the Assets through a purchasing group which will include one or more real estate companies and operating companies for each of the Hospitals, which include (collectively, the "**Purchasing Group Companies**") are expected to include other investors, including real estate investment trusts, other real estate investors and a cross section of participating local physicians. Accordingly, Seller agrees that Purchaser may assign some or all of its rights, duties and obligations under this Agreement and the Related Agreements to one or more Purchasing Group Companies, provided that, prior to any such assignment occurring or taking effect, (i) Purchaser shall provide written notice to Seller detailing the terms and conditions relating to such assignment, including the local physicians participating in the Purchasing Group Companies, (ii) the applicable Purchasing Group Companies sign and deliver to Seller an assumption agreement pursuant to which the Purchaser and the Purchasing Group Companies agree to be jointly and severally responsible for each and every obligation, duty and right of Purchaser under this Agreement and the Related Agreements, which agreement shall be (i) in form and substance reasonably acceptable to Seller, and (ii) executed by Purchaser and the applicable Purchasing Group Companies.

12.3 **Governing Law; Venue.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California as applied to contracts made and performed within the State of California. The parties hereby waive their right to claim in any proceeding involving this Agreement that the law of any jurisdiction other than the State of California and applicable federal Laws described under Laws or as applicable in the Chapter 9

- 81 -

Proceeding shall apply to such dispute; and the parties hereby covenant that they shall assert no such claim in any dispute arising under this Agreement. Subject to Section 12.18.2, venue shall be in the County of Riverside, State of California.

12.4   **Amendments.**   This Agreement may not be amended other than by written instrument signed by the parties hereto.

12.5   **Exhibits, Schedules and Disclosure Schedule.**   The Disclosure Schedule and all exhibits and schedules referred to in this Agreement shall be attached hereto and are incorporated by reference in this Agreement. From the Effective Date until the Closing, the Parties agree that Seller may update the Disclosure Schedule subject to Article VIII. Any matter disclosed in this Agreement or in the Disclosure Schedule with reference to any Section of this Agreement shall be deemed a disclosure in respect of all sections to which such disclosure may apply.

12.6   **Notices.**   Any notice, demand or communication required, permitted, or desired to be given under this Agreement shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including facsimile) or overnight courier, or five (5) calendar days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

If to Purchaser:   Physicians for Healthy Hospitals, Inc.
1525 West Florida, Suite A
Hemet, California 92543
Attention: Sreenivasa Nakka, M.D., President

With a simultaneous copies to:   Steven Wade
400 N. Mountain Ave., Suite 214B
Upland, California 91786
Telephone: (909) 985-6500
Facsimile: (909) 985-2865

and

Todd Swanson
Hooper, Lundy & Bookman, Inc.
1875 Century Park East, Suite 1600
Los Angeles, California 90067
Telephone: (310) 551-8195
Facsimile: (310) 551-8181

If to Seller:   Chairman of the Board
Valley Health System
1117 East Devonshire Avenue
Hemet, CA. 92543
Telephone: (951) 765-4844
Facsimile: (951) 765-4745

- 82 -

With a simultaneous copy to   John B. Marshall, Esq.
Lewitt, Hackman, Shapiro, Marshall & Harlan
16633 Ventura Blvd., Suite 1100
Encino, CA. 91436
Telephone: (818) 907-3228
Facsimile: (818) 981-4764

or at such other address as one party may designate by notice under this Agreement to the other parties.

12.7   **Headings.**   The section and other headings contained in this Agreement and in the Disclosure Schedule, exhibits and schedules to this Agreement are included for the purpose of convenient reference only and shall not restrict, amplify, modify or otherwise affect in any way the meaning or interpretation of this Agreement or the Disclosure Schedule, exhibits and schedules hereto.

12.8   **Confidentiality and Publicity.**   Any information that a Party or its Affiliates, agents or representatives furnish to another Party in connection with the transactions contemplated pursuant to this Agreement, whether furnished before or after the Effective Date, and all notes, analyses, compilations, studies and other documents, whether prepared by the receiving Party or others, which incorporate, summarize, contain or otherwise reflect or refer to such information shall be referred to collectively as "**Confidential Material**".   The term "Confidential Material" does not include information which (i) becomes generally available to the public other than as a result of a disclosure by the receiving Party or its affiliates or representatives, (ii) was rightfully available to the receiving Party on a non-confidential basis prior to its disclosure to the receiving Party by the disclosing Party, (iii) becomes rightfully available to the receiving Party on a non-confidential basis from a source other than the disclosing Party, provided that such source is not bound by a confidentiality agreement with any of said Parties or otherwise prohibited from transmitting the information to the receiving Party by a contractual, legal or fiduciary obligation, or (iv) any information which Seller's counsel deems to be covered by the California Public Records Law (Government Code Section 64000 et seq) or the Ralph M. Brown Act (Government Code Section 56000 et seq.).

12.8.1   Each receiving Party shall treat the Evaluation Material it receives under this Agreement confidentially in accordance with the terms of this Agreement, subject to Seller's obligations under the California open records laws (Govt. Code §§6250 et seq) and open meetings laws (Govt. Code §§54950 et seq). Each receiving Party shall not, and shall direct its directors, officers, agents and employees who become privy to Evaluation Material not to, disclose any of the Evaluation Material relating to the disclosing Party to any person who is not a direct participant in the evaluation or consummation of the transactions contemplated hereby. The term "person" as used in this Section 12.8 shall be broadly interpreted to include, without limitation, any corporation, company, partnership, trust or individual.   Each receiving Party shall not, and shall direct its Affiliates, directors, officers, employees and representatives who become privy to Evaluation Material not to, use any of the Evaluation Material relating to the disclosing Party for any reason or purpose other than to evaluate or consummate the transactions pursuant to this Agreement.

12.8.2   In the event a termination of this Agreement, at the request of a disclosing Party at any time, a receiving Party shall as requested either destroy or return to the disclosing party all Evaluation Material, except that each Party may retain a single copy of the Evaluation Material in

- 83 -

1070039-2

F:\Board\PHH\FINAL ASA 10.12.09.DOC

a confidential business archive in accord with prudent recordkeeping practice and for use in resolving potential disputes under this Agreement. Notwithstanding the foregoing, in the event that this Agreement is terminated and the Alternative Transaction shall be effected, then the Purchaser shall return all managed care and insurance contracts provided to it by Seller and all pricing material related to the sale of goods or services of Hemet Valley Medical Center to Seller, and such other materials delivered by Seller to Purchaser or compilation or summaries of same prepared by Purchaser that are related to competitive matters as Seller may reasonably designate shall be further delivered or destroyed as Seller may request prior to the consummation of the Alternative Transaction.

12.8.3   In the event that a receiving Party or any of its Affiliates are requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process or by applicable laws and regulations or stock exchange rules or by a governmental authority) to disclose any information supplied to it in the course of its dealings with the disclosing Party or any of such disclosing Party's agents or representatives, such receiving Party shall provide the disclosing Party with prompt notice of such request(s) or requirement(s) so that the disclosing Party may seek an appropriate protective order and assert any legal privilege against disclosure and/or waive such receiving Party's compliance with the provisions of this Agreement. If in the absence of a protective order or the receipt of a waiver under this Agreement, such receiving Party is nonetheless, in the reasonable opinion of its counsel, compelled to disclose information concerning the disclosing Party or else stand liable for contempt or suffer other censure or penalty, after so advising the disclosing party, the receiving Party may disclose such information without liability under this Agreement.

12.8.4   Notwithstanding the preceding, Purchaser may continue to communicate with its existing investors and existing and prospective funding sources, including without limitation real estate investment trusts or other real property investors/lenders, provided that they shall accept the confidentiality provisions of this Section 12 in writing.

12.8.5   Because this Agreement will be subject to the California Public Records Act (California Government Code Section 6250, et seq) and because some of the information to be contained in the Schedules to this Agreement may contain confidential information exempt from disclosure pursuant to the California Public Records Act (e.g. certain personnel information, patient medical records, medical peer review committee records, medical quality improvement records, confidential attorney-client communications, and other matters exempted from disclosure under the California Public Records Act), certain Schedules may not be attached to this Agreement but shall instead be provided separately, and shall be subject to and exempt from disclosure under the California Public Records Act and the California Evidence Code, to the extent provided thereunder.

12.9   Fair Meaning.  This Agreement shall be construed according to its fair meaning and as if prepared by all parties hereto.

12.10   Gender and Number; Construction.  All references to the neuter gender shall include the feminine or masculine gender and vice versa, where applicable, and all references to the singular shall include the plural and vice versa, where applicable.  Unless otherwise expressly provided, the word "including" followed by a listing does not limit the preceding words or terms and shall mean "including, without limitation."

- 84 -

12.11   Third Party Beneficiary.  None of the provisions contained in this Agreement are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a party to this Agreement.

12.12   Expenses and Attorneys' Fees.  Each party shall bear and pay its own costs and expenses relating to the transactions contemplated by, or the performance of or compliance with any condition or covenant set forth in, this Agreement.  In determining the costs and expenses of each party under this Agreement, the following rules shall apply:  (a) all costs of the Preliminary Title Reports, and a Title Policy shall be paid by Seller up to an amount equal to the amount Seller would have incurred if the Title Policy were a standard coverage owner's policy of title insurance (that deleted survey exceptions) at an insurable value not to exceed the fair market value of the Real Property as set forth in the appraisal obtained by Seller as described in Section 1.4.17 and the remaining costs of the Title Policy, if any, shall be borne by Purchaser; (b) all costs of the Title Surveys shall be borne by Purchaser; (c) all costs of the Environmental Surveys (including Phase I and Phase II Assessments, if Purchaser so elects) shall be borne by Purchaser, (d) all documentary transfer taxes, recording fees, and other transfer taxes shall be paid by Purchaser, (e) all filing fees payable in connection with submissions to governmental agencies relating to the approval of the transactions contemplated hereby shall be paid by Purchaser, (f) all escrow charges and related fees shall be borne by Purchaser, (g) all sales and use taxes shall be borne by Purchaser, and (h) all other costs, charges and expenses shall, except as otherwise provided in this Agreement, be allocated between Purchaser and Seller in accordance with the customs of Riverside County, which is the County in which the Real Property is located.

12.13   No Offset.  Neither Purchaser nor Seller (and their respective successors, assigns and affiliates) shall have the right to offset amounts payable under this Agreement against, nor shall Purchaser or Seller have the right to contest an obligation to transfer, satisfy, release, pay-off, assign and convey to Seller or Purchaser or Purchaser's behalf because of, outstanding claims, liabilities or obligations asserted by Purchaser or Seller including but not limited to pursuant to the indemnification provisions of Section 10.2.

12.14   Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement, binding on all of the parties hereto.  The parties agree that facsimile copies of signatures shall be deemed originals for all purposes of this Agreement and that a party may produce such copies, without the need to produce original signatures, to prove the existence of this Agreement in any proceeding brought under this Agreement.

12.15   Entire Agreement.  This Agreement, the Related Agreements, the Disclosure Schedule, the exhibits and schedules, and the documents referred to in this Agreement contain the entire understanding between the parties with respect to the transactions contemplated herein and supersede all prior or contemporaneous agreements, letters of intent, understandings, representations and statements, oral or written, between the parties on the subject matter of this Agreement (the "Superseded Agreements"), which Superseded Agreements shall be of no further force or effect.

12.16   No Waiver.  Any term, covenant or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof but only by a written notice signed by the party expressly waiving such term or condition.  The subsequent acceptance of performance under this Agreement by a party shall not be deemed to be a waiver of any preceding material breach

- 85 -

160

or default by any other party of any term, covenant or condition of this Agreement, other than the failure of such other party to perform the particular duties so accepted, regardless of the accepting party's knowledge of such preceding material breach at the time of acceptance of such performance. The waiver of any term, covenant or condition shall not be construed as a waiver of any other term, covenant or condition of this Agreement.

12.17 **Severability.** If any term, provision, condition or covenant of this Agreement or the application thereof to any party or circumstance shall be held to be invalid or unenforceable to any extent in any jurisdiction, then the remainder of this Agreement and the application of such term, provision, condition or covenant in any other jurisdiction or to persons or circumstances other than those as to whom or which it is held to be invalid or unenforceable, shall not be affected thereby, and each term, provision, condition and covenant of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

12.18 **Dispute Resolution.** Subject to the exclusions set forth in Section 12.18.5 below, in the event any disagreement, dispute or claim arises between or among the parties hereto (collectively, a "**Dispute**") with respect to the enforcement or interpretation of any term or provision of this Agreement or any Related Agreement or with respect to whether an alleged material breach or default under this Agreement or Related Agreement has or has not occurred, or with respect to any other matter related to or arising out of this Agreement or any Related Agreement, or the relationship or transactions contemplated hereby or thereby, such Dispute shall be resolved in accordance with the following procedures:

12.18.1 **Meet-and-Confer.** In the event of a Dispute between the parties hereto, either party may give written notice to the other party setting forth the nature of such Dispute ("**Dispute Notice**"). The parties shall meet and confer to discuss the Dispute in good faith within 30 days of the other party's receipt of the Dispute Notice in an attempt to resolve the Dispute. All representatives shall meet at such dates and times as are mutually convenient to the representatives of each party within such 30-day period.

12.18.2 **Arbitration of Disputes.** Except as set forth below, any Dispute which cannot be resolved by the parties hereto within 30 days after either party's receipt of a Dispute Notice may be submitted at the option of either party to binding arbitration, which arbitration shall be conducted in accordance with the following provisions:

(a) **Venue.** The arbitration shall be conducted in Riverside County, State of California, unless the parties mutually determine that another venue would be more convenient for the parties.

(b) **Law.** The governing law shall be the substantive law of the State of California as provided in Section 12.3.

(c) **Selection.** A single disinterested third party arbitrator shall be selected by mutual written agreement of the parties, or if they are unable to mutually select an arbitrator within fifteen (15) days after either party notifies the other of his desire to arbitrate the Dispute, then by JAMS/Endispute (JAMS) in accordance with its then-current Rules of Practice and Procedure.

(d) **Administration.** The arbitration shall be administered by JAMS.

(e) **Rules.** The rules of arbitration shall be the Rules of Practice and Procedure of JAMS as may be modified by the parties to the arbitration by mutual written agreement at the time of the arbitration, except that the provisions of California Code of Civil Procedure § 1283.05 are incorporated into and made applicable to this agreement to arbitrate, unless the parties agree otherwise at such time. For good cause shown and on order of the arbitrator, depositions may be taken and discovery may be obtained in accordance with California Code of Civil Procedure § 1283.05.

(f) **Award.** The decision of the arbitrator shall be final and binding as to any matters submitted hereunder; provided, however, the arbitrator shall not have the power to commit errors of law or legal reasoning, and the arbitration award shall be vacated or corrected by a court of competent jurisdiction for any such error. Judgment upon the award may be entered in any court of competent jurisdiction in the United States. The award shall include written findings of fact, a summary of the evidence and reasons underlying the decision and conclusions of law. The arbitrator shall have the power to award equitable relief, including specific performance of the terms and conditions of this Agreement and/or injunctive relief, consistent with the terms and limits set forth in this Agreement.

(g) **Fees and Costs.** As part of the award, the arbitrator may award reasonable and necessary costs actually incurred by the prevailing party, as determined by the arbitrator in his or her award, including that party's share of the arbitrators' fees, costs and expenses, as well as any administration fees. The arbitrator may also include reasonable attorneys' fees in an award of costs to the prevailing party and such fees and costs shall be recoverable by the prevailing party in any appeal.

NOTICE: By initiating the space below the parties hereto are agreeing to have any Dispute arising out of the matters included in this "arbitration of disputes" provision decided by neutral arbitration as provided by California law (provided that such Dispute has not been resolved through the meet-and-confer discussions and mediation procedures described above) and the parties are giving up any rights they might possess to have the Dispute litigated in a court or jury trial. By initiating the space below the parties hereby agree to give up their judicial rights to discovery and appeal, unless those rights are specifically included in this "arbitration of disputes" provision. If either party refuses to submit to arbitration after agreeing to this provision, such party may be compelled to arbitrate under the authority of the California Code of Civil Procedure.

Purchaser _____        Seller _____

12.18.3 **Injunctive Relief.** Nothing in this Agreement shall be interpreted to limit either party's right to pursue preliminary or provisional equitable relief pending the arbitration award, including, without limitation, specific performance or a temporary restraining order or preliminary injunctive relief, from a court of competent jurisdiction at any time. By way of example, the foregoing provisions of this Section shall not be interpreted to require either party to

submit to meet-and-confer or arbitration prior to exercising such party's right to pursue preliminary equitable relief to protect trade secrets or prevent irreparable harm.

**12.18.4  Selection of Alternative Arbitrator.**  In the event that JAMS is not in existence at the time of commencement of the arbitration proceeding, as applicable, then the Commercial Panel of the American Arbitration Association ("**AAA**") shall administer such proceeding. In such case, all references to JAMS in this Agreement shall instead refer to the AAA, and all references to the Rules of Practice and Procedure of JAMS in this Agreement shall instead refer to a reference to the then-current commercial arbitration rules of the AAA.

**12.18.5  Post-Closing Disputes.**  If the Closing occurs and a Dispute arises with respect to the enforcement or interpretation of any term or provision of this Agreement or of any Related Agreement, with respect to whether an alleged material breach of this Agreement or such Related Agreement has or has not occurred, or with respect to the manner or time by which such breach shall be cured, then in addition to the foregoing provisions of this Section 12.18 the following provisions shall apply to the resolution of such Dispute:

(a)  If either party (the "**Complaining Party**") believes the other party (hereinafter referred to as the potentially non-performing party or "**NPP**") is in default in the performance of any duty or obligation to be performed by the NPP thereunder, then the Complaining Party shall give the NPP a Dispute Notice which shall state the grounds for the Complaining Party's belief that a default has occurred and which shall describe with sufficient specificity the nature of the alleged default.

(b)  The Complaining Party shall not commence an arbitration action pursuant to Section 12.18.2 or any judicial action pursuant to Section 12.18.3 if the NPP commences to cure the events which constitute the grounds for the Complaining Party's assertion of a default by the NPP. The NPP shall have sixty (60) days to cure the material breach specified in the Default Notice; however, if such breach cannot reasonably be cured within such 60-day period, then the NPP shall promptly commence to cure such default and diligently pursue such cure to completion. Moreover, if the grounds constituting the events of a material breach are incapable of cure, no action pursuant to Section 12.18.2 or 12.18.3 shall be commenced if the NPP takes such corrective actions as are reasonably necessary to prevent the occurrence of such grounds of material breach in the future.

(c)  If the NPP disagrees with the Dispute Notice delivered under this subsection (f) or if the Complaining Party asserts a Dispute with respect to the manner or time by which the NPP is attempting to cure the material breach set forth in such Dispute Notice, then the same shall be resolved pursuant to Sections 12.18.1, 12.18.2 and 12.18.3 except that if the arbitration award concludes that a material breach by the NPP occurred (or that such breach was not properly or timely cured), then the award shall also include a description of corrective actions that shall be undertaken to cure or prevent the occurrence in the future of the basis for the Dispute and a recommended reasonable time to complete such cure or corrective action.

(d)  Notwithstanding the foregoing to the contrary, the NPP shall bear no responsibility for, and have no duty to cure, a material breach set forth in the Dispute Notice delivered under this subsection (f) to the extent such breach results from the acts or omissions of the Complaining Party or any of its Affiliates and their respective officers, directors, trustees, employees, agents or representatives.

- 88 -

1070039.2    *F:\Boar\FHH\FINAL ASA 10.12.09.DOC*

---

[Signature Page to Asset Sale Agreement]

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

PURCHASER:

**Physicians for Healthy Hospitals, Inc.**

By: _____

Name: _____

Its: _____

SELLER:

**Valley Health System**

By: _____

Name: _____

Its: _____

- 89 -

1070039.2    *F:\Boar\FHH\FINAL ASA 10.12.09.DOC*

Effective Date and the Closing Date in the same manner as provided in Section 2.23 of the Agreement.

The Parties understand that Seller may be subject to certain agreements covering multiple facilities, including MVCH, such as managed care and other provider agreements, and that Purchaser may enter into managed care and other provider agreements. In order to satisfy the obligations of Seller and Purchaser under any such agreements and so as to avoid or limit any claims which might arise from the termination or modification of pre-existing agreements to the extent and only for so long as is necessary to satisfy such obligations and avoid such claims, the Parties agree to cooperate and to negotiate provider agreements between themselves to provide services to patients who are subject to such agreements with the other Party, at commercially reasonable rates, which shall be reciprocal and on terms consistent with applicable Laws.

The purchased assets shall include only those assets described above, and such assets shall be purchased "AS IS-WHERE IS-WITH ALL FAULTS" as detailed in the Agreement but shall be subject to the same representations and warranties and limitations thereon to the extent applicable to the Alternative Transaction, and to other express requirements which are contained in the Agreement, including receipt of good and marketable title to the Alternative Assets, except for exceptions as provided for in the Agreement.

3. Alternative Excluded Assets. The following assets of Seller shall be excluded from the purchased Alternative Assets; provided, however, the Parties agree that the following list is not meant to be an exhaustive list ("Alternative Excluded Assets") (but may be augmented by mutually acceptable additional Alternative Excluded Assets of the type customarily excluded in transactions of the type contemplated by this term sheet):

(a) All of Seller's cash, cash equivalents, cash in bank accounts, certificates of deposit, treasury bills, notes, and marketable securities;

(b) All of Seller's accounts receivable, including all claims, contract rights, or any other right of Seller to payment from all sources whatsoever, including governmental reimbursement programs;

(c) All of Seller's claims, choses in action, rights of recovery, rights of offset, recoupment, rights to refunds and similar rights pertaining to the Alternative Assets;

(d) Any records of Seller which by law Seller is required to retain in its possession, other than medical records at MVMC, which Purchaser shall maintain thereat, and as to which Seller shall have reasonable rights of access for appropriate purposes;

(e) All of Seller's assets located at Seller's home office and at Seller's other hospital facilities and which are used by Seller for the majority of their use in connection with any businesses, operations and activities other than MVMC;

(f) All of Seller's credits, prepaid expenses, deferred charges, sums or fees, advance payments, security deposits, prepaid items, and all prepaid insurance premiums; and

(g) Seller's pension or other funded Employee Benefit Plan assets; and

---

## SCHEDULE 1.3.2
## TERM SHEET FOR ALTERNATIVE TRANSACTION

The terms and conditions of the asset sale agreement for the Alternative Transaction ("Definitive Alternative Agreement") shall be similar to the asset sale agreement to which this is attached ("Agreement") except as it needs to be modified to be consistent with the Alternative Purchase Consideration and other terms of the Alternative Transaction as summarized below.

1. Alternative Purchase Consideration. The purchase consideration in connection with the Alternative Transaction shall be Twenty-Nine Million Dollars ($29,000,000) in immediately available funds (the "Alternative Purchase Consideration"), subject to adjustment as provided below.

2. Purchased Alternative Assets. The purchased Alternative Assets shall include substantially all of the assets used only in connection with the operation of Menifee Valley Medical Center ("MVMC"), consisting of the following:

(a) All of the real estate, and improvements thereto, owned or leased by Seller and used in connection with the operation of MVMC, including without limitation, fee title to the real property commonly known as 28400 McCall Boulevard, Sun City, CA 92586 and all vacant land owned by Seller adjacent to the Hospital but excluding the Orchard Property located immediately to the east of MVMC, under Schedule 1.6.1-A, all as defined on Addendum 2(a) ("Menifee Land"), including:

(i) All rights, privileges and easements appurtenant to and for the benefit of the Menifee Land, including, without limitation, all minerals, oil, gas and other hydrocarbon substances on and/or under the Menifee Land, as well as all development rights, air rights, water, water rights and water stock relating to the Menifee Land and any other easements, rights of way or appurtenances relating to or used in connection with the ownership, operation, use, occupancy or enjoyment of the Menifee Land, subject to covenants, easements and other restrictions of record;

(ii) All improvements, structures, buildings and fixtures located on the Menifee Land, including, without limitation, all fixtures located on and/or used in connection with the ownership, operation, use, occupancy or enjoyment of the improvements (such as heating and air conditioning, systems, and facilities used to provide any utility services, parking services, refrigeration, ventilation, garbage disposal, recreation or other services thereto); and any and all computers and/or computer systems used for or in connection with any building operating systems, elevator systems, irrigation systems, climate control systems and security systems; and

(b) All other tangible assets and equipment, including without limitation all assets of the type included within the definition of Assets in the Agreement, actually located and used at, or which are used primarily in connection with the operations of, MVMC, as provided in these Disclosure Schedules.

The Parties shall develop Schedules, Exhibits and other materials with respect to the Alternative Transaction within forty-five (45) days in the same manner as provided in Section 1.14 of the Agreement. Seller may supplement, modify or correct any such certificate, document or other instrument, by reason of the discovery or change outside the control of Seller occurring between the

MVMC, including non-severable Seller information technology (including use of computer programs and of the Seller telephone system); provided, however, Seller agrees to permit Purchaser to utilize such assets, some of which may be subject to a licensing agreement between the Parties, for which Purchaser shall pay Seller a fee at the fair market value for the use of such intangible property and for such services.

4. Alternative Assumed Liabilities. Purchaser shall assume post-closing liabilities associated with MVMC except with respect to the Existing Bonds and the excluded liabilities addressed below (the "**Alternative Assumed Liabilities**") in addition to payment of Alternative Purchase Consideration. The Alternative Assumed Liabilities shall relate only to the categories of Assumed Obligations set forth in Section 1.8 of the Agreement to the extent applicable to the Alternative Assets, and the operations, contracts and employees applicable to MVMC.

5. Excluded Liabilities. The Alternative Assumed Liabilities shall exclude all of the types of Excluded Liabilities described in the Agreement, as applicable to the Alternative Transaction and Alternative Assets. In addition, the Alternative Assumed Liabilities shall exclude:

(a) All liabilities associated with any assets of the Seller other than the Alternative Assets transferred to Purchaser; and

(b) All Current Liabilities of Seller, and all other liabilities of Seller, arising out of or relating to any act, omission, event or occurrence, connected with the Hospital Businesses prior to the Effective Time, including without limitation all liabilities in connection with claims of professional malpractice or other tortious conduct, overpayments by governmental or other payors, and all liabilities and responsibilities under Benefit Plans, or otherwise related to any of Seller's employees, to the extent arising out of or relating to acts, omissions, events or occurrences prior to the Effective Time.

6. Covenants of Seller.

(a) The covenants of Seller at Article IV of the Agreement shall apply in the Definitive Alternative Agreement, to the extent applicable to the Alternative Assets and the operations, contracts and employees applicable to MVMC.

(b) Purchaser shall have the right, in its sole discretion, to enter into a commercially reasonable, long-term (35 year) ground lease of the Orchard Property, to the fullest extent legally permissible, for which Purchaser shall pay to Seller fair market rental value as determined by independent appraisal. Such ground lease shall contain commercially reasonable and customary terms and conditions. In any case, however, Purchaser will be granted, at Closing a commercially reasonable right of first refusal to purchase the Orchard Property to the extent permitted by law.

164

7. Covenants of Purchaser.

(a) The covenants of Purchaser at Article V of the Agreement shall apply in the Definitive Alternative Agreement to the extent reasonably applicable to the Alternative Assets and the operations, contracts and employees applicable to MVMC.

(b) Purchaser shall, as a condition to taking assignment of any contracts which it has elected to assume, pay any payments required to be paid under Section 365 of the Bankruptcy Code in order for Purchaser to assume such contracts, which amount shall be credited to the Alternative Purchase Consideration; provided, however, that such adjustment to the Alternative Purchase Consideration shall not, in any case, exceed One Million Dollars ($1,000,000). In the event that such amount exceeds One Million Dollars ($1,000,000), Purchaser may either (i) pay such additional amount, which shall not be credited to the Alternative Purchase Consideration, or (ii) terminate the Alternative Transaction and receive a refund of Purchaser's Deposit.

(c) In the event that Purchaser determines not to assume any Contracts entered into post-petition relating to MVMC, and such determination results in an administrative claim by the contracting party for breach of such agreement, Purchaser shall defend, indemnify and hold Seller harmless of and from such damage claim based upon such breach (excluding amounts accrued and due to such creditor for good or services rendered prior to the Closing Date other than as a result of such breach claim).

(d) The employee related covenants of Purchaser set forth at Section 5.4 of the Agreement shall relate only to the Hospital Businesses' Employees engaged with respect to MVMC businesses ("**Seller's MVMC Employees**"). Purchaser shall pay or assume the Accrued Paid Time Off Amounts of Hired Employees in connection with the Alternative Transaction in the same manner as provided in Section 9.5 of the Agreement; provided that the Alternative Purchase Consideration shall be adjusted to deduct the amount of such assumed Accrued Paid Time Off Amounts. Purchaser shall also pay any severance payments owing to those Seller's MVMC Employees to whom Purchaser has not extended an offer of employment with Purchaser and any Accrued Paid Time Off Amounts owing to Seller's MVMC Employees who are not hired by Purchaser or who do not consent to the transfer of such Accrued Paid Time Off Amounts to the extent that the Alternative Purchase Consideration shall be adjusted to deduct the amount of such severance and Accrued Paid Time Off Amounts paid by Purchaser and Accrued Paid Time Off Amount obligations assumed by Purchaser. Purchaser shall also credit to each of Seller's MVMC Employees who become Hired Employee such employee's accrued ESL Benefits (as defined in the Agreement), on the same terms and conditions as Seller's ESL Benefit plans, which obligation shall not be credited to the Alternative Purchase Consideration.

(e) Purchaser will assume responsibilities arising after the Effective Time for all union contracts related to MVMC employees, as of the Closing Date. Seller will retain liability for accrued paid time off, severance obligations, if any, and all other amounts owing, and liabilities, to employees preceding the Effective Time, unless otherwise agreed by the parties, and subject to customary purchase consideration adjustment.

(f)    Purchaser will offer available positions to a substantial portion employees providing services at, or primarily associated with, the operations at MVMC campus consistent with the provisions of the Agreement.

(g)    Purchaser and Seller will enter into an agreement or agreements whereby Purchaser shall purchase certain administrative and support services from Seller, or enter into shared services arrangements, including those which may be necessary for the operation of MVMC (i.e. finance, IT, HR, telephones, internet, etc.) as mutually agreed, at the agreed fair market value for such services.

(h)    The covenants set forth at Sections 5.9.3 to 5.9.5 of the Agreement shall only apply with respect to MVMC. The covenants set forth at Section 5.9.1 and 5.9.2 shall not apply to the Alternative Transaction. Purchaser shall maintain all medical records on behalf of Seller as required by law, and will make them available to Seller if needed in the future.

8.   Closing.

(a)    The Closing of the Alternative Transaction shall occur by the Closing Date as set forth in the Agreement.

(b)    The Parties shall cause the Escrow to deliver to the Bond Trustees of the Existing Bonds, at Closing, such funds from the Alternative Purchase Consideration as required, and shall use their best efforts to obtain the Bond Release, as applicable to the Alternative Assets, subject to the special covenants set forth below in the event such Bond Release is not obtained and related to required forbearance of certain covenants.

(c)    Since licensing and Medicare approvals may not be feasible prior to the Closing, Seller and Purchaser will enter into a Lease and a Management Agreement consistent with the terms of the Agreement, but covering only MVMC  and the Alternative Assets to the extent and in the manner legally permissible.  Purchaser will own MVMC, Seller will be the tenant, Seller will continue to hold the license, Medicare/Medi-Cal certification, and payor contracts, and Seller will contract with Purchaser to provide management services at essentially a "no gain/no loss" to Seller, all as consistent with the provisions set forth at Section 1.3.6 of the Agreement.  When licensing and Medicare and Medi-Cal certification is complete, the Lease and the Management Agreement will terminate, in the same manner as provided in Section 1.3.6 of the Agreement.

9.   Seller's Conditions to Close.

(a)    The conditions precedent to obligations of Seller, as set forth at Article VI of the Agreement, shall apply in Definitive Alternative Agreement only to the extent applicable to the Alternative Assets and Alternative Transaction.  Without limiting the preceding, the conditions precedent in the following Sections of the Agreement shall not apply in the event of the Alternative Transaction:  6.7 and 6.8 (to the extent of requirements greater than needed for just the acquisition and working capital for MVMC ).

(b)    In the event of the Alternative Transaction, Purchaser will cause the Select Administrative Note to be modified, as of the Closing Date, to continue bear interest at the rate

of 5% per annum and be repaid in monthly payments of interest only commencing twenty-four (24) months after Closing (with interest accruing and added to principal from the Closing Date until such twenty-fourth month) and continuing for a period of thirty-six (36) months thereafter, whereupon equal monthly payments of principal and interest shall commence in an amount sufficient to fully amortize the balance of principal and interest over a period of sixty (60) months thereafter. As a condition to such modification, the Select Administrative Note, as modified, shall be secured by a first position a Deed(s) of Trust with Chicago Title as trustee upon and utilizing Chicago Title's standard Long Form Deed of Trust, upon the real properties commonly known as, the Medical Arts Building and, to the extent not inconsistent with Existing Bond covenants unless waived by the bondholders, the excess land portion of the Florida/San Jacinto property ("Excess Land").

(c)    Bond Actions: The Parties must obtain a Bond Release prior to Closing; provided, however, if the holders of (or the Trustees of) the Existing Bonds do not provide the consents necessary for the Bond Release required under this Agreement in response to such payment, Purchaser will purchase or cause to be purchased such Existing Bonds as necessary to obtain consent to the Bond Release, or will make the Alternative Loan as provided below. In addition, as of the Closing Date, Purchaser shall either:

(i)    Obtain the consent of the Existing Bonds to a modified payment schedule under the Existing Bonds which includes the payment of interest only for three (3) years from the Closing Date, with principal re-amortized thereafter over the remaining terms of the Existing Bonds, and which provides for forbearance ("Payment Forbearance"), after the Closing Date of any claims, actions or other enforcement against future of Seller based on failure of Seller to meet any covenants (the "Bond Covenants") in the Indentures or other documents relating to the Existing Bonds ("Bond Documents") based upon the financial performance or status of Seller and its operations (but excluding payment defaults under the Existing Bonds, for which such forbearance shall not apply, including without limitation covenants related to the required net income available for debt service or other debt coverage requirements or any covenant against seeking bankruptcy relief (to the extent it would be violated by the existing Chapter 9 Proceeding) ("Covenant Forbearance"); or

(ii)    Enter into a new secured loan agreement (the "Alternative Loan") with Seller by which Purchaser will advance, on Seller's behalf, funds necessary to pay off the balance of Existing Bonds (after application of proceeds of the Alternative Transaction), which loan shall become a new loan on substantially the same terms as the Bond Documents, including the Bond Covenants (as modified as set forth in subparagraph (i) above including the Payment Forbearance and the Covenant Forbearance), to be secured by collateral as provided in the Existing Bonds and additionally secured by the "Additional Collateral");

(A)   a second position deed of trust (junior to the modified Select Administrative Note lien) on the Medical Arts Building and the excess land portion of the Florida/San Jacinto, and

(B)   a first position lien on the Orchard Property.

The Covenant Forbearance shall remain in effect through Seller's Fiscal Year ending June 30, 2012. In the event that Seller is in default of the Bond Covenants as of the end of Seller's Fiscal Year ending June 30, 2011, Purchaser may, as its sole remedy for a Covenant Default other than a payment default, require that Seller engage a nationally recognized Manager ("**Manager**") with experience in operating hospital similar to HVMC. Seller shall consult with Purchaser in the selection of such Manager, and such Manager shall be reasonably acceptable to Purchaser, which acceptance shall not be unreasonably withheld, delayed or conditioned. Purchaser shall be entitled to monitor the performance of the Manager and receive monthly reports on Manager's progress and the financial condition of Seller. The foregoing notwithstanding, the parties understand that MVMC may be competitive with HVMC and that the sharing of certain information may violate federal or state antitrust or unfair competition Laws.

Further, the Manager may become aware of confidential information, including rates under managed care contracts, matters covered by the attorney-client privilege, attorney work-product privilege, matters covered by quality assurance and peer review, and other matters covered by applicable privileges. The Manager may also become aware of matters which are confidential pursuant to contractual arrangements with unaffiliated third parties. The Manager may also become aware of matters discussed by Seller's Board of Directors in closed session, which matters are not subject to public disclosure. Accordingly, in the event that Manager obtains such information which Seller's Board of Directors or counsel reasonably determines is confidential or privileged information, Seller may require that Manager maintain such matters in confidence. Purchaser also agrees that, to the extent that Purchaser obtains information from Seller which is confidential or privileged as provided above, Purchaser shall maintain such information in confidence to the fullest extent permitted by law. The foregoing notwithstanding, in the event that Purchaser in good faith deems its interests are materially and adversely affected by a matter which is disclosed in confidence, Purchaser shall notify Seller in writing and may seek release from such restriction through appropriate application to a court of competent jurisdiction.

In the event that Seller is in default of the Bond Covenants as of the end of Seller's Fiscal Year ending June 30, 2012, Purchaser shall have rights of enforcement in the same manner as provided in the Bond Documents.

Without limiting the preceding, the Covenant Forbearance shall not include a forbearance of any covenants restricting further encumbrances by Seller (excluding any encumbrances in favor of PHH, encumbrances as permitted in the Bond Documents, or otherwise as contemplated by this Agreement), transfer of Seller's assets or merger or restructuring of Seller (except in connection with Seller's Chapter 9 proceeding and otherwise consistent with the terms of this Agreement). The Alternative Loan shall be provided pursuant to documents which, to the extent reasonably applicable, are consistent with the terms of the Bond Documents, and security and other provisions which are customary for commercial real property

secured loans (to the extent not inconsistent with the applicable terms under the Bond Documents or this Agreement). The Medical Arts Building and Excess Land are further identified in Schedule 1.6.1-A.

Provided that Seller is not in default of payments and the Bond Covenants under the Alternative Loan, the Additional Collateral shall be released upon issuance of Seller's audited financial statements for the fiscal year ended June 30, 2012.

(d)   Plan of Adjustment: If, prior to the Closing, Seller shall have filed a Plan of Adjustment ("**Plan**"), in the Chapter 9 Proceeding, either;

    (i)   such Plan shall have been confirmed; or

    (ii)   the holders of the Affiliated Claims shall have voted to accept such Plan or agreed, in writing, to accept such Plan; or

    (iii)   the holders of the Affiliated Claims shall have agreed, in writing, not to, directly or indirectly, oppose such Plan and/or sought to influence either the Unsecured Creditors Committee and/or others to vote against or otherwise oppose such Plan, and have, in fact, not done so.

For purposes of the foregoing, "**Affiliated Claims**" shall mean the claims of Hemet Community Medical Group, Menifee Valley Community Medical Group, KM Strategic Management, Inc., and the claims of LHIO, Inc. and any claims of constituent members thereof which are derivative from such claims.

10.   **Purchaser's Conditions to Close.** The conditions precedent to obligations of Purchaser, as set forth at Article VII of the Agreement, shall apply in Definitive Alternative Agreement only to the extent applicable to the Alternative Assets and Alternative Transaction. Without limiting the preceding, the conditions precedent in the following Sections of the Agreement shall not apply in the event of the Alternative Transaction: 7.11 and 7.12.

11.   **Post-Closing Covenants.** The post-closing covenants contained at Article IX of the Agreement, including without limitation covenants set forth at Sections 9.2 (preservation and access to records,) 9.3 (provision of benefits of certain contracts) and 9.5 (employee transition) shall apply only to the extent applicable to the Alternative Assets, and the operations, contracts and employees applicable to MVMC. In addition, without limiting the preceding, Seller's covenant not to compete shall apply only with respect to MVMC.

12.   **Termination.** The bases for termination, and the application of the Deposit and the Termination Fee, as provided at Section 8 of the Agreement shall apply with respect to the Alternative Transaction to the extent of the terms and conditions of the Alternative Transaction.

13.   **Assignment.** Purchaser shall have the right to assign its rights and obligations under the Alternative Transaction, subject to the terms of Section 12.2 of the Agreement.

# Exhibit 4

1   CHARLES D. AXELROD (STATE BAR NO. 39507)
    GARY E. KLAUSNER (STATE BAR NO. 69077)
2   H. ALEXANDER FISCH (STATE BAR NO. 223211)
    NEETA MENON (STATE BAR NO. 254736)
3   STUTMAN, TREISTER & GLATT
    PROFESSIONAL CORPORATION
4   1901 Avenue of the Stars
    12th Floor
5   Los Angeles, CA 90067
    Telephone: (310) 228-5600
6   Telecopy: (310) 228-5788
    E-mail: caxelrod@stutman.com
7           gklausner@stutman.com
            afisch@stutman.com
8           nmenon@stutman.com

9

10  Chapter 9 Counsel for
    Valley Health System

11

12              UNITED STATES BANKRUPTCY COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14                      RIVERSIDE DIVISION

15  In re                          )  Case No. 6:07-bk-18293-PC
                                   )
16  VALLEY HEALTH SYSTEM,          )  Chapter 9
                                   )
17                                 )
                                   )
18                                 )  FIRST AMENDED PLAN FOR THE
                                   )  ADJUSTMENT OF DEBTS OF VALLEY
19                                 )  HEALTH SYSTEM DATED DECEMBER
                                   )  17, 2009
20                                 )
                                   )  Disclosure Statement Hearing
21                                 )
                                   )  Date:     December 17, 2009
22                                 )  Time:     2:00 p.m.
            Debtor,                )  Place:    Courtroom 304
23                                 )            United States Bankruptcy Court
                                   )            3420 Twelfth Street
24  ─────────────────────────────── )          Riverside, California

25

26  NOTE: The Bankruptcy Court Has Not Yet Approved A Disclosure Statement With Respect

27  To The Proposed Plan Of Adjustment Of Debts. The Filing Of This Proposed Plan Is Not

28  Intended To And Should Not Be Construed To Be A Solicitation Of Acceptances Of The Plan.

533946v2

EXHIBIT A

57

73

## <u>TABLE OF CONTENTS</u>

Page(s)

I.   DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION . . . . . . . . 2

    A.   Definitions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.   Rules of Construction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.  TREATMENT AND DEADLINE FOR THE ASSERTION OF
    ADMINISTRATIVE CLAIMS AND PROFESSIONAL CLAIMS . . . . . . . . . . . . . 10

    A.   Treatment Of Administrative Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.   Treatment of the Select Administrative Claims. . . . . . . . . . . . . . . . . 10

        2.   Treatment of All Other Administrative Claims, Except for
           Professional Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.   Treatment Of Professional Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    C.   Priority Claims In Chapter 9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    D.   Deadline For The Filing And Assertion Of Administrative Claims
        (Other Than Ordinary Course Administrative Claims) And
        Professional Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III. DESIGNATION OF CLASSES OF CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.  TREATMENT OF CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A.   Class 1A – Claims of the Bondholders of Series 1993 Bonds. . . . . . . . . . . . 13

        1.   Impairment And Voting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        2.   Treatment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    B.   Class 1B – Claims of the Bondholders of the Series 1996 Bonds. . . . . . . . . 13

        1.   Impairment and Voting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        2.   Treatment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    C.   Class 1C – Other Secured Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        1.   Impairment and Voting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        2.   Treatment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    D.   Class 2A – General Unsecured Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        1.   Impairment And Voting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        2.   Treatment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

533946v2

i

EXHIBIT A

58

74

1      E.    Class 2B – General Unsecured Claims of KM Strategic Management, Inc., Hemet Community Medical Group, Menifee Valley Community Medical Group, and LHIO, LLC and Claims of Constituent Members Thereof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

          1.   Impairment And Voting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

          2.   Treatment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      F.    Class 2C – Interests of Defined Benefit Plan Participants. . . . . . . . . . . . . . . 16

          1.   Impairment And Voting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          2.   Treatment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

V.   ACCEPTANCE OR REJECTION; CRAM DOWN . . . . . . . . . . . . . . . . . . . . . . . 16

      A.    Voting Of Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

VI.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      A.    Assumption Of Executory Contracts And Unexpired Leases. . . . . . . . . . . . . . 17

      B.    Cure Payments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      C.    Rejection of Executory Contracts And Unexpired Leases. . . . . . . . . . . . . . . 17

      D.    Claims Arising From Rejection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

VII. IMPLEMENTATION AND MEANS FOR IMPLEMENTATION OF THIS PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      A.    The Two Hospital Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      B.    Claims and Causes of Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

VIII. DISTRIBUTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      A.    Distribution Agent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      B.    Delivery Of Distributions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      C.    Undeliverable Distributions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

          1.   Holding Of Undeliverable Distributions. . . . . . . . . . . . . . . . . . . 20

          2.   Unclaimed Property. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

          3.   Notification And Forfeiture Of Unclaimed Property. . . . . . . . . . . . 21

      D.    Distributions of Cash. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      E.    Timeliness Of Payments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      F.    Compliance With Tax Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

-ii-

533946v2

| | G. | Time Bar To Cash Payments. | 22 |
| | H. | No *De Minimis* Distributions. | 22 |
| | I. | No Distributions On Account Of Disputed Claims. | 22 |
| | J. | No Postpetition Accrual. | 23 |
| IX. | | DISPUTED CLAIMS; OBJECTIONS TO CLAIMS; PROSECUTION OF OBJECTIONS TO DISPUTED CLAIMS. | 23 |
| | A. | Claims Objection Deadline; Prosecution of Objections. | 23 |
| | B. | Reserves, Payments, And Distributions With Respect To Disputed Claims. | 23 |
| X. | | EFFECT OF CONFIRMATION | 23 |
| | A. | Discharge Of The District. | 23 |
| | B. | Injunction. | 24 |
| | C. | Term Of Existing Injunctions Or Stays. | 24 |
| XI. | | RETENTION OF JURISDICTION | 25 |
| XII. | | CONDITIONS PRECEDENT | 27 |
| | A. | Condition Precedent To Confirmation. | 27 |
| | B. | Conditions Precedent To Effective Date. | 27 |
| | C. | Waiver Of Conditions To Effective Date. | 28 |
| | D. | Effect Of Failure Of Conditions. | 28 |
| XIII. | | MISCELLANEOUS PROVISIONS | 28 |
| | A. | Dissolution Of The Committee. | 28 |
| | B. | Severability. | 28 |
| | C. | Governing Law. | 29 |
| | D. | Effectuating Documents And Further Transactions. | 29 |
| | E. | Notice Of Effective Date. | 29 |

533946v2

-iii-

EXHIBIT A

1

## TABLE OF AUTHORITIES

2

**CASES**

3

*In re Valley Health System,*
   Case No. 6:07-bk-18293-PC ................................................................4

4

5

**STATUTES**

6

11 U.S.C. § 102 .......................................................................................10
11 U.S.C. § 105 .......................................................................................24

7

11 U.S.C. § 362 .......................................................................................24
11 U.S.C. § 365(a) ....................................................................................3

8

11 U.S.C. § 365(f) .....................................................................................3

9

11 U.S.C. § 503(b) ....................................................................................2
11 U.S.C. § 506(a) ....................................................................................8

10

11 U.S.C. § 507(a) .............................................................................2, 12
11 U.S.C. § 553 ........................................................................................8

11

11 U.S.C. § 922 .......................................................................................24

12

11 U.S.C. § 943 ....................................................................................5, 11
11 U.S.C. § 1102(a) ..................................................................................5

13

11 U.S.C. § 1122 ...............................................................................12, 14
11 U.S.C. § 1124 ......................................................................................6

14

11 U.S.C. § 1125 ......................................................................................5
11 U.S.C. § 1129 .....................................................................................27

15

11 U.S.C. § 1142(b) ................................................................................26
California Health & Safety Code Section 32121(p) ...................................8

16

**RULES**

17

18

Bankruptcy Rule 9006(a) .........................................................................10

19

20

21

22

23

24

25

26

27

28

EXHIBIT A                                                61

1              Valley Health System (the "District"), a California local healthcare district and a

2  debtor under chapter 9 of the United States Bankruptcy Code, hereby proposes the following Plan of

3  Adjustment of Debts (this "Plan") pursuant to section 941 of the Bankruptcy Code.[1]

4              On October 6, 2009, at a special public meeting, the District's Board of Directors

5  considered and approved the Asset Sale Agreement that was ultimately dated October 14, 2009 (the

6  "ASA"), by and between the District and Physicians For Healthy Hospitals, Inc., a Delaware

7  corporation ("PHH"), that provides for a sale of substantially all of the District's assets to PHH (the

8  "Two Hospital Transaction").  At an election held on December 15, 2009, the District obtained

9  Public Approval of the Two Hospital Transaction.  The Two Hospital Transaction is the primary

10  means by which this Plan will be implemented.

11              Please refer to the accompanying Disclosure Statement for a discussion of the

12  District's history, operations, and financial condition, and for a summary and analysis of this Plan

13  and other important information.  A copy of the ASA will be posted to the District's website.  The

14  District encourages you to read this Plan and the Disclosure Statement in their entirety before voting

15.  to accept or reject this Plan.  No materials other than the Disclosure Statement and the various

16  Exhibits and Schedules attached to or incorporated therein have been approved for use in soliciting

17  acceptance or rejections of this Plan.

18  **I.**      **DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION**

19      **A.**    **Definitions.**

20          1.     **Administrative Claim** means any Claim for an administrative expense of the

21  kind described in sections 503(b) or 507(a)(2) of the Bankruptcy Code.

22          2.     **Allowed** means a Claim that:

23            a.    Is asserted in a proof of Claim filed in compliance with section 501 of

24  the Bankruptcy Code and any applicable orders of the Bankruptcy Court and as to which:

25  (i) no objection has been filed within the deadline established pursuant to Section IX; (ii) the

26  Bankruptcy Court has entered a Final Order allowing all or a portion of such Claim (but only

27

---

28  [1]  The definitions of capitalized terms used throughout this Plan are set forth in Section I.A.

533946v2

EXHIBIT A

1   in the amount so allowed); or (iii) the Bankruptcy Court has entered a Final Order under

2   section 502(c) of the Bankruptcy Code estimating the amount of the Claim for purposes of

3   allowance;

4         b.    Is represented by the Select Administrative Note;

5         c.    Is subject to a stipulation between the District and the holder of such

6   Claim providing for the allowance of such Claim;

7         d.    Is deemed "allowed" pursuant to this Plan;

8         e.    Is designated as "allowed" in a pleading entitled "Designation of

9   Allowed Claims" (or a similar title of the same import) filed with the Bankruptcy Court by

10  the District on or after the Effective Date; or

11        f.    Is an Administrative Claim as to which the Bankruptcy Court has

12  entered a Final Order allowing all or a portion of such claim (but only in the amount so

13  allowed), or is represented by the Select Administrative Note.

14      3.    **ASA** means the Asset Sale Agreement dated October 14, 2009, by and

15  between PHH and the District.

16      4.    **Assumption/Assignment Motion** means the motion to be filed with the

17  Bankruptcy Court prior to the Sale Closing Date, in which the District will seek approval of the

18  assumption and immediate assignment of the executory contracts and unexpired leases as are set

19  forth or provided for in the ASA, pursuant to section 365(a) and (f)(2) of the Bankruptcy Code.

20      5.    **Ballot** means the ballot(s), in the form(s) approved by the Bankruptcy Court

21  in the Plan Solicitation Order, accompanying the Disclosure Statement and provided to each holder

22  of a Claim entitled to vote to accept or reject this Plan.

23      6.    **Bankruptcy Code** means title 11 of the United States Code, as amended from

24  time to time, as applicable to the Chapter 9 Case.

25      7.    **Bankruptcy Court** means the United States Bankruptcy Court for the Central

26  District of California, Riverside Division, or such other court that lawfully exercises jurisdiction

27  over the Chapter 9 Case.

28

-3-

533946v2

EXHIBIT A

174
**EXHIBIT 2**

1        8.    **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as

2   amended from time to time, as applicable to the Chapter 9 Case, together with the local rules of the

3   Bankruptcy Court applicable to the Chapter 9 Case. Unless otherwise indicated, references in this

4   Plan to "Bankruptcy Rule _____" are to the specifically identified rule of the Federal Rules of

5   Bankruptcy Procedure.

6        9.    **Bar Date** means the applicable date by which a particular proof of Claim

7   must be filed, as established by the Bankruptcy Court.

8        10.    **Bond Documents** means (i) the Series 1993 IPA, (ii) the Series 1993

9   Indenture, and (iii) the Series 1996 Indenture.

10       11.    **Bondholders** mean the owners of the Bonds.

11       12.    **Bonds** means, collectively, the Series 1993 COPs and the Series 1996 Bonds.

12       13.    **Cash** means cash and cash equivalents, including withdrawable bank deposits,

13   wire transfers, checks, and other similar items.

14       14.    **Chapter 9 Case** means the case under chapter 9 of the Bankruptcy Code

15   commenced by the District, styled as *In re Valley Health System*, Case No. 6:07-bk-18293-PC,

16   currently pending in the Bankruptcy Court.

17       15.    **Claim** means a claim against the District or the property of the District within

18   the meaning of section 101(5) of the Bankruptcy Code.

19       16.    **Class** means one of the classes of Claims established under Section III

20   pursuant to section 1122 of the Bankruptcy Code.

21       17.    **Class 2B Claims** means the rejection and postpetition breach claims held by

22   KM Strategic Management, Inc., Hemet Community Medical Group, Menifee Valley Community

23   Medical Group and LHIO, LLC, including claims of constituent members thereof which are

24   derivative from such claims by the preceding entities, which are currently asserted in an aggregate

25   amount of approximately $55 million and which claims have been docketed in the claims docket in

26   the Chapter 9 Case as claim nos. 134, 135, 136 and 168.

27       18.    **Collateral** means any property or interest in property of the District subject

28   to a lien or security interest that is not subject to avoidance under the Bankruptcy Code or otherwise

-4-

533946v2

1 invalid under the Bankruptcy Code or applicable federal and/or state law.

2        19.    **Committee** means the Official Committee of Unsecured Creditors of Valley

3 Health System, appointed in the Chapter 9 Case by the Office of the United States Trustee pursuant

4 to section 1102(a)(1) of the Bankruptcy Code as the membership thereof has been reconstituted from

5 time to time by the Office of the United States Trustee.

6        20.    **Confirmation Date** means the date on which the Clerk of the Bankruptcy

7 Court enters the Confirmation Order on the docket of the Bankruptcy Court.

8        21.    **Confirmation Order** means the order of the Bankruptcy Court confirming

9 this Plan under section 943 of the Bankruptcy Code.

10        22.    **Defined Benefit Plan Participants** means the participants in the VHS

11 Retirement Plan.

12        23.    **Disallowed** means a Claim or portion thereof that has been disallowed by an

13 Order.

14        24.    **Disclosure Statement** means the disclosure statement, and all exhibits and

15 schedules incorporated therein, that relates to this Plan and that is approved by the Bankruptcy Court

16 pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, modified or

17 supplemented in accordance with the Bankruptcy Code.

18        25.    **Disputed Claim** means any Claim or portion thereof that has not become

19 Allowed and that is not Disallowed. In the event that any part of a Claim is Disputed, except as

20 otherwise provided in this Plan, such Claim shall be deemed Disputed in its entirety for purposes of

21 distribution under this Plan unless the District agrees otherwise in its sole discretion. Without

22 limiting the foregoing, a Claim that is the subject of a pending application, motion, complaint,

23 objection, or any other legal proceeding seeking to disallow, limit, reduce, subordinate, or estimate

24 such Claim shall be deemed to be Disputed.

25        26.    **District** means Valley Health System, a California local healthcare district

26 and the chapter 9 debtor in the Chapter 9 Case.

27        27.    **District Assets** means all the assets of the District which the District has

28 agreed to transfer to PHH at closing of the Two Hospital Transaction pursuant to the ASA.

533946v2

-5-

1       28.   **Effective Date** means the first day after the date on which the conditions

2   specified in Section XII.B have been satisfied or waived.

3       29.   **Final Order** means a judgment, order, ruling, or other decree issued and

4   entered by the Bankruptcy Court or by any state or other federal court or other tribunal having

5   jurisdiction over the subject matter thereof which judgment, order, ruling, or other decree has not

6   been reversed, stayed, modified, or amended and as to which: (a) the time to appeal or petition for

7   review, rehearing or certiorari has expired and no appeal or petition for review, rehearing or

8   certiorari is then pending; or (b) any appeal or petition for review, rehearing or certiorari has been

9   finally decided and no further appeal or petition for review, rehearing or certiorari can be taken or

10  granted.

11      30.   **General Unsecured Claim** means an Unsecured Claim.

12      31.   **Impaired** means a Claim or Interest that is impaired within the meaning of

13  section 1124 of the Bankruptcy Code.

14      32.   **Indenture Trustee** means U.S. Bank, National Association when acting in

15  that capacity in respect of the Bonds.

16      33.   **Kaiser** means Kaiser Foundation Hospitals.

17      34.   **MetLife Group Annuity Contract** means the MetLife Group Annuity

18  Contract No. 884 as amended, pursuant to which the VHS Retirement Plan is administered by

19  MetLife Group.

20      35.   **Moreno** means Moreno Valley Community Hospital, located in Moreno

21  Valley, California.

22      36.   **Moreno Asset Sale Agreement** means the Asset Sale Agreement dated

23  August 8, 2007 between the District and Select, as such has been amended by the First Amendment

24  to Asset Sale Agreement by and among the District, Select and Kaiser dated February 25, 2008 and

25  as further amended by the Second and Third Amendments thereto and side letter agreement dated

26  May 13, 2008.

27

28

-6-

533946v2

EXHIBIT A

66

1    37. **MOU** means the Memorandum of Understanding, dated September 16, 2009,

2 entered into by and between the District and PHH, which sets forth a summary of the salient terms of

3 the ASA.

4    38. **Ordinary Course Administrative Claim** means an Administrative Claim,

5 other than a Professional Claim, that represents an obligation incurred in the ordinary course of

6 business of the District (as determined by the District in its sole discretion).

7    39. **Petition Date** means December 13, 2007.

8    40. **PHH** means Physicians for Healthy Hospitals, Inc., a Delaware corporation,

9 the "Purchaser" under the ASA.

10    41. **Plan** means this Plan of Adjustment of Debts, together with all Exhibits

11 hereto, each in their present form or as they may be altered, amended or modified from time to time

12 in accordance with the provisions of this Plan, the Confirmation Order, the Bankruptcy Code, and

13 the Bankruptcy Rules.

14    42. **Plan Solicitation Order** means the Order Approving (I) Adequacy Of

15 Information In Disclosure Statement With Respect To The District's Plan Of Adjustment; (II) Form,

16 Scope And Nature of Solicitation, Balloting, Tabulation And Notices With Respect Thereto; And

17 (III) Related Confirmation Procedures, Deadlines And Notices, by which the Bankruptcy Court

18 approved the Disclosure Statement as containing adequate information for the purpose of

19 dissemination and solicitation of votes on and confirmation of this Plan and established certain rules,

20 deadlines, and procedures for the solicitation of votes with respect to and the balloting on this Plan.

21    43. **PHH Assumed Other Liabilities** means the liabilities of the District as of the

22 Effective Date that are to be assumed by PHH under section 1.2.1(a)(iii) of the ASA.

23    44. **PHH Administrative Claims Fund** means (i) the $4 million dollars that PHH

24 is required, pursuant to section 1.2.4.1 of the ASA, to deposit into a separate account designated

25 solely for the payment of Allowed Administrative Claims that are not PHH Assumed Other

26 Liabilities, and (ii) monies in excess of $4 million that may be payable to the District under section

27 1.2.4.3 of the ASA.

28

-7-

533946v2

1        45.    **Public Approval** means the requisite votes that were obtained in a public

2  election which was held on December 15, 2009, in accordance with the requirements of California

3  Health & Safety Code Section 32121(p), which votes allow the District to consummate the Two

4  Hospital Transaction as contemplated by the ASA.

5        46.    **Professional Claim** means a Claim required to be filed pursuant to Section II

6  for approval of amounts paid or to be paid for services or expenses in the Chapter 9 Case or incident

7  to this Plan.

8        47.    **Rejection Motion** means the motion to be filed, pursuant to section 365(a) of

9  the Bankruptcy Court, by the District pursuant to which the District shall seek approval and

10  authorization for the rejection of such executory contracts and unexpired leases as shall be identified

11  in the Rejection Motion.

12        48.    **Rights of Action** means any rights, claims, or causes of action owned by,

13  accruing to, or assigned to the District pursuant to the Bankruptcy Code or pursuant to any contract,

14  statute, or legal theory, including without limitation any rights to, claims, or causes of action for

15  recovery under any policies of insurance issued to or on behalf of the District.

16        49.    **Sale Closing Date** means the date that the Two Hospital Transaction is

17  consummated pursuant to the ASA.

18        50.    **Secured Claim** means a Claim that is secured, in whole or in part, (a) by a

19  lien that is not subject to avoidance or subordination under the Bankruptcy Code or applicable non-

20  bankruptcy law; or (b) as a result of rights of setoff under section 553 of the Bankruptcy Code; but in

21  any event only to the extent of the value, determined in accordance with section 506(a) of the

22  Bankruptcy Code, of the holder's interest in the District's interest in property or to the extent of the

23  amount subject to such setoff, as the case may be.

24        51.    **Select** means Select VHS Acquisition Company, LLC.

25        52.    **Select's Allowed Administrative Claim** means the Claim represented by the

26  Select Administrative Note that is entitled to administrative priority in the Chapter 9 Case.

27        53.    **Select Administrative Note** means the 5% unsecured promissory note of the

28  District issued to Select at the closing of the sale of Moreno to Kaiser, with a current approximate

533946v2

-8-

1  balance of $8,400,000, consistent with the form thereof that appears as Exhibit "A" to the Select

2  Stipulation.

3       54.   **Select Stipulation** means the stipulation among the District, Select and the

4  Indenture Trustee that was filed with the Bankruptcy Court and appears on the Docket of the

5  Chapter 9 Case as document number 199.

6       55.   **Series 1993 COPs** means the Valley Health System Certificates of

7  Participation (1993 Refunding Project) issued pursuant to (i) the Series 1993 IPA and (ii) the Series

8  1993 Indenture. The COPs designated as Series 1993 have a current principal amount of

9  approximately $40,615,000.

10      56.   **Series 1993 Indenture** means the Trust Agreement dated June 1, 1993 by and

11  among the Valley Health System Service Corporation, the District and First Interstate Bank as

12  Trustee, as predecessor indenture trustee, in connection with the Series 1993 COPs.

13      57.   **Series 1993 IPA** means the Installment Purchase Agreement dated June 1,

14  1993, entered into by the Valley Health System Service Corporation and the District in connection

15  with the Series 1993 COPs.

16      58.   **Series 1996 Bonds** means the Valley Health System Hospital Revenue Bonds

17  (Refunding and Improvements Project) 1996 Series A issued pursuant to the Series 1996 Indenture.

18  The Bonds designated as Series 1996 have a current principal amount of approximately $4,935,000.

19      59.   **Series 1996 Indenture** means the Trust Indenture dated January 1, 1996,

20  entered into between the District and First Interstate Bank, as predecessor indenture trustee, in

21  connection with the Series 1996 Bonds.

22      60.   **SNF** means Hemet Valley Healthcare Center, located in Hemet, California, at

23  which the District currently operates a chemical dependency program and Sage Retreat.

24      61.   **Two Hospital Transaction** means the sale of the District Assets to PHH

25  pursuant to the ASA in the event that Public Approval is obtained.

26      62.   **Unimpaired** means a Claim that is not Impaired within the meaning of

27  section 1124 of the Bankruptcy Code.

28

-9-

533946v2

1         63.    **Unsecured Claim** means any claim that is not a Secured Claim or an

2  Administrative Claim.

3         64.    **VHS Retirement Plan** means the "Valley Health System Retirement Plan

4  Adopted January 1, 1971", as amended.  Under section 4.8 of the VHS Retirement Plan, the plan

5  was frozen effective May 4, 1999, such that the "Accrued Benefit" of each plan participant was

6  frozen as of this date, and participants have accrued no benefits under the plan since such date.

7    **B.**    **Rules of Construction.**

8        The following rules of construction apply to this Plan:  (a) unless otherwise specified,

9  all references in this Plan to "Sections" and "Exhibits" are to the respective Section in or Exhibit to

10  this Plan, as the same may be amended or modified from time to time; (b) the headings in this Plan

11  are for convenience of reference only and do no limit or otherwise affect the provisions of this Plan;

12  (c) words denoting the singular number include the plural number and vice versa; (d) the rules of

13  construction set forth in section 102 of the Bankruptcy Code apply; (e) in computing any period of

14  time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) apply; and

15  (f) the words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Plan

16  as a whole and not to any particular Section, subsection, or clause contained in this Plan.

17  **II.**    **TREATMENT AND DEADLINE FOR THE ASSERTION OF ADMINISTRATIVE CLAIMS AND PROFESSIONAL CLAIMS**

18

19    **A.**    **Treatment Of Administrative Claims.**

20        **1.**    **Treatment of the Select Administrative Claims.**

21        Pursuant to section 1.2.1(a)(ii) of the ASA, at the closing of the Two Hospital

22  Transaction, the Select Note shall be satisfied in full or all obligations evidenced thereby shall be

23  assumed by PHH and the District shall be released from any further liability in connection with the

24  Select Administrative Note.  The District understands that Select has agreed to the foregoing

25  treatment.

26

27

28

-10-

533946v2

1        **2.**     **Treatment of All Other Administrative Claims, Except for Professional**

2               **Claims.**

3         Pursuant to paragraph 1.2.1(a)(iii) of the ASA, PHH shall, upon closing of the Two

4  Hospital Transaction, assume and satisfy certain postpetition administrative claims of the District

5  which are defined therein as the "Assumed Other Liabilities". The Assumed Other Liabilities

6  consist of the "Assumed Current Liabilities" and "Other Liabilities", both of which are defined in the

7  aforesaid section of the ASA. The District believes that substantially all of its administrative claims,

8  with the exception of professional fees and certain claims arising from the rejection of certain

9  postpetition executory contracts, will be included in the Assumed Other Liabilities. PHH shall also

10  contribute additional funds as are necessary to satisfy other Administrative Claims, including

11  Professional Claims ("Covered Claims", as defined in the ASA) in the event the $4 million

12  contributed at Closing is insufficient to pay such Covered Claims.

13        To the extent of any administrative claims, other than the Assumed Other Liabilities,

14  and except as provided in Section II.B, with respect to Professional Claims or to the extent that the

15  holder of an Allowed Administrative Claim agrees to a different treatment, the District or its agent

16  shall pay to each holder of an Allowed Administrative Claim, in full satisfaction, release and

17  discharge of such Claim, Cash in an amount equal to such Allowed Administrative Claim on the

18  later of (i) the Effective Date, (ii) the date on which such Claim becomes an Allowed Administrative

19  Claim, or as soon thereafter as is practicable, and (iii) the date funds are to be available for that

20  purpose under section 1.2.4.3 of the ASA.

21        From and after the Sale Closing Date, and except for Professional Claims, creditors

22  holding Claims that relate to, or arise from, any of the PHH Assumed Other Liabilities and Covered

23  Claims shall only have a right to collect payment on account of such Claims from PHH and the

24  Administrative Claims Fund, and the District shall thereafter be relieved of any and all liability for

25  the payment of any and all Claims relating to, or arising from, any of the PHH Assumed Current

26  Liabilities or Covered Claims.

27

28

533946v2

B.     **Treatment Of Professional Claims.**

Pursuant to section 943(a)(3) of the Bankruptcy Code, all amounts paid or to be paid for services or expenses in the Chapter 9 Case or incident to this Plan must be disclosed to the Bankruptcy Court and must be reasonable. There shall be paid to each holder of a Professional Claim, either from the PHH Administrative Claims Fund or the District's cash on hand, in full satisfaction, release and discharge of such Claim, Cash in an amount equal to that portion of such Claim that the Bankruptcy Court approves as reasonable with credit being given to the extent such Claim previously has been paid, on or as soon as reasonably practicable following the date on which the Bankruptcy Court enters an Order determining such reasonableness.

C.     **Priority Claims In Chapter 9.**

The only kind of priority claims incorporated into Chapter 9 through Section 901 are Administrative Claims allowed under section 507(a)(2) of the Bankruptcy Code. The treatment of all such Administrative Claims is set forth above in Sections II.A.1 and II.A.2. No other kinds of priority claims set forth in section 507 of the Bankruptcy Code are recognized in chapter 9 cases.

D.     **Deadline For The Filing And Assertion Of Administrative Claims (Other Than Ordinary Course Administrative Claims) And Professional Claims.**

All requests for payment or any other means of preserving and obtaining payment of Administrative Claims (other than ordinary course Administrative Claims and claims under the Select Administrative Note) that have not been paid, released, or otherwise settled, and all requests for approval of Professional Claims, must be filed with the Bankruptcy Court and served upon the District no later than thirty (30) days after the date on which the Notice of Effective Date is mailed. Any request for payment of an Administrative Claim or a Professional Claim that is not timely filed by such date will be forever barred, and holders of such Claims shall be barred from asserting such Claims in any manner against the District.

III.     **DESIGNATION OF CLASSES OF CLAIM**

Pursuant to section 1122 of the Bankruptcy Code, all Claims other than Administrative Claims and Professional Claims are classified for all purposes, including voting, confirmation, and distribution pursuant to this Plan, as follows:

-12-

533946v2

1          Class 1A – Claims of the Bondholders of the Series 1993 COPs

2          Class 1B – Claims of the Bondholders of the Series 1996 Bonds

3          Class 1C – Other Secured Claims

4          Class 2A – General Unsecured Claims

5          Class 2B – General Unsecured Claims of KM Strategic Management, Inc., Hemet

6    Community Medical Group, Menifee Valley Community Medical Group, LHIO, LLC and Claims of

7    Constituent Members Thereof

8          Class 2C – Defined Benefit Plan Claims

9    **IV.     TREATMENT OF CLAIMS**

10        A.     **Class 1A – Claims of the Bondholders of Series 1993 Bonds.**

11             1.     **Impairment And Voting.**

12             Class 1A is Impaired by this Plan since the treatment of this Class will affect the

13   legal, equitable or contractual right to which the holders of Claims in this Class are entitled and,

14   accordingly, this Class is entitled to vote to accept or reject this Plan in accordance with the Plan

15   Solicitation Order.

16             2.     **Treatment.**

17             The Indenture Trustee for the Series 1993 COPs will be paid, on the Sale Closing

18   Date, a sum sufficient to fully satisfy all Allowed Class 1A Claims, including payment of all

19   outstanding principal and accrued interest on the Series 1993 COPs through the Sale Closing Date,

20   plus all related outstanding fees and expenses of the Indenture Trustee and its attorneys and advisors

21   to which the Indenture Trustee is entitled.

22        B.     **Class 1B – Claims of the Bondholders of the Series 1996 Bonds.**

23             1.     **Impairment and Voting.**

24             Class 1B is Impaired by this Plan since the treatment of this Class will affect the

25   legal, equitable or contractual right to which the holders of Claims in this Class are entitled and,

26   accordingly, this Class is entitled to vote to accept or reject this Plan in accordance with the Plan

27   Solicitation Order.

28

-13-

533946v2

2.    **Treatment.**

.    The Indenture Trustee for the Series 1996 Bonds will be paid, on the Sale Closing Date, a sum sufficient to fully satisfy all Allowed Class 1B Claims, including payment of all outstanding principal and accrued interest on the Series 1996 Bonds through the Sale Closing Date, plus all related outstanding fees and expenses of the Indenture Trustee and its attorney and advisors to which the Indenture Trustee is entitled.

C.    **Class 1C – Other Secured Claims.**

1.    **Impairment and Voting.**

In accordance with Bankruptcy Code section 1122(a), to the extent that there is more than one Holder of an Allowed Class 1C Claim, the Claim of each such Holder shall be deemed to be classified in a separate sub-class of Class 1C, such that each such sub-class of Class 1C shall be deemed to be a separate Class under this Plan.

Class 1C is Unimpaired by this Plan and, accordingly, the holders of Claims in this Class are not entitled to vote such Allowed Claims, if any, to accept or reject this Plan and the Holders of Claims in Class 1C are presumed to have accepted this Plan.

2.    **Treatment.**

As soon as practicable after the Effective Date, each entity holding an Allowed Class 1C Claim will receive, at the election of the District, in its discretion, one of the following treatments in full satisfaction, discharge, exchange and release of its Allowed 1C Claim:

(a)    The Holder of the Class 1C Claim will receive the Collateral in which that Holder has a security interest; or

(b)    The Holder of the Class 1C Claim will receive any proceeds actually received by the District from the sale or disposition of the Collateral in which that Holder has a security interest; or

(c)    The Holder of the Class 1C Claim will receive Cash in the amount of that Holder's Allowed Class 1C Claim; or

-14-

533946v2

1        (d)    The Holder of the Class 1C Claim will receive such other distributions or

2                treatment as are necessary to leave the rights of said Holder Unimpaired or as

3                are necessary to otherwise satisfy those requirements of chapter 11 that are

4                incorporated into chapter 9 of the Bankruptcy Code.

5        The District shall have fourteen (14) days after the date on which the Class 1C Claim

6  is Allowed or deemed Allowed, to elect which treatment to provide to such holder of an Allowed

7  Class 1C Claim.

8      **D.**     **Class 2A -- General Unsecured Claims.**

9         **1.**     **Impairment And Voting.**

10         Class 2A is Impaired by this Plan and, accordingly, the holders of Allowed

11  Claims classified into Class 2A are entitled to vote their Allowed General Unsecured Claims to

12  accept or reject this Plan in accordance with the Plan Solicitation Order.

13         **2.**     **Treatment.**

14         The holders of Allowed Claims classified into Class 2A shall receive their pro

15  rata share of $17 million or such increased or reduced amount that will be available for payment of

16  such Claims, as discussed below, which distributions shall be paid in four equal annual installments

17  without interest, with the first payment to be made on the first anniversary of the Sale Closing Date,

18  and on each anniversary thereafter; provided, however, that such $17 million may either be

19  (a) increased by any unused portion of the $4 million that PHH will deposit into the PHH

20  Administrative Claims Fund; or (b) reduced, at the time and in the manner set forth in section 1.2.4.3

21  of the ASA, by any amount in excess of the $4 million that PHH may be required to deposit into the

22  PHH Administrative Claims Fund to pay Allowed Administrative Claims in full.

23      **E.**     **Class 2B – General Unsecured Claims of KM Strategic Management, Inc.,**
24             **Hemet Community Medical Group, Menifee Valley Community Medical Group,**
                 **and LHIO, LLC and Claims of Constituent Members Thereof.**

25         **1.**     **Impairment And Voting.**

26         Class 2B is Impaired by this Plan and, accordingly, the holders of Claims

27  classified into Class 2B are entitled to vote their General Unsecured Claims to accept or reject this

28  Plan in accordance with the Plan Solicitation Order.

-15-

533946v2

1     **2.**     **Treatment.**

2     Upon the Sale Closing Date, PHH will assume or otherwise satisfy all

3 obligations owed to holders of Allowed Class 2B Claims, with the District being fully and

4 completely released from any liability thereunder and held harmless from such Claims by PHH.

5 Accordingly, the holders of Allowed Class 2B Claims shall receive no distributions from, and shall

6 have no recourse to, the District or any property of the District.

7     **F.**     **Class 2C - Interests of Defined Benefit Plan Participants.**

8     **1.**     **Impairment And Voting.**

9     Class 2C is Unimpaired by this Plan and, accordingly, the Defined Benefit

10 Plan Participants are not entitled to vote such Allowed Claims, if any, as they may have to accept or

11 reject this Plan.

12     **2.**     **Treatment.**

13     Defined Benefit Plan Participants will be entitled to the same rights and

14 benefits to which such participants are currently entitled under the VHS Retirement Plan and the

15 MetLife Group Annuity Contract, and such participants shall have no recourse to the District or to

16 any assets of the District, and shall not be entitled to receive any distributions under this Plan.

17 Instead, all unallocated amounts held by MetLife Group, pursuant to the VHS Retirement Plan and

18 the MetLife Group Annuity Contract, will continue to be made available to provide retirement

19 benefits for participants in the manner indicated under the provisions of the VHS Retirement Plan

20 and the MetLife Group Annuity Contract. Accordingly, the treatment of Allowed Class 2C Claim

21 holders set forth herein shall not affect any legal, equitable or contractual rights to which the VHS

22 Retirement Plan participants are entitled.

23 **V.**     **ACCEPTANCE OR REJECTION; CRAM DOWN**

24     **A.**     **Voting Of Claims.**

25     Each holder of an Allowed Claim classified into Classes 1A, 1B, 2A and 2B shall be

26 entitled to vote each such Claim to accept or reject this Plan.

27     With respect to any Impaired Class of Claims that fails to accept this Plan, the

28 District, as proponent of this Plan, intends to request that the Bankruptcy Court nonetheless confirm

-16-

533946v2

1   this Plan pursuant to the so-called "cram down" powers set forth in Bankruptcy Code section

2   1129(b).

3   **VI.**     **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

4       **A.**     **Assumption Of Executory Contracts And Unexpired Leases.**

5         As to any executory contract or unexpired lease that PHH notifies the District in

6   writing that it has duly elected to assume in the manner and in the time period required by the ASA,

7   the District shall make the Assumption/Assignment Motion, which, if granted shall cause the

8   District to assume and assign such contracts and leases to PHH pursuant to order of the Bankruptcy

9   Court.

10       **B.**     **Cure Payments.**

11         After the provision of notice and the opportunity for a hearing on the

12   Assumption/Assignment Motion, in accord with the Bankruptcy Rules, the Bankruptcy Court shall

13   resolve all disputes regarding: (a) the amount of any cure payment to be made in connection with the

14   assumption of any contract or lease; (b) the ability of PHH to provide "adequate assurance of future

15   performance" within the meaning of section 365 of the Bankruptcy Code under the contract or lease

16   to be assumed; and (c) any other matter pertaining to such assumption and assignment. Any party to

17   an executory contract or unexpired lease that is included in the Assumption/Assignment Motion that

18   asserts that any payment or other performance is due as a condition to the proposed assumption shall

19   file with the Bankruptcy Court and serve upon the District a written statement and accompanying

20   declaration in support thereof, specifying the basis for its claim within such deadline and in the

21   manner established for filing objections as shall be set forth in the Assumption/Assignment Motion.

22   The failure to timely file and serve such a statement in accordance with the instructions set forth in

23   the Assumption/Assignment Motion shall be deemed to be a waiver of any and all objections to the

24   proposed assumption and any claim for cure amounts of the agreement at issue.

25       **C.**     **Rejection of Executory Contracts And Unexpired Leases.**

26         The Rejection Motion shall seek authority to reject such executory contracts and

27   unexpired leases that PHH has not elected to assume that the District in the exercise of its business

28

-17-

533946v2

EXHIBIT A

1   judgment deems warranted.  The District anticipates rejecting any executory contract and unexpired

2   lease that is not needed for it to continue operating as a healthcare district.

3        **D.**    **Claims Arising From Rejection.**

4           Proofs of Claims arising from the rejection of executory contracts or unexpired leases

5   must be filed with the Bankruptcy Court and served on the District no later than thirty (30) days after

6   the date on which notice of entry of the order approving the rejection is mailed.  Any Claim for

7   which a proof of Claim is not filed and served within such time will be forever barred and shall not

8   be enforceable against the District or its assets, properties, or interests in property.  Unless otherwise

9   ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be

10  classified into Class 2A and treated accordingly.

11  **VII.**   **IMPLEMENTATION AND MEANS FOR IMPLEMENTATION OF THIS PLAN**

12       **A.**    **The Two Hospital Transaction.**

13          PHH will provide the following combination of cash and assumption of liabilities to

14  enable the District to implement this Plan and satisfy its obligations under the Two Hospital

15  Transaction described in this Plan:

16          (1)    An amount of cash sufficient to pay the Allowed Claims in Classes 1A and 1B

17  in full, on the Sale Closing Date, after application of any reserves held internally by the District for

18  payment of interest or principal on Class 1A and Class 1B Claims.

19          (2)    Assumption of the Select Note.

20          (3)    Assumption of the PHH Assumed Current Liabilities and indemnification of

21  the District with respect thereto.

22          (4)    Payment in full of Administrative Claims that are not part of the PHH

23  Assumed Current Liabilities from the $4 million PHH Administrative Claims Fund or such

24  additional monies as are needed to pay Allowed Administrative Claims, to be funded by PHH

25  pursuant to section 1.2.4 of the ASA.

26          (5)    Contribute $17 million towards payment of Allowed Class 2A Claims in four

27  equal annual payments, with the first distribution to be made on the first anniversary of the Sale

28  Closing Date; provided however, that to the extent the PHH Administrative Claims Fund is

-18-

533946v2

EXHIBIT A

78

1   insufficient to pay all of the Allowed Administrative Claims in full, PHH shall be obligated to
2   advance any such additional amounts as are necessary to pay all Allowed Administrative Claims,
3   and any amount so advanced shall be deducted dollar for dollar from PHH's obligation to contribute
4   $17 million for the payment of Allowed Class 2A General Unsecured Claims while, conversely, to
5   the extent the PHH Administrative Claim Fund is not fully needed to pay Allowed Administrative
6   Claims, such excess shall be added to the $17 million to be paid pro rata to Class 2A.

7            (6)    Assume or otherwise satisfy claims designated in the Bankruptcy Court
8   docket by numbers 134, 135, 136 and 168 and indemnify and hold the District harmless with respect
9   thereto.

10           (7)    Accept assignment of the contract and leases as required by the ASA.

11           (8)    Pay the severance payments owing to those District employees to whom PHH
12   does extend an offer of employment consistent with the terms set forth in the ASA or its Schedules.

13           (9)    Provide $400,000 per year to the District, commencing on the Sale Closing
14  Date, for a period of five (5) years for use by the District, among other things, to pay its ongoing
15  operating expenses, including payroll and professional fees, and to fund any necessary elections,
16  monitor PHH's performance under the ASA, evaluate, analyze and object to creditor claims and
17  resolve any disputes concerning creditor claims, and make distributions to creditors under this Plan.

18           (10)   Pay, for a period of five (5) years from the Sale Closing Date, the premiums
19  for (a) the District's directors and officers tail errors and omissions insurance, which is currently
20  estimated at $450,000 and (b) the general liability and medical malpractice tail insurance currently
21  estimated at $3,750,000.

22  **B.**   **Claims and Causes of Action.**

23           Pursuant to section 1.6.12 of the ASA, all of the District's claims, causes of action,
24  rights of recovery, rights of offset, recoupment rights to refunds and similar rights shall be
25  transferred to PHH with certain limited exceptions set forth in section 1.7 of the ASA or Schedule
26  1.6.12 to the ASA.

27           The failure to list in the Disclosure Statement any potential or existing Right of
28  Action retained by the District under the ASA generally or specifically is not intended to and shall

-19-

533946v2

1  not limit the rights of the District to pursue any such action. Unless a Right of Action is expressly

2  waived, relinquished, released, compromised or settled in this Plan, the District expressly reserves

3  all Rights of Action for later adjudication and, as a result, no preclusion doctrine, including the

4  doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial,

5  equitable or otherwise) or laches, shall apply to such Rights of Action upon or after the confirmation

6  or consummation of this Plan or the Effective Date. In addition, the District expressly reserves the

7  right to pursue or adopt against any other entity any claims alleged in any lawsuit in which the

8  District is a defendant or an interested party.

9  **VIII.  DISTRIBUTIONS**

10.      **A.      Distribution Agent.**

11          On or after the Effective Date, the District may retain one or more agents to perform

12  or assist it in performing the distributions to be made pursuant to this Plan, which agents may

13  perform without bond. The District may provide reasonable compensation to any such agent(s)

14  without further notice or Court approval.

15      **B.      Delivery Of Distributions.**

16          All distributions to any holder of an Allowed Claim shall be made at the address of

17  such holder as set forth in the books and records of the District or its agents, unless the District has

18  been notified by such holder in a writing that contains an address for such holder different from the

19  address reflected in its books and records. All distributions to the Bondholders shall be made in

20  accordance with the operative documents that govern the Bonds.

21      **C.      Undeliverable Distributions.**

22          **1.      Holding Of Undeliverable Distributions.**

23              If any distribution to any holders is returned to the District or its agent as

24  undeliverable, no further distributions shall be made to such holder unless and until the District is

25  notified in writing of such holder's then-current address. Unless and until the District is so notified,

26  such distribution shall be deemed to be "Unclaimed Property" and shall be dealt with in accordance

27  with Section VIII.C.2.

28

-20-

533946v2

1    2.  **Unclaimed Property.**

2      If any entity entitled to receive distributions pursuant to this Plan does not

3 present itself on the Effective Date or on such other date on which such entity becomes eligible for

4 distribution, such distributions shall be deemed to be "Unclaimed Property."  Unclaimed Property

5 shall be set aside and held in a segregated account to be maintained by the District pursuant to the

6 terms of this Plan.

7    3.  **Notification And Forfeiture Of Unclaimed Property.**

8      On the first anniversary of the Effective Date, the District shall file with the

9 Bankruptcy Court a list of Unclaimed Property, together with a schedule that identifies the name and

10 last-known address of holders of the Unclaimed Property; the District otherwise shall not be required

11 to attempt to locate any such entity.  On the second anniversary of the Effective Date, all remaining

12 Unclaimed Property and accrued interest or dividends earned thereon shall be remitted to and vest in

13 the District.

14   **D.**  **Distributions of Cash.**

15      Any payment of Cash to be made by the District or its agent pursuant to this Plan

16 shall be made by check drawn on a domestic bank or by wire transfer, at the sole option of the

17 District.

18   **E.**  **Timeliness Of Payments.**

19      Any payments or distributions to be made pursuant to this Plan shall be deemed to be

20 timely made if made within fourteen (14) days after the dates specified in this Plan; provided,

21 however, that all distributions on the Class 1A and Class 1B Claims will be paid on the Sale Closing

22 Date.  Whenever any distribution to be made under this Plan shall be due on a day that is a Saturday,

23 Sunday, or legal holiday, such distribution instead shall be made, without interest, on the

24 immediately succeeding day that is not a Saturday, Sunday, or legal holiday, but shall be deemed to

25 have been made on the date due.

26   **F.**  **Compliance With Tax Requirements.**

27      The District shall comply with all tax withholding and reporting requirements

28 imposed on it by any government unit, and all distributions pursuant to this Plan shall be subject to

-21-

533946v2

1  such withholding and reporting requirements.  In connection with each distribution with respect to

2  which the filing of an information return (such as Internal Revenue Service Form 1099 or 1042) or

3  withholding is required, the District shall file such information return with the Internal Revenue

4  Service and provide any required statements in connection therewith to the recipients of such

5  distribution, or effect any such withholding and deposit all moneys so withheld to the extent required

6  by law.  With respect to any entity from whom a tax identification number, certified tax

7  identification number, or other tax information is required by law to avoid withholding has not been

8  received by the District, the District at its sole option, may withhold the amount required and

9  distribute the balance to such entity or decline to make such distribution until the information is

10  received.

11  **G.**    **Time Bar To Cash Payments.**

12  Checks issued by the District on account of Allowed Claims shall be null and void if

13  not negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for

14  reissuance of any check shall be made directly to the District by the holder of the Allowed Claim

15  with respect to which such check originally was issued.  Any claim in respect of such a voided check

16  shall be made on or before the second anniversary of the Effective Date.  After such date, all Claims

17  in respect of voided checks shall be discharged and forever barred and the District shall retain all

18  moneys related thereto.

19  **H.**    **No *De Minimis* Distributions.**

20  Notwithstanding any other provision of this Plan, no Cash payment of less than ten

21  dollars ($10.00) shall be made by the District on account of any Allowed Claim.

22  **I.**    **No Distributions On Account Of Disputed Claims.**

23  Notwithstanding anything to the contrary in this Plan, no distributions shall be made

24  on account of any part of any Disputed Claim until such Claim becomes Allowed (and then only to

25  the extent so Allowed).  Distributions made after the Effective Date in respect of Claims that were

26  not Allowed as of the Effective Date (but which later became Allowed) shall be deemed to have

27  been made as of the Effective Date.

28

-22-

533946v2

EXHIBIT A

82

98

J.  **No Postpetition Accrual.**

1

2  Unless otherwise specifically provided in this Plan or Allowed by order of the

3  Bankruptcy Court, the District shall not be required to pay to any holder of a Claim any interest,

4  penalty or late charge accruing with respect to such Claim on or after the Petition Date. As provided

5  in this Plan, all postpetition interest which has accrued on the Bonds will be paid through the Sale

6  Closing Date.

7  IX.  **DISPUTED CLAIMS; OBJECTIONS TO CLAIMS; PROSECUTION OF
      OBJECTIONS TO DISPUTED CLAIMS.**

8

9  A.  **Claims Objection Deadline; Prosecution of Objections.**

10  The District shall have the right to object to the allowance of Claims filed with the

11  Bankruptcy Court with respect to which liability or allowance is disputed in whole or in part. Unless

12  otherwise ordered by the Bankruptcy Court, the District shall file and serve any such objections to

13  Claims by not later than one hundred and eighty (180) days after the Effective Date (or, in the case

14  of Claims lawfully filed after the Effective Date, by not later than one hundred and eighty (180) days

15  after the date of filing of such Claims).

16  B.  **Reserves, Payments, And Distributions With Respect To Disputed Claims.**

17  At such time as a Disputed Claim becomes an Allowed Claim, in whole or in part, the

18  District or its agent shall distribute to the holder thereof the distributions, if any, to which such

19  holder is then entitled under this Plan. Such distributions, if any, shall be made as soon as

20  practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed

21  Claim becomes a Final Order (or such other date as the Claim becomes an Allowed Claim), but in no

22  event more than thirty (30) days thereafter. Unless otherwise specifically provided in this Plan or

23  Allowed by order of the Bankruptcy Court, no interest shall be paid on Disputed Claims that later

24  become Allowed Claims.

25  X.  **EFFECT OF CONFIRMATION**

26  A.  **Discharge Of The District.**

27  Pursuant to section 944 of the Bankruptcy Code, upon the Effective Date, the District

28  shall be discharged from all debts (as defined in the Bankruptcy Code) of the District and Claims

-23-

1  against the District other than (a) any debt specifically and expressly excepted from discharge by this

2  Plan or the Confirmation Order, or (b) any debt owed to an entity that, before the confirmation of

3  this Plan, had neither notice nor actual knowledge of the Chapter 9 Case.

4         The rights afforded in this Plan and the treatment of all Holders of Claims, be the

5  Claims Impaired or Unimpaired under this Plan, shall be in exchange for and in complete

6  satisfaction, discharge and release of all Claims of any nature whatsoever arising on or before the

7  Effective Date, known or unknown, including any interest accrued or expenses incurred thereon

8  from and after the Petition Date, whether against the District or any of its properties, assets or

9  interests in property. Except as otherwise provided herein, upon the Effective Date, all Claims

10  against the District shall be and shall be deemed to be satisfied, discharged and released in full, be

11  they Impaired or Unimpaired under this Plan.

12      **B.**    **Injunction.**

13         Except as otherwise expressly provided in this Plan, all entities who have held, hold

14  or may hold pre-Effective Date Claims shall be permanently enjoined from and after the Effective

15  Date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind

16  with respect to any such pre-Effective Date Claim against the District or its property; (b) enforcing,

17  attaching, collecting, or recovering by any manner or means any judgment, award, decree or order

18  against the District or its property with respect to such pre-Effective Date Claims; (c) creating,

19  perfecting, or enforcing any lien or encumbrance of any kind against the District or its property; and

20  (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to

21  the District with respect to any such pre-Effective Date Claim, except as otherwise permitted by

22  section 553 of the Bankruptcy Code.

23      **C.**    **Term Of Existing Injunctions Or Stays.**

24         Unless otherwise provided, all injunctions or stays provided for in the Chapter 9 Case

25  pursuant to sections 105, 362, or 922 of the Bankruptcy Code, or otherwise, and in existence on the

26  Confirmation Date, shall remain in full force and effect until the Effective Date.

27

28

-24-

533946v2

XI.    **RETENTION OF JURISDICTION**

Following the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction over any matter (x) arising under the Bankruptcy Code and relating to the District, (y) arising in or related to the Chapter 9 Case or this Plan or the Plan Documents, and (z) otherwise for the following:

1.    to resolve any objection duly and timely filed by either PHH or the Committee under sections 1.2.4.2 or 1.2.4.3 of the ASA to the District's intent to pay a given Claim or Claims that appears on the list of Covered Claim from the PHH Administrative Claims Fund or that would make the aggregate amount of Covered Claims paid in excess of the PHH Administrative Claims Fund;

2.    to resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the District is a party or with respect to which the District may be liable, and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to the amendment after the Effective Date of this Plan, and to add any executory contracts or unexpired leases to the Rejection Motion, as necessary;

3.    to enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents related to this Plan;

4.    to determine any and all motions, adversary proceeding, applications and contested or litigated matters that may be pending on the Effective Date or that, pursuant to this Plan, may be instituted by the District after the Effective Date or that are instituted by any holder of a Claim before or after the Effective Date concerning any matter based upon, arising out of, or relating to the Chapter 9 Case, whether or not such action initially is filed in the Bankruptcy Court or any other court;

5.    to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

-25-

533946v2

6.      to hear and determine any objections to Claims or to proofs of Claim filed, both before and after the Effective Date, including any objections to the classification of any Claim, and to allow, disallow, determine, liquidate, classify, estimate or establish the priority of or secured or unsecured status of any Claim, in whole or in part;

7.      to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed or vacated;

8.      to issue such orders in aid of execution of this Plan, to the extent authorized by section 1142(b) of the Bankruptcy Code;

9.      to consider any modifications of this Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

10.     to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

11.     to hear and determine all disputes or controversies arising in connection with or relating to this Plan or the Confirmation Order or the interpretation, implementation, or enforcement of this Plan or the Confirmation Order or the extent of any entity's obligations incurred in connection with or released under this Plan or the Confirmation Order;

12.     to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of this Plan;

13.     to determine any other matters that may arise in connection with or are related to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document related to this Plan or the Disclosure Statement (including the Plan Documents);

14.     to hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code;

15.     to hear and determine any Rights of Action retained by the District under the ASA;

-26-

533946v2

EXHIBIT A

1     16. to hear and determine any motion made by the Indenture Trustee under

2 paragraph 8 of the Select Stipulation utilizing the standards set forth therein; and

3     17. to enter a final decree closing the Chapter 9 Case.

4 **XII.** **CONDITIONS PRECEDENT**

5   **A.** **Condition Precedent To Confirmation.**

6    The entry of the Confirmation Order in form and substance satisfactory to the District

7 and PHH shall be a condition precedent to confirmation of this Plan.

8   **B.** **Conditions Precedent To Effective Date.**

9    The "effective date of the plan," as used in section 1129 of the Bankruptcy Code,

10 shall not occur, and this Plan shall be of no force and effect, until the Effective Date.  The

11 occurrence of the Effective Date is subject to the satisfaction (or waiver as set forth in Section XII.C)

12 of the following conditions precedent:

13     1. **Confirmation Order.**  The Confirmation Order shall have been

14 entered.

15     2. **Plan Documents.**  All agreements and instruments contemplated by,

16 or to be entered into pursuant to, this Plan shall be in form and substance acceptable to the District

17 and PHH and shall have been duly and validly executed and delivered, or deemed executed by the

18 parties thereto, and all conditions to their effectiveness shall have been satisfied or waived.

19     3. **Sale Closing.**  The occurrence of the Sale Closing Date with respect to

20 the Two Hospitals Transaction.

21     4. **Satisfaction of Class 1A and 1B Claims.**  The payments

22 contemplated under Sections IV.A.2 and IV.B.2 of this Plan are made on the Sale Closing Date;

23 provided, however, that such condition may be waived in writing by the Indenture Trustee.

24     5. **Timing.**  The Effective Date shall occur on the first day after which

25 the conditions set forth in Section XII.B are satisfied or waived; *provided* that, unless otherwise

26 ordered by the Bankruptcy Court, the Effective Date must occur by no later than one year after the

27 Confirmation Date.

28

-27-

533946v2

EXHIBIT A

87

103

**C.**      **Waiver Of Conditions To Effective Date.**

       The District or PHH may waive in whole or in part condition 2 to effectiveness of this Plan. Any such waiver of a condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

**D.**      **Effect Of Failure Of Conditions.**

       In the event that the conditions to effectiveness of this Plan have not been timely satisfied or waived, and upon notification submitted by the District to the Bankruptcy Court (a) the Confirmation Order shall be vacated, (b) no distributions under this Plan shall be made, (c) the District and all holders of Claims shall be restored to the *status quo* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (d) all of the District's obligations with respect to the Claims shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the District or any other entity or to prejudice in any manner the rights of the District or any entity in any further proceedings involving the District.

**XIII. MISCELLANEOUS PROVISIONS**

**A.**      **Dissolution Of The Committee.**

       On the Effective Date, the Committee shall be released and discharged of and from all further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 9 Case and the Committee shall be deemed dissolved and its appointment terminated. The professionals retained by the Committee and the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered or expenses incurred after the Effective Date, except for services rendered and expenses incurred in connection with any applications by such professionals or committee members for allowance of Professional Claims timely filed after the Effective Date as provided in this Plan.

**B.**      **Severability.**

       If, prior to the Confirmation Date, any term or provisions of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, with the consent of the

-28-

533946v2

1    District, shall have the power to alter and interpret such term or provision to make it valid or

2    enforceable to the maximum extent practicable, consistent with the original purpose of the term or

3    provision held to be invalid, void or unenforceable, and such term or provision shall then be

4    applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation,

5    the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall

6    in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The

7    Confirmation Order shall constitute a judicial determination and shall provide that each term and

8    provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is

9    valid and enforceable pursuant to its terms.

10        C.      **Governing Law.**

11            Except to the extent that the Bankruptcy Code or other federal law is applicable, or to

12    the extent that an Exhibit hereto or Plan Document provides otherwise, the rights, duties and

13    obligations arising under this Plan shall be governed by, and construed and enforced in accordance

14    with, the laws of the State of California, without giving effect to principles of conflicts of laws.

15        D.      **Effectuating Documents And Further Transactions.**

16            Each of the officials and employees of the District is authorized to execute, deliver,

17    file, or record such contracts, instruments, releases, indentures, and other agreements or documents

18    and take such actions as may be necessary or appropriate to effectuate and further evidence the terms

19    and provisions of this Plan.

20        E.      **Notice Of Effective Date.**

21            On or before ten (10) days after occurrence of the Effective Date, the District or its

22    agent shall mail or cause to be mailed to all holders of Claims a Notice that informs such holders of:

23    (a) entry of the Confirmation Order; (b) the occurrence of the Effective Date; (c) the assumption and

24    rejection of the District's executory contracts and unexpired leases pursuant to this Plan, as well as

25    the deadline for the filing of Claims arising from such rejection; (d) the deadline established under

26    this Plan for the filing of Administrative Claims; (e) the procedures for changing an address of

27    record pursuant to Section VII.B; and (f) such other matters as the District deems to be appropriate.

28

-29-

533946v2

EXHIBIT A

200
**EXHIBIT 2**

DATED: December 16, 2009

VALLEY HEALTH SYSTEM

By:     /s/ Joel M. Bergenfeld
        Joel M. Bergenfeld,
        Chief Executive Officer

Submitted By:

STUTMAN, TREISTER & GLATT
PROFESSIONAL CORPORATION
Reorganization Counsel for the District

By:     /s/ Neeta Menon
        Charles D. Axelrod
        Gary E. Klausner
        H. Alexander Fisch
        Neeta Menon

-30-

533946v2

# Exhibit 5

1  CHARLES D. AXELROD (STATE BAR NO. 39507)
   GARY E. KLAUSNER (STATE BAR NO. 69077)
2  MARINA FINEMAN (STATE BAR NO. 193065)
   NEETA MENON (STATE BAR NO. 254736)
3  STUTMAN, TREISTER & GLATT
   PROFESSIONAL CORPORATION
4  1901 Avenue of the Stars
   12th Floor
5  Los Angeles, CA 90067
   Telephone:  (310) 228-5600
6  Telecopy:  (310) 228-5788
   caxelrod@stutman.com
7  gklausner@stutman.com
   afisch@stutman.com
8  nmenon@stutman.com

9  Chapter 9 Counsel for
   Valley Health System

10

11                    UNITED STATES BANKRUPTCY COURT

12                    CENTRAL DISTRICT OF CALIFORNIA

13                          RIVERSIDE DIVISION

14

15  In re                          )  Case No. 6:07-bk-18293-PC
                                    )
16  VALLEY HEALTH SYSTEM,           )  Chapter 9
                                    )
17                                  )
                                    )  **MODIFICATION OF FIRST AMENDED**
18                                  )  **PLAN FOR THE ADJUSTMENT OF**
                                    )  **DEBTS OF VALLEY HEALTH SYSTEM**
19                                  )  **DATED DECEMBER 17, 2009**
                                    )
20                                  )
                                    )
21                                  )
                                    )
22              Debtor,             )
                                    )  [No Hearing Required]
23                                  )
                                    )
24                                  )
                                    )
25                                  )
                                    )
26                                  )
                                    )
27  _____)

28

536695v1                         203

1              Valley Health System, the debtor in this chapter 9 case ("District"), hereby files,

2   pursuant to Bankruptcy Code section 942, the modifications set forth in numbered paragraph 1-4

3   below (the "Plan Modifications") to the "First Amended Plan For The Adjustment Of Debts Of

4   Valley Health System Dated December 17, 2009" (the "Existing Plan") that was found by the Court

5   in the plan confirmation proceedings that commenced on the February 9, 2010 (the "February 9th

6   Record") and were continued to February 22, 2010, to have been duly accepted by each class of

7   claims impaired thereunder. The Plan Modifications are enumerated in the February 9th Record as

8   are the rulings of the Court that (i) no further disclosure concerning the Plan Modifications is

9   required and (ii) the Plan Modifications do not adversely change the treatment of the claims of any

10   creditors other than those that voluntarily agreed to subordinate their claims on an individualized

11   basis. Accordingly, upon the filing of the Plan Modifications: (i) the Existing Plan, as so modified,

12   becomes the chapter 9 plan for adjustment of the debts of District pursuant to section 942 of the

13   Bankruptcy Code and (ii) pursuant to section 1127(d) of the Bankruptcy Code and Rule 3019(a) of

14   the Federal Rules of Bankruptcy Procedure, the Existing Plan, as so modified, is deemed accepted

15   by all creditors who previously accepted the Existing Plan.

16           1.      Section A of Article I of the Existing Plan is augmented by adding the

17   following:

18              "16.A. <u>Class 2A Claims Allowance/Disbursing Agent</u> means the

19      person or entity designated by the Creditors Committee to: (a) assess the filed Class

20      2A proofs of claim and their supporting documentation, if any, (b) object to the

21      allowance of any Class 2A claim in whole or in part, (c) receive from PHH all funds

22      to be distributed to Class 2A, (d) distribute pro rata (subject to subordination

23      agreements entered into by holders of certain Class 2A Claims) to the holders of

24      Allowed Class 2A Claims all funds received from PHH that remain after paying its

25      fees and costs and those of any professional person it retains to assist it in discharging

26      its functions."

27           2.      Section D.2. of Article IV of the Existing Plan is modified by

28

536695v1

1          (i)     inserting in line 3 thereof "approximately $ 2 million on the Effective

2    Date and the balance" after "paid"; and

3          (ii)    inserting at the end of Section D.2. "and further reduced by the fees

4    and costs of the Class 2A Claims Allowance/Disbursing Agent and those of any professional person

5    retained by it to assist in the discharge of its duties."

6          3.    Section A of Article VIII of the Existing Plan is deleted to negate the power of

7    the District to retain a disbursing agent.

8          4.    Sections A. and B. of Article IX of the Existing Plan are amended by deleting

9    "the District" from the two places that it appears in Section A and the one time it appears in Section

10   B with the "Class 2A Claims Allowance/Disbursing Agent" being inserted in lieu thereof so as to

11   grant to the Class 2A Allowance /Disbursing Agent the right to object to the allowance of Claims

12   filed with the Bankruptcy Court with respect to which liability or allowance is disputed in whole or

13   in part in lieu of the District having such right.

14

15   Dated:  February 19, 2010              */s/ Neeta Menon*
                                            Neeta Menon, a Member of
16                                          STUTMAN, TREISTER & GLATT
                                            PROFESSIONAL CORPORATION
17                                          Bankruptcy Counsel for Debtor

18

19

20

21

22

23

24

25

26

27

28

536695v1

| In re: Valley Health System | CHAPTER 9 |
|---|---|
| Debtor(s). | CASE NUMBER: 6:07-bk-18293-PC |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**Stutman, Treister & Glatt, Professional Corporation, 1901 Avenue of the Stars, 12th Floor, Los Angeles, California 90067-6013**

The foregoing document described **MODIFICATION OF FIRST AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF VALLEY HEALTH SYSTEM DATED DECEMBER 17, 2009** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF") – Pursuant to controlling General** Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **February 19, 2010**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

**II.  SERVED BY U.S. MAIL** (indicate method for each person or entity served):   On **February 19, 2010,** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

☒ Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 2/19/2010 | Debra G. Ige | *Debra G. Ige* |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| In re: Valley Health System | CHAPTER 9 |
|---|---|
| Debtor(s). | CASE NUMBER: 6:07-bk-18293-PC |

## I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING**

Andrew K Alper on behalf of Creditor Key Equipment Finance Inc.
aalper@frandzel.com, efiling@frandzel.com;ekidder@frandzel.com

Terri H Andersen on behalf of U.S. Trustee United States Trustee (RS)
terri.andersen@usdoj.gov

Kathryn M Barnes on behalf of Creditor c/o Kathryn Barnes Valley Medical Staffing, Inc.
kbarnes@thelen.com

Mark Bradshaw on behalf of Creditor Hemet Community Medical Group Inc
mbradshaw@shbllp.com

Michael E Busch on behalf of Creditor BETA Healthcare Group
michael.busch@fnf.com

Traci L Cotton on behalf of Creditor UT System obo UT MD Anderson Cancer Center
tcotton@utsystem.edu

Jennifer Witherell Crastz on behalf of Creditor Beckman Coulter, Inc.
jcrastz@hemar-rousso.com

Melissa Davis on behalf of Creditor KM Strategic Management LLC
mdavis@shbllp.com

Timothy J Farris on behalf of U.S. Trustee United States Trustee (RS)
timothy.j.farris@usdoj.gov

H Alexander Fisch on behalf of Counter-Defendant Valley Health System
afisch@stutman.com

Heather Fowler on behalf of Interested Party Prime Healthcare Services, Inc.
heather.fowler@lw.com, colleen.rico@lw.com

Roger F Friedman on behalf of Creditor Kali Chaudhuri
rfriedman@rutan.com

Mark S Horoupian on behalf of Interested Party Prime Healthcare Management LLC
mhoroupian@sulmeyerlaw.com

Allan H Ickowitz on behalf of Creditor Kaiser Foundation Hospitals
aickowitz@nossaman.com

Jeffrey L Kandel on behalf of Creditor Committee Official Committee of Creditors Holding Unsecured Claims
jkandel@pszjlaw.com

Sheri Kanesaka on behalf of Creditor Catholic Healthcare West
sheri.kanesaka@lw.com, jjacobs@mrllp.com;fbaig@mrllp.com;scasselberry@mrllp.com;fbaig@mrllp.com

Q Scott Kaye on behalf of Creditor U.S. Bank, National Association, as trustee
qskaye@mwe.com

John W Kim on behalf of Creditor Kaiser Foundation Hospitals
jkim@nossaman.com

*January 2009*
537004v.1

**F 9013-3.1**

| In re: Valley Health System | CHAPTER 9 |
|---|---|
| Debtor(s). | CASE NUMBER: 6:07-bk-18293-PC |

Stuart I Koenig on behalf of Creditor Blue Cross Of California
Skoenig@cmkllp.com

Jean LeBlanc on behalf of Creditor U.S. Bank, National Association, as trustee
jleblanc@mwe.com

Dana N Levitt on behalf of Creditor U.S. Bank, National Association, as trustee
dlevitt@mwe.com, WSmith@mwe.com

Michael S Lurey on behalf of Creditor Catholic Healthcare West
michael.lurey@lw.com, colleen.rico@lw.com

Samuel R Maizel on behalf of Creditor Committee Official Committee of Creditors Holding Unsecured Claims
smaizel@pszjlaw.com, smaizel@pszjlaw.com

David J Mccarty on behalf of Counter-Claimant Aetna Health Management LLC
dmccarty@sheppardmullin.com, pibsen@sheppardmullin.com

Uzzi O Raanan on behalf of Creditor Siemens Financial Services, Inc.
uor@dgdk.com

Christian L Raisner on behalf of Creditor Local 121 RN
bankruptcycourtnotices@unioncounsel.net, craisner@unioncounsel.net

Christopher O Rivas on behalf of Creditor General Electric Capital Corporation
crivas@reedsmith.com

Stephanie M Seidl on behalf of Counter-Claimant Aetna Health Management LLC
sseidl@sheppardmullin.com

Leonard M Shulman on behalf of Creditor Hemet Community Medical Group Inc
lshulman@shbllp.com

Gerald N Sims on behalf of Creditor BETA Healthcare Group
jerrys@psdslaw.com

Adam M Starr on behalf of Creditor Anaheim Memorial Hospital
starra@gtlaw.com

Jason D Strabo on behalf of Creditor U.S. Bank, National Association, as trustee
jstrabo@mwe.com, briley@mwe.com

Derrick Talerico on behalf of Creditor SCAN Health Plan
dtalerico@loeb.com, kpresson@loeb.com;ljurich@loeb.com

Wayne R Terry on behalf of Creditor BANK OF THE WEST
wterry@hemar-rousso.com

United States Trustee (RS)
ustpregion16.rs.ecf@usdoj.gov

Andrea M Valdez on behalf of Creditor Universal Health Services
avaldez@fulbright.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

208

*January 2009*
537004v.1

**F 9013-3.1**

| In re: Valley Health System | CHAPTER 9 |
| Debtor(s). | CASE NUMBER: 6:07-bk-18293-PC |

David M Wiseblood on behalf of Creditor c/o Christian L. SEIU-United Healthcare Workers West
dwiseblood@seyfarth.com

## II. SERVED BY U.S. MAIL

VALLEY HEALTH SYSTEM
5965 - Special Notice List
Revised 12/23/2009
Doc. No. 483619v4

The Honorable Peter Carroll
USBC - Central District of California
3420 Twelfth Street
Courtroom No. 304
Riverside, CA 92501-3819

Valley Health System
1117 East Devonshire Avenue
Hemet, CA 92543

Attys for the Committee of Unsecured
Creditors
Sam Maizel, Esq.
Jeff Kandel, Esq.
Pachulski, Stang Ziel & Jones LLP
10100 Santa Monica Blvd., Suite 100
Los Angeles, CA 90067

Internal Revenue Service
Insolvency Group 1
290 North "D" Street
San Bernardino, CA 92401

Securities Exchange Commission
5670 Wilshire Blvd., 11th Floor
Los Angeles, CA 90036

Employment Development Dpt.
Bankruptcy Group MIC 92E
P.O. Box 826880
Sacramento, CA 94280-0001

Franchise Tax Board
Attn: Bankruptcy
P.O. Box 2952
Sacramento, CA 95812-2952

Trustee for Bondholders
US Bank/ FAX: 651/495-3775
Attn: Mike Vraa, Trust Officer
60 Livingston Ave.
Mail Code EP-MN-WE3T
St. Paul, MN 55107-2292

United States Trustee
Office of the U.S. Trustee
3685 Main Street, Suite 300
Riverside, CA 92501

Atty for Both: Menifee Valley Community Medical
Group & Hemet Community Medical Group
Joseph M. Galosic, Esq.
26632 Towne Center Dr. #300
Foothill Ranch, CA 92610-2808

Atty/ DePuy Orthopedics, Inc.
David W. Dykhouse
Patterson Bleknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710

Atty: Anaheim Memorial Hospital
Paul R. Glassman
Greenberg Traurig, LLP
2450 Colorado Avenue, Ste. 400E
Santa Monica, CA 90404

DaVita
Michael S Winsten, Esq.
Winsten Law Group
27201 Puerta Real, Ste. 465
Mission Viejo, CA 926917

Renal Treatment Center- California, Inc.
Michael S Winsten, Esq.
Winsten Law Group
27201 Puerta Real, Ste. 465
Mission Viejo, CA 92691

Primeshares
60 Madison Ave., 2nd Floor
New York, NY 10011-1600

Atty/Sodexho USA aka Sodexho Marriott Servs.
Poyner & Spruill LLP
Attn: Judy D. Thompson
301 South College St., #2300
Charlotte, NC 28202

Atty/Blue Cross of CA
Creim Macias Koenig & Frey LLP
Attn: Stuart I. Koenig
633 W. Fifth St., 51st Fl.
Los Angeles, CA 90071

Atty/Menifee Valley Community Med. Grp.
William E. Thomas, Esq.
6800 Indiana Avenue, #130
Riverside, CA 92506

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

209

January 2009
537004v.1

**F 9013-3.1**

| In re: Valley Health System | CHAPTER 9 |
| Debtor(s). | CASE NUMBER:  6:07-bk-18293-PC |

Atty/KM Strategic Mgmt.
Davis & Wojcik
Robert A. Davis, Jr.
1105 East Florida Ave.
Hemet, CA  92543

Atty/Southland Endoscopy Center
Davis & Wojcik
Attn:  Joseph M. Wojcik
1001 E. Morton Place, Suite A
Hemet, CA  92543

Atty/Hemet Community Med. Group
Shulman Hodges & Bastian LLP
Attn:  L.M. Shulman/M. Bradshaw
26632 Towne Center Dr., #300
Foothill Ranch, CA  92610

IBM Credit LLC
Special Handling Group
Attn:  Pamela Wilcox
4111 Northside Parkway
Atlanta, GA  30327

Atty/Health Net
Pillsbury Winthrop Shaw Pittman LLP
Attn:  Nadine J. Youssef
725 S. Figueroa St., #2800
Los Angeles, CA  90017

Health Net
Attn:  Patrice Halloway
7755 Center Ave., 8th Fl.
Huntington Beach, CA  92647

Atty/ Siemens Financial Services Inc.
Uzzi O Raanan
Danning Gill et al LLP
2029 Century Park E, 3rd Fl.
Los Angeles, CA  90067-2904

Attys/ Siemens Financial Services Inc.
Arlene N. Gelman & Stephanie Hor-Chen
Vedder Price P.C.
222 North LaSalle Street
Chicago, IL  60601

Atty/ Valley Medical Staffing Inc.
Michael B. Conley
3685 Mount Diablo Blvd,. #351
Lafayette, CA  94549

Owens & Minor, Inc.
Larry R. Whitley CBF
455 South Brea Canyon Road
City of Industry, CA  91789-3058

Meline Industries, Inc.
Attn: Anne Kisha
One Medline Place
Mundelein, IL  60060

Atty/ Owens & Minor, Inc
Buchalter Nemer P.C.
Benjamin S. Seigel, Esq.
1000 Wilshire Blvd., Ste. 1500
Los Angeles, CA  90017

Atty/ HRC Manor Care Inc.
Fredrick, Glen Stebens, Dale Pomerantz
Beam, Brobeck, West, Borges & Rosa LLP
1301 Dove Street, #700
Newport Beach, CA  92660-2412

Agent for GE Money Bank
Recovery Management Systems Corp.
Attn: Ramesh Singh
25 SE 2nd Ave., Ste 1120
Miami, FL  33131-1605

Atty/ Inland Empire Health Plan
Tin Kin Lee Esq.
Law Offices of Tin Kin Lee
55 S. Lake Ave., Ste 705
Pasadena, CA  91101

Atty/ US Bank National Association
Jean B LeBlanc
McDermott Will & Emery LLP
2049 Century Park East, Ste. 3800
Los Angeles, CA  90067

Atty/ US Bank National Association
Jason D. Strabo
McDermott Will & Emery LLP
2049 Century Park East, 38th Floor
Los Angeles, CA  90067

Atty/ US Bank National Assn. as Trustee
William P. Smith, Nathan F. Coco, Miles
W. Hughes, & Jason J. DeJonker
McDermott, Will Emery
227 West Monroe St., Ste. 5400
Chicago, IL  60606

U.S. Bank National Association Corporate Trust
Services
Attn: Keith Marshall
633 West Fifth St., 24th Floor
Los Angeles, CA  90071

Universal Health Services
Robert E. Darby
Fulbright & Jaworski, LLP
555 South Flower St., 41st Floor
Los Angeles, CA  90071

Atty/ Cardinal Health 110, Inc. et al
Greenberg Traurig LLP
Attn: S.L. Heyen/ J.K. Terry
1000 Louisiana, #1800
Houston, TX  77002

Atty/ Scan Health
Karl E. Block, Esq.
Loeb & Loeb LLP
10100 Santa Monica Blvd., Ste. 2200
Los Angeles, CA  90067

Atty/Prime Healthcare Management, Inc./ Albert
L. Lewis, Jr./John Lloyd/ Edward J. Fazekas
Daniel P. Brunton, Esq.
Lauren B. Ross, Esq.
Latham & Watkins LLP
600 West Broadway, Suite 1800
San Diego, CA 92101-3375

Counsel for Save the Hospitals, Inc.;
Prime Healthcare Services, Inc./ A. Lewis
Jr./ J. Lloyd/ E. Fazekas
Marc Rappel/Heather Fowler/Nathan
Smith
Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA 90071

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

210

*January 2009*
537004v.1

**F 9013-3.1**

| In re: Valley Health System | CHAPTER 9 |
| | |
| Debtor(s). | CASE NUMBER: 6:07-bk-18293-PC |

Law Offices of Yolanda Flores-Burt
Yolanda Flores-Burt
780 North Euclid Street, Suite 201
Anaheim, CA 92801

Law Offices of Shawna S. Nazari
15303 Ventura Blvd., 9th Floor
Sherman Oaks, CA 91403

Attorney for Beckman Coulter
Jillan L. Nolan, Esq.
Bernstein Law Firm P
Suite 2200 Gulf Tower
Pittsburgh, PA 15219

Attorney for Beckman Coulter
Jennifer Witherell Crastz, Esq.
Hemar, Rousso & Heald, LLP
15910 Ventura Blvd., 12th Flr.
Encino, CA 91436

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

211

January 2009
537004v.1

F 9013-3.1

# Exhibit 6

# CHICAGO TITLE COMPANY

```
              BUYER'S/BORROWER'S SETTLEMENT STATEMENT                    PAGE: 01

ESCROW NUMBER: 05660-910055440-001     ORDER NUMBER: 05660-910055440

CLOSING DATE:  10/13/10        CLOSER: Irene Meltzer

BUYER:      Physicians for Healthy Hospitals, Inc.
            PHH Real Estate, LLC

SELLER:     Valley Health System, a Ca Local Health Care District

PROPERTY:   Asset Purchase, Hemet, CALIFORNIA


                                              CHARGE BUYER        CREDIT BUYER

Deposits
   Received 10/13/10 LOAN FUNDS           30,761,685.23
   Received 10/12/10 ADD'L CLOSING FUNDS   8,668,883.62
   Received 10/11/10 ADD'L CLOSING FUNDS   2,000,000.00
   Received 10/08/10 CLOSING FUNDS        16,234,774.78
                                         --------------
       TOTAL RECEIPTS                                         57,665,343.63

Payoff Existing Loan With US Bank 1993 COP's    40,615,000.00
   Interest from 05/15/09 to 10/13/10 @ $  7,756.34   3,947,975.43
   Trustee's Fees/Expenses                       2,000.00
   Est Trustee Counsel Fees                     17,000.00
   Credit-1993 Revenue Fund                                      56,441.80
   Credit-1993 Reserve Fund                                   1,107,404.44
Payoff Existing Loan With US Bank 1996 Bonds     4,935,000.00
   Interest from 05/15/09 to 10/13/10 @ $    891.04     453,540.21
   Credit-1996 Reserve Fund                                     277,838.94

Interest on invested funds                                          352.27

Settlement or Closing Fee                          8,500.00
ALTA owners increase                               4,793.00
Owner's End ($4,793.00)& Ldr End ($3,500.00)       8,293.00
Loan policies                                        300.00
Recording Fees                                       750.00
Expedited delivery charge                            100.00

Wald Financial Group, Inc-Loan broker fee        500,000.00
Pachulski Stang Ziehl & Johnes LLP-Official Credito  2,000,000.00
Valley Health System-Annual Support Grant          400,000.00
Valley Health System-Claims Fund                 4,000,000.00
Sub escrow                                       2,207,056.67

Funds Due To Buyer At Closing                      7,072.77
                                         ----------------- -----------------

TOTALS                                 $   59,107,381.08 $   59,107,381.08
                                         ================= =================
```

# Exhibit 7

1   CHARLES D. AXELROD (STATE BAR NO. 39507)
    GARY E. KLAUSNER (STATE BAR NO. 69077)
2   H. ALEXANDER FISCH (STATE BAR NO. 223211)
    NEETA MENON (STATE BAR NO. 254736
3   STUTMAN, TREISTER & GLATT
    PROFESSIONAL CORPORATION
4   1901 Avenue of the Stars
    12th Floor
5   Los Angeles, CA 90067
    Telephone:  (310) 228-5600
6   Telecopy:  (310) 228-5788

7   Chapter 9 Counsel for
    Valley Health System

8

**FILED & ENTERED**

**DEC 23 2009**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY craig        DEPUTY CLERK

9                    **UNITED STATES BANKRUPTCY COURT**

10                   **CENTRAL DISTRICT OF CALIFORNIA**

11                         **RIVERSIDE DIVISION**

| | |
|---|---|
| 12  In re | )  Case No. 6:07-bk-18293-PC |
| 13 | )  Chapter 9 |
|     VALLEY HEALTH SYSTEM, a California | ) |
| 14  Local Health Care District | )  **ORDER: (1)APPROVING THE** |
| | )  **ADEQUACY OF THE FIRST AMENDED** |
| 15                          Debtor, | )  **DISCLOSURE STATEMENT; (2)** |
|     ` | )  **SETTING DATE AND TIME OF THE** |
| 16 | )  **CONFIRMATION HEARING; (3)** |
| | )  **ESTABLISHING THE LAST DAY TO** |
| 17 | )  **VOTE ON OR OBJECT TO** |
| | )  **CONFIRMATION OF THE FIRST** |
| 18 | )  **AMENDED PLAN; AND (4)** |
| | )  **ESTABLISHING OTHER** |
| 19 | )  **CONFIRMATION PROCEDURES** |
| 20 | ) |
| | )  Date:     December 17, 2009 |
| 21 | )  Time:     2:00 p.m. |
| | )  Place:    Courtroom 304 |
| 22 | )             United States Bankruptcy Court |
| | )             3420 Twelfth Street |
| 23 | )             Riverside, California |
| 24 | ) |
| | ) |
| 25 | ) |
| 26 | |

27

28

                              215

1   The "Motion for an Order: (1) Approving the Adequacy of the Disclosure Statement

2   Filed by Valley Health System Regarding the Chapter 9 Plan of Adjustment Dated November 2,

3   2009 of Which It Is the Proponent, and (2) Establishing Confirmation Procedures" (the "Motion") of

4   Valley Health System, a California Local Health Care District (the "Debtor"), pursuant to which the

5   Debtor sought approval of its "First Amended Disclosure Statement With Respect to the Plan for the

6   Adjustment of Debts of Valley Health System Dated December 17, 2009" (the "First Amended

7   Disclosure Statement"), to which the Debtor's "First Amended Plan for the Adjustment of Debts of

8   Valley Health System Dated December 17, 2009" (the "First Amended Plan") was attached as

9   Exhibit A, duly came on for hearing on December 17, 2009 at 2:00 p.m. before the Honorable Peter

10  H. Carroll, United States Bankruptcy Judge, in courtroom 304 located at 3420 Twelfth Street,

11  Riverside 92501, with appearances noted in the record of that hearing.

12  The Court, having considered: (i) the evidence and memorandum of points and

13  authorities submitted in support of the adequacy of the First Amended Disclosure Statement and the

14  propriety of the confirmation procedures sought to be established; (ii) the objection filed by U.S.

15  Bank National Association, as Indenture Trustee ("Bond Objection"), which was withdrawn at the

16  hearing with a reservation of rights by the Indenture Trustee to raise its objection again in connection

17  with the hearing on confirmation of the First Amended Plan; (iii) the objection filed by Save The

18  Hospitals, Inc., et al. (the "Prime Objection"); (iv) the response of the Debtor to the Bond Objection

19  and the Prime Objection; and (v) the argument of counsel at the hearing, and having noted that

20  neither of the filed objections raises an issue concerning the confirmation procedures proffered by

21  the Debtor in the Motion and found that good cause exists therefore, hereby

22  **ORDERS:**

23  1.   The Prime Objection is hereby sustained in part, and the First Amended

24  Disclosure Statement shall be amended in the manner required by, and read into the record at the

25  hearing by, the Court.

26  2.   Subject to inclusion of the amendments required by the Court at the hearing,

27  as set forth in Paragraph 1 above, the First Amended Disclosure Statement contains adequate

28  information and may be disseminated to all creditors and other parties in interests as set forth below.

533720v2

2.       The Debtor shall serve, on or before December 29, 2009, the following documents on parties entitled to vote on the First Amended Plan (collectively, the "Solicitation Package"): (1) a copy of the First Amended Plan; (2) a copy of the First Amended Disclosure Statement; (3) a form of ballot as approved hereinafter in this Order; (4) notice of the hearing on confirmation of the First Amended Plan and related deadlines and procedures as established hereinafter; and (5) a letter from the Creditors' Committee, in a form acceptable to the Debtor, recommending that the voting Classes vote to accept the First Amended Plan, should the Creditors' Committee determine, in its discretion, to make such recommendation (the "Confirmation Notice").

3.       January 25, 2010 at 4:30 p.m. (Pacific Time) is hereby set as the deadline by which: (i) the Voting Agent appointed below must receive a ballot to accept or reject the First Amended Plan if such ballot is to be counted (the "Voting Deadline"); and (ii) any objection to confirmation of the First Amended Plan must be filed with the Court and be received by counsel for the Debtor; provided, however, that any objection relating to the Challenge Actions[1] shall have a separate briefing schedule and shall not be subject to the January 25, 2010 objection deadline, as set forth below.

4.       February 4, 2010 is hereby set as the deadline for: (i) the Debtor filing and serving its memorandum in support of the First Amended Plan, including any response to objections to confirmation that were timely filed; and (ii) the filing of the ballot tabulation analysis with this Court.

5.       The hearing to confirm the First Amended Plan (the "Confirmation Hearing") shall be held on February 9, 2010 at 10:30 a.m., or as soon thereafter as counsel may be heard.

6.       The Debtor shall serve a Solicitation Package on each creditor who filed a proof of claim that has not been disallowed, expunged or satisfied in full on or before the voting deadline (the "Solicitation Package"), and a courtesy copy of the Solicitation Package on all parties or their counsel who have filed and served a request for special notice.

---

[1]       Any capitalized terms not defined herein shall have the meaning set forth in the First Amended Disclosure Statement [D.E. 678].

217

3

7.      The Debtor shall use the Official Form Ballot (Form 14) as such appears in Exhibit 1 to the Motion for each Class impaired under the First Amended Plan, which include the secured claims of the bondholders in Classes 1A and 1B and the allowed general unsecured claims of the holders of claims in Classes 2A and 2B.

8.      Pursuant to Bankruptcy Rule 3003(c)(2), any party who has not filed timely a proof of claim by the bar date applicable to it will not be eligible to vote to accept or reject the First Amended Plan.

9.      The amount of an eligible claim voted to accept or reject the First Amended Plan will be, as applicable: (i) the fixed liquidated amount set forth in a proof of claim (the "Claim Amount")[2], which proof of claim (a) was filed on or before the applicable Claims Bar Date, and (b) is not subject to a pending objection or request for estimation filed on or before the Voting Deadline; or (ii) the amount estimated for voting purposes by order of the Court.

10.      If, on or before the Voting Deadline, a creditor casts more than one ballot voting the same claim, then the last ballot received prior to the Voting Deadline will supersede any prior ballot(s).

11.      If a creditor submits a ballot that (i) fails to indicate whether the creditor accepts or rejects the First Amended Plan, or (ii) purports both to accept and reject the First Amended Plan, then such ballot will be counted as a vote to accept the First Amended Plan.

12.      The following types of ballots will be disregarded for purposes of tabulating votes to accept or reject the First Amended Plan: (i) ballots that are incomplete (other than with respect to acceptance or rejection); (ii) ballots that are not received by the Voting Deadline; and (iii) ballots purporting to vote one or more claims that are unclassified or not otherwise entitled to vote under the First Amended Plan.

---

[2]  The Claim Amount will include only those liquidated dollar amounts specified in a proof of Claim.  For example, if a proof of claim lists a claim for "$100 plus accrued interest and attorney's fees", then the Claim Amount will be $100.

533720v2

1          13.     Kendra A. Johnson a paralegal at Stutman, Treister & Glatt Professional

2   Corporation, will serve as the Debtor's "Voting Agent" to receive and tabulate the ballots for the

3   First Amended Plan and prepare the ballot tabulation analysis.

4          14.     This Court shall resolve various issues raised in the Challenge Actions as part

5   of the First Amended Plan confirmation process.  The evidentiary hearing relating to the Challenge

6   Actions shall be held on February 22, 2010 at 10:30 a.m. and may be continued, as necessary, to

7   February 23, 2010 at 10:30 a.m.

8          15.     A pretrial conference for the Challenge Actions shall be held on January 19,

9   2010 at 9:30 a.m.;  provided, however, that the parties to such actions shall not be required to file

10   any pretrial orders or status reports in advance of such pretrial conference.

11          16.     The parties to the Challenge Actions shall file and serve electronically a Joint

12   Pretrial Order on or by 4:00 p.m. (Pacific Time) on February 18, 2010, which shall include a list of

13   witnesses that each party intends to call during the Challenge Action evidentiary hearings, as well as

14   a list of exhibits the parties intend to present.  The parties shall exchange exhibits on or before

15   February 18, 2010.

16

17   Presented by:

18   /s/  Neeta Menon
      CHARLES D. AXELROD

19   GARY E. KLAUSNER
      H. ALEXANDER FISCH

20   NEETA MENON
      STUTMAN, TREISTER & GLATT

21   PROFESSIONAL CORPORATION
      Counsel for Valley Health System

22                        # # #

23

24

25

26   DATED: December 23, 2009       _____
                                  United States Bankruptcy Judge

27

28

| In re:  VALLEY HEALTH SYSTEM, | CHAPTER 9 |
|---|---|
| Debtor(s). | CASE NUMBER 6:07-bk-18293-PC |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I.
Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 1901 Avenue of the Stars, 12th Floor, Los Angeles, CA  90067.

The foregoing document described **[PROPOSED] "ORDER: (1)APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT; (2) SETTING DATE AND TIME OF THE CONFIRMATION HEARING; (3) ESTABLISHING THE LAST DAY TO VOTE ON OR OBJECT TO CONFIRMATION OF THE PLAN; AND (4) ESTABLISHING OTHER CONFIRMATION PROCEDURES"** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")</u>** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

    None.

          ☐ Service information continued on attached page

**II.  <u>SERVED BY U.S. MAIL OR OVERNIGHT MAIL</u>**(indicate method for each person or entity served)**:**
On **December 18, 2009**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.*

          ☒ Service information continued on attached page

**III.  <u>SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL</u>** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  *Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.*

          ☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 12/18/09 | Debra G. Ige | /s/  Debra G. Ige |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9013-3.1**

533720v2

| In re:  VALLEY HEALTH SYSTEM, | CHAPTER 9 |
|---|---|
| Debtor(s). | CASE NUMBER 6:07-bk-18293-PC |

## II.  SERVED BY U.S. MAIL

VALLEY HEALTH SYSTEM
5965 - Special Notice List
Revised 6/2/09
Doc. No. 483619v4

The Honorable Peter Carroll
USBC - Central District of California
3420 Twelfth Street
Courtroom No. 304
Riverside, CA 92501-3819

Valley Health System
1117 East Devonshire Avenue
Hemet, CA  92543

Attys for the Committee of Unsecured
Creditors
Sam Maizel, Esq.
Jeff Kandel, Esq.
Pachulski, Stang Ziel & Jones LLP
10100 Santa Monica Blvd., Suite 100
Los Angeles, CA  90067

Internal Revenue Service
Insolvency Group 1
290 North "D" Street
San Bernardino, CA  92401

Securities Exchange Commission
5670 Wilshire Blvd., 11th Floor
Los Angeles, CA  90036

Employment Development Dpt.
Bankruptcy Group MIC 92E
P.O. Box 826880
Sacramento, CA  94280-0001

Franchise Tax Board
Attn:  Bankruptcy
P.O. Box 2952
Sacramento, CA  95812-2952

Trustee for Bondholders
US Bank/ FAX:  651/495-3775
Attn:  Mike Vraa, Trust Officer
60 Livingston Ave.
Mail Code EP-MN-WE3T
St. Paul, MN  55107-2292

United States Trustee
Office of the U.S. Trustee
3685 Main Street, Suite 300
Riverside, CA  92501

Atty for Both: Menifee Valley Community Medical
Group & Hemet Community Medical Group
Joseph M. Galosic, Esq.
26632 Towne Center Dr. #300
Foothill Ranch, CA 92610-2808

Atty/ DePuy Orthopedics, Inc.
David W. Dykhouse
Patterson Bleknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710

Atty: Anaheim Memorial Hospital
Paul R. Glassman
Greenberg Traurig, LLP
2450 Colorado Avenue, Ste. 400E
Santa Monica, CA 90404

DaVita
Michael S Winsten, Esq.
Winsten Law Group
27201 Puerta Real, Ste. 465
Mission Viejo, CA 926917

Renal Treatment Center- California, Inc.
Michael S Winsten, Esq.
Winsten Law Group
27201 Puerta Real, Ste. 465
Mission Viejo, CA 92691

Primeshares
60 Madison Ave., 2d Floor
New York, NY 10011-1600

Atty/Sodexho USA aka Sodexho Marriott Servs.
Poyner & Spruill LLP
Attn:  Judy D. Thompson
301 South College St., #2300
Charlotte, NC  28202

Atty/Blue Cross of CA
Creim Macias Koenig & Frey LLP
Attn:  Stuart I. Koenig
633 W. Fifth St., 51st Fl.
Los Angeles, CA  90071

Atty/Menifee Valley Community Med. Grp.
William E. Thomas, Esq.
6800 Indiana Avenue, #130
Riverside, CA  92506

Atty/KM Strategic Mgmt.
Davis & Wojcik
Robert A. Davis, Jr.
1105 East Florida Ave.
Hemet, CA  92543

Atty/Southland Endoscopy
Davis & Wojcik
Attn:  Joseph M. Wojcik
1105 East Florida Ave.
Hemet, CA  92543

Atty/Hemet Community Med. Group
Shulman Hodges & Bastian LLP
Attn:  L.M. Shulman/M. Bradshaw
26632 Towne Center Dr., #300
Foothill Ranch, CA  92610

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| In re:  VALLEY HEALTH SYSTEM, | CHAPTER 9 |
|---|---|
| Debtor(s). | CASE NUMBER 6:07-bk-18293-PC |

IBM Credit LLC
Special Handling Group
Attn:  Pamela Wilcox
4111 Northside Parkway
Atlanta, GA   30327

Atty/Health Net
Pillsbury Winthrop Shaw Pittman LLP
Attn:  Nadine J. Youssef
725 S. Figueroa St., #2800
Los Angeles, CA  90017

Health Net
Attn:  Patrice Halloway
7755 Center Ave., 8th Fl.
Huntington Beach, CA  92647

Atty/ Siemens Financial Services Inc.
Uzzi O Raanan
Danning Gill et al LLP
2029 Century Park E 3FL
Los Angeles, CA 90067-2904

Attys/ Siemens Financial Services Inc.
Arlene N. Gelman & Stephanie Hor-Chen
Vedder Price P.C.
222 North LaSalle Street
Chicago, IL 60601

Atty/ Valley Medical Staffing Inc.,
Michael B. Conley
3685 Mount Diablo Blvd. #351
Lafayette, CA 94549

Owens & Minor, Inc.
Larry R. Whitley CBF
455 South Brea Canyon Road
City of Industry, CA 91789-3058

Meline Industries, Inc.
Attn: Anne Kisha
One Medline Place
Mundelein, IL 60060

Atty/ Owens & Minor, Inc
Buchalter Nemer P.C.
Benjamin S. Seigel, Esq.
1000 Wilshire Blvd., Ste. 1500
Los Angeles, CA 90017

Atty/ HRC Manor Care Inc.
Fredrick Borges, Glen Stebens, Dale Pomerantz
Beam, Brobeck, West, Borges & Rosa LLP
1301 Dove Street, #700
Newport Beach, CA   92660-2412

Agent for GE Money Bank
Recovery Management Systems Corp.
Attn: Ramesh Singh
25 SE 2nd Ave. Ste 1120
Miami, FL 33131-1605

Atty/ Inland Empire Health Plan
Tin Kin Lee Esq.
Law Offices of Tin Kin Lee
55 S. Lake Ave. Ste 705
Pasadena, CA 91101

Atty/ US Bank National Association
Jean B LeBlanc
McDermott Will & Emery LLP
2049 Century Park East, Ste. 3800
Los Angeles, CA 90067

Atty/ US Bank National Assn. as Trustee
William P. Smith, Nathan F. Coco, Miles W.
Hughes, & Jason J. DeJonker
McDermott, Will Emery
227 West Monroe St. Ste. 5400
Chicago,IL 60606

U.S. Bank National Association Corporate
Trust Services
Attn: Keith Marshall
633 West Fifth St. 24th Floor
Los Angeles, CA 90071

Universal Health Services
Robert E. Darby
Fulbright & Jaworski, LLP
555 South Flower St., 41st floor
Los Angeles, CA 90071

Atty/ Cardinal Health 110, Inc. et al
Greenberg Traurig LLP
Attn: S.L. Heyen/ J.K. Terry
1000 Louisiana #1800
Houston, TX 77002

Atty/ Scan Health
Karl E. Block, Esq.
Loeb & Loeb LLP
10100 Santa Monica Blvd. Ste. 2200
Los Angeles, CA 90067

Atty/Prime Healthcare Management, Inc./ Albert
L. Lewis, Jr./John Lloyd/ Edward J. Fazekas
Daniel P. Brunton, Esq.
Lauren B. Ross, Esq.
Latham & Watkins LLP
600 West Broadway, Suite 1800
San Diego, CA 92101-3375

Atty/ US Bank National Association
Jason D. Strabo
McDermott Will & Emery LLP
2049 Century Park East, 38th Floor
Los Angeles, CA  90067

Counsel for Save the Hospitals, Inc.;
Prime Healthcare Services, Inc.; etc.
Marc Rappel/Heather L. Fowler
Nathan M. Smith
Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA 90071

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009

F 9013-3.1

533720v2

| | |
|---|---|
| In re:  VALLEY HEALTH SYSTEM, | CHAPTER 9 |
| Debtor(s). | CASE NUMBER 6:07-bk-18293-PC |

**NOTE TO USERS OF THIS FORM**:

**1)**  Attach this form to the last page of a proposed Order or Judgment.  Do not file as a separate document.
**2)**  The title of the judgment or order and all service information must be filled in by the party lodging the order.
**3)  Category I.** below:  The United States trustee and case trustee (if any) will always be in this category.
**4)  Category II.** below:  List ONLY addresses for debtor (and attorney), movant (or attorney) and person/entity (or attorney) who filed an opposition to the requested relief. <u>DO NOT</u> list an address if person/entity is listed in category I.

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled "**ORDER: (1)APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT; (2) SETTING DATE AND TIME OF THE CONFIRMATION HEARING; (3) ESTABLISHING THE LAST DAY TO VOTE ON OR OBJECT TO CONFIRMATION OF THE PLAN; AND (4) ESTABLISHING OTHER CONFIRMATION PROCEDURES**" was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I.  SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**  Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of _____, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

       See following page.

                             ☒ Service information continued on attached page

**II.  SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by U.S. Mail to the following person(s) and/or entity(ies) at the address(es) indicated below:

       See following page.

                             ☐ Service information continued on attached page

**III.  TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s) and/or email address(es) indicated below:

                             ☒ Service information continued on attached page

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

533720v2

223

**F 9021-1.1**

| In re:  VALLEY HEALTH SYSTEM, | CHAPTER 9 |
|---|---|
| Debtor(s). | CASE NUMBER 6:07-bk-18293-PC |

## I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING**

Andrew K Alper on behalf of Creditor Key Equipment Finance Inc.
aalper@frandzel.com, efiling@frandzel.com;ekidder@frandzel.com

Terri H Andersen on behalf of U.S. Trustee United States Trustee (RS)
terri.andersen@usdoj.gov

Kathryn M Barnes on behalf of Creditor c/o Kathryn Barnes Valley Medical Staffing, Inc.
kbarnes@thelen.com

Mark Bradshaw on behalf of Creditor Hemet Community Medical Group Inc
mbradshaw@shbllp.com

Michael E Busch on behalf of Creditor BETA Healthcare Group
michael.busch@fnf.com

Traci L Cotton on behalf of Creditor UT System obo UT MD Anderson Cancer Center
tcotton@utsystem.edu

Jennifer Witherell Crastz on behalf of Creditor Beckman Coulter, Inc.
jcrastz@hemar-rousso.com

Melissa Davis on behalf of Creditor KM Strategic Management LLC
mdavis@shbllp.com

Timothy J Farris on behalf of U.S. Trustee United States Trustee (RS)
timothy.j.farris@usdoj.gov

H Alexander Fisch on behalf of Counter-Defendant Valley Health System
afisch@stutman.com

Heather Fowler on behalf of Interested Party Prime Healthcare Services, Inc.
heather.fowler@lw.com, colleen.rico@lw.com

Roger F Friedman on behalf of Creditor Kali Chaudhuri
rfriedman@rutan.com

Mark S Horoupian on behalf of Interested Party Prime Healthcare Management LLC
mhoroupian@sulmeyerlaw.com

Allan H Ickowitz on behalf of Creditor Kaiser Foundation Hospitals
aickowitz@nossaman.com

Jeffrey L Kandel on behalf of Creditor Committee Official Committee of Creditors Holding Unsecured Claims
jkandel@pszjlaw.com

Sheri Kanesaka on behalf of Creditor Catholic Healthcare West
sheri.kanesaka@lw.com, jjacobs@mrllp.com;fbaig@mrllp.com;scasselberry@mrllp.com;fbaig@mrllp.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

533720v2

224

**F 9021-1.1**

| In re:  VALLEY HEALTH SYSTEM, | CHAPTER 9 |
|---|---|
| Debtor(s). | CASE NUMBER 6:07-bk-18293-PC |

Q Scott Kaye on behalf of Creditor U.S. Bank, National Association, as trustee
qskaye@mwe.com

John W Kim on behalf of Creditor Kaiser Foundation Hospitals
jkim@nossaman.com

Stuart I Koenig on behalf of Creditor Blue Cross Of California
Skoenig@cmkllp.com

Jean LeBlanc on behalf of Creditor U.S. Bank, National Association, as trustee
jleblanc@mwe.com

Dana N Levitt on behalf of Creditor U.S. Bank, National Association, as trustee
dlevitt@mwe.com, WSmith@mwe.com

Michael S Lurey on behalf of Creditor Catholic Healthcare West
michael.lurey@lw.com, colleen.rico@lw.com

Samuel R Maizel on behalf of Creditor Committee Official Committee of Creditors Holding Unsecured Claims
smaizel@pszjlaw.com, smaizel@pszjlaw.com

David J McCarty on behalf of Counter-Claimant Aetna Health Management LLC
dmccarty@sheppardmullin.com, pibsen@sheppardmullin.com

Uzzi O Raanan on behalf of Creditor Siemens Financial Services, Inc.
uor@dgdk.com

Christian L Raisner on behalf of Creditor Local 121 RN
bankruptcycourtnotices@unioncounsel.net, craisner@unioncounsel.net

Christopher O Rivas on behalf of Creditor General Electric Capital Corporation
crivas@reedsmith.com

Stephanie M Seidl on behalf of Counter-Claimant Aetna Health Management LLC
sseidl@sheppardmullin.com

Leonard M Shulman on behalf of Creditor Hemet Community Medical Group Inc
lshulman@shbllp.com

Gerald N Sims on behalf of Creditor BETA Healthcare Group
jerrys@psdslaw.com

Adam M Starr on behalf of Creditor Anaheim Memorial Hospital
starra@gtlaw.com

Jason D Strabo on behalf of Creditor U.S. Bank, National Association, as trustee
jstrabo@mwe.com, briley@mwe.com

Derrick Talerico on behalf of Creditor SCAN Health Plan
dtalerico@loeb.com, kpresson@loeb.com;ljurich@loeb.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9021-1.1**

533720v2

| In re:  VALLEY HEALTH SYSTEM, | CHAPTER 9 |
| --- | --- |
| Debtor(s). | CASE NUMBER 6:07-bk-18293-PC |

Wayne R Terry on behalf of Creditor BANK OF THE WEST
wterry@hemar-rousso.com

United States Trustee (RS)
ustpregion16.rs.ecf@usdoj.gov

Andrea M Valdez on behalf of Creditor Universal Health Services
avaldez@fulbright.com

David M Wiseblood on behalf of Creditor c/o Christian L. SEIU-United Healthcare Workers West
dwiseblood@seyfarth.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                                  **F 9021-1.1**

533720v2

| In re: VALLEY HEALTH SYSTEM, | CHAPTER 9 |
|---|---|
| Debtor(s). | CASE NUMBER 6:07-bk-18293-PC |

### III. **TO BE SERVED BY THE LODGING PARTY**

VALLEY HEALTH SYSTEM
5965 - Special Notice List
Revised 6/2/09
Doc. No. 483619v4

Valley Health System
1117 East Devonshire Avenue
Hemet, CA 92543

Attys for the Committee of Unsecured Creditors
Sam Maizel, Esq.
Jeff Kandel, Esq.
Pachulski, Stang Ziel & Jones LLP
10100 Santa Monica Blvd., Suite 100
Los Angeles, CA 90067

Internal Revenue Service
Insolvency Group 1
290 North "D" Street
San Bernardino, CA 92401

Securities Exchange Commission
5670 Wilshire Blvd., 11th Floor
Los Angeles, CA 90036

Employment Development Dpt.
Bankruptcy Group MIC 92E
P.O. Box 826880
Sacramento, CA 94280-0001

Franchise Tax Board
Attn: Bankruptcy
P.O. Box 2952
Sacramento, CA 95812-2952

Trustee for Bondholders
US Bank/ FAX: 651/495-3775
Attn: Mike Vraa, Trust Officer
60 Livingston Ave.
Mail Code EP-MN-WE3T
St. Paul, MN 55107-2292

United States Trustee
Office of the U.S. Trustee
3685 Main Street, Suite 300
Riverside, CA 92501

Atty for Both: Menifee Valley Community Medical Group & Hemet Community Medical Group
Joseph M. Galosic, Esq.
26632 Towne Center Dr. #300
Foothill Ranch, CA 92610-2808

Atty/ DePuy Orthopedics, Inc.
David W. Dykhouse
Patterson Bleknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710

Atty: Anaheim Memorial Hospital
Paul R. Glassman
Greenberg Traurig, LLP
2450 Colorado Avenue, Ste. 400E
Santa Monica, CA 90404

DaVita
Michael S Winsten, Esq.
Winsten Law Group
27201 Puerta Real, Ste. 465
Mission Viejo, CA 926917

Renal Treatment Center- California, Inc.
Michael S Winsten, Esq.
Winsten Law Group
27201 Puerta Real, Ste. 465
Mission Viejo, CA 92691

Primeshares
60 Madison Ave., 2d Floor
New York, NY 10011-1600

Atty/Sodexho USA aka Sodexho Marriott Servs.
Poyner & Spruill LLP
Attn: Judy D. Thompson
301 South College St., #2300
Charlotte, NC 28202

Atty/Blue Cross of CA
Creim Macias Koenig & Frey LLP
Attn: Stuart I. Koenig
633 W. Fifth St., 51st Fl.
Los Angeles, CA 90071

Atty/Menifee Valley Community Med. Grp.
William E. Thomas, Esq.
6800 Indiana Avenue, #130
Riverside, CA 92506

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9021-1.1**

533720v2

| In re:  VALLEY HEALTH SYSTEM, | CHAPTER 9 |
|---|---|
| Debtor(s). | CASE NUMBER 6:07-bk-18293-PC |

Atty/KM Strategic Mgmt.
Davis & Wojcik
Robert A. Davis, Jr.
1105 East Florida Ave.
Hemet, CA  92543

Atty/Southland Endoscopy
Davis & Wojcik
Attn: Joseph M. Wojcik
1105 East Florida Ave.
Hemet, CA  92543

Atty/Hemet Community Med. Group
Shulman Hodges & Bastian LLP
Attn:  L.M. Shulman/M. Bradshaw
26632 Towne Center Dr., #300
Foothill Ranch, CA  92610

IBM Credit LLC
Special Handling Group
Attn:  Pamela Wilcox
4111 Northside Parkway
Atlanta, GA  30327

Atty/Health Net
Pillsbury Winthrop Shaw Pittman LLP
Attn:  Nadine J. Youssef
725 S. Figueroa St., #2800
Los Angeles, CA  90017

Health Net
Attn:  Patrice Halloway
7755 Center Ave., 8th Fl.
Huntington Beach, CA  92647

Atty/ Siemens Financial Services Inc.
Uzzi O Raanan
Danning Gill et al LLP
2029 Century Park E 3FL
Los Angeles, CA 90067-2904

Attys/ Siemens Financial Services Inc.
Arlene N. Gelman & Stephanie Hor-Chen
Vedder Price P.C.
222 North LaSalle Street
Chicago, IL 60601

Atty/ Valley Medical Staffing Inc.,
Michael B. Conley
3685 Mount Diablo Blvd. #351
Lafayette, CA 94549

Owens & Minor, Inc.
Larry R. Whitley CBF
455 South Brea Canyon Road
City of Industry, CA 91789-3058

Meline Industries, Inc.
Attn: Anne Kisha
One Medline Place
Mundelein, IL 60060

Atty/ Owens & Minor, Inc
Buchalter Nemer P.C.
Benjamin S. Seigel, Esq.
1000 Wilshire Blvd., Ste. 1500
Los Angeles, CA 90017

Atty/ HRC Manor Care Inc.
Fredrick Borges, Glen Stebens, Dale Pomerantz
Beam, Brobeck, West, Borges & Rosa LLP
1301 Dove Street, #700
Newport Beach, CA   92660-2412

Agent for GE Money Bank
Recovery Management Systems Corp.
Attn: Ramesh Singh
25 SE 2nd Ave. Ste 1120
Miami, FL 33131-1605

Atty/ Inland Empire Health Plan
Tin Kin Lee Esq.
Law Offices of Tin Kin Lee
55 S. Lake Ave. Ste 705
Pasadena, CA 91101

Atty/ US Bank National Association
Jean B LeBlanc
McDermott Will & Emery LLP
2049 Century Park East, Ste. 3800
Los Angeles, CA 90067

Atty/ US Bank National Assn. as Trustee
William P. Smith, Nathan F. Coco, Miles W.
Hughes, & Jason J. DeJonker
McDermott, Will Emery
227 West Monroe St. Ste. 5400
Chicago,IL 60606

U.S. Bank National Association Corporate
Trust Services
Attn: Keith Marshall
633 West Fifth St. 24th Floor
Los Angeles, CA 90071

Universal Health Services
Robert E. Darby
Fulbright & Jaworski, LLP
555 South Flower St., 41st floor
Los Angeles, CA 90071

Atty/ Cardinal Health 110, Inc. et al
Greenberg Traurig LLP
Attn: S.L. Heyen/ J.K. Terry
1000 Louisiana #1800
Houston, TX 77002

Atty/ Scan Health
Karl E. Block, Esq.
Loeb & Loeb LLP
10100 Santa Monica Blvd. Ste. 2200
Los Angeles, CA 90067

Atty/Prime Healthcare Management, Inc./ Albert
L. Lewis, Jr./John Lloyd/ Edward J. Fazekas
Daniel P. Brunton, Esq.
Lauren B. Ross, Esq.
Latham & Watkins LLP
600 West Broadway, Suite 1800
San Diego, CA 92101-3375

Atty/ US Bank National Association
Jason D. Strabo
McDermott Will & Emery LLP
2049 Century Park East, 38th Floor
Los Angeles, CA  90067

Counsel for Save the Hospitals, Inc.;
Prime Healthcare Services, Inc.; etc.
Marc Rappel/Heather L. Fowler
Nathan M. Smith
Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA 90071

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9021-1.1**

# Exhibit 8

1  CHARLES D. AXELROD (STATE BAR NO. 39507)
   GARY E. KLAUSNER (STATE BAR NO. 69077)
2  NEETA MENON (STATE BAR NO. 254736)
   STUTMAN, TREISTER & GLATT
3  1901 Avenue of the Stars, 12th Floor
   Los Angeles, CA  90067
4  Telephone:  (310) 228-5600
   Telecopy:   (310) 228-5788
5
   Chapter 9 Counsel for
6  Valley Health System

7  MARC RAPPEL (STATE BAR NO. 097032)
   HEATHER L. FOWLER (STATE BAR NO. 251750)
8  NATHAN M. SMITH (STATE BAR NO. 255212)
   LATHAM & WATKINS LLP
9  355 South Grand Avenue
   Los Angeles, California  90071-1560
10 Telephone:  (213) 485-1234
   Facsimile:   (213) 891-8763
11
   Counsel for Save The Hospitals, Inc., a California
12 corporation; Prime Healthcare Services, Inc., a
   Delaware corporation; Albert L. Lewis, Jr., a taxpayer
13 and resident of the VHS local health care district;
   John Lloyd, a taxpayer and resident of the VHS local
14 health care district; Edward J. Fazekas, a taxpayer and
   resident of the VHS local health care district
15

16            **UNITED STATES BANKRUPTCY COURT**

17            **CENTRAL DISTRICT OF CALIFORNIA**

18                **RIVERSIDE DIVISION**

| 19 | In re | Case No. 6:07 -bk-18293-PC |
|---|---|---|
| 20 | VALLEY HEALTH SYSTEM, a California Local Health Care District, | Chapter 9 |
| 21 | | **STIPULATION TO WITHDRAW RENEWED MOTION FOR RELIEF FROM STAY, DISMISS APPEAL AND TO ADJUDICATE ISSUES RAISED BY CHALLENGE ACTIONS** |
| 22 | Debtor. | |
| 23 | | |
| 24 | | Hearing: |
| 25 | | Date:  January 21, 2010 |
| 26 | | Time:  9:30 a.m. |
| 27 | | Place:  Courtroom 304 |
| | | 3420 Twelfth Street |
| | | Riverside, CA  92501 |
| | | Judge:  Hon. Peter H. Caroll |

28

535672v.1

1        THIS STIPULATION is entered into between Chapter 9 Debtor Valley Health

2  System, a California Local Health Care District, ("VHS" or the "District") and Movants and

3  Interested Parties Save The Hospital, Inc., Prime Healthcare Services, Inc., John Lloyd, Ed Fazekas

4  and Albert L. Lewis, Jr. (collectively, the "Movants") and is based on the following facts:

5                **RECITALS**

6        1.     On November 20, 2009, Movants filed their Renewed Notice of Motion and

7  Motion for Relief From the Automatic Stay ("Renewed Motion").  Docket No. 632;

8        2.     On December 14, 2009, Movants filed a Notice of Hearing setting the

9  Renewed Motion for hearing on January 7, 2009.  Docket No. 673.  The hearing is now scheduled

10  for January 21, 2010 at 9:30 a.m.

11        3.     Movants filed the Renewed Motion to obtain relief from the automatic stay to

12  file the state court complaint (the "Conflict Action") attached as Exhibit A to Movants'

13  Supplemental Brief in Support of Motion for Relief from Automatic Stay to Pursue State Court

14  Litigation, Docket No. 603, and to permit continued prosecution of the CEQA action styled Prime

15  Healthcare Management, Inc.; Albert L. Lewis Jr.; John Lloyd; and Edward J. Fazekas v. Valley

16  Health System; Does 1-10, as Respondents and Physicians for Healthy Hospitals, Inc., as a Real

17  Party in Interest, now pending before this court as Adversary Proceeding 6:09-ap-01708 (the "CEQA

18  Action");

19        4.     On December 23, 2009, this Court issued an order: (1) Approving the

20  Adequacy of the First Amended Disclosure Statement; (2) Setting Date and Time of the

21  Confirmation Hearing; (3) Establishing the Last Day to Vote on or Object to Confirmation of the

22  First Amended Plan; and (4) Establishing Other Confirmation Procedures (the "Order").  Docket No.

23  694.  The Order states that this Court "shall resolve various issues raised in the Challenge Actions"

24  as part of the plan confirmation process.

25        5.     On or about January 15, 2010, Movants filed their Supplemental Brief which

26  contained a proposed First Amended Complaint in the Conflict Action ("First Amended

27  Complaint").

28

535672v.1

6.      On or about January 14, 2010, Movants filed their "Report" in connection with the Status Conference scheduled for January 19, 2010 pertaining to the Challenge Actions, which sets forth, in Part II B thereof, all of the grounds upon which the Movants are currently challenging the District's proposed sale to Physicians For Healthy Hospitals, Inc ("PHH") (herein the "Sale").

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED** by and between the parties to this Stipulation, through their undersigned counsel, that:

A.      Movants hereby withdraw the renewed notice of motion and motion for relief from the automatic stay, Docket No. 362, and the notice of hearing on the renewed motion, Docket No. 673;

B.      Movants shall promptly dismiss their appeal from the Bankruptcy Court's order entered November  23, 2009 denying their initial motion for relief from stay;

C.      Subject to paragraph D. below, the Bankruptcy Court shall hear and decide: (1) all of the causes of action set forth in the Challenge Actions, including those set forth in the First Amended Complaint, and (2) all grounds for opposing the Sale set forth in Part II B of Prime's Report.  The Bankruptcy Court shall have the authority to make any findings and orders and to grant any relief that could be granted by a state court of competent jurisdiction in ruling on Movant's claims, as set forth in the First Amended Complaint or part II B of the Report, that :  (1) the PHH transaction does not provide "fair value" for the District's assets; (2) member(s) of the VHS board who voted to approve the PHH transaction had conflict(s) of interest prohibited by California Government Code section 1090 *et. seq.*; (3) the PHH transaction required approval by LAFCO under Government Code section 56824.12; (4) VHS violated CEQA in connection with the PHH transaction; and (5) the VHS board breached its fiduciary duty in approving the ASA with a "no shop" provision as set forth in section 4.7 thereof (collectively, the "State Law Claims").

D.      To the extent that Movants assert any grounds for opposing the Sale (other than the State Law Claims) that challenge the feasibility of the District's First Amended Plan of Adjustment ("Plan") or otherwise raise issues of bankruptcy law : (1) nothing herein contained shall constitute an admission or concession that any of the Movants have any standing or qualify as

232

2

1  "parties in interest" for purposes of appearing or being heard in connection with the District's Plan,

2  (2) such objections shall be governed by and decided under applicable provisions of the Bankruptcy

3  Code and cases decided thereunder, and (3) the District reserves all rights to oppose, defend against

4  and dispute any such Plan objections and the bankruptcy court's authority to grant any relief related

5  thereto other than to deny confirmation of its Plan.

6  Dated: January 20, 2010

7

8                                        /s/  Neeta Menon
                                         Charles D. Axelrod, CA State Bar No. 39507
9                                        Gary E. Klausner, CA State Bar No. 69077
                                         NEETA MENON, CA State Bar No. 254736
10                                       STUTMAN, TREISTER & GLATT PROFESSIONAL
                                         CORPORATION
11                                       ATTORNEYS FOR VALLEY HEALTH SYSTEM.

12  Dated: January 20, 2010

13

14                                       /s/  Marc Rappel
                                         Marc Rappel, CA State Bar No. 097032
15                                       Heather L. Fowler, CA State Bar No. 251750
                                         Nathan M. Smith, CA State Bar No. 255212
16                                       LATHAM & WATKINS LLP
                                         ATTORNEYS FOR SAVE THE HOSPITALS, INC.,
17                                       A CALIFORNIA CORPORATION; PRIME
                                         HEALTHCARE SERVICES, INC., A DELAWARE
18                                       CORPORATION; ALBERT L. LEWIS, JR., A
                                         TAXPAYER AND RESIDENT OF THE VHS LOCAL
19                                       HEALTHCARE DISTRICT; JOHN LLOYD, A
                                         TAXPAYER AND RESIDENT OF THE VHS LOCAL
20                                       HEALTHCARE DISTRICT; AND EDWARD J.
                                         FAZEKAS, A TAXPAYER AND RESIDENT OF
21                                       THE VHS LOCAL HEALTHCARE DISTRICT.

22

23

24

25

26

27

28

233
3

| In re: | CHAPTER 9 |
|---|---|
| VALLEY HEALTH SYSTEM,<br><br>Debtor(s). | CASE NUMBER 6:07-bk-18293-PC |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 1901 Avenue of the Stars, 12th Floor, Los Angeles, CA 90067.

The foregoing document described **ORDER APPROVING STIPULATION TO WITHDRAW RENEWED MOTION FOR RELIEF FROM STAY, DISMISS APPEAL AND TO ADJUDICATE ISSUES RAISED BY CHALLENGE ACTIONS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **January 20, 2010**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**
On **January 20, 2010**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

☒ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served)**:** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 1/20/2010 | Lisa Masse | /s/ Lisa Masse |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*
535679v1

234

F 9013-3.1

| In re: | CHAPTER 9 |
| VALLEY HEALTH SYSTEM, | |
| Debtor(s). | CASE NUMBER 6:07-bk-18293-PC |

## I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")

Andrew K Alper on behalf of Creditor Key Equipment Finance Inc.
aalper@frandzel.com, efiling@frandzel.com;ekidder@frandzel.com

Terri H Andersen on behalf of U.S. Trustee United States Trustee (RS)
terri.andersen@usdoj.gov

Kathryn M Barnes on behalf of Creditor c/o Kathryn Barnes Valley Medical Staffing, Inc.
kbarnes@thelen.com

Mark Bradshaw on behalf of Creditor Hemet Community Medical Group Inc
mbradshaw@shbllp.com

Michael E Busch on behalf of Creditor BETA Healthcare Group
michael.busch@fnf.com

Traci L Cotton on behalf of Creditor UT System obo UT MD Anderson Cancer Center
tcotton@utsystem.edu

Jennifer Witherell Crastz on behalf of Creditor Beckman Coulter, Inc.
jcrastz@hemar-rousso.com

Melissa Davis on behalf of Creditor KM Strategic Management LLC
mdavis@shbllp.com

Timothy J Farris on behalf of U.S. Trustee United States Trustee (RS)
timothy.j.farris@usdoj.gov

H Alexander Fisch on behalf of Counter-Defendant Valley Health System
afisch@stutman.com

Yolanda Flores-Burt on behalf of Interested Party NEF
yflores1@sbcglobal.net

Heather Fowler on behalf of Interested Party Prime Healthcare Management, Inc.
heather.fowler@lw.com, colleen.rico@lw.com

Roger F Friedman on behalf of Creditor Kali Chaudhuri
rfriedman@rutan.com

Mark S Horoupian on behalf of Interested Party Prime Healthcare Management LLC
mhoroupian@sulmeyerlaw.com

Allan H Ickowitz on behalf of Creditor Kaiser Foundation Hospitals
aickowitz@nossaman.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

235

January 2009                                                                          F 9013-3.1
535679v1

| In re: | | CHAPTER 9 |
|---|---|---|
| VALLEY HEALTH SYSTEM, | Debtor(s). | CASE NUMBER 6:07-bk-18293-PC |

Jeffrey L Kandel on behalf of Creditor Committee Official Committee of Creditors Holding Unsecured Claims
jkandel@pszjlaw.com

Sheri Kanesaka on behalf of Creditor Catholic Healthcare West
sheri.kanesaka@lw.com, jjacobs@mrllp.com;fbaig@mrllp.com;scasselberry@mrllp.com;fbaig@mrllp.com

Q Scott Kaye on behalf of Creditor U.S. Bank, National Association, as trustee
qskaye@mwe.com

John W Kim on behalf of Creditor Kaiser Foundation Hospitals
jkim@nossaman.com

Stuart I Koenig on behalf of Creditor Blue Cross Of California
Skoenig@cmkllp.com

Jean LeBlanc on behalf of Creditor U.S. Bank, National Association, as trustee
jleblanc@mwe.com

Dana N Levitt on behalf of Creditor U.S. Bank, National Association, as trustee
dlevitt@mwe.com, WSmith@mwe.com

Michael S Lurey on behalf of Creditor Catholic Healthcare West
michael.lurey@lw.com, colleen.rico@lw.com

Samuel R Maizel on behalf of Creditor Committee Official Committee of Creditors Holding Unsecured Claims
smaizel@pszjlaw.com, smaizel@pszjlaw.com

David J Mccarty on behalf of Counter-Claimant Aetna Health Management LLC
dmccarty@sheppardmullin.com, pibsen@sheppardmullin.com

Neeta Menon on behalf of Debtor Valley Health System
nmenon@stutman.com

Uzzi O Raanan on behalf of Creditor Siemens Financial Services, Inc.
uor@dgdk.com

Christian L Raisner on behalf of Creditor Local 121 RN
bankruptcycourtnotices@unioncounsel.net, craisner@unioncounsel.net

Christopher O Rivas on behalf of Creditor General Electric Capital Corporation
crivas@reedsmith.com

Stephanie M Seidl on behalf of Counter-Claimant Aetna Health Management LLC
sseidl@sheppardmullin.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

236

*January 2009*
535679v1

**F 9013-3.1**

| In re: | | CHAPTER 9 |
|---|---|---|
| | VALLEY HEALTH SYSTEM, | |
| | Debtor(s). | CASE NUMBER 6:07-bk-18293-PC |

Leonard M Shulman on behalf of Creditor Hemet Community Medical Group Inc
lshulman@shbllp.com

Gerald N Sims on behalf of Creditor BETA Healthcare Group
jerrys@psdslaw.com

Adam M Starr on behalf of Creditor Anaheim Memorial Hospital
starra@gtlaw.com

Jason D Strabo on behalf of Creditor U.S. Bank, National Association, as trustee
jstrabo@mwe.com, losangelestrialdocket@mwe.com

Derrick Talerico on behalf of Creditor SCAN Health Plan
dtalerico@loeb.com, kpresson@loeb.com;ljurich@loeb.com

Wayne R Terry on behalf of Creditor BANK OF THE WEST
wterry@hemar-rousso.com

United States Trustee (RS)
ustpregion16.rs.ecf@usdoj.gov

Andrea M Valdez on behalf of Creditor Universal Health Services
avaldez@fulbright.com

David M Wiseblood on behalf of Creditor c/o Christian L. SEIU-United Healthcare Workers West
dwiseblood@seyfarth.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

237

January 2009
535679v1

**F 9013-3.1**

| In re: | | CHAPTER 9 |
| --- | --- | --- |
| | VALLEY HEALTH SYSTEM, | |
| | Debtor(s). | CASE NUMBER 6:07-bk-18293-PC |

## II. SERVED BY U.S. MAIL

VALLEY HEALTH SYSTEM
5965 - Special Notice List
Revised 12/23/2009
Doc. No. 483619v4

**Served by Federal Express**

The Honorable Peter Carroll
USBC - Central District of CA
3420 Twelfth Street
Courtroom No. 304
Riverside, CA  92501-3819

Internal Revenue Service
Insolvency Group 1
290 North "D" Street
San Bernardino, CA  92401

Franchise Tax Board
Attn:  Bankruptcy
P.O. Box 2952
Sacramento, CA  95812-2952

Atty for Both: Menifee Valley
Community Medical Group &
Hemet Community Medical Group
Joseph M. Galosic, Esq.
26632 Towne Center Dr. #300
Foothill Ranch, CA  92610-2808

DaVita
Michael S Winsten, Esq.
Winsten Law Group
27201 Puerta Real, Ste. 465
Mission Viejo, CA  926917

Atty/Sodexho USA aka Sodexho
Marriott Servs.
Poyner & Spruill LLP
Attn:  Judy D. Thompson
301 South College St., #2300
Charlotte, NC  28202

Atty/KM Strategic Mgmt.
Davis & Wojcik
Robert A. Davis, Jr.
1105 East Florida Ave.
Hemet, CA  92543

Valley Health System
1117 East Devonshire Avenue
Hemet, CA  92543

Securities Exchange Commission
5670 Wilshire Blvd., 11th Floor
Los Angeles, CA  90036

Trustee for Bondholders
US Bank/ FAX:  651/495-3775
Attn:  Mike Vraa, Trust Officer
60 Livingston Ave.
Mail Code EP-MN-WE3T
St. Paul, MN  55107-2292

Atty/ DePuy Orthopedics, Inc.
David W. Dykhouse
Patterson Bleknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY  10036-6710

Renal Treatment Center- California,
Inc.
Michael S Winsten, Esq.
Winsten Law Group
27201 Puerta Real, Ste. 465
Mission Viejo, CA  92691

Atty/Blue Cross of CA
Creim Macias Koenig & Frey LLP
Attn:  Stuart I. Koenig
633 W. Fifth St., 51st Fl.
Los Angeles, CA  90071

Atty/Southland Endoscopy Center
Davis & Wojcik
Attn:  Joseph M. Wojcik
1001 E. Morton Place, Suite A
Hemet, CA  92543

Attys for the Committee of Unsecured
Creditors
Sam Maizel, Esq./Jeff Kandel, Esq.
Pachulski, Stang Ziel & Jones LLP
10100 Santa Monica Blvd., Suite 100
Los Angeles, CA  90067

Employment Development Dpt.
Bankruptcy Group MIC 92E
P.O. Box 826880
Sacramento, CA  94280-0001

United States Trustee
Office of the U.S. Trustee
3685 Main Street, Suite 300
Riverside, CA  92501

Atty: Anaheim Memorial Hospital
Paul R. Glassman
Greenberg Traurig, LLP
2450 Colorado Avenue, Ste. 400E
Santa Monica, CA  90404

Primeshares
60 Madison Ave., 2nd Floor
New York, NY  10011-1600

Atty/Menifee Valley Community Med. Grp.
William E. Thomas, Esq.
6800 Indiana Avenue, #130
Riverside, CA  92506

Atty/Hemet Community Med. Group
Shulman Hodges & Bastian LLP
Attn:  L.M. Shulman/M. Bradshaw
26632 Towne Center Dr., #300
Foothill Ranch, CA  92610

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

238

*January 2009*
535679v1

**F 9013-3.1**

| In re: VALLEY HEALTH SYSTEM, | CHAPTER 9 |
|---|---|
| Debtor(s). | CASE NUMBER 6:07-bk-18293-PC |

IBM Credit LLC
Special Handling Group
Attn:  Pamela Wilcox
4111 Northside Parkway
Atlanta, GA  30327

Atty/ Siemens Financial Services
Inc.
Uzzi O Raanan
Danning Gill et al LLP
2029 Century Park E, 3rd Fl.
Los Angeles, CA  90067-2904

Owens & Minor, Inc.
Larry R. Whitley CBF
455 South Brea Canyon Road
City of Industry, CA  91789-3058

Atty/ HRC Manor Care Inc.
Fredrick, Glen Stebens, Dale
Pomerantz
Beam, Brobeck, West, Borges &
Rosa LLP
1301 Dove Street, #700
Atty/ US Bank National
Association
Jean B LeBlanc
McDermott Will & Emery LLP
2049 Century Park East, Ste. 3800
Los Angeles, CA  90067

U.S. Bank National Association
Corporate Trust Services
Attn: Keith Marshall
633 West Fifth St., 24th Floor
Los Angeles, CA  90071

Atty/ Scan Health
Karl E. Block, Esq.
Loeb & Loeb LLP
10100 Santa Monica Blvd., Ste.
2200
Los Angeles, CA  90067

Law Offices of Yolanda Flores-
Burt
Yolanda Flores-Burt
780 North Euclid Street, Suite 201
Anaheim, CA 92801

Atty/Health Net
Pillsbury Winthrop Shaw Pittman LLP
Attn:  Nadine J. Youssef
725 S. Figueroa St., #2800
Los Angeles, CA  90017

Attys/ Siemens Financial Services Inc.
Arlene N. Gelman & Stephanie Hor-
Chen
Vedder Price P.C.
222 North LaSalle Street
Chicago, IL  60601

Meline Industries, Inc.
Attn: Anne Kisha
One Medline Place
Mundelein, IL  60060

Agent for GE Money Bank
Recovery Management Systems Corp.
Attn: Ramesh Singh
25 SE 2nd Ave., Ste 1120
Miami, FL  33131-1605

Atty/ US Bank National Association
Jason D. Strabo
McDermott Will & Emery LLP
2049 Century Park East, 38th Floor
Los Angeles, CA  90067

Universal Health Services
Robert E. Darby
Fulbright & Jaworski, LLP
555 South Flower St., 41st Floor
Los Angeles, CA  90071

Atty/Prime Healthcare Management, Inc./ Albert
L. Lewis, Jr./John Lloyd/ Edward J. Fazekas
Daniel P. Brunton,/Lauren B. Ross
Latham & Watkins LLP
600 West Broadway, Suite 1800
San Diego, CA 92101-3375

Law Offices of Shawna S. Nazari
15303 Ventura Blvd., 9th Floor
Sherman Oaks, CA 91403

Health Net
Attn:  Patrice Halloway
7755 Center Ave., 8th Fl.
Huntington Beach, CA  92647

Atty/ Valley Medical Staffing Inc.
Michael B. Conley
3685 Mount Diablo Blvd,. #351
Lafayette, CA  94549

Atty/ Owens & Minor, Inc
Buchalter Nemer P.C.
Benjamin S. Seigel, Esq.
1000 Wilshire Blvd., Ste. 1500
Los Angeles, CA  90017

Atty/ Inland Empire Health Plan
Tin Kin Lee Esq.
Law Offices of Tin Kin Lee
55 S. Lake Ave., Ste 705
Pasadena, CA  91101

Atty/ US Bank National Assn. as Trustee
William P. Smith, Nathan F. Coco, Miles W.
Hughes, & Jason J. DeJonker
McDermott, Will Emery
227 West Monroe St., Ste. 5400
Chicago, IL  60606

Atty/ Cardinal Health 110, Inc. et al
Greenberg Traurig LLP
Attn: S.L. Heyen/ J.K. Terry
1000 Louisiana, #1800
Houston, TX  77002

Counsel for Save the Hospitals, Inc.; Prime Healthcare
Services, Inc./ A. Lewis Jr./ J. Lloyd/ E. Fazekas
Marc Rappel/Heather Fowler/Nathan Smith
Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA 90071

Attorney for Beckman Coulter
Jillan L. Nolan, Esq.
Bernstein Law Firm P
Suite 2200 Gulf Tower
Pittsburgh, PA 15219

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

239

January 2009
535679v1

F 9013-3.1

| In re:<br><br>VALLEY HEALTH SYSTEM,<br><br><div align="right">Debtor(s).</div> | CHAPTER 9<br><br>CASE NUMBER 6:07-bk-18293-PC |
| --- | --- |

Attorney for Beckman Coulter
Jennifer Witherell Crastz, Esq.
Hemar, Rousso & Heald, LLP
15910 Ventura Blvd., 12th Flr.
Encino, CA 91436

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

240

January 2009                                                                                                              F 9013-3.1
535679v1

# Exhibit 9

⬛ DUPLICATE

1          UNITED STATES BANKRUPTCY COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                     --oOo--

4  In Re:                      ) Case No. RS07-18293-PC
                               )
5  VALLEY HEALTH SYSTEM,       ) Riverside, California
                               ) Tuesday, February 23, 2010
6          Debtor.             ) 9:00 a.m.
   _____ )

7

8                              ADV. 09-01708 PRIME HEALTHCARE
                               MANAGEMENT, INC. ET AL V.
9                              VALLEY HEALTH SYSTEM

10                             EVIDENTIARY HEARING RE:
                               CHALLENGE ACTIONS

11

12               TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE PETER CARROLL
13            UNITED STATES BANKRUPTCY JUDGE

14 APPEARANCES:

15 For Save the Hospitals, Inc.,   MARC RAPPEL, ESQ.
      Prime Healthcare Services,   NATHAN M. SMITH, ESQ.
16    Inc., Albert Lewis, John     ROBERT KLYMAN, ESQ.
      Lloyd, Edward Fisicas:       Latham & Watkins
17                                 355 South Grand Avenue
                                   Los Angeles, California 90071
18                                 (213) 485-1234

19 For the Debtor:                 DANIEL K. SPRADLIN, ESQ.
                                   Woodruff, Spradlin & Smart
20                                 555 Anton Boulevard
                                   Suite 1200
21                                 Costa Mesa, California 92626
                                   (714) 558-7000

22

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

```
                                                                    ii
 1 APPEARANCES:   (cont'd.)

 2 For the Creditors Committee:    JEFFREY KANDEL, ESQ.
                                   Pachulski, Stang, Ziehl
 3                                    & Jones
                                   10100 Santa Monica Boulevard
 4                                 11th Floor
                                   Los Angeles, California 90067
 5                                 (310) 201-0760

 6 For the District:              GARY KLAUSNER, ESQ.
                                   Stutman, Treister & Glatt
 7                                 1901 Avenue of the Stars
                                   Twelfth Floor
 8                                 Los Angeles, California 90067
                                   (310) 228-5735
 9

10 For Physicians for Healthy      KYLE KIRWAN, ESQ.
      Hospitals, Inc.:             CARLYLE HALL, ESQ.
11                                 Akin, Gump & Strauss
                                   2029 Century Park East
12                                 Suite 2400
                                   Los Angeles, California 90067
13                                 (310) 229-1050

14 For Dr. Chaudhuri:             PETER MORT, ESQ.
                                   41250 Gallop Lane
15                                 Murrieta, California 92562
                                   (951) 698-4982
16

17 Courtroom Recorder:            John Craig
                                   United States Bankruptcy Court
18                                 3420 Twelfth Street
                                   Riverside, California 92501
19

20 Transcriber:                   Briggs Reporting Company, Inc.
                                   6336 Greenwich Drive, Suite B
21                                 San Diego, California 92122
                                   (310) 410-4151
22

23

24

25
```

*Briggs Reporting Company, Inc.*

2

1 for the PHH on the CEQA mandamus action still waiting in the

2 wings for my turn at bat.

3　　　　THE COURT:  All right.  I think the first issue

4 the Court should take up is its findings and conclusions with

5 respect to the remaining non-challenge action objection by

6 Prime to the feasibility of Valley Health System's first

7 amended plan.  At the initial confirmation hearing on

8 February 9, 2010, the Court determined that Valley Health's

9 first amended plan satisfied the confirmation requirements of

10 Section 943(b)(1) through (6).  The Court overruled Prime's

11 objection under 943(b)(7) that the first amended plan was not

12 in the best interest of creditors nor feasible due to the

13 potential impact of certain healthcare legislation that was

14 pending before Congress.

15　　　　Then the Court continued the hearing on

16 confirmation with respect to Prime's remaining non-challenge

17 action objection that the first amended plan is not feasible

18 because "it is not clear that PHH has or will be able to

19 obtain the financing necessary to effectuate the proposed

20 purchase of substantially all of VHS' assets."  The Code does

21 not define feasibility in Chapter 9, nor does it specify what

22 factors the Court should consider in determining whether a

23 plan is feasible in Chapter 9.  In Re Mt. Carbon Metropolitan

24 District 242 BR 18 at 31 bankruptcy district of Colorado

25 1999.

3

1          The feasibility standard in Chapter 9 is actually

2 less stringent than the standard under Section 1129(a)(11)

3 for Chapter 11 cases.  Under Section 1129(a)(11), the court

4 may not confirm a plan in Chapter 11 absent a finding that

5 confirmation of a plan is not likely to be followed by the

6 liquidation or the need for further reorganization of the

7 debtor or any successor of the debtor under the plan unless

8 liquidation or reorganization is proposed by the plan.

9 Section 1129(a)1(11) was not incorporated in Chapter 9 by

10 Section 901(a).  Indeed creditors have alternatives in

11 Chapter 11 that they do not have in Chapter 9.

12          Creditors in Chapter 11 can propose an alternate

13 plan of reorganization.  They can seek appointment of a

14 trustee, seek liquidation of the Debtor either in Chapter 7

15 or through a competing plan in Chapter 11 but in Chapter 9

16 the only alternative is dismissal and the possibility of

17 restructuring the municipality in accordance with state law.

18 Chapter 9, therefore, has its own feasibility standard under

19 Section 943(b)(7) and a plan of adjustment is feasible under

20 Section 943(b)(7) if it offers "a reasonable prospect of

21 success and is workable."  Mt. Carbon at 35.

22          VHS bears the burden of satisfying the

23 confirmation requirements of Section 943(b) by a

24 preponderance of the evidence, including the feasibility

25 standard.  At the continued hearing, the Court received into

*Briggs Reporting Company, Inc.*

4

1 evidence the direct testimony of Michael B. Foutz, a CPA

2 retained by PHH.  As a financial and business consultant in

3 connection with the asset sale agreement with VHS together

4 with Exhibits 55, his direct testimony declaration and

5 Exhibits 256 through 273.

6          Mr. Foutz testified by declaration, by

7 supplemental declaration and by live testimony in Court.

8 Prime was given the opportunity to depose Mr. Foutz prior to

9 the continued confirmation hearing.  Prime chipped away at

10 Mr. Foutz' direct testimony through rigorous cross

11 examination yesterday during the hearing but Prime's cross

12 examination bears only on the weight that the Court would

13 accord and is according Mr. Foutz' testimony.

14          There is, in fact, no evidence in the record to

15 the contrary and because there is no evidence in the record

16 contrary to Mr. Foutz' testimony on the issue of feasibility,

17 VHS has established by a preponderance of the evidence that

18 PHH will meet its closing obligations under the asset sale

19 agreement.  To meet those closing obligations, PHH needs

20 $56,150,000 in closing.  I've never sanctioned a court

21 reporter.  Now that $56,150,000 figure might be reduced as

22 much as $1,750,000 but it will not be higher than

23 $56,150,000.

24          PHH initially deposited $2,000,000 in cash in an

25 escrow account pursuant to paragraph 1.2.3 of the ASA, asset

*Briggs Reporting Company, Inc.*

5

1 sale agreement, five doctors, Anil Ristogy, Bhooden Tiwari,

2 Ratan Tiwari, Girhari Purohit and Sreevivas Nakka have each

3 signed an acknowledgment of investment interest dated

4 December 1, 2009 confirming their intent to make an aggregate

5 investment of $20,000,000 in PHH, LLC for the purpose of

6 funding the asset purchase under the ASA.  The sum of

7 $15,750,000 has been collected from the doctors and deposited

8 in PHH accounts at Bank of Hemet pending a sale closing date.

9          Michael B. Foutz and his brother Todd Foutz have

10 each committed to invest $2,000,000 in PHH for the purpose of

11 funding the asset purchase under the ASA.  The sum of

12 $4,000,000 has been collected from the Foutz brothers and

13 deposited in a PHH account at Bank of Hemet pending the sale

14 closing date.  49 physicians are identified in Exhibit H each

15 of whom have deposited $1,000 or more to demonstrate their

16 interest in becoming investors in PHH for the purpose of

17 funding the asset purchase under the ASA subject to the

18 completion of the private placement memorandum.

19          PHH expects to raise up to an additional

20 $20,000,000 from these physicians according to Mr. Foutz'

21 testimony.  Mr. Foutz testified that PHH has received

22 $26,650,000 in cash.  $24,650,000 of which is on deposit with

23 the Bank of Hemet at the time of his testimony, and another

24 $2,000,000 was collected from investors which has yet to be

25 deposited.  PHH expects approval of a $35,000,000 loan from

*Briggs Reporting Company, Inc.*

6

1 an institutional investor for which the loan underwriting and

2 approval process were continuing as of February 19, 2010

3 still pursuant to a term sheet dated September 25, 2009.  Mr.

4 Foutz testified that the executive in charge of the

5 underwriting the loan had visited the hospitals, met with the

6 CEO and facilities manager, and conducted on site inspections

7 in January 2010.

8          The loan will provide, according to Mr. Foutz'

9 testimony, $28,500,000 in cash to PHH for the purpose of

10 meeting its obligations on the sale closing date.  Finally by

11 letter dated February 8, 2010, Dr. Kali Chaudhuri agreed to

12 invest, loan or contribute funds necessary to permit PHH to

13 meet its obligations on the sale closing date to the extent

14 PHH's offerings intended to raise funds were insufficient to

15 "fund the proposed transaction" by April 15, 2010.  By letter

16 dated February 18, 2010, the Bank of Hemet confirmed that Dr.

17 Chaudhuri consistently maintains funds of unrestricted or

18 deposits of unrestricted funds at the bank of between

19 $20,000,000 and $25,000,000 for which he has signature

20 authority.

21          Now it is true that PHH does not have a binding

22 commitment from the lender nor are any of the physicians who

23 have contributed funds under any binding agreement or

24 obligation to contribute even more.  However, the evidence in

25 the record supports a finding that PHH has or expects to

*Briggs Reporting Company, Inc.*

1 receive funds of up to $75,500,000 prior to the sale closing

2 date summarized as follows.   Funds in escrow $2,000,000,

3 funds to be derived from the five doctors previously named

4 $20,000,000, 49 doctors another $20,000,000, the Foutz

5 brothers $4,000,000, the institutional lender $28,500,000 in

6 cash with respect to the sale closing date.

7        With Dr. Chaudhuri's back stop of another

8 $25,000,000, the Court finds that VHS has established by a

9 preponderance of the evidence that PHH has or will be able to

10 obtain the funds necessary to meet its obligations on the

11 sale closing date.   Finally, the Court notes that the two

12 largest stake holders, the unsecured creditors and the bond

13 holders are satisfied that the plan of adjustment is

14 feasible.   The unsecured creditors committee supports

15 confirmation of the first amended plan.

16        Mr. Maizel, who is counsel for the unsecured

17 creditors committee, stated at the initial confirmation

18 hearing on February 9th that the creditors committee reviewed

19 PHH's business plan and the alternate sources of income to

20 fund the plan and that the creditors committee was assisted

21 in its evaluation of the plan by its financial advisor,

22 Alvarez and Marselle Healthcare Industry Group.   The

23 unsecured creditors committee did not object to any aspect of

24 VHS' first amended plan, including the feasibility of the

25 plan.

*Briggs Reporting Company, Inc.*

8

1          The unsecured creditors committee sent a letter to

2    the holders of unsecured claims entitled to vote urging an

3    affirmative vote for the first a mended plan.   97.67 percent

4    in number and 98.67 percent in dollar amount of class 2A, the

5    general unsecured creditors, totaling approximately

6    $58,000,000 voted to accept the first amended plan, including

7    BP Cabinets which voted for the plan prior to selling its

8    $4,200 unsecured non-priority claim to Prime.

9          U.S. Bank as indenture trustee for the bond

10   holders arguably VHS' single largest -- objected to

11   confirmation alleging that the first amended plan was not

12   feasible as required by Section 943(b)(7) because there was

13   little evidence that PHH had the financial wherewithal to

14   close the transaction.   VHS' first amended plan provides for

15   the payment to the bond holders of allowed class 1A and class

16   1B claims in full on the sale closing date.   Those claims

17   total approximately $44.7 million dollars.   The bond holders

18   expect to be paid and they expect to be paid in full on the

19   sale closing date.

20         U.S. Bank was skeptical last August about PHH's

21   ability to perform with respect to a sale of substantially

22   all of VHS' assets.   It has changed its mind.   Mr. Coco,

23   counsel for U.S. Bank, stated at the hearing on February 9th

24   that it was clear to U.S. Bank that PHH was committed to the

25   transaction, that PHH had devoted substantial resources to

*Briggs Reporting Company, Inc.*

9

1 the transaction and that U.S. Bank was "confident the pieces

2 are in place to make a closing to effect a closing when the

3 time comes for the transaction to close."

4      VHS' first amended plan will permit Hemet Hospital

5 and Menifee Hospital to continue in operation.  It will

6 preserve jobs and continue vital medical services to

7 individuals served by the district.  By referendum election

8 in December, the sale contemplated by the plan was approved

9 by over 87 percent of the voters in the district.  Each of

10 the impaired classes of claims under VHS' first amended plan

11 has voted to accept the plan.  The effective date of the plan

12 is tied directly to the sale closing date and other

13 conditions specified in Section 12(b) of the plan.  If the

14 sale does not close, the plan simply will not become

15 effective.

16      So for all of those reasons, the Court finds that

17 VHS' first amended plan is feasible and that it offers a

18 reasonable prospect of success and is workable, and that

19 Prime's remaining feasibility objection that is not tied to

20 the challenge actions is overruled.

21      MR. KLAUSNER:  Thank you, your Honor.

22      THE COURT:  Mr. Rappel, I think you lead off on

23 the challenge actions.

24      MR. KLYMAN:  Your Honor, I was wondering if I

25 could be excused from the rest of the proceedings.  Do you

235

1        I certify that the foregoing is a correct

2 transcript from the electronic sound recording of the

3 proceedings in the above-entitled matter.

4 _____          _8/3/10_____

5 Transcriber                       Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*